CASE NO. 2026-1089

BEFORE THE UNITED STATES
COURT OF APPEALS FOR THE FEDERAL CIRCUIT

KUMHO TIRE (VIETNAM) CO., LTD.,

*Plaintiff-Appellant*

V.

UNITED STATES, UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS
INTERNATIONAL UNION, AFL-CIO, CLC,

*Defendants-Appellees*

APPEAL FROM
THE U.S. COURT OF INTERNATIONAL TRADE
IN CASE NO. 1:21-CV-00397,
JUDGE TIMOTHY M. REIF

PRINCIPAL BRIEF OF KUMHO TIRE (VIETNAM) CO., LTD.

*Submitted by*

Jeffrey M. Winton
Vi N. Mai

WINTON & CHAPMAN PLLC
1100 13th Street, N.W., Suite 825
Washington, D.C. 20005
(202) 774-5500

Attorneys for Kumho Tire (Vietnam) Co., Ltd.

March 23, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2026-1089

**Short Case Caption** Kumho Tire (Vietnam) Co., Ltd. v. US

**Filing Party/Entity** Kumho Tire (Vietnam) Co., Ltd.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/23/2026

Signature: /s/ Jeffrey M. Winton

Name: Jeffrey M. Winton

Table of Contents

Page

STATEMENT OF RELATED CASES ........................................................................1

JURISDICTIONAL STATEMENT......................................................................1

STATEMENT OF ISSUES ........................................................................2

STATEMENT OF THE CASE AND FACTS ........................................................3

SUMMARY OF ARGUMENT........................................................................6

    A.  Commerce Lacks Authority to Countervail  Currency Undervaluation........................................................................6

    B.  Commerce's Regulation Impermissibly Collapses the Statutory Specificity Requirement by Equating the Broad Category of "Traded Goods" With a Specific "Group" of Industries ........................................................................9

ARGUMENT ........................................................................11

    A.  Standard of Review........................................................................11

    B.  Commerce Lacks the Authority to Treat Foreign-Government Action that Allegedly Results  in an Undervalued Currency as a Subsidy ........................................................13

        1.  Under Longstanding Administrative Practice, Currency Devaluations Do Not Constitute Countervailable Subsidies ........................................................................13

            a.  Historical Precedent ........................................................13

            b.  Modern Agency Reaffirmation ........................................18

        2.  Because Congress Has Acquiesced in Commerce's Long- Standing Practice, Commerce Lacked Authority to Modify that Practice without Express Congressional Authorization........................................................................23

a. The Common Knowledge of Commerce's Practice and Congressional Response ................................ 23

b. The Legislative History of the 2015 TFTEA Confirms a Deliberate Congressional Choice to Withhold Authority ....................................... 26

c. Congress Specifically Delegated Currency Oversight to the Treasury, Not Commerce ......................... 32

3. The Major Questions Doctrine Bars Commerce's Assertion of Authority Over Currency Valuation ....................... 35

4. Under *Loper Bright*, This Court Must Exercise Independent Judgment and Reject Commerce's Self-Expanding Interpretation ................................. 38

a. The Text of the CVD Statute .............................. 39

b. The Court Must Determine the Best Reading of the CVD Statute ................................. 40

c. Commerce's Inconsistency Undermines Any Claim to Persuasive Weight ............................ 41

d. Any Statutory "Gap" Must Be Addressed by Congress, Not Commerce ................................ 43

C. Commerce's Regulation Impermissibly Collapses the Statutory Specificity Requirement by Equating the Broad Category of "Traded Goods" With a Specific "Group" of Industries ................................................. 45

1. Commerce's Reliance on the "Traded Goods" Sector is Insufficient to Establish Specificity Where the Benefit Has Horizontal Application. ................................. 45

a. The Requirement for a Reasoned "Grouping" Analysis .................................................. 47

b. The Distinction Between Discrete Segments and General Availability ................................. 51

c. The "Closely Related" Test for Predominant Users ............52

2. The "Traded Goods" Grouping is Legally Insufficient in a Trade-Saturated Economy....................................................54

CONCLUSION.............................................................................................60

ADDENDA

1. *Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 28566 (May 27, 2021)

2. Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam (May 21, 2021)

3. *Kumho Tire (Vietnam) Co. v. United States*, Slip Op. 24-115 (Ct. Int'l Trade 2024)

4. Final Results of Redetermination Pursuant to Court Remand

5. *Kumho Tire (Vietnam) Co. v. United States*, Slip Op. 25-109 (Ct. Int'l Trade 2025)

6. *Kumho Tire (Vietnam) Co. v. United States*, August 22 Judgment

Table of Authorities

Page


*ABB Inc. v. United States.*,
  920 F.3d 811 (Fed. Cir. 2019) ........................................................... 11, 12

*Changzhou Trina Solar Energy Co., Ltd. v. United States*,
  352 F. Supp. 3d 1316 (2018) .................................................................52

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)................................................................... passim

*Georgetown Steel Corp. v. United States*,
  801 F.2d 1308 (Fed. Cir. 1986) .............................................................45

*GPX Int'l Tire Corp. v. United States*,
  666 F.3d 732 (Fed. Cir. 2011) ................................................. 8, 19, 31, 44

*Hammond Lead Prods., Inc. v. United States*,
  440 F.2d 1024 (1971) ......................................................................... 14, 44

*Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375 (Fed. Cir. 2022)....47

*Hyundai Steel Company v. United States*,
  745 F. Supp. 3d 1345 (CIT 2024)...........................................................48

*Kumho Tire (Vietnam) Co. v. United States*,
  741 F. Supp. 3d 1277 (Ct. Int'l Trade 2024) ............................. 5, 39, 44, 45

*Kumho Tire (Vietnam) Co. v. United States*,
  799 F.Supp.3d 1297 (Ct. Int'l Trade 2025)..................................................5

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369, 412 (2024) ................................................................. passim

*Mosaic Company v. United States*,
  744 F. Supp. 3d 1367 (Ct. Int'l Trade 2025).............................................51

(iv)

<u>Page</u>

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
595 U.S. 109 (2022)......................................................................32

*Oman Fasteners, LLC v. United States*,
125 F.4th 1068 (Fed. Cir. 2025) ........................................ 46, 47

*POSCO v. United States*,
794 F. Supp. 3d 1402 (Ct. Int'l Trade 2025) ..................... 46, 47

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)............................................................ 12, 42

*Utility Air Regulatory Group v. Environmental Protection Agency*,
573 U.S. 302 (2014)......................................................................38

*West Virginia v. Environmental Protection Agency*,
597 U.S. 697 (2022)................................................. 8, 32, 36, 37

*Wilmar Trading Pte Ltd. v. United States*,
466 F. Supp. 3d 1334 (Ct. Int'l Trade 2020)..............................51

<u>STATUTES</u>

19 U.S.C. § 1671(a) ......................................................................39

19 U.S.C. § 1677(5)............................................................ 33, 39, 40

19 U.S.C. § 1677(5A) ........................................................... passim

19 U.S.C. §§ 4421-4422 ..............................................................34

22 U.S.C. § 5302(6).......................................................................24

22 U.S.C. §§ 5304, 5305, 5306 ............................................. 24, 34

Omnibus Trade and Competitiveness Act of 1988.........................24

Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125,
§§ 701-702 (2016) ..............................................................29

Page

REGULATIONS

19 C.F.R. § 351.502(c) ..................................................... 2, 9, 45, 46

*Modification of Regulations Regarding Benefit and Specificity in
Countervailing Duty Proceedings,*
85 Fed. Reg. 6031 (Feb. 4, 2020) ..............................................3

ADMINISTRATIVE DECISIONS

*Aluminum Extrusions from the People's Republic of China:
Final Affirmative Countervailing Duty Determination*, 76 Fed. Reg. 18521
(Apr. 4, 2011) ......................................................................20

*Carbon Steel Wire Rod from Poland; Final Negative Countervailing Duty
Determination,*
49 Fed. Reg. 19374 (May 7, 1984)..............................................18

*Carbon Steel Wire Rod from Poland; Preliminary Negative Countervailing
Duty Determination,*
49 Fed. Reg. 6768 (Feb. 23, 1984) ....................................... 17, 18

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-
Fed Presses from the People's Republic of China:
Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59213
(Sept. 27, 2010)....................................................................20

*Certain Oil Country Tubular Goods from the Republic of Turkey: Final
Affirmative Countervailing Duty Determination and Final Affirmative
Critical Circumstances Determination,*
79 Fed. Reg. 41964 (July 18, 2014) ...........................................53

*Chlorinated Isocyanurates from the People's Republic of China: Final
Affirmative Countervailing Duty Determination; 2012,*
79 Fed. Reg. 56560 (Sept. 22, 2014) ..................................... 53, 54

*Final Negative Countervailing Duty Determination; Pork Rind Pellets from
Mexico,*
48 Fed. Reg. 39105 (Aug. 29, 1983) ...........................................17

Final Results of Redetermination Pursuant to Court Remand,
*Kumho Tire (Vietnam) Co. v. United States*, 741 F. Supp. 3d 1277 (Ct. Int'l Trade 2024) (No. 21-00397), ECF No. 91-1 (Jan. 15, 2025).......................5

Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam (May 21, 2021).... 4, 5, 49, 52

*Lamb Meat from New Zealand; Preliminary Affirmative Countervailing Duty Determination,*
46 Fed. Reg. 58128 (Nov. 30, 1981) ..................................................... 15, 16

Memorandum from Team to R. Lorentzen re Countervailing Duty Investigation: Aluminum Extrusions from the People's Republic of China, Subsidy Allegation – Currency, Aug. 30, 2010................................... 20, 21

Memorandum from Team to R. Lorentzen re Countervailing Duty Investigation: Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China New Subsidy Allegation – Currency, Aug. 30, 2010 .......................... 20, 21

*Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination*,
86 Fed. Reg. 28566 (May 27, 2021)................................................................1

OTHER AUTHORITIES

161 Cong. Rec. H8846 (daily ed. Dec. 1, 2015) ...........................................28

161 Cong. Rec. H9296-97 (daily ed. Dec. 11, 2015) ....................................27

Barack Obama, Statement of Administration Policy: Senate Amendments to H.R. 644 – Trade Facilitation and Trade Enforcement Act of 2015 Online by Gerhard Peters and John T. Woolley, The American Presidency Project ........................................................................................................................30

H.R. 2378, 111th Cong. (2009-2010)...........................................................25

H.R. Rep. No. 111-646 (2010) .............................................................. 24, 25

Page

H.R. Rep. No. 114-376 (2015) (Conf. Rep.) ........................................... 27, 29

Letter from Jacob J. Lew, Sec'y of the Treasury, to Sen. Orrin G. Hatch, Chairman, S. Comm. on Fin. (May 11, 2015)...............................................30

S. 1619, 112th Cong. (2011-12) ......................................................................25

S. Rep. No. 114-45 (2015)...............................................................................26

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, at 925 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 .......................................................................... passim

Trade Facilitation and Trade Enforcement Act of 2015, S. 1269, 114th Cong. (2015); S. Rep. No. 114-45 (2015)...........................................................26

This brief is submitted on behalf of Appellant Kumho Tire (Vietnam) Co., Ltd. ("KTV") in the appeal of the August 22, 2025, decision by the Court of International Trade in *Kumho Tire (Vietnam) Co., Ltd. v. United States*, Ct. No. 21-00397.

STATEMENT OF RELATED CASES

Counsel for KTV is unaware of any cases pending in this Court that may directly affect or be directly affected by this Court's decision in this appeal.

JURISDICTIONAL STATEMENT

This appeal arises out of the final determination by the Department of Commerce ("Commerce") in the countervailing duty investigation of *Passenger Vehicle and Light Truck Tires* ("PVLT Tires") *from the Socialist Republic of Vietnam*. Notice of Commerce's final determination was published in the *Federal Register* on May 27, 2021.[1] Commerce's determination was appealed to the Court of International Trade pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i), and the CIT exercised jurisdiction over that appeal by reason of 28 U.S.C. § 1581(c).

---

[1] *Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 28566 (May 27, 2021) (APPX000365-APPX000368).

The CIT entered final judgment in this action on August 22, 2025. KTV filed notice of its appeal to this Court within 60 days after the entry of the CIT's final judgment (on October 21, 2025), making this appeal timely under 28 U.S.C. § 2645(c), 28 U.S.C. § 2107(b), and Federal Circuit Rule 4. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(5). This appeal is from a final order or judgment by the CIT that disposes of all parties' claims.

<u>STATEMENT OF ISSUES</u>

1. Whether the Department of Commerce may unilaterally expand the scope of the countervailing duty statute to encompass currency undervaluation, despite 40 years of consistent practice to the contrary and specific congressional choices to delegate such authority elsewhere?

2. Whether 19 C.F.R. § 351.502(c) is a permissible construction of the statutory specificity requirements in 19 U.S.C. § 1677(5A), where the regulation allows Commerce to find *de facto* specificity based solely on an alleged program's targeting the "traded goods sector," which eliminates the statutory distinction between a limited "group" of enterprises or industries and the broad universe of all manufacturing and primary sectors in a given economy?

Exchange rates are foundational prices that affect every facet of international commerce, from trade flows to capital investments. Their economy-wide application distinguishes them from the targeted domestic or export subsidies governed by the Tariff Act of 1930. As a result, the Department of Commerce ("Commerce") has historically declined to treat currency undervaluation as a countervailable subsidy. Congress has acquiesced in that longstanding practice by repeatedly declining to amend the statute to authorize such treatment while instead directing currency-related concerns to other statutory and policy mechanisms not administered by Commerce. That settled practice was abruptly reversed in 2020.

On February 4, 2020, Commerce promulgated a final rule, which for the first time explicitly authorized the agency to treat "currency undervaluation" as a countervailable subsidy.[2] Prior to this amendment, Commerce had historically declined to treat exchange rate policies as subsidies under the Tariff Act of 1930. The new regulation established a framework wherein Commerce would consult with the Department of the Treasury ("Treasury") to determine whether a currency was undervalued. The regulation also

---

[2] *Modification of Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings*, 85 Fed. Reg. 6031 (Feb. 4, 2020).

adopted a new "specificity" criteria, determining that a subsidy is specific if it

is provided to a "group of enterprises" that comprise the "traded goods

sector," essentially any company that buys or sells goods internationally.

Following a petition filed in May 2020, Commerce initiated a

countervailing duty ("CVD") investigation into *Passenger Vehicle and Light

Truck Tires* from the Socialist Republic of Vietnam. This became the first

proceeding in history where Commerce applied the new currency regulations,

which included the newly-minted "traded group sector" designation.

In its final determination, Commerce concluded that the Government of

Vietnam ("GOV") provided a countervailable subsidy by undervaluing the

Vietnamese Dong ("VND").[3] Commerce relied on Treasury's assessment that

the VND was undervalued by approximately 4.7% relative to the U.S. dollar

due to GOV intervention in the foreign exchange market.[4] Commerce further

found that this "subsidy" was *de facto* specific to the "traded goods sector,"

---

[3] *See* Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam, at cmts. 3-5 (May 21, 2021) (hereinafter, "Final Issues and Decision Memo") (APPX000379-APPX000394).

[4] *Id*. at cmt. 5 (APPX000389-APPX000394).

because exporters were the predominant users of the foreign exchange market in Vietnam.[5]

KTV challenged Commerce's final determination before the Court of International Trade ("CIT").  In 2024, the CIT issued a lengthy decision that ultimately upheld Commerce's authority to countervail currency undervaluation but identified significant evidentiary gaps in its application.[6] The CIT, therefore, remanded to Commerce for further explanation on certain aspects of Commerce's benefit and specificity analysis for the currency undervaluation "subsidy."

Commerce submitted the Final Results of Redetermination in early 2025.[7] On August 22, 2025, the CIT issued its final opinion sustaining these results.[8] The court found that:

---

[5] *Id*. at cmt. 4 (APPX000384-APPX000388).

[6] *Kumho Tire (Vietnam) Co. v. United States*, 741 F. Supp. 3d 1277, Slip Op. 24-115 (Ct. Int'l Trade 2024) (hereinafter, "*Kumho I*") (APPX000065-APPX000201).

[7] Final Results of Redetermination Pursuant to Court Remand, *Kumho Tire (Vietnam) Co. v. United States*, 741 F. Supp. 3d 1277 (Ct. Int'l Trade 2024) (No. 21-00397), ECF No. 91-1 (Jan. 15, 2025) (APPX000038-APPX000064).

[8] *Kumho Tire (Vietnam) Co. v. United States*, 799 F.Supp.3d 1297, Slip Op. 25-109 (Ct. Int'l Trade 2025) (hereinafter, "*Kumho II*") (APPX000001-APPX000036).

(1) Commerce sufficiently explained its use of facts available (due to the Government of Vietnam's failure to provide specific conversion data).

(2) The use of International Monetary Fund ("IMF") data as a proxy for currency conversion was reasonable under the circumstances.

(3) Substantial evidence supported a finding that the "traded goods sector" was the predominant user of the program, satisfying the *de facto* specificity requirement.

The CIT's decision effectively grants Commerce unchecked discretion to treat any macroeconomic condition it deems "undervalued" as a countervailable subsidy. This appeal seeks to reinstate the proper boundaries of the CVD statute, asserting that the authority to address currency misalignment lies elsewhere and that the CIT erred in allowing Commerce to rewrite its own statutory limits.

SUMMARY OF ARGUMENT

A. *Commerce Lacks Authority to Countervail Currency Undervaluation*

This Court should overrule the CIT's decision, which failed to perform the independent judicial review required under *Loper Bright* and instead affirmed an expansion of authority unsupported by the CVD statute. By affirming Commerce's determination to countervail Vietnam's exchange-rate

practices, the CIT failed to account for a consistent past agency practice to which Congress has acquiesced. The CIT holding permits the agency to bypass the statutory specificity requirement and disregards the clear intent of Congress, which has repeatedly considered and declined to extend countervailing duty authority to encompass macroeconomic currency regimes.

Commerce lacks the statutory authority to treat currency undervaluation as a countervailable subsidy. For over 40 years, Commerce maintained a consistent and reasoned administrative practice that exchange rate regimes fall outside the scope of the CVD statute. This long-standing interpretation was rooted in the statutory requirement of "specificity," recognizing that macro-monetary policies applicable to an entire economy cannot, by definition, be specific to an "enterprise or industry, or group of enterprises or industries" under 19 U.S.C. § 1677(5A). From *Lamb Meat from New Zealand* (1981) to *Aluminum Extrusions from China* (2011), Commerce repeatedly and explicitly disclaimed the legal and technical capacity to countervail currency.

Because Congress has historically accepted Commerce's decision not to penalize currency practices, the doctrine of congressional acquiescence bars Commerce from suddenly classifying currency undervaluation as a

countervailable subsidy. Under the Supreme Court's framework of *FDA v. Brown & Williamson Tobacco Corp.* and the Federal Circuit's precedent in *GPX Int'l Tire Corp. v. United States*, an agency cannot claim a power it has historically disclaimed when Congress has legislated against the backdrop of that disclaimer. Congress was very much aware of Commerce's position. Congress repeatedly considered and failed to pass numerous bills, such as the Currency Reform for Fair Trade Act, designed to grant Commerce this very authority. Most tellingly, in 2015, Congress did not adopt a provision from the Senate version of the Trade Facilitation and Trade Enforcement Act that would have authorized countervailing duty investigations into currency undervaluation. By not enacting these proposals, Congress signaled its intent to maintain the status quo.

Furthermore, Commerce's new regulation violates the Major Questions Doctrine. As established in *West Virginia v. EPA*, agencies may not discover "unheralded power" in long-standing statutes to regulate matters of "vast economic and political significance" without clear congressional authorization. Currency valuation is a fundamental tool of international diplomacy and global macroeconomics, which is a "Major Question" that Congress has specifically delegated to the Department of the Treasury, not Commerce, through various laws including but not limited to the Omnibus

Trade and Competitiveness Act of 1988 and the Trade Facilitation and Trade Enforcement Act of 2015. Expanding the CVD statute to allow Commerce to countervail global exchange rates is an extraordinary claim of authority that lacks the requisite "clear" mandate from Congress.

Finally, under the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, this Court must reject Commerce's self-expanding interpretation. The era of *Chevron* deference is over. This Court must exercise independent judgment to determine the "best reading" of the CVD statute. The best reading, which is informed by four decades of Commerce's practice and the statutory text as well as congressional action, is that the law applies to industry-specific benefits, not international monetary regimes. Because Commerce's new position is an abrupt departure from prior agency practice, it lacks the "power to persuade" under *Skidmore*. If a gap exists in the statute regarding currency, *Loper Bright* dictates that such a gap is a matter for Congress to resolve, not a blank check for Commerce to fill.

    *B.*   *Commerce's Regulation Impermissibly Collapses the Statutory Specificity Requirement by Equating the Broad Category of "Traded Goods" With a Specific "Group" of Industries*

Commerce's 2020 "Traded Goods" regulation, 19 C.F.R. § 351.502(c), is unlawful because it abrogates the fundamental statutory requirement that a countervailable subsidy be "specific" to an enterprise, industry, or "group"

thereof.  Under 19 U.S.C. § 1677(5A), the specificity test serves as a critical statutory screening mechanism designed to distinguish between targeted government assistance and benefits that are broadly available throughout an economy.  By defining the "group" as any enterprise that buys or sells goods internationally, Commerce has effectively eliminated this screening mechanism, capturing nearly every productive entity in a modern, trade-saturated economy such as Vietnam.

Commerce's reliance on the "traded goods sector" also fails to establish *de facto* specificity because the alleged benefit has a horizontal application across the vast majority of the economy.  Recent judicial precedent from the CIT, including *POSCO v. United States* and *Hyundai Steel Co. v. United States*, reinforces that Commerce cannot rely on conclusory groupings of disparate industries.  To satisfy the statute, Commerce must provide a reasoned explanation for how disparate entities form a "group" beyond merely being subject to the same macro-monetary or regulatory regime.

Furthermore, Commerce's new regulation ignores its own "closely related" test.  As seen in *Mosaic Company* and administrative determinations such as *Oil Country Tubular Goods from Turkey* and *Chlorinated Isocyanurates from China*, the Department has historically refused to group industries together unless they are "closely related in terms of processes and

output." Commerce is also required to compare the recipients of a subsidy to the entire industry makeup of the country.

In the specific context of a trade-saturated economy like Vietnam, where the vast majority of the country's Gross Domestic Product ("GDP") is tied to the production and export of goods, the "traded goods" grouping is legally insufficient. By defining the recipients so broadly, Commerce is not identifying a "specific group," but is instead countervailing the entire economic structure of a sovereign nation, which is a result that contradicts the express language of the CVD statute and the intent of the Statement of Administrative Action ("SAA").

ARGUMENT

*A. Standard of Review*

This Court reviews decisions by the Court of International Trade de novo and applies the standard used by the CIT in reviewing the decision of Commerce.[9] While this Court typically affords great weight to the CIT's judgment, which often serves as the initial point of analysis, Commerce's

---

[9] *See ABB Inc. v. United States*, 920 F.3d 811, 820 (Fed. Cir. 2019).

- 11 -

determination may only be upheld if it is supported by substantial evidence on the record, or otherwise in accordance with law.[10]

"Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority."[11]  Consequently, this Court no longer affords deference to Commerce's interpretation of ambiguous statutory provisions under the now-overruled *Chevron* framework.  Instead, the Court must determine the "best reading" of the statute by applying traditional tools of statutory construction.[12]  While the Court may consider Commerce's interpretation to the extent it has the "power to persuade" based on the agency's specialized expertise, the Court remains the final arbiter of whether Commerce has stayed within the boundaries of the statute as enacted by Congress.[13]

---

[10] *Id.*

[11] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

[12] *Id*. at 400 ("In the business of statutory interpretation, if it is not the best, it is not permissible.").

[13] *See id*. at 402 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

*B.*     *Commerce Lacks the Authority to Treat Foreign-*
        *Government Action that Allegedly Results*
        *in an Undervalued Currency as a Subsidy*

    *1.*     *Under Longstanding Administrative Practice, Currency*
         *Devaluations Do Not Constitute Countervailable*
         *Subsidies*

For decades, Commerce has maintained an unbroken and principled

practice of excluding currency exchange regimes from the reach of the CVD

statute. This consistent interpretation demonstrates that the agency has long

recognized it lacks the legal tools to treat macro-monetary adjustments as

countervailable subsidies. By consistently declining to treat currency as a

countervailable subsidy under the statute, Commerce created a stable and

definitive regulatory landscape upon which Congress has repeatedly relied

when reenacting and amending the CVD statute.

    *a.*     *Historical Precedent*

Commerce's refusal to countervail currency exchange is rooted in the

foundational principle that currency devaluations are distinct from the

"bounties or grants" targeted by CVD law. This was recognized by this

Court's predecessor as early as 1971 in *Hammond Lead Prods., Inc. v. United*

*States*. In *Hammond Lead*, the Court of Customs and Patent Appeals

("CCPA") clarified that CVD law is not intended to serve as a blanket remedy

for all foreign economic policies that may incidentally benefit exports.[14]  With

respect to currency undervaluation, the CCPA explained that:

> Nothing, at least in the short range, stimulates exports more than a devaluation of the currency….  Yet we do not assess countervailing duties against countries because they devalue their currencies. Why not? The only valid reason is that these devaluations have been encouraged by our government, in the effort it has expended since Bretton Woods for a worldwide system of freely convertible currencies.[15]

The CCPA also noted that Congress was well aware of the issue, but had

acquiesced in the interpretation that CVD laws exclude currency valuation

practices from the definition of a subsidy:

> The Congress is, of course, well aware of these problems, and it would seem it elects to rely on executive discretion to avoid making the United States ridiculous by penalizing imports from foreign countries which have taken reasonable action, action our own government takes or counsels.[16]

The countervailing duty statute has been amended on several occasions since

the CCPA made those observations.  Responsibility for administering the

countervailing duty statute was transferred from the Department of the

Treasury to Commerce in 1980.  The countervailing duty provisions of the

---

[14] *Hammond Lead Prods., Inc. v. United States*, 440 F.2d 1024, 1030-31 (1971).

[15] *Id.*

[16] *Id.*

statute were substantially re-written in 1979 to implement the results of the "Tokyo Round" of multilateral negotiations, and again in 1995 to implement the results of the "Uruguay Round."  The terminology used to describe the criteria for finding subsidies has changed considerably to reflect international agreement, as embodied most recently in the Uruguay Round Agreement on Subsidies and Countervailing Measures.  Yet, until 2020, agency practice under Commerce's interpretation of the statute remained the same as it had under the Treasury in 1971.  And, while Congress was fully aware of that practice, it made no effort to overturn it.

In fact, one of Commerce's earliest decisions after it assumed responsibility for administering the CVD statute explicitly re-affirmed the longstanding Treasury position that devaluations of an exchange rate that applied equally to all imports and exports do not constitute a subsidy.  In *Lamb Meat from New Zealand*, Commerce explained that:

> Since the New Zealand exchange rate is the same for all sectors of the economy, for export as well as import transactions, and are freely available to all to use in converting currencies, we do not consider the periodic adjustment of the rate to be a subsidy within the meaning of the countervailing duty law.[17]

---

[17] *See Lamb Meat from New Zealand; Preliminary Affirmative Countervailing Duty Determination,* 46 Fed. Reg. 58128, 58131 (Nov. 30, 1981).  There was no final determination in the *New Zealand Lamb* investigation, because the
*(footnote continued on following page)*

In other words, Commerce determined that a currency devaluation did not constitute a countervailable subsidy because it was a macro-monetary adjustment of general applicability rather than a targeted industry benefit.[18] This distinction was further solidified in *Pork Rind Pellets from Mexico*, where Commerce found that even a dual exchange rate system did not warrant countervailing duties because the program was not directed at a specific industry or group of industries, but was instead an instrument of national economic policy.[19]

---

*(footnote continued from previous page)*
petitioners withdrew their petition after Commerce's preliminary determination was made.

[18] *See id.*

[19] In the *Mexican Pork Rind Pellets* case, Commerce explained that:

> The Department has determined that the operation of the Mexican exchange rate system does not confer an export bounty or grant on pork rind pellets....  Whether or not the pork rind pellet industry exported pellets to the United States, it would be eligible to import pork skins at the controlled rate because this item is contained on the January 18, 1983 revision to the tariff list.  Further, all exporters are required to convert their foreign earnings at the less favorable controlled exchange rate.
>
> Additionally, we find that the dual exchange rate system does not benefit a "specific enterprise or industry, or group of enterprises or industries" within Mexico as specified in section 771(5)(B) of the Act, because all firms may import many different goods using the controlled exchange rate. As

*(footnote continued on following page)*

- 16 -

The jurisdictional boundary of the CVD law was further confirmed in

*Carbon Steel Wire Rod from Poland*, in which Commerce explicitly relied on

the CCPA's decision in *Hammond Lead* to support the conclusion that "we do

not assess countervailing duties against countries which devalue their

currency."[20]  In that case, Commerce also re-affirmed its earlier holding that a

dual exchange rate system does not constitute a subsidy where a single rate

applied to all import and export transactions.[21]  Taken together, these

---

*(footnote continued from previous page)*

> indicated above, the goods on the tariff list for which foreign
> currency may be obtained at the controlled rate range from
> plants and animal products to orange peelers to heavy
> machinery.  Because the Mexican government, through the
> creation of the above-described tariff list, has not singled out
> for benefit a specific industry or enterprise or a specific
> group of industries or enterprises, the Department
> determines that the Mexican dual exchange rate system does
> not operate to confer a domestic subsidy on the pork rind
> pellet industry.

*Final Negative Countervailing Duty Determination; Pork Rind Pellets from Mexico*, 48 Fed. Reg. 39105, 39107 (Aug. 29, 1983).

[20] *See Carbon Steel Wire Rod from Poland; Preliminary Negative Countervailing Duty Determination*, 49 Fed. Reg. 6768, 6771 (Feb. 23, 1984).

[21] Commerce explained that:

> As recognized by the CCPA in *United States v. Hammond
> Lead Products, Inc.*, 440 F.2d 1024, 1030 (1971), a
> devaluation in a market economy stimulates exports, but,
> nevertheless, does not confer a subsidy...:

*(footnote continued on following page)*

determinations demonstrate a consistent administrative and judicial

recognition that the CVD statute is designed to neutralize discrete, micro-

economic distortions, not to litigate the perceived fairness of a sovereign

nation's monetary regime.

### b.  *Modern Agency Reaffirmation*

As mentioned, the CVD statute has been amended on several occasions

since the *Hammond Lead* decision and transfer of responsibility to Commerce

for administering the CVD statute.  Of relevance, the terminology used to

describe the criteria for finding subsidies has changed considerably to reflect

---

*(footnote continued from previous page)*

> Based on our experience and judicial precedent, we do not believe that, in a market economy country, a multiple exchange rate system including both a non-trade exchange rate (or rates) and a uniform exchange rate applied to trade transactions confers a bounty or grant within the meaning of the Act. To the extent that the uniform exchange rate applied to trade has any meaning in a nonmarket economy country, like Poland, the economic effects would be identical to those in a market economy. The divergence between a trade rate and non-trade rate (or rates) would be equivalent to a devaluation or revaluation, and hence we would not find the multiple exchange rate to confer a subsidy.

*Id.*

The final determination in *Polish Wire Rod* did not address the currency-valuation issue, because Commerce made a negative determination based on the broader principle that the countervailing duty law did not apply to non-market economies.  *See Carbon Steel Wire Rod from Poland; Final Negative Countervailing Duty Determination,* 49 Fed. Reg. 19374 (May 7, 1984).

international agreement, as embodied most recently in the Uruguay Round

Agreement on Subsidies and Countervailing Measures.

The Uruguay Round Agreements Act ("URAA") replaced the "bounty or

grant" language with the term "countervailable subsidy."  However, the

Statement of Administrative Action ("SAA") makes clear that these concepts

remain synonymous and that existing administrative and judicial precedent,

including the foundational reasoning in *Hammond Lead*, continues to

govern.[22]  And, this Court reaffirmed in *GPX Int'l Tire Corp. v. United States*,

the URAA did not fundamentally alter the nature of what constitutes a

countervailable subsidy.[23]

---

[22] *See* Statement of Administrative Action Accompanying the Uruguay Round
Agreements Act, H.R. Rep. No. 103-316, at 925 (1994), *reprinted in* 1994
U.S.C.C.A.N. 4040 (hereinafter, "SAA") ("{T}he Administration intends that
the definition of 'subsidy' will have the same meaning that administrative
practice and courts have ascribed to the term 'bounty or grant' and 'subsidy'
under prior versions of the statute, unless that practice or interpretation is
inconsistent with the definition contained in the bill… Section 771(5A)
implements the provisions of Article 2 of the Subsidies Agreement dealing
with specificity. Article 2 essentially reflects U.S. practice, so the substance
of the specificity test in section 771(5A) generally reflects *existing law and
practice*.") (emphasis added).

[23] *GPX Int'l Tire Corp. v. United States*, 666 F.3d 732, 738 (Fed. Cir. 2011)
("The 'bounty or grant' language … was replaced by the current
'countervailable subsidy' language in the Uruguay Round Agreements Act,
Pub. L. No. 103–465, 108 Stat. 4809 (1994) ( "URAA"), but Congress made
clear that this change was not intended to substantively affect the
countervailing duty law.").

These principles were tested in 2010 when two petitions were filed alleging that China's undervaluation of its currency constituted a countervailable subsidy. In *Certain Coated Paper* and *Aluminum Extrusions*, Commerce declined to initiate an investigation of the currency claims, on the grounds that currency-valuation practices were not "specific" to an industry or group of industries, and therefore could not constitute subsidies under the U.S. countervailing duty laws.[24]

The agency's internal deliberations during this period highlight the statutory grounding of this position, particularly as it relates to the specificity test mandated by the SAA.[25] In two memoranda to then-Deputy Assistant Secretary Ronald Lorentzen, Commerce's team stated that "treating exporters

---

[24] *See Aluminum Extrusions from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 76 Fed. Reg. 18521 (Apr. 4, 2011), and accompanying Issues and Decision Memorandum at cmt. 33; *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59213 (Sept. 27, 2010), and accompanying Issues and Decision Memorandum, at cmts. 5-7. *See also* Memorandum from Team to R. Lorentzen re Countervailing Duty Investigation: Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China New Subsidy Allegation – Currency, Aug. 30, 2010, at 5; Memorandum from Team to R. Lorentzen re Countervailing Duty Investigation: Aluminum Extrusions from the People's Republic of China, Subsidy Allegation – Currency, Aug. 30, 2010, at 5.

[25] *See* SAA, at 929-30.

as a 'group' for purposes of finding a domestic subsidy" would "set {the statutory scheme} on its head."[26]  This concern aligns with the SAA's instruction, which states that:

> The Administration intends to apply the specificity test in light of its original purpose, which is to function as an initial screening mechanism to winnow out only those foreign subsidies which truly are broadly available and widely used throughout an economy … The specificity test was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, the benefit of the subsidy is spread throughout an economy.  Conversely, the specificity test was not intended to function as a loophole through which narrowly focussed subsidies provided to or used by discrete segments of an economy could escape the purview of the CVD law.[27]

The SAA makes clear that the specificity test is to be applied as a rule of reason and an initial screening mechanism.  This test is a mechanism to "winnow out" subsidies that are truly broadly available and widely used throughout an economy, such as public highways and bridges, rather than

---

[26] *See* Memorandum from Team to R. Lorentzen re Countervailing Duty Investigation: Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China New Subsidy Allegation – Currency, Aug. 30, 2010, at 5; Memorandum from Team to R. Lorentzen re Countervailing Duty Investigation: Aluminum Extrusions from the People's Republic of China, Subsidy Allegation – Currency, Aug. 30, 2010, at 5.

[27] *See* SAA, at 929-30.

those targeted at specific recipients.[28]  By declining to bridge the gap between general government intervention and targeted subsidies, Commerce recognized that failing to maintain this distinction would produce absurd results.  As the SAA warns, without a robust specificity requirement, almost every import entering the stream of U.S. commerce would be subject to countervailing duties, effectively punishing the foundational infrastructure of a modern economy.[29]

Commerce's own analysis confirms that currency is an economy-wide phenomenon that cannot be shoehorned into the CVD statute without breaking the law's internal logic.  This long-settled interpretation, which was consistently applied from 1971 through 2011, formed the basis of a stable practice that Congress has chosen not to alter, despite numerous opportunities to do so during successive reenactments of the trade laws.

---

[28] This is because "all governments ... intervene in their economies to one extent or another, and to regard all such interventions as countervailable subsidies would produce absurd results," namely, "that almost every import entering the stream of American commerce {would} be countervailed."  *Id*.

[29] *Id*.

2. *Because Congress Has Acquiesced in Commerce's Long-Standing Practice, Commerce Lacked Authority to Modify that Practice without Express Congressional Authorization*

The Department's 2020 regulatory modification, which seeks to treat currency undervaluation as a countervailable subsidy, is an *ultra vires* act that ignores decades of explicit congressional acquiescence to the contrary.  When Congress repeatedly declines to grant an agency a specific power it has openly considered, that "inaction" becomes a binding limit on agency discretion.

a. *The Common Knowledge of Commerce's Practice and Congressional Response*

As the CCPA noted in the *Hammond Lead* decision, "Congress is, of course, well aware of {the currency devaluation} problems...."  In 1988, several years after Commerce issued its decisions in *New Zealand Lamb, Mexican Pork Rind Pellets*, and *Polish Steel Wire Rod*, Congress explicitly addressed foreign government manipulation of exchange rates in the Omnibus Trade and Competitiveness Act of 1988.  In that Act, Congress made the explicit finding that:

> policy initiatives by some major trading nations that
> manipulate the value of their currencies in relation to the
> United States dollar to gain competitive advantage continue

to create serious competitive problems for United States industries....[30]

Nevertheless, Congress did not direct Commerce to modify its treatment of currency devaluation in countervailing duty cases.  Instead, rather than altering the definition of a subsidy, Congress directed the Department of the Treasury, not Commerce, to address these issues through reports and negotiations.[31]

Congress again squarely addressed the issue of currency manipulation following Commerce's 2010 refusal to initiate countervailing duty investigations premised on alleged currency devaluation.  Congress was fully aware that Commerce had declined to treat such practices as a countervailable subsidy.[32]  In direct response, lawmakers introduced legislation that would have expressly overturned Commerce's interpretation and amended the Tariff

---

[30] *See* Omnibus Trade and Competitiveness Act of 1988, P.L. 100-418, § 3002(6), 22 U.S.C. § 5302(6).

[31] *Id.* §§ 3004, 3005, 3006; 22 U.S.C. §§ 5304, 5305, 5306.

[32] For example, during consideration of the proposed Currency Reform for Fair Trade Act, H.R. 2378, 111th Cong. (2010), the House committee report noted: "{I}n two pending countervailing duty investigations (*Aluminum Extrusions from the People's Republic of China and Certain Coated Paper suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China*), the Department of Commerce decided not to investigate allegations that the undervaluation of the currency of the People's Republic of China (the renminbi, or 'RMB') confers a countervailing subsidy." H.R. Rep. No. 111-646, at 7 (2010).

Act of 1930 to require that currency undervaluation be treated as a countervailable subsidy.[33]  Most prominently, the Currency Reform for Fair Trade Act of 2010 would have amended the Tariff Act of 1930 to treat fundamentally undervalued foreign currency as a countervailable subsidy.[34] Similarly, the Currency Exchange Rate Oversight Reform Act of 2011 would have directed Commerce to initiate countervailing duty investigations where a currency was designated as fundamentally misaligned.[35]  Both bills failed to pass.  Instead, in subsequent legislation including the Trade Facilitation and Trade Enforcement Act of 2015, Congress reinforced and expanded the Treasury's authority to monitor and engage foreign governments concerning exchange-rate practices, while leaving Commerce's countervailing duty authority unchanged with respect to Commerce's longstanding practice.[36]

In short, the administrative practice by Commerce and the Treasury has been consistent from at least 1971 through 2019.  Congress has, therefore, been aware of this practice — not only through "deemed" knowledge as a matter of law, but in actual fact.  And yet, although Congress undertook

---

[33] H.R. Rep. No. 111-646, at 1-2.

[34] H.R. 2378, 111th Cong. (2009-2010).

[35] S. 1619, 112th Cong. (2011-12).

[36] *See infra* 26-32.

substantial amendments to the countervailing duty laws, it has never overturned the longstanding administrative practice that currency valuation practices, even outright manipulation, is not within the purview of the countervailing duty laws.  This Congressional acquiescence in the Department's longstanding practice precludes Commerce from unilaterally altering its approach.

### b. The Legislative History of the 2015 TFTEA Confirms a Deliberate Congressional Choice to Withhold Authority

The legislative history of the Trade Facilitation and Trade Enforcement Act of 2015 ("TFTEA") confirms that Congress directly considered and declined to confer the precise authority Commerce now asserts.  During the 114th Congress, the Senate version of TFTEA (S. 1269) included a provision that would have amended the Tariff Act of 1930 to treat currency undervaluation as a countervailable subsidy.[37]  This provision, specifically Section 702, would have expressly authorized Commerce to investigate and countervail currency-undervaluation practices by defining them as a "benefit" under the subsidy law.[38]

---

[37] *See* Trade Facilitation and Trade Enforcement Act of 2015, S. 1269, 114th Cong., at Title VII, Subtitle A (2015).

[38] S. Rep. No. 114-45, at 45 (2015).

The legislative path to the final TFTEA reveals that, through a complex bicameral process, Congress ultimately enacted a statute that omitted the Senate's proposed CVD mechanism while simultaneously expanding the Treasury's currency-reporting and negotiating framework.[39]  Significantly, the record reveals this was not an accidental omission by Congress, but a rejection that crossed party lines based on specific policy and legal concerns. During the House debate to send the Senate-amended H.R. 644 (containing the texts of S. 1269) to conference, a motion was made to instruct the conferees to include the Senate's currency CVD language in the conference bill.  In response, House Ways and Means Chairman, Republican Congressman Kevin Brady, argued forcefully against the motion and the inclusion of the currency CVD language.  Chairman Brady warned that unilateral tariffs on currency valuation under the CVD process would invite a

---

[39] While the Senate moved forward with the CVD language in S. 1269, the House considered a legislation similar to S. 1269 in H.R. 1907, which did not contain the Senate's currency-CVD provision.  Ultimately, the Senate used H.R. 644, initially a minor House-passed bill titled "America Gives More Act of 2015," as a legislative vehicle by stripping its original text and "swapping" it for the contents of S. 1269, including the controversial currency language. The currency language was later removed during conference.  *See* Trade Facilitation and Trade Enforcement Act of 2015, H.R. 1907, 114th Cong. (2015); H.R. Rep. No. 114-376, at 75-79 (2015) (Conf. Rep.); 161 Cong. Rec. H9296-97 (daily ed. Dec. 11, 2015) (adoption of conference committee recommendations).

"dangerous cycle" of reciprocal actions and risk retaliation from major trading partners.[40] He further noted that such a mechanism could put the United States in violation of its international obligations, explicitly highlighting a rare point of bipartisan consensus by stating that the Obama administration shared these specific concerns.[41] The motion was voted down. The Senate's currency-CVD language did not appear in the conference

---

[40] 161 Cong. Rec. H8846 (daily ed. Dec. 1, 2015) (statement of Rep. Brady). Congressman Brady argued,

> There is no question currency manipulation is a real problem, and I and many other Republicans are committed to fighting it … However, if the United States begins unilaterally levying tariffs, our trading partners will no doubt do the same, leading to a very dangerous cycle. This would undermine the very purpose of trade agreements: to break down barriers and to open economic freedom. More importantly, this would hurt American competitiveness and hurt our jobs. I am also concerned that pursuing a unilateral approach could cause the United States to be a target for retaliation by countries like China, harming our businesses and their employees, and risk putting the United State in violation of international obligations and out of WTO compliance.

[41] *See id.* ("And the administration agrees. Earlier this year, Secretary {of the Treasury} Lew sent a letter to Congress stating that the administration would oppose legislation that would use the countervailing duty process to address currency undervaluation because it would raise questions about consistency with our international obligations and that it would be counterproductive to our ongoing bilateral and multilateral engagement….")

agreement, which instead adopted a Treasury-centered engagement and reporting framework.[42]

This alignment between a House Republican leader and the Democratic administration underscored the gravity of the risks involved, as both branches of government concluded that the proposed currency CVD approach to address currency practices would be legally and economically counterproductive. The final enacted statute omitted the Senate's proposed CVD amendment and instead adopted a framework centered on reporting and bilateral engagement mechanisms assigned to Treasury.[43]

Rather than expanding Commerce's authority, Congress strengthened the Treasury-administered framework for monitoring and engaging foreign governments on currency practices. The final law thus reflects an affirmative legislative choice not to expand Commerce's authority to encompass currency undervaluation when administering CVD laws.[44] Under *FDA v. Brown &*

---

[42] H.R. Rep. No. 114-376, at 75-79.

[43] *See* Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125, §§ 701-702 (2016).

[44] This choice aligned with the Obama Administration's formal opposition to the CVD approach, which Treasury Secretary Jacob Lew argued would be "counterproductive to our ongoing bilateral and multilateral engagement" and the President cautioned would be "highly problematic" regarding international consistency and lead to other countries pursuing retaliatory

*(footnote continued on following page)*

*Williamson Tobacco Corp.*, that sequence is dispositive.[45]  The Supreme

Court clarified that when Congress has "directly spoken to the precise

question at issue," and the statutory scheme shows that Congress withheld the

claimed authority, particularly where it has vested related authority in another

entity, an agency may not rely on statutory ambiguity to assert that power.[46]

Here, Congress addressed the precise question whether currency

undervaluation should be treated as a countervailable subsidy and chose not to

enact the Senate's proposal after weighing the risks of retaliation and

international illegality.  Instead, Congress elected to enhance the framework

centered on reporting and bilateral engagement mechanisms assigned to

---

*(footnote continued from previous page)*
measures that could hurt "our exporters, and be difficult to administer."
Letter from Jacob J. Lew, Sec'y of the Treasury, to Sen. Orrin G. Hatch,
Chairman, S. Comm. on Fin. (May 11, 2015),
https://home.treasury.gov/news/press-releases/jl10033; *see also* Barack
Obama, Statement of Administration Policy: Senate Amendments to H.R. 644
– Trade Facilitation and Trade Enforcement Act of 2015 Online by Gerhard
Peters and John T. Woolley, The American Presidency Project,
https://www.presidency.ucsb.edu/node/310870.

[45] *See Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529
U.S. 120 (2000) (holding that that the Food and Drug Administration (FDA)
lacks authority under the Food, Drug, and Cosmetic Act to regulate tobacco
products as "drugs" or "devices," because Congress has clearly indicated
through the overall statutory scheme and subsequent tobacco-specific
legislation that it did not intend to grant the FDA such power).

[46] *See id*. at 132.

Treasury. As such, Commerce cannot now obtain through regulation the authority that Congress considered and withheld.

Furthermore, when Congress reenacts or amends a statute without disturbing a settled administrative interpretation, particularly after considering and rejecting a specific change, it adopts the existing framework as the governing law.[47]  In *GPX Int'l Tire Corp. v. United States*, this Court held that when Congress reenacts a statute without altering a settled administrative interpretation, it is presumed to ratify that interpretation, and the agency loses discretion to change it.[48]  This Court further explained that Congress's awareness of an administrative interpretation, coupled with its decision not to enact proposed changes, supports the conclusion that Congress ratified the existing framework and foreclosed a contrary agency interpretation.[49]

Here, Congress repeatedly considered legislation that would expressly authorize Commerce to treat currency undervaluation as a countervailable subsidy, including the Currency Reform for Fair Trade Act of 2010 and the Currency Exchange Rate Oversight Reform Act of 2011.[50]  None of those

---

[47] *See GPX Int'l Tire Corp.*, 666 F.3d at 739-42.

[48] *See id.*

[49] *See id.*

[50] *See supra* 24-25.

proposals were enacted.  Furthermore, the inclusion of such language in the

Senate version of the TFTEA (S. 1269 and the later Senate-amended H.R.

644) confirms that Congress understood the issue and how to grant that

authority if it chose to do so.  By enacting the TFTEA to strengthen

antidumping and countervailing duty enforcement while rejecting the

Senate's currency-CVD language, Congress ratified Commerce's

longstanding position.

Exchange-rate practices fall outside the scope of the CVD law.  Having

failed to secure authority legislatively, Commerce may not unilaterally

expand its authority to countervail currency practices through regulation.[51]

### c. Congress Specifically Delegated Currency Oversight to the Treasury, Not Commerce

Commerce's assertion of authority over currency valuation cannot be

reconciled with the statutory structure Congress enacted.  When the relevant

---

[51] *See also West Virginia v. Environmental Protection Agency*, 597 U.S. 697, 743 (2022)  (Gorsuch, J., concurring) ("{T}his Court has found it telling when Congress has 'considered and rejected' bills authorizing something akin to the agency's proposed course of action … That too may be a sign that an agency is attempting to 'work {a}round' the legislative process to resolve for itself a question of great political significance.") (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 144; *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 122 (2022)).

trade statutes are read as a whole, they demonstrate that Congress assigned responsibility for currency matters to Treasury, not to Commerce.

The Supreme Court has instructed that statutes must be interpreted as a "harmonious whole," with each provision understood in light of the broader statutory scheme.[52] Where Congress has created a distinct framework to address a particular subject, an agency may not use a separate, more general statute to intrude upon that framework.[53]

Here, the CVD provisions administered by Commerce address discrete "financial contributions" and "benefits" provided to specific industries or enterprises.[54] By contrast, Congress has enacted separate provisions governing exchange-rate policy and currency practices, placing that responsibility squarely with Treasury.[55] In the Omnibus Trade and Competitiveness Act of 1988, Congress established a detailed regime requiring the Secretary of the Treasury to analyze exchange-rate policies of foreign countries, report to Congress, and, where appropriate, initiate negotiations with countries found to be manipulating their currency for

---

[52] *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 133.

[53] *Id.* at 159-60.

[54] *See* 19 U.S.C. § 1677(5) and (5A).

[55] *See supra* 26-32.

purposes of gaining unfair competitive advantage in international trade.[56] That statute reflects Congress's considered judgment that exchange-rate policy is a matter of macroeconomic and diplomatic engagement, to be handled through monitoring, reporting, and bilateral negotiations, not through trade-remedy duties imposed by Commerce.

Congress has since reaffirmed and refined Treasury's role in subsequent enactments, maintaining Treasury as the agency on currency matters through the passage of the Trade Facilitation and Trade Enforcement Act of 2015, which requires even more detailed semiannual reporting on macroeconomic and foreign exchange policies and enhanced analysis for countries meeting specified statutory criteria.[57]  This allocation of responsibility is structural, not incidental.  Congress did not merely reference currency issues in passing.  It created a specific oversight and negotiation mechanism and vested it in a particular department with expertise in international monetary affairs.

By creating a comprehensive and specific regime for the Treasury to identify and address currency manipulation, Congress effectively excluded currency practices from the general "subsidy" framework administered by

---

[56] *See* 22 U.S.C. §§ 5304, 5305, 5306.

[57] *See* 19 U.S.C. §§ 4421-4422.

Commerce.  Reading the countervailing duty statute to authorize Commerce

to regulate global exchange-rate policies would disrupt that carefully

constructed allocation of authority and collapse the distinction Congress drew

between trade remedies and monetary diplomacy[58].  It would also create inter-

agency conflict, permitting Commerce to impose duties based on

determinations that Congress directed Treasury to handle through

consultation and negotiation.

### 3. *The Major Questions Doctrine Bars Commerce's Assertion of Authority Over Currency Valuation*

Commerce's attempt to treat currency devaluation as a countervailable

subsidy implicates the Supreme Court's Major Questions Doctrine and

therefore cannot be sustained absent clear Congressional authorization.

Exchange-rate policy is addressed through a dedicated statutory framework

administered by the Department of the Treasury.[59]  Allowing Commerce to

regulate exchange rates through the CVD statute would effectively displace

that specialized regime.

In *West Virginia v. EPA*, the Supreme Court held that agencies may not

"discover in a long-extant statute an unheralded power representing a

---

[58] *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 159-61.

[59] *See supra* 32-35.

transformative expansion in {their} regulatory authority."[60]  Where an agency

asserts authority over a matter of "vast economic and political significance,"

it must point to "clear congressional authorization" for the power it claims.[61]

Absent such clarity, courts must reject the agency's interpretation.

Commerce's assertion of authority here qualifies as precisely the type of

"extraordinary case" contemplated in *West Virginia*.  Because it implicates

international monetary policy, sovereign exchange-rate regimes, and the

conduct of foreign relations, the regulation of currency valuation is not a

discrete trade remedy question.  Exchange-rate policy affects trillions of

dollars in global capital flows, sovereign debt markets, trade balances, and

diplomatic relations with major trading partners.  Questions of currency

alignment have long been treated as matters of macroeconomic coordination

and international diplomacy, traditionally entrusted to the political branches

and, in practice, to the Department of the Treasury.[62]

By contrast, the CVD statute is a trade-remedy law designed to address

specific financial contributions and benefits conferred by foreign

---

[60] *West Virginia v. Environmental Protection Agency*, 597 U.S. 697, 724 (2022).

[61] *Id*. at 716-23.

[62] *See supra* 25-35.

governments to particular industries.  Commerce now seeks to deploy that statute to discipline a sovereign nation's exchange-rate policy, which is an area far removed from the statute's historical application and one carrying sweeping economic and geopolitical consequences.

Under *West Virginia*, such an expansion demands unmistakable statutory language.  Yet Congress has never clearly authorized Commerce to treat currency valuation or exchange-rate policy as a countervailable subsidy.  To the contrary, as discussed above, Congress has repeatedly considered whether to grant such authority and declined to do so, and instead assigned responsibility for exchange-rate matters to Treasury.[63]  The absence of clear authorization is dispositive under the Major Questions Doctrine.

Allowing Commerce to regulate currency valuation through a the trade-remedy statute would permit the agency to assume control over a domain of vast economic and political significance without explicit congressional sanction.  That approach does not pass the requirement set by the Supreme Court in *West Virginia*.[64]  Because Commerce cannot identify clear

---

[63] *See supra* 24-53.

[64] *See West Virginia*, 597 U.S. at 721-23 (holding that when an agency asserts highly consequential power beyond what Congress could reasonably be understood to have granted, something more than a merely plausible textual basis for the agency action is necessary, and the agency instead must point to
*(footnote continued on following page)*

congressional authorization for this extraordinary assertion of power,

Commerce's determination in this case to countervail currency

undervaluation must be set aside.

> 4.  *Under Loper Bright, This Court Must Exercise Independent Judgment and Reject Commerce's Self-Expanding Interpretation*

The Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*

fundamentally alters the analytical framework governing this case.  With the

overruling of *Chevron*, Commerce can no longer rely on alleged statutory

"ambiguity" in the CVD statute as a safe harbor for expanding its regulatory

authority.  The question before this Court is not whether Commerce's new

interpretation is "permissible," but whether it is the best reading of the statute.

It is not.

---

*(footnote continued from previous page)*
"clear congressional authorization" for the power it claims); *Brown & Williamson Tobacco Corp.*, 529 U.S. at 159-60 (the statute does not authorize the FDA to regulate tobacco products as "drugs" or "devices," in part because Congress did not clearly delegate that authority); *Utility Air Regulatory Group v. Environmental Protection Agency*, 573 U.S. 302, 324 (2014) (declining to uphold EPA's asserted authority where it would give the agency the power to exercise broad regulatory authority of "vast economic and political significance" without clear congressional authorization).

### a. *The Text of the CVD Statute*

The CVD statute grants Commerce authority to determine whether a subsidy is countervailable, but it does so through carefully circumscribed criteria.[65] A subsidy is countervailable only where Commerce finds: (1) a financial contribution by a foreign government or public body; (2) a benefit conferred thereby; and (3) specificity to an enterprise, industry, or group thereof.[66] The statute notably does not define "group," nor does it address currency practices.

Relying on this silence, the CIT reasoned that the statute "does not exclude, expressly or otherwise, the undervaluation of currency" from the definition of a countervailable subsidy, and therefore concluded that Commerce may treat currency undervaluation as countervailable.[67] That reasoning is flawed. Statutory silence is not a grant of authority. The relevant question is not whether the statute expressly forbids Commerce's interpretation, but whether it represents the "best reading" of the statute as a whole. By treating the absence of an express exclusion as affirmative

---

[65] 19 U.S.C. §§ 1671(a), 1677.

[66] 19 U.S.C. § 1677(5), (5A).

[67] *Kumho I*, 741 F. Supp. 3d at 1296, Slip Op. 24-115, at 23-24 (APPX000087- APPX000088).

authorization, the CIT expanded Commerce's authority beyond the statute's text, structure, and limits, and failed to grapple with whether Congress in fact intended the CVD regime, which is designed to address discrete, enterprise-specific subsidies, to reach economy-wide currency policies.

### b. The Court Must Determine the Best Reading of the CVD Statute

In *Loper Bright*, the Court held unequivocally that "courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority."[68]  Applying independent judgment, the best reading of the CVD statute confirms that it targets industry-specific subsidies involving a defined "financial contribution" and a "benefit" that is "specific" to an enterprise or industry.[69]  For more than four decades, Commerce consistently interpreted these requirements as excluding national monetary policy and exchange-rate regimes.[70]  That interpretation reflects the statutory text, structure, and design: the statute addresses discrete governmental transfers or foregone revenue tied to identifiable recipients, not sovereign exchange-rate systems that apply economy-wide.

---

[68] *Loper Bright*, 603 U.S. at 412.

[69] 19 U.S.C. § 1677(5), (5A).

[70] *See supra* 13-22.

Currency valuation is not "specific" to an industry. Rather, it is a macroeconomic policy applicable across an entire national economy. The best reading of the statutory language, particularly when informed by its longstanding and consistent application, confirms that Congress did not authorize Commerce to countervail national monetary regimes.

Before *Loper Bright*, Commerce might have argued that its new interpretation was at least a "permissible" construction of an ambiguous statute under *Chevron*. That argument is no longer available.[71] Under *Loper Bright*, "permissible" is not enough.[72] If the statute does not clearly authorize Commerce to treat currency valuation as a countervailable subsidy, this Court may not defer to the agency's policy preference. Silence or ambiguity does not create a delegation of authority. As explained above, absence of explicit congressional authorization to countervail currency practices is dispositive, not an invitation for administrative innovation.

### c. *Commerce's Inconsistency Undermines Any Claim to Persuasive Weight*

Although *Loper Bright* eliminated mandatory deference, it acknowledged that agency interpretations may still be entitled to respect to the extent they

---

[71] *Loper Bright*, 603 U.S. at 412-13.

[72] *Id.* at 400-01.

are persuasive under *Skidmore*.[73]  But persuasiveness depends on consistency, expertise, and reasoned explanation.[74]  Commerce's position here satisfies none of those criteria.

First, Commerce's interpretation that currency practices may be countervailable has not been consistent.  From the early 1980s through 2019, including determinations such as *Pork Rind Pellets* and *Aluminum Extrusions*, Commerce repeatedly concluded that currency valuation did not constitute a countervailable subsidy.[75]  A sudden reversal after forty years of settled agency practice weakens any claim to persuasive authority.  An interpretation that contradicts decades of agency precedent is entitled to diminished weight, particularly where the change lacks a compelling statutory basis.

Second, Commerce's own prior analyses acknowledged statutory limitations.  As reflected in internal memoranda during the 2010 proceedings, Commerce concluded that it lacked the statutory framework necessary to measure and countervail currency undervaluation.[76]  An agency that long

---

[73] *Id.* at 402 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

[74] *Id.* at 388.

[75] *See supra* 13-22.

[76] *Id.*

maintained it lacked statutory authority cannot now claim heightened expertise as a basis for deference.

Under *Loper Bright*, the "power to persuade" depends on the quality and consistency of the agency's reasoning.[77] Commerce's abrupt departure from forty years of practice forfeits any claim to such persuasive weight.

### d. Any Statutory "Gap" Must Be Addressed by Congress, Not Commerce

Finally, *Loper Bright* underscores that the Administrative Procedure Act requires courts, not agencies, to determine the meaning of the law.[78] If the CVD statute is silent regarding currency valuation, that silence does not constitute a blank check for administrative expansion. It is a legislative boundary.

Under *Loper Bright*, this Court must independently determine the best reading of the statute and reject interpretations that exceed statutory limits. Because the CVD statute does not clearly authorize Commerce to regulate international currency regimes and because Congress has considered but did not enact legislative proposals that would have provided such authority, the

---

[77] *Loper Bright*, 603 U.S. at 388.

[78] *Id.* at 391-94.

Court should hold Commerce's newly-asserted authority to countervail currency unlawful.

The CIT erred by failing to recognize *Hammond Lead* as the foundational judicial authority that explained the scope of the CVD statute for over fifty years.[79] In treating the CCPA's analysis as mere dicta, the court overlooked the fact that *Hammond Lead* provided the legal boundary for what constitutes a "bounty or grant," explicitly identifying currency devaluations as macroeconomic actions beyond the reach of trade remedies.[80] This was not a passing observation. It was a judicially recognized interpretation of the statutory landscape upon which both the executive and legislative branches have relied for decades. Under the doctrine of Congressional acquiescence, when an agency maintains a consistent practice, such as Commerce's four-decade refusal to countervail currency undervaluation, and Congress repeatedly re-enacts that statute without modification, it is presumed that Congress has adopted the agency's interpretation.[81] The CIT's focus on the

---

[79] *Kumho I*, 741 F. Supp. 3d at 1298-1299, Slip Op. 24-115, at 28-29 (APPX000092- APPX000093).

[80] *See Hammond Lead Prods.*, 440 F.2d at 1030-31.

[81] *See cf. GPX Int'l Tire Corp.*, 666 F.3d at 739 ("In explaining the '{p}resent law' on NME imports, the conference noted that 'the Department of Commerce has determined that the countervailing duty laws cannot be

*(footnote continued on following page)*

narrow factual nuances of subsequent cases ignores the broader reality that

*Hammond Lead* provided the foundational framework that Congress

acquiesced.[82]  Because Congress has repeatedly amended the trade laws while

leaving this specific boundary undisturbed, Commerce lacks the authority to

unilaterally expand its jurisdiction to regulate currency exchange practices

through a regulatory policy shift.

    C.   *Commerce's Regulation Impermissibly Collapses the Statutory Specificity Requirement by Equating the Broad Category of "Traded Goods" With a Specific "Group" of Industries*

        1.   *Commerce's Reliance on the "Traded Goods" Sector is Insufficient to Establish Specificity Where the Benefit Has Horizontal Application.*

Commerce's invention of the "traded goods sector" in its 2020 regulation

(19 C.F.R. § 351.502(c)) is an attempt to bypass the statutory specificity

requirement of 19 U.S.C. § 1677(5A)(D)(iii).  Recognizing that currency

---

*(footnote continued from previous page)*
applied to nonmarket economy imports' and that '{t}his decision is pending judicial resolution,' referring to the then-pending *Georgetown Steel* case.  *Id*.  Congress was thus well aware of Commerce's interpretation that countervailing duties could not be imposed on NME imports, and when reenacting the trade law, it rejected amendments designed to alter that approach.") (citing *Georgetown Steel Corp. v. United States*, 801 F.2d 1308 (Fed. Cir. 1986)).

[82] *Kumho I*, 741 F. Supp. 3d at 1298-1304, Slip Op. 24-115, at 28-40 (APPX000092-APPX000104).

exchange is a universal, horizontal function of an entire national economy, Commerce faced a legal hurdle:  a benefit available to everyone cannot, by definition, be specific.  To manufacture specificity where none exists, Commerce created the "traded goods sector" by grouping any entity that simply "buys or sells goods internationally" into a single category.[83]  In affirming Commerce's grouping in this case, the CIT validated a "group" that encompasses nearly every productive entity in a trade-saturated economy like Vietnam and effectively permitted the "specificity" requirement to be transformed from a mandatory statutory screening mechanism into a hollow formality.

Such as result ignores the judicial mandate that "Commerce cannot use its discretion to choose the largest consumers of a subsidy, group them together with no further explanation, and call it a reasonable choice."[84]  By affirming Commerce's reliance on the "trade good sector," the CIT has allowed the agency to treat an economy-wide monetary condition as though it were an industry-specific subsidy by tying the "specificity" requirement to the mere

---

[83] *See* 19 C.F.R. § 351.502(c).

[84] *POSCO v. United States*, 794 F. Supp. 3d 1402, 1408 (Ct. Int'l Trade 2025) (citing *Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1086-87 (Fed. Cir. 2025)).

act of trading across a border, which is the primary driver of Vietnam's GDP. Under *Loper Bright*, this Court should exercise its independent judgment to overrule the CIT's flawed reasoning and find that the "traded goods sector" must be rejected as an arbitrary, all-encompassing cluster that replaces a statutory requirement with a workaround of the legislative process.

     *a.   The Requirement for a Reasoned "Grouping" Analysis*

Citing this Court's decisions, judge Restani of the CIT held in *POSCO v. United States* that "Commerce cannot use its discretion to choose the largest consumers of a subsidy, group them together with no further explanation, and call it a reasonable choice."[85] Rather, Commerce must provide a "logical basis" for why disparate industries form a cohesive, discrete group.[86] Just as broadly applicable regulatory regimes such as electricity pricing do not automatically create a specific group, the mere participation in international trade does not transform a diverse array of industries into a discrete segment of the economy.[87] By designating the "traded goods sector" as a group,

---

[85] *Id.* (citing *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1386 (Fed. Cir. 2022); *Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1086-87 (Fed. Cir. 2025)).

[86] *See id.*

[87] *See id.* at 1407-11 (holding that Commerce's finding of *de facto* specificity for electricity was unsupported where it relied on broad groupings and

*(footnote continued on following page)*

Commerce has bypassed the factual inquiry required by the statute in favor of a sweeping generalization that lacks a tether to industrial reality.

Judge Kelly of the CIT reinforced in *Hyundai Steel Co. v. United States*, that such conclusory groupings lack the substantial evidence required to survive judicial review.[88]  In that case, the court acknowledged that Commerce's regulation permits the agency to forgo identifying "shared characteristics" among grouped enterprises or industries in its specificity analysis, but only where the alleged subsidies "are not widely available."[89]  By contrast, currency exchange, and any purported benefits arising from an alleged devaluation, permeates the entire economy particularly within a unified exchange system such as Vietnam's.  Where a subsidy is broadly available and horizontally applied, Commerce cannot aggregate all entities

---

*(footnote continued from previous page)*
aggregate consumption without showing that the respondent industry received a disproportionate share of a widely available input).

[88] *See Hyundai Steel Company v. United States*, 745 F. Supp. 3d 1345, 1353 (CIT 2024) ("Even where an agency has discretion to act it must act reasonably and explain itself … Where a subsidy is widely distributed, Commerce cannot create a group to limit the subsidy for purposes of satisfying the specificity requirement without providing a rational basis for the grouping.") (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983)).

[89] *Id*.

engaged in international trade into a single group while failing to provide a reasoned explanation for that classification.[90]

Furthermore, in the context of the trade-saturated economy of Vietnam, the "traded goods" label is a distinction without a difference. It fails to account for the "extent of diversification" within the economy, as mandated by 19 U.S.C. § 1677(5A)(D)(iii). When a group is defined so broadly that it encompasses every entity from high-tech electronics manufacturers to agricultural exporters, it ceases to be a "group" and becomes a proxy for the economy itself. Under the *POSCO* and *Hyundai Steel* framework, Commerce cannot satisfy its burden of reasoned explanation by simply pointing to a shared economic activity (buying and selling goods internationally) while ignoring the profound disparities in the "processes and output" of the individual enterprises it seeks to penalize.[91]

---

[90] In response to the parties' contention that the traded goods sector is overly broad, and that Commerce should instead examine the specific industries and enterprises within that sector to assess whether the subsidy was widely available across the economy, Commerce summarily dismissed the argument as "irrelevant." Final Issues and Decision Memo, at 19-20 (APPX000387-APPX000388). As the CIT made clear in *POSCO* and *Hyundai Steel*, however, that position is simply incorrect.

[91] *See infra* at 52-54.

While the CIT's decisions in *POSCO* and *Hyundai* addressed Commerce's analysis of *de facto* specificity under a disproportionate use basis (19 U.S.C. § 1677(5A)(D)(iii)(III), rather than the predominant use basis central to this appeal (19 U.S.C. § 1677(5A)(D)(iii)(II)), the core legal requirement remains unchanged. Both frameworks are governed by the overarching requirement that Commerce must provide a reasoned explanation for its grouping decisions to survive judicial review. Commerce simply failed to do so here.

Commerce's expansive definition of the "traded goods sector" effectively bypasses the specificity filter mandated by 19 U.S.C. § 1677(5A). By grouping together a vast array of industries, Commerce has established a precedent that would allow any broad economic category, such as digital services or carbon-intensive production, to be treated as a discrete segment of an economy. Such an interpretation nullifies the legislative intent of the specificity test, which is to address distortions within limited sectors rather than to penalize a nation's foundational economic structure. If the "traded goods" designation is accepted as a valid group, the statutory requirement for a limited or specific number of recipients becomes a mere formality, granting Commerce nearly unlimited discretion to countervail any economy with an trade-oriented growth model.

### b. The Distinction Between Discrete Segments and General Availability

The core of the specificity inquiry is whether a benefit is "spread throughout the economy."[92] Commerce must distinguish between subsidies used by discrete segments and those distributed throughout the entire economy.[93] This distinction is dispositive in the context of currency undervaluation.

An exchange rate is not a targeted subsidy tool. It is a macroeconomic price that permeates every sector of a national economy. By definition, if a benefit such as an undervalued currency is available to every enterprise that engages in international commerce, it is not specific to a discrete segment of the economy. In a trade-saturated economy like Vietnam, where the "traded goods sector" constitutes the overwhelming majority of the nation's productive output, the benefit is so ubiquitous that it fails the threshold for *de facto* specificity.[94]

---

[92] *See Wilmar Trading Pte Ltd. v. United States*, 466 F. Supp. 3d 1334, 1358 (Ct. Int'l Trade 2020).

[93] *See Mosaic Company v. United States*, 744 F. Supp. 3d 1367, 1379 (Ct. Int'l Trade 2025) (citing the SAA).

[94] *See infra* 54-60.

Furthermore, under *Changzhou Trina Solar Energy Co., Ltd. v. United States*, Commerce has an obligation to compare the industries receiving the subsidy to the industry makeup of the country as a whole.[95] In Vietnam, the "traded goods" sector is not a slice of the pie. It is the pie itself. By failing to account for the horizontal nature of currency exchange, Commerce has transformed a sovereign macroeconomic condition into a countervailable subsidy, effectively nullifying the statutory requirement that a subsidy be specific.

### c. The "Closely Related" Test for Predominant Users

Commerce's determination that currency undervaluation is *de facto* specific rests on the flawed premise that the "traded goods sector," or more specifically all exporters as a group in Vietnam, constitutes the "predominant user" of the alleged subsidy.[96] This application of the "predominant user" factor under 19 U.S.C. § 1677(5A)(D)(iii)(II) is legally unsustainable.

---

[95] *See Changzhou Trina Solar Energy Co., Ltd. v. United States*, 352 F. Supp. 3d. 1316, 1330 (2018) ("{A}lthough Commerce was under no obligation pursuant to its regulations to compare the characteristics of the six industries listed by the GOC against one another, Commerce should have determined whether these six industries made up a significant enough portion of all Chinese industries to render the subsidy nonspecific despite the use of only six categories to describe these industries.").

[96] Final Issues and Decision Memo, at cmt. 4 (APPX000384-APPX000388).

In *Oil Country Tubular Goods from Turkey*, Commerce concluded that the power industry was the predominant user of natural gas because it accounted for 47.5 percent of natural gas consumption in Turkey, while the iron and steel industry accounted for approximately five percent of natural gas consumption.[97]  The Department then concluded that because the respondent steel producers were not part of the power industry, it was not appropriate to group the iron and steel industry with the power industry and did not find that the provision of natural gas was specific for the steel industry.[98]  Similarly, in the countervailing duty investigation of *Chlorinated Isocyanurates from China*, the Department found that the agriculture industry was the predominant user of urea in China, consuming over 70 percent.[99]  The Department declined to group the chemical industry with the agriculture industry, because there was a lack of information on the record to find that the

---

[97] *See Certain Oil Country Tubular Goods from the Republic of Turkey: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 79 Fed. Reg. 41964 (July 18, 2014), and accompanying Issues and Decision Memorandum at "B. Program Found To Be Not Countervailable" Section.

[98] *See id*.

[99] *See Chlorinated Isocyanurates from the People's Republic of China: Final Affirmative Countervailing Duty Determination; 2012*, 79 Fed. Reg. 56560 (Sept. 22, 2014), and accompanying Issues and Decision Memorandum at cmt. 4.

chemical industry's usage of urea was "closely related … in terms of processes and output" to the agricultural industry.[100]

By contrast, in its currency analysis, Commerce has discarded the "closely related processes and output" test entirely. Rather than requiring that the recipients be "closely related," Commerce has grouped every Vietnamese exporter from high-tech electronics firms to textile mills and agricultural producers into a single "traded goods" category. These industries share no commonality in their "processes" or their "outputs." Their only shared characteristic is that they buy and sell goods internationally. If the steel and power industries in Turkey were not "closely related" enough to form a group for natural gas consumption, then the vast and disparate array of industries comprising Vietnam's export economy cannot possibly constitute a "discrete group" for currency exchange.

### 2. The "Traded Goods" Grouping is Legally Insufficient in a Trade-Saturated Economy

The application of the "traded goods" sector designation is particularly egregious in the context of Vietnam. In an economy where the vast majority of the country's GDP is tied to the import and export of goods, defining the

_____

[100] *See id.*

recipients of an alleged subsidy as the "traded goods sector" is a distinction without a difference.

The 2019 economic data for Vietnam illustrates this point with startling clarity.[101] In 2019, Vietnam's GDP was approximately $329 billion.[102] During the same period, Vietnam's total import-export turnover reached a staggering $517 billion, representing roughly 157 percent of its GDP.[103] This extraordinary trade-to-GDP ratio proves that the traded sector is not a "discrete segment" of the Vietnamese economy.

---

[101] *See* Government of Vietnam's Initial Response, at Exhibit A-5-5, at 119-121 (APPX011411-APPX011413).

[102] *See id.* at 119-121 (APPX011411-APPX011413). In 2019, Vietnam's re-evaluated GDP at current prices was 7,654.3 trillion VND. Based on the average "spot rate" of 23,224 VND/USD in 2019 reported by the Treasury to Commerce, this converts to a GDP of approximately $329 billion. This figure is derived by dividing the total VND valuation by the 2019 "spot rate." Department of the Treasury Submission to DOC Regarding Currency, at 3 (Aug. 24, 2020) (APPX009528).

[103] *See* Government of Vietnam's Initial Response, at Exhibit A-5-5, at 119-121 (APPX011411-APPX011413).

## Table 1
## Vietnam Balance of Payments[104]

(Millions of U.S. Dollars)

| | Q1 2019 | Q2 2019 | Q3 2019 | Q4 2019 | 2019 | Percentage |
|---|---|---|---|---|---|---|
| Goods, credit (exports) | 58,807.0 | 63,658.0 | 72,188.0 | 69,536.0 | 264,189.0 | 49% |
| Goods, debit (imports) | 54,996.0 | 60,807.0 | 64,013.0 | 62,878.8 | 242,694.8 | 45% |
| Services, credit (exports) | 4,155.0 | 3,765.0 | 4,050.0 | 4,667.0 | 16,637.0 | 3% |
| Services, debit (imports) | 4,490.0 | 4,718.0 | 4,900.0 | 4,880.0 | 18,988.0 | 4% |
| Total | | | | | 542,508.8 | 100% |

While the 2019 import-export turnover figure includes both goods and services, information in Table 1 demonstrates that the "traded goods" sector accounted for more than 90 percent of the country's total import-export turnover. As such, the traded goods sector is also not a "discrete segment" of the Vietnamese economy. It is the primary engine and the very fabric of the country's output. When a designated "group" encompasses nearly the entire breadth of a nation's economic activity, it ceases to be a "discrete group" and instead becomes a proxy for the economy itself, rendering the specificity test meaningless.

By capturing every productive entity in Vietnam under this label, Commerce has effectively ruled that any country with a trade growth model

---

[104] *See* Memorandum to the File, "International Monetary Fund and the Organisation for Economic Co-operation and Development Data," at 3, dated October 8, 2020 (APPX021411); Memorandum to the File, "International Monetary Fund Data - Correction," at 3, dated January 10, 2025 (APPX038307).

is, by default, providing specific subsidies.  This contradicts the statutory intent of 19 U.S.C. § 1677(5A)(D)(iii), which seeks to address distortions provided to limited segments of an economy, not to penalize an entire nation's economic structure.[105]

Furthermore, Commerce's "traded goods" grouping is inherently unreasonable because it excludes the services sector, which is inextricably tied to the same unified exchange regime in Vietnam.  In a modern, integrated economy like Vietnam's, providers of cross-border services, ranging from informational technology and telecommunications to tourism and logistics, stand to benefit or lose from exchange-rate fluctuations just as much as exporters of physical merchandise.  The data for 2019 provided in Table 2 below underscores this interconnectedness.

---

[105] *See* SAA, at 929-32.

<u>Table 2</u>
Number of Active Enterprises as of the End of 2019[106]

| | | |
|---|---|---|
| **Agriculture, forestry and fishing** | **10,085** | **1.33%** |
| **Industry and construction** | **239,755** | **31.60%** |
| *Industry* | *127,340* | *16.79%* |
| Mining and quarrying | 5,106 | 0.67% |
| Manufacturing | 115,548 | 15.23% |
| Electricity, gas, steam and air conditioning supply | | |
| Water supply; sewerage, waste management and remediation activities | 6,686 | 0.88% |
| *Construction* | *112,415* | *14.82%* |
| **Services** | **508,770** | **67.07%** |
| *Wholesale and retail trade; repair of motor vehicles and motorcycles* | *262,776* | *34.64%* |
| *Transportation and storage* | *39,771* | *5.24%* |
| *Accommodation and food service activities* | *29,780* | *3.93%* |
| *Information and communication* | *17,329* | *2.28%* |
| *Financial, banking and insurance activities* | *5,737* | *0.76%* |
| *Real estate activities* | *26,049* | *3.43%* |
| *Professional, scientific and technical activities* | *59,935* | *7.90%* |
| *Administrative and support service activities* | *36,456* | *4.81%* |
| *Education* | *14,984* | *1.98%* |
| *Human health and social work activities* | *3,581* | *0.47%* |
| *Arts, entertainment and recreation* | *4,749* | *0.63%* |
| *Other service activities* | *7,623* | *1.00%* |
| **Total** | **758,610** | **100%** |

There were over 750,000 enterprises established in Vietnam operating in at least 18 different industries in 2019.[107] With the exception of maybe one or two of these industries, there are companies that buy or sell goods

---

[106] Government of Vietnam's Initial Response, at Exhibit A-5-5, at 232-234 (APPX011524-APPX011526).

[107] *See id.*

internationally in nearly all of these industries. Among Vietnam's 750,000 active enterprises, more than 500,000 operated within the service sector in 2019. Therefore, any purported currency undervaluation could theoretically benefit 67 percent of all domestic entities, which is a figure that underscores the purely horizontal, economy-wide application of the alleged subsidy.[108] Commerce's *de facto* specificity finding, predicated on the claim that the "traded goods" sector is the "predominant user" of the undervalued currency, is undermined by the actual structural makeup of the Vietnamese economy. Crucially, this analysis of the service sector is offered solely to illustrate the systemic flaws and lack of a rational basis in Commerce's specificity finding. It does not, however, diminish the reality that the "traded goods" sector is so fundamentally large as to be indistinguishable from the Vietnamese economy as a whole.

Because the organization of the Vietnamese economy is such that international trade is pervasive across nearly all sectors, there is nothing "specific" about the traded goods sector. By isolating "goods" for disparate treatment, the Department has arrived at a determination that is unsupported

---

[108] *See id.*

by the record and inconsistent with the holistic nature of Vietnam's cross-border commerce.

In short, if the "group" is so large that it encompasses the entirety of the nation's industrial output, it ceases to be a "group" and becomes the general economy. Commerce's conclusion that Vietnam's currency practice is specific based on the "traded goods sector" as a group is thus not in accordance with law and constitutes reversible error.

<u>CONCLUSION</u>

Commerce's decision to countervail currency undervaluation contradicts its own long-standing practice and ignores the clear intent of Congress. Because Congress acquiesced to the non-countervailability of currency and delegated exchange rate oversight to the Treasury, Commerce's decision must be vacated as *ultra vires*. In addition, the "traded goods sector" is a functional category of the macro-economy, similar to the workforce or taxpayers. Given Vietnam's highly integrated export-import economy, countervailing a currency undervaluation based on this "group" effectively countervails the entire manufacturing sector, violating the SAA's mandate that CVD measures should not be used for widely-available benefits. In light of the foregoing, we respectfully request that the Court reverse the decision

by the CIT and remand this case with instructions for Commerce to vacate the

assessment of countervailing duties predicated on currency undervaluation.

Respectfully submitted,

/s/Jeffrey M. Winton

Jeffrey M. Winton
Vi N. Mai

WINTON & CHAPMAN PLLC
1100 13th Street, N.W., Suite 825
Washington, D.C.  20005
(202) 774-5500

Attorneys for Kumho Tire
(Vietnam) Co., Ltd.

March 23, 2026



ADDENDA

Addendum 1

*Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 28566 (May 27, 2021)


Tires from Cheng Shin's Margin Calculation

Comment 5: Whether Commerce Should Match Control Numbers in the U.S. and Home Markets Based on Similarities in Product Characteristics

Comment 6: Whether Commerce Should Take Tire Category into Account in Conducting its Matching Analysis

Comment 7: Whether Commerce Should Exclude Home Market CONNUMs with Small Quantities From the Dumping Calculation

Comment 8: Whether Commerce Should Remove Maxxis-branded Home Market Sales for the Calculation of Normal Value

Comment 9: Whether Commerce Should Remove Sales Not Intended for Sale in the U.S. Market from Dumping Calculation

Comment 10: Whether Commerce Should Use the A-to-A Methodology in the Final Determination and Refrain from Zeroing

Comment 11: Whether Commerce Should Allow Certain Non-Operating Income Offsets to the Reported General and Administrative (G&A) Expenses

VII. Recommendation

[FR Doc. 2021–11263 Filed 5–26–21; 8:45 am]

**BILLING CODE 3510–DS–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

[C–552–829]

## Passenger Vehicle and Light Truck Tires From the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that countervailable subsidies are being provided to producers and exporters of passenger vehicle and light truck tires (passenger tires) from the Socialist Republic of Vietnam (Vietnam).

**DATES:** Applicable May 27, 2021.

**FOR FURTHER INFORMATION CONTACT:** Michael Romani or Thomas Schauer, AD/CVD Operations, Office I, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0198 or (202) 482–0410, respectively.

**SUPPLEMENTARY INFORMATION:**

## Background

On November 10, 2020, Commerce published the *Preliminary Determination* in the **Federal Register**.[1]

---

[1] See Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Preliminary

In addition to the Government of Vietnam (GOV), the mandatory respondents in this investigation are Kumho Tire (Vietnam) Co., Ltd. (KTV) and Sailun (Vietnam) Co., Ltd. (Sailun). In the *Preliminary Determination,* and in accordance with section 705(a)(1) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.210(b)(4), Commerce aligned the final countervailable duty (CVD) determination with the final antidumping duty (AD) determination.[2]

A summary of the events that occurred since Commerce published the *Preliminary Determination* is found in the Issues and Decision Memorandum.[3] The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/.*

## Period of Investigation

The period of investigation is January 1, 2019, through December 31, 2019.

## Scope of the Investigation

The products covered by this investigation are passenger tires from Vietnam. For a complete description of the scope of the investigation, *see* Appendix I.

## Scope Comments

During the course of this investigation, Commerce received scope comments from interested parties. Commerce issued a Preliminary Scope Decision Memorandum to address these comments.[4] We received comments from interested parties on the Preliminary Scope Decision Memorandum, which we address in the

---

*Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination,* 85 FR 71607 (November 10, 2020) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum.

[2] See *Preliminary Determination,* 85 FR at 71608.

[3] See Memorandum, "Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[4] See Memorandum, "Passenger Vehicle and Light Truck Tires from the Republic of Korea, Taiwan, Thailand, and the Socialist Republic of Vietnam: Preliminary Scope Comments Decision Memorandum," dated December 29, 2020 (Preliminary Scope Decision Memorandum).

Final Scope Decision Memorandum.[5] With the exception of one revision to correct a typographical error, Commerce is not modifying the scope language as it appeared in the correction to the preliminary determinations issued in the concurrent AD investigations.[6] *See* Appendix I for the final scope of the investigation.

## Verification

Commerce was unable to conduct on-site verification of the information relied upon in making its final determination in this investigation. However, we took additional steps in lieu of on-site verification to verify the information relied upon in making this final determination, in accordance with section 782(i) of the Act.[7]

## Analysis of Subsidy Programs and Comments Received

The subsidy programs under investigation and the issues raised in the case and rebuttal briefs by parties in this investigation are discussed in the Issues and Decision Memorandum. For a list of the issues raised by parties, to which we responded in the Issues and Decision Memorandum, *see* Appendix II of this notice.

## Methodology

Commerce conducted this investigation in accordance with section 701 of the Act. For each of the subsidy programs found countervailable, Commerce determines that there is a subsidy, *i.e.,* a financial contribution by an "authority" that gives rise to a benefit to the recipient, and that the subsidy is specific.[8] For a full

---

[5] See Memorandum, "Passenger Vehicle and Light Truck Tires from the Republic of Korea, Taiwan, Thailand, and the Socialist Republic of Vietnam: Scope Comments Final Decision Memorandum," dated concurrently with, and hereby adopted by, this notice (Final Scope Decision Memorandum).

[6] See *Passenger Vehicle and Light Truck Tires from the Republic of Korea, Taiwan, Thailand, and the Socialist Republic of Vietnam: Notice of Correction to Preliminary Determinations in Less-Than-Fair-Value Investigations,* 86 FR 7252 (January 27, 2021).

[7] See Commerce's Letters, dated February 18, 2021; see also GOV's Letter, "Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: GOV's Verification Questionnaire Response," dated February 26, 2021; KTVs Letter, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from Vietnam— Response to February 18 In Lieu of Verification Questionnaire," dated February 26, 2021; and Sailun's Letter, "Sailun Verification Questionnaire Response in the Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires ("PVLT") From Vietnam (C–552–829)," dated February 26, 2021.

[8] See sections 771(5)(B) and (D) of the Act regarding financial contribution; section 771(5)(E) of the Act regarding benefit; and section 771(5A) of the Act regarding specificity.

description of the methodology underlying this final determination, *see* the Issues and Decision Memorandum.

## Changes Since the Preliminary Determination

Based on our review and analysis of the record and the comments received, we made certain changes to the countervailable subsidy rate calculations. For discussion of these changes, *see* the Issues and Decision Memorandum.

## All-Others Rate

Section 705(c)(5)(A) of the Act provides that in the final determination, Commerce shall determine an all-others rate for companies not individually examined. This rate shall be an amount equal to the weighted average of the estimated subsidy rates established for those companies individually examined, excluding any rates that are zero, *de minimis,* or based entirely under section 776 of the Act.

In this investigation, Commerce calculated individual estimated countervailable subsidy rates for KTV and Sailun that are not zero, *de minimis,* or based entirely on facts otherwise available. Commerce calculated the all-others rate using a weighted average of the individual estimated subsidy rates calculated for the examined respondents using each company's publicly-ranged values for the merchandise under consideration.[9]

## Final Determination

We determine the countervailable subsidy rates to be:

| Company | Subsidy rate (percent) |
|---|---|
| Kumho Tire (Vietnam) Co., Ltd | 7.89 |

[9] With two respondents under examination, Commerce normally calculates: (A) A weighted-average of the estimated subsidy rates calculated for the examined respondents; (B) a simple average of the estimated subsidy rates calculated for the examined respondents; and (C) a weighted-average of the estimated subsidy rates calculated for the examined respondents using each company's publicly-ranged U.S. sale quantities for the merchandise under consideration. Commerce then compares (B) and (C) to (A) and selects the rate closest to (A) as the most appropriate rate for all other producers and exporters. *See, e.g., Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews, Final Results of Changed-Circumstances Review, and Revocation of an Order in Part,* 75 FR 53661, 53663 (September 1, 2010). As complete publicly ranged sales data was available, Commerce based the all-others rate on the publicly ranged sales data of the mandatory respondents. For a complete analysis of the data, *see* Memorandum, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Calculation of All-Others Rate," dated concurrently with this notice.

| Company | Subsidy rate (percent) |
|---|---|
| Sailun (Vietnam) Co., Ltd | 6.23 |
| All Others | 6.46 |

## Disclosure

We intend to disclose the calculations performed in this final determination to interested parties within five days of any public announcement or, if there is no public announcement, within five days of the date of the publication of this notice in the **Federal Register**, in accordance with 19 CFR 351.224(b).

## Continuation of Suspension of Liquidation

As a result of our *Preliminary Determination,* and pursuant to section 703(d)(1)(B) and (d)(2) of the Act, we instructed U.S. Customs and Border Protection (CBP) to suspend liquidation of all passenger tires from Vietnam, that were entered, or withdrawn from warehouse, for consumption on or after November 10, 2020, the date of the publication of the *Preliminary Determination* in the **Federal Register**.

In accordance with section 703(d) of the Act, effective March 10, 2021, we instructed CBP to discontinue the suspension of liquidation of all entries, but to continue the suspension of liquidation of all entries between November 10, 2020, through March 9, 2021.

If the U.S. International Trade Commission (ITC) issues a final affirmative injury determination, we will issue a CVD order, reinstate the suspension of liquidation, and require a cash deposit of estimated countervailable duties for such entries of subject merchandise in the amounts indicated above, in accordance with section 706(a) of the Act. If the ITC determines that material injury, or threat of material injury, does not exist, this proceeding will be terminated and all cash deposits will be refunded or canceled.

## ITC Notification

In accordance with section 705(d) of the Act, we will notify the ITC of our determination. Because the final determination in this proceeding is affirmative, in accordance with section 705(b) of the Act, the ITC will make its final determination as to whether the domestic industry in the United States is materially injured, or threatened with material injury, by reason of imports of passenger tires from Vietnam no later than 45 days after our final determination. In addition, we are making available to the ITC all non-privileged and non-proprietary

information related to this investigation. We will allow the ITC access to all privileged and business proprietary information in our files, provided the ITC confirms that it will not disclose such information, either publicly or under an administrative protective order (APO), without the written consent of the Assistant Secretary for Enforcement and Compliance.

## Notification Regarding APO

In the event that the ITC issues a final negative injury determination, this notice will serve as the only reminder to the parties subject to APO of their responsibility concerning the disposition of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return or destruction of APO materials, or conversion to judicial protective order, is hereby requested. Failure to comply with the regulations and terms of an APO is a violation subject to sanction.

## Notification to Interested Parties

This determination is issued and published in accordance with sections 705(d) and 777(i) of the Act, and 19 CFR 351.210(c).

Dated: May 21, 2021.

**Christian Marsh,**
*Acting Assistant Secretary for Enforcement and Compliance.*

## Appendix I—Scope of the Investigation

The scope of this investigation is passenger vehicle and light truck tires. Passenger vehicle and light truck tires are new pneumatic tires, of rubber, with a passenger vehicle or light truck size designation. Tires covered by this investigation may be tube-type, tubeless, radial, or non-radial, and they may be intended for sale to original equipment manufacturers or the replacement market.

Subject tires have, at the time of importation, the symbol "DOT" on the sidewall, certifying that the tire conforms to applicable motor vehicle safety standards. Subject tires may also have the following prefixes or suffix in their tire size designation, which also appears on the sidewall of the tire:

Prefix designations:

P—Identifies a tire intended primarily for service on passenger cars.

LT—Identifies a tire intended primarily for service on light trucks.

Suffix letter designations:

LT—Identifies light truck tires for service on trucks, buses, trailers, and multipurpose passenger vehicles used in nominal highway service.

All tires with a "P" or "LT" prefix, and all tires with an "LT" suffix in their sidewall markings are covered by this investigation regardless of their intended use.

In addition, all tires that lack a "P" or "LT" prefix or suffix in their sidewall markings, as

well as all tires that include any other prefix or suffix in their sidewall markings, are included in the scope, regardless of their intended use, as long as the tire is of a size that fits passenger cars or light trucks. Sizes that fit passenger cars and light trucks include, but are not limited to, the numerical size designations listed in the passenger car section or light truck section of the Tire and Rim Association Year Book, as updated annually. The scope includes all tires that are of a size that fits passenger cars or light trucks, unless the tire falls within one of the specific exclusions set out below.

Passenger vehicle and light truck tires, whether or not attached to wheels or rims, are included in the scope. However, if a subject tire is imported attached to a wheel or rim, only the tire is covered by the scope.

Specifically excluded from the scope are the following types of tires:

(1) Racing car tires; such tires do not bear the symbol "DOT" on the sidewall and may be marked with "ZR" in size designation;

(2) pneumatic tires, of rubber, that are not new, including recycled and retreaded tires;

(3) non-pneumatic tires, such as solid rubber tires;

(4) tires designed and marketed exclusively as temporary use spare tires for passenger vehicles which, in addition, exhibit each of the following physical characteristics:

(a) The size designation and load index combination molded on the tire's sidewall are listed in Table PCT–1R ("T" Type Spare Tires for Temporary Use on Passenger Vehicles) or PGT–1B ("T" Type Diagonal (Bias) Spare Tires for Temporary Use on Passenger Vehicles) of the Tire and Rim Association Year Book,

(b) the designation "T" is molded into the tire's sidewall as part of the size designation, and,

(c) the tire's speed rating is molded on the sidewall, indicating the rated speed in MPH or a letter rating as listed by Tire and Rim Association Year Book, and the rated speed is 81 MPH or a "M" rating;

(5) tires designed and marketed exclusively as temporary use spare tires for light trucks which, in addition, exhibit each of the following physical characteristics:

(a) The tires have a 265/70R17, 255/80R17, 265/70R16, 245/70R17, 245/75R17, 245/70R18, or 265/70R18 size designation;

(b) "Temporary Use Only" or "Spare" is molded into the tire's sidewall;

(c) the tread depth of the tire is no greater than 6.2 mm; and

(d) Uniform Tire Quality Grade Standards ("UTQG") ratings are not molded into the tire's sidewall with the exception of 265/70R17 and 255/80R17 which may have UTQG molded on the tire sidewall;

(6) tires designed and marketed exclusively for specialty tire (ST) use which, in addition, exhibit each of the following conditions:

(a) The size designation molded on the tire's sidewall is listed in the ST sections of the Tire and Rim Association Year Book,

(b) the designation "ST" is molded into the tire's sidewall as part of the size designation,

(c) the tire incorporates a warning, prominently molded on the sidewall, that the tire is "For Trailer Service Only" or "For Trailer Use Only",

(d) the load index molded on the tire's sidewall meets or exceeds those load indexes listed in the Tire and Rim Association Year Book for the relevant ST tire size, and

(e) either

(i) the tire's speed rating is molded on the sidewall, indicating the rated speed in MPH or a letter rating as listed by Tire and Rim Association Year Book, and the rated speed does not exceed 81 MPH or an "M" rating; or

(ii) the tire's speed rating molded on the sidewall is 87 MPH or an "N" rating, and in either case the tire's maximum pressure and maximum load limit are molded on the sidewall and either

(1) both exceed the maximum pressure and maximum load limit for any tire of the same size designation in either the passenger car or light truck section of the Tire and Rim Association Year Book; or

(2) if the maximum cold inflation pressure molded on the tire is less than any cold inflation pressure listed for that size designation in either the passenger car or light truck section of the Tire and Rim Association Year Book, the maximum load limit molded on the tire is higher than the maximum load limit listed at that cold inflation pressure for that size designation in either the passenger car or light truck section of the Tire and Rim Association Year Book;

(7) tires designed and marketed exclusively for off-road use and which, in addition, exhibit each of the following physical characteristics:

(a) The size designation and load index combination molded on the tire's sidewall are listed in the off-the-road, agricultural, industrial or ATV section of the Tire and Rim Association Year Book,

(b) in addition to any size designation markings, the tire incorporates a warning, prominently molded on the sidewall, that the tire is "Not For Highway Service" or "Not for Highway Use",

(c) the tire's speed rating is molded on the sidewall, indicating the rated speed in MPH or a letter rating as listed by the Tire and Rim Association Year Book, and the rated speed does not exceed 55 MPH or a "G" rating, and

(d) the tire features a recognizable off-road tread design;

(8) Tires designed and marketed for off-road use as all-terrain-vehicle (ATV) tires or utility-terrain-vehicle (UTV) tires, and which, in addition, exhibit each of the following characteristics:

(a) The tire's speed rating is molded on the sidewall, indicating the rated speed in MPH or a letter rating as listed by the Tire and Rim Association Year Book, and the rated speed does not exceed 87 MPH or an "N" rating, and

(b) both of the following physical characteristics are satisfied:

(i) The size designation and load index combination molded on the tire's sidewall does not match any of those listed in the passenger car or light truck sections of the Tire and Rim Association Year Book, and

(ii) The size designation and load index combination molded on the tire's sidewall matches any of the following size designation (American standard or metric) and load index combinations:

| American standard size | Metric size | Load index |
|---|---|---|
| 26x10R12 ........ | 254/70R/12 | 72 |
| 27x10R14 ........ | 254/65R/14 | 73 |
| 28x10R14 ........ | 254/70R/14 | 75 |
| 28x10R14 ........ | 254/70R/14 | 86 |
| 30x10R14 ........ | 254/80R/14 | 79 |
| 30x10R15 ........ | 254/75R/15 | 78 |
| 30x10R14 ........ | 254/80R/14 | 90 |
| 31x10R14 ........ | 254/85R/14 | 81 |
| 32x10R14 ........ | 254/90R/14 | 95 |
| 32x10R15 ........ | 254/85R/15 | 83 |
| 32x10R15 ........ | 254/85R/15 | 94 |
| 33x10R15 ........ | 254/90R/15 | 86 |
| 33x10R15 ........ | 254/90R/15 | 95 |
| 35x9.50R15 ..... | 241/105R/15 | 82 |
| 35x10R15 ........ | 254/100R/15 | 97 |

The products covered by this investigation are currently classified under the following Harmonized Tariff Schedule of the United States (HTSUS) subheadings: 4011.10.10.10, 4011.10.10.20, 4011.10.10.30, 4011.10.10.40, 4011.10.10.50, 4011.10.10.60, 4011.10.10.70, 4011.10.50.00, 4011.20.10.05, and 4011.20.50.10. Tires meeting the scope description may also enter under the following HTSUS subheadings: 4011.90.10.10, 4011.90.10.50, 4011.90.20.10, 4011.90.20.50, 4011.90.80.10, 4011.90.80.50, 8708.70.45.30, 8708.70.45.46, 8708.70.45.48, 8708.70.45.60, 8708.70.60.30, 8708.70.60.45, and 8708.70.60.60. While HTSUS subheadings are provided for convenience and for customs purposes, the written description of the subject merchandise is dispositive.

**Appendix II—List of Topics Discussed in the Final Decision Memorandum**

I. Summary
II. Background
III. Scope of the Investigation
IV. Subsidies Valuation Information
V. Analysis of Programs
VI. Analysis of Comments
  Comment 1: Whether International and U.S. Law Permits Commerce to Countervail Exchanges of Undervalued Currency
  Comment 2: Whether Commerce's Promulgation of the Currency Regulations in the Absence of Legislative Authority Is Outside Its Legal Authority
  Comment 3: Whether an Exchange of Currency Constitutes a Financial Contribution
  Comment 4: Whether the Currency Program Is Specific
  Comment 5: Whether the Vietnamese Dong Was Undervalued During the POI
  Comment 6: Whether Countervailing Currency Exchanges Results in a Double Remedy
  Comment 7: How the Subsidy Rate for the Currency Program Should Be Calculated
  Comment 8: Whether Import Duty Exemptions for Raw Materials Are Countervailable
  Comment 9: Whether Commerce Should Revise the Benchmark for the Provision of Natural Rubber to KTV
  Comment 10: Whether KTV's Preferential Rent is Countervailable

Comment 11: Whether Sailun Used the Program on Preferential Rent

Comment 12: Whether Commerce Should Revise the Benchmark for Preferential Rent for KTV

VII. Recommendation

[FR Doc. 2021–11265 Filed 5–26–21; 8:45 am]

BILLING CODE 3510–DS–P

## DEPARTMENT OF COMMERCE

## International Trade Administration

[A–580–908]

## Passenger Vehicle and Light Truck Tires From the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that passenger vehicle and light truck tires (passenger tires) from the Republic of Korea (Korea) are being, or are likely to be, sold in the United States at less than fair value (LTFV) for the period of investigation (POI) April 1, 2019, through March 31, 2020.

**DATES:** Applicable May 27, 2021.

**FOR FURTHER INFORMATION CONTACT:** Elfi Blum or Jun Jack Zhao, AD/CVD Operations, Office VII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0197 or (202) 482–1396, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On January 6, 2021, Commerce published in the **Federal Register** its preliminary affirmative determination in the LTFV investigation of passenger tires from Korea, in which we also postponed the final determination until May 21, 2021.[1] We invited interested parties to comment on the *Preliminary Determination.* A summary of the events that occurred since Commerce published the *Preliminary Determination* is found in the Issues and Decision Memorandum.[2]

[1] *See Passenger Vehicle and Light Truck Tires from the Republic of Korea: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 86 FR 501 (January 6, 2021) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum.

[2] *See* Memorandum, "Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Passenger Vehicle and Light Truck

### Scope of the Investigation

The products covered by this investigation are passenger tires from Korea. For a complete description of the scope of this investigation, *see* Appendix I.

### Scope Comments

During the course of this investigation, Commerce received scope comments from interested parties. Commerce issued a Preliminary Scope Decision Memorandum to address these comments.[3] We received comments from interested parties on the Preliminary Scope Decision Memorandum, which we addressed in the Final Scope Decision Memorandum.[4] With the exception of one revision to correct a typographical error, Commerce is not modifying the scope language as it appeared in the correction to the *Preliminary Determination.*[5] *See* Appendix I for the final scope of the investigation.

### Analysis of Comments Received

All issues raised in the case and rebuttal briefs that were submitted by parties in this investigation are addressed in the Issues and Decision Memorandum. A list of the issues addressed in the Issues and Decision Memorandum is attached to this notice at Appendix II. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn.*

### Verification

Commerce was unable to conduct on-site verification of the information

Tires from the Republic of Korea," dated concurrently with, and herby adopted by, this notice (Issues and Decision Memorandum).

[3] *See* Memorandum, "Passenger Vehicle and Light Truck Tires from the Republic of Korea, Taiwan, Thailand, and the Socialist Republic of Vietnam: Preliminary Scope Comments Decision Memorandum." dated December 29, 2020 (Preliminary Scope Decision Memorandum).

[4] *See* Memorandum, "Passenger Vehicle and Light Truck Tires from the Republic of Korea, Taiwan, Thailand, and the Socialist Republic of Vietnam: Scope Comments Final Decision Memorandum." dated concurrently with this notice (Final Scope Decision Memorandum).

[5] *See Passenger Vehicle and Light Truck Tires from the Republic of Korea, Taiwan, Thailand, and the Socialist Republic of Vietnam: Notice of Correction to Preliminary Determinations in Less-Than-Fair-Value Investigations,* 86 FR 7252 (January 27, 2021).

relied upon in making its final determination in this investigation. However, we took additional steps in lieu of on-site verification to verify the information relied upon in making this final determination, in accordance with section 782(i) of the Tariff Act of 1930, as amended (the Act).[6]

### Changes Since the Preliminary Determination

Based on our analysis of the comments received and our findings related to our requests for information in lieu of verification, we made changes to the margin calculations regarding Hankook Tire & Technology Co. Ltd. (Hankook) and Nexen Tire Corporation (Nexen). For a discussion of these changes, *see* the Issues and Decision Memorandum as well as the final analysis memoranda for Hankook and Nexen.[7]

### All-Others Rate

Section 735(c)(5)(A) of the Act provides that the estimated weighted-average dumping margin for all other producers and exporters not individually investigated shall be equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually investigated excluding rates that are zero, *de minimis,* or determined entirely under section 776 of the Act. Pursuant to section 735(c)(5)(B) of the Act, if the estimated weighted-average dumping margins established for all exporters and producers individually examined are zero, *de minimis* or determined based entirely on facts otherwise available, Commerce may use any reasonable method to establish the estimated weighted-average dumping margin for all other producers or exporters.

In this investigation, Commerce calculated estimated weighted-average dumping margins for Hankook and Nexen that are not zero, *de minimis,* or based entirely on facts otherwise

[6] *See* Commerce's Letters, "In Lieu of Verification Supplemental," dated March 8, 2021; *see also* Hankook's Letter, "Passenger Vehicle and Light Truck Tires from the Republic of Korea (A–580–908): Verification Questionnaire Response," dated March 16, 2021, and Nexen's Letter, "Passenger Vehicle and Light Truck Tires from South Korea: Response to Request for Information In Lieu of Verification," dated March 17, 2021.

[7] *See* Memoranda, "Analysis for the Final Determination of the Less-Than-Fair Value Investigation of Passenger Vehicle and Light Truck Tires from South Korea: Final Margin Analysis for Hankook Tire & Technology Co. Ltd." dated May 21, 2021; "Analysis for the Final Determination of the Less-Than-Fair Value Investigation of Passenger Vehicle and Light Truck Tires from South Korea: Final Margin Analysis for Nexen Tire Corporation." dated May 21, 2021.

Addendum 2

Issues and Decision Memorandum for the Final Determination in the
Countervailing Duty Investigation of Passenger Vehicle and Light Truck
Tires from the Socialist Republic of Vietnam (May 21, 2021)

Barcode:4124246-01 C-552-829 INV - Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-552-829
Investigation
POI:  01/01/2019 – 12/31/2019
**Public Document**
E&C/OI:  TES, MR

May 21, 2021

**MEMORANDUM TO:**     Christian Marsh
Acting Assistant Secretary
  for Enforcement and Compliance

**FROM:**     James Maeder
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

**SUBJECT:**     Issues and Decision Memorandum for the Final Determination in
the Countervailing Duty Investigation of Passenger Vehicle and
Light Truck Tires from the Socialist Republic of Vietnam

---

## I.     SUMMARY

The Department of Commerce (Commerce) determines that countervailable subsidies are being provided to producers of passenger vehicle and light truck tires from the Socialist Republic of Vietnam (Vietnam), as provided in section 705 of the Tariff Act of 1930, as amended (the Act). The mandatory respondents subject to this investigation are Kumho Tire (Vietnam) Co., Ltd. (KTV) and Sailun (Vietnam) Co., Ltd. (Sailun).  The period of investigation (POI) is January 1, 2019, through December 31, 2019.

After analyzing the comments submitted by interested parties, we have made changes to the *Preliminary Determination*.[1]  We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum.  Below is the complete list of issues in this investigation for which we received comments from interested parties:

Comment 1:     Whether International and U.S. Law Permits Commerce to Countervail
Exchanges of Undervalued Currency
Comment 2:     Whether Commerce's Promulgation of the Currency Regulations in the Absence
of Legislative Authority is Outside its Legal Authority
Comment 3:     Whether an Exchange of Currency Constitutes a Financial Contribution
Comment 4:     Whether the Currency Program Is Specific
Comment 5:     Whether the Vietnamese Dong Was Undervalued During the POI

---

[1] *See Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam:  Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 85 FR 71607 (November 10, 2020) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

Filed By: Thomas Schauer, Filed Date: 5/24/21 1:05 PM, Submission Status: Approved



Comment 6:     Whether Countervailing Currency Exchanges Results in a Double Remedy
Comment 7:     How the Subsidy Rate for the Currency Program Should Be Calculated
Comment 8:     Whether Import Duty Exemptions for Raw Materials Are Countervailable
Comment 9:     Whether Commerce Should Revise the Benchmark for the Provision of Natural Rubber to KTV
Comment 10:    Whether KTV's Preferential Rent is Countervailable
Comment 11:    Whether Sailun Used the Program on Preferential Rent
Comment 12:    Whether Commerce Should Revise the Benchmark for Preferential Rent for KTV

## II.    BACKGROUND

On November 10, 2020, Commerce published the *Preliminary Determination* in this proceeding. We subsequently issued questionnaires in lieu of verification of the questionnaire responses submitted by the respondents and received responses from the Government of Vietnam (GOV), KTV, and Sailun.[2]  Interested parties submitted case briefs[3] and rebuttal briefs[4] in March 2021.

## III.    SCOPE OF THE INVESTIGATION

The products covered by this investigation are passenger vehicle and light truck tires from Vietnam.  For a complete description of the scope of this investigation, *see* this memorandum's accompanying *Federal Register* notice at Appendix I.

## IV.    SUBSIDIES VALUATION INFORMATION

### A.    Allocation Period

We made no changes to, and interested parties raised no issues in their case briefs regarding, the allocation methodology used in the *Preliminary Determination*.  For a description of the allocation period and the methodology used for this final determination, *see* the *Preliminary Determination*.[5]

---

[2] *See* Commerce's Letters, Questionnaires in Lieu of Verification, dated February 18, 2021; *see also* GOV's Letter, "Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam:  GOV's Verification Questionnaire Response," dated February 26, 2021; KTVs Letter, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from Vietnam – Response to February 18 In Lieu of Verification Questionnaire," dated February 26, 2021; and Sailun's Letter, "Sailun Verification Questionnaire Response in the Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires ("PVLT") From Vietnam (C-552-829)," dated February 26, 2021.

[3] *See* Petitioner's Letter, "Passenger Vehicle and Light Truck Tires from Vietnam:  Submission of Case Brief," dated March 9, 2021 (Petitioner's Case Brief); GOV's Letter, "Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam:  GOV's Case Brief," dated March 9, 2021 (GOV's Case Brief); KTV's Letter, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from Vietnam — Case Brief of Kumho Tire (Vietnam) Co., Ltd.," dated March 9, 2021 (KTV's Case Brief); and Sailun's Letter, "March 9, 2021," dated March 9, 2021 (Sailun's Case Brief).  The petitioner is the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC.

[4] *See* Petitioner's Letter, "Passenger Vehicle and Light Truck Tires from Vietnam:  Submission of Rebuttal Brief," dated March 24, 2021 (Petitioner's Rebuttal Brief); and KTV's Letter, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from Vietnam — Rebuttal Brief of Kumho Tire (Vietnam) Co., Ltd.," dated March 24, 2021 (KTV's Rebuttal Brief).

[5] *See Preliminary Determination* at 5.

2

**B.      Attribution of Subsidies**

We made no changes to, and interested parties raised no issues in their case briefs regarding, the allocation methodology used in the *Preliminary Determination*.  For a description of the allocation period and the methodology used for this final determination, *see* the *Preliminary Determination*.[6]

**C.      Denominators**

We made no changes to the denominators used to calculate the subsidy rates in this final determination.  We have addressed Sailun's comments with respect to the denominator used to calculate a final subsidy rate for the currency program in our discussion at Comment 7.

**D.      Benchmarks and Interest Rates**

Interested parties raised issues in their case briefs regarding the benchmarks we used in the *Preliminary Determination*,[7] which are addressed in Comments 9 and 12.  Commerce has modified the calculation of the benchmark for land and natural rubber as described in Comments 9 and 12.

**V.      ANALYSIS OF PROGRAMS**

**A.      Programs Determined to Be Countervailable**

      *1.   Tax Benefits for New Investments*

We made no changes to our methodology for calculating the subsidy rate for this program.  The final subsidy rate is 2.78 percent *ad valorem* for Sailun.[8]

      *2.   Import Duty Exemptions on Imports of Raw Materials for Exporting Goods*

We made no changes to our methodology for calculating the subsidy rates for this program.  The final subsidy rate is 0.52 percent *ad valorem* for KTV and 0.03 percent *ad valorem* for Sailun.[9]

---

[6] *Id.* at 5-6.
[7] *See Preliminary Determination* PDM at 7-12.
[8] *See* Commerce's Memorandum, "Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam; Preliminary Determination Calculations for Sailun (Vietnam) Co. Ltd.," dated October 30, 2020 (Sailun Preliminary Analysis Memorandum).
[9] *See* Memorandum, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam:  Final Determination Analysis Memorandum for Kumho Tire (Vietnam) Co., Ltd.," dated concurrently with this memorandum (KTV Final Analysis Memorandum); and Sailun Preliminary Analysis Memorandum.

    *3. Exemption of Import Duties for Imports into Industrial Zones*

We made no changes to our methodology for calculating the subsidy rates for this program. The final subsidy rate is 0.04 percent *ad valorem* for KTV and 0.01 percent *ad valorem* for Sailun.[10]

    *4. Natural Rubber for Less Than Adequate Remuneration (LTAR)*

We made no changes to our methodology for calculating the subsidy rates for this program with the exception of the change to the benchmark described above. The final subsidy rate is 0.06 percent *ad valorem* for KTV and 0.11 percent *ad valorem* for Sailun.[11]

    *5. Currency Exchanges*

We made no changes to our methodology for calculating the subsidy rates for this program. The final subsidy rate is 1.69 percent *ad valorem* for KTV and 1.16 percent *ad valorem* for Sailun.[12]

    *6. Preferential Rent for Areas with Difficult Socio-Economic Conditions*

We made no changes to our methodology for calculating the subsidy rates for this program with the exception of the change to the benchmark described above. The final subsidy rate is 5.16 percent *ad valorem* for KTV and 2.14 percent *ad valorem* for Sailun.[13]

    *7. Other Subsidies*

Other Income Tax Preferences

We made no changes to our methodology for calculating the subsidy rates for this program. The final subsidy rate is 0.42 percent *ad valorem* for KTV.[14]

## B. Programs Determined to Be Not Used During the POI

    *1. Income Tax Preferences for Companies in Special Zones (Decree No. 124/2008/ND-CP)*
    *2. Income Tax Preferences for Exporters*
    *3. Exemption of Import Duties for Foreign-Invested Enterprises (FIEs)*
    *5. Exemptions or Reductions of Rent for Encouraged Enterprises*
    *6. Exemption or Reduction of Rent for Exporters*
    *7. Exemption or Reduction of Rent for FIEs*
    *8. Preferential Rent for Enterprises Located in Special Zones*
    *9. Export Promotion Grants*
    *10. Export Credits from the Vietnam Development Bank*

---

[10] *Id.*
[11] *Id.*
[12] *See* KTV Final Analysis Memorandum; and Sailun Preliminary Analysis Memorandum.
[13] *Id.*
[14] *See* KTV Final Analysis Memorandum.

Filed By: Thomas Schauer, Filed Date: 5/24/21 1:05 PM, Submission Status: Approved

11. *Interest Rate Support from the Vietnam Development Bank*
12. *Export Factoring by State-Owned Commercial Banks (SOCB)*
13. *Guarantees for Export Activities*
14. *Preferential Lending to Exporters by SOCB*
15. *Investment Support (Decree 51, Article 30)*
16. *Land Use Rights for LTAR for Encouraged Industries*
17. *Exemption of Import Taxes on Imports of Iron and Steel for Tire Production*
18. *Policy Lending for Industries Supporting Backbone Industries*

# VI. ANALYSIS OF COMMENTS

**Comment 1:** **Whether International and U.S. Law Permits Commerce to Countervail Exchanges of Undervalued Currency**

*GOV's Case Brief*:
- Commerce must terminate its investigation of the currency undervaluation program.[15]
- There is no record evidence that the Vietnamese Dong (VND) is undervalued for the purpose of supporting exports.[16]
- Commerce lacks the legal authority to investigate and countervail currency undervaluation programs.[17]
  - The General Agreement on Tariffs and Trade (GATT) and the Articles of Agreement of the International Monetary Fund (IMF) support the conclusion that no legal authority exists to treat undervalued currencies as countervailable subsidies.[18]
    - In order to facilitate this consultation process, the IMF and the World Trade Organization (WTO) have entered into the Agreement between the IMF and the WTO, which provides that the Dispute Settlement Body (DSB) may request that the IMF inform in writing whether a Member State's exchange rate is consistent with the IMF Agreement.[19]
    - The IMF's Article IV Consultations Staff Report makes plain that Vietnam has not violated the IMF provision that members of the IMF shall avoid manipulating exchange rates or the international monetary system in order to prevent effective balance of payments adjustment or to gain an unfair competitive advantage over other members.[20]
  - The Act and the Agreement on Subsidies and Countervailing Measures (SCM Agreement) do not provide authority to countervail undervalued currencies.[21]
    - The alleged currency undervaluation subsidy at issue here meets none of the criteria specified in Article 1.1 of the SCM Agreement or section 771(5)(D) of the Act as a financial contribution.[22]

---

[15] *See* GOV's Case Brief at 3-21.
[16] *Id.* at 3.
[17] *Id.* at 4-23.
[18] *Id.* at 5-8.
[19] *Id.* at 6.
[20] *Id.* at 7.
[21] *Id.* at 8-19.
[22] *Id.* at 8-11.

5

- Commerce has no legal basis for concluding that the exchange of currency is *de facto* specific because there is no subsidy program as interpreted by Article 2.1(c) of the SCM Agreement.[23]
  - Exchange rate policy does not provide a benefit as required by Article 1.1(b) of the SCM Agreement or section 771(5)(E) of the Act.[24]
  - Legislative attempts to amend the act to authorize countervailing undervalued currency failed, further demonstrating lack of statutory authority.[25]
    - If the Act already provided statutory authority to treat an undervalued currency as a countervailable subsidy then it would not have been necessary for the numerous attempts, which stretch back many years, to revise the law to provide such authority.[26]

*KTV's Case Brief*:
- The statute does not permit Commerce to impose countervailing duties to address foreign-government currency practices.[27]

*Sailun's Case Brief*:
- Commerce's finding on currency undervaluation was flawed and should be reversed for the final determination.[28]
- Commerce's determination in *Twist Ties from China* to postpone its determination nullifies Commerce's basis for initiation and preliminary countervailing of this program.[29]
- There are serious questions regarding specificity, financial contribution, and benefit that were deferred in *Twist Ties from China*.[30]
- Commerce should reverse its determination to countervail the currency undervaluation program in this investigation at least until the issues of law asserted in this case and *Twist Ties from China* are addressed, or at minimum, Commerce should defer the currency undervaluation analysis until the first administrative review.[31]

*Petitioner's Rebuttal Brief*:
- Commerce should continue to countervail Vietnam's currency undervaluation subsidy.[32]
  - Commerce should not defer countervailing currency undervaluation to the first administrative review.[33]

---

[23] *Id*. at 11-12.
[24] *Id*. at 16-19.
[25] *Id*. at 19-21.
[26] *Id*. at 19-20.
[27] *See* KTV's Case Brief at 14-24.
[28] *See* Sailun's Case Brief at 7-10.
[29] *Id*. at 7-8 (citing *Twist Ties from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 86 FR 10542 (February 22, 2021) (*Twist Ties from China*), and accompanying Issues and Decision Memorandum (IDM) at Comment 1).
[30] *Id*. at 8-9.
[31] *Id*. at 10.
[32] *See* Petitioner's Rebuttal Brief at 13-32.
[33] *Id*. at 13-17.

6

APPX000374

- By law, Commerce is required to include a final determination on this subsidy in its final results.[34]
- While Commerce may defer the consideration of subsidies discovered during an investigation if it concludes that insufficient time to investigate such subsidies remains before the scheduled date for the final determination, there is no such flexibility in the statute or the regulations for subsidies alleged in the petition.[35]
- In *Twist Ties from China*, Commerce was able to cite to only one case in which it has deferred consideration of an allegation alleged in a petition.[36]
- Even if the circumstances were sufficient to justify Commerce's deferral in *Twist Ties from China* and *Silicon Metal from Kazakhstan*, none of the same facts apply in this case. [37]

- Commerce has the authority to countervail currency undervaluation under the statute.[38]
  - International obligations do not constrain Commerce's authority under U.S. law.[39]
    - WTO dispute settlement determinations that have not been implemented by the United States are not legally binding, and they should have no impact on Commerce's determination in this investigation.[40]
  - Prior agency and Congressional action on currency undervaluation do not constrain Commerce's authority to countervail currency undervaluation.[41]
    - The cases cited by the respondents were based on Commerce's determination that the petitioners had failed to support their allegations with reasonably available information.[42]
    - At no point did Commerce find that currency undervaluation cannot legally be considered a countervailable subsidy, nor did Commerce specifically foreclose the possibility of ever countervailing currency undervaluation in the future.[43]
    - The GOV's and KTV's argument that Congress has precluded Commerce from countervailing currency undervaluation by failing to amend the statute after Commerce declined to investigate currency allegations in prior cases is flawed because those cases were based on the individual records of those cases and Commerce did not establish a fixed statutory interpretation regarding the countervailability of currency undervaluation for Congress to ratify.[44]

**Commerce's Position:** We are conducting this investigation pursuant to U.S. CVD law, specifically the Act and Commerce's regulations. To the extent that the GOV is raising arguments concerning certain provisions of the SCM Agreement in this proceeding, the U.S.

---

[34] *Id.* at 13-14.

[35] *Id.* at 14-15.

[36] *Id.* at 15-16 (citing *Silicon Metal from the Republic of Kazakhstan: Final Affirmative Countervailing Duty Determination*, 83 FR 9831 (March 8, 2018) (*Silicon Metal from Kazakhstan*), and accompanying IDM at Comment 6).

[37] *Id.* at 16-17.

[38] *Id.* at 17-24.

[39] *Id.* at 17-18.

[40] *Id.*

[41] *Id.* at 18-21.

[42] *Id.* at 18.

[43] *Id.* at 18-19.

[44] *Id.* at 19-20.

7

CVD law fully implements the United States' obligations under the SCM Agreement. U.S. law is fully compliant with our WTO obligations. Moreover, it is the Act and Commerce's regulations that have direct legal effect under U.S. law, and not the WTO Agreements or WTO reports. In this regard, WTO reports do not have any power to change U.S. law or to order such a change. Indeed, the SAA states:

> The WTO will have no power to change U.S. law. If there is a conflict between U.S. law and any of the Uruguay Round agreements, section 102(a) of the implementing bill makes clear that U.S. law will take precedence: 'No provision of any of the Uruguay Round Agreements, nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect.' Moreover, as explained in greater detail in this Statement in connection with the Dispute Settlement Understanding, WTO dispute settlement panels will not have any power to change U.S. law or order such a change. Only Congress and the Administration can decide whether to implement a WTO panel recommendation and, if so, how to implement it. [45]

Therefore, because our decisions here are consistent with the Act and our regulations, they are also consistent with our obligations under the SCM Agreement. The GOV's WTO-related arguments have no merit in this regard.

Further, in the *Final Rule* Commerce addressed the concerns raised by the GOV. Specifically, Commerce found nothing under U.S. law or the IMF Articles of Agreement that prevents a member of the IMF from analyzing whether an exchange involving an undervalued currency constitutes a countervailable subsidy under a nation's CVD law.[46] The GOV did not cite to any provision under U.S. law or within the IMF Articles of Agreement that prohibit the remedies set forth under the CVD law to be applied against imports that benefit from countervailable subsidies resulting from an undervalued currency. In addition, the GOV cites no language in the *Final Rule* that restricts in any manner the actions undertaken by the IMF or any language that infringes on any actions of the IMF. Additionally, the SCM Agreement explicitly includes certain currency-related practices in item (b) of the ''Illustrative List of Export Subsidies'' in Annex I;[47] thus, it is incorrect for the GOV to suggest that the IMF is the only international organization with jurisdiction over currency matters.

We disagree with the GOV that the Act does not provide Commerce with the authority to countervail exchanges of undervalued currencies on the grounds that there is no financial contribution or benefit and that it is not specific. We find that the GOV's undervaluation of currency provides a financial contribution, that it is specific, and that it provides a benefit. For a full discussion of our findings concerning financial contribution, specificity, and benefit, *see* Comments 3, 4, and 5, below.

---

[45] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol 1 (1994) (SAA) at 659.
[46] *See Modification of Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings*, 85 FR 6031, 6040 (February 4, 2020) (*Final Rule*).
[47] *See* WTO Agreement on Subsidies and Countervailing Measures (SCM Agreement).

Filed By: Thomas Schauer, Filed Date: 5/24/21 1:05 PM, Submission Status: Approved

We disagree with the GOV's assertion that the fact that legislative attempts to amend the Act to authorize countervailing undervalued currency failed supports the conclusion that Commerce lacks the statutory authority to treat currency undervaluation as a countervailable subsidy.  The U.S. Supreme Court has stated that "Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change."[48]  Thus, the fact that there have been such legislative attempts which failed is not relevant to our interpretation of the Act as it currently stands.

Finally, we disagree with Sailun that we should not countervail exchanges of undervalued currency or defer the analysis until the first administrative review.  Sailun contends that we must address the legal arguments concerning Commerce's authority to countervail currency-related subsidies and whether Commerce's currency undervaluation regulations are consistent with the statute.  We agree and have done so in this memorandum.  While it is true that we deferred our analysis in *Twist Ties from China* of many of the same issues that have been raised in investigation, the reason for deferral, in that case, was significant time constraints such that we were not able to fully consider parties' arguments; the CVD investigation was aligned with the antidumping duty (AD) investigation, but the latter was not postponed.[49]  We do not face such time constraints in this investigation.  Accordingly, there is no reason to defer our analysis of currency undervaluation.

**Comment 2:   Whether Commerce's Promulgation of the Currency Regulations in the Absence of Legislative Authority is Outside its Legal Authority**

*GOV's Case Brief*:
- Given the absence of legislative authority, Commerce's promulgation of its regulations that treat currency undervaluation as a countervailable subsidy is *ultra vires* and, thus, null and void.[50]
  - Applying the principles established in precedent from the Court of Appeals for the Federal Circuit, Commerce exceeded its authority in promulgating its currency undervaluation regulations.[51]

*KTV's Case Brief*:
- Commerce's 2020 modification to its regulations to permit the treatment of alleged currency undervaluation as a subsidy is unlawful and invalid.[52]
  - Commerce consistently held that an allegedly undervalued unified exchange rate does not constitute a countervailable subsidy for more than 35 years.[53]

---

[48] *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994) (*Central Bank of Denver*).

[49] *See Twist Ties from China* IDM at Comment 1.

[50] *See* GOV's Case Brief at 21-23.

[51] *Id.* at 21-22 (citing *FAG Italia S.p.A. v. United States*, 291 F.3d 806, 814-18 (Fed. Cir. 2002); and *Agro Dutch Indus. v. United States*, 508 F.3d 1024, 1033 (Fed. Cir. 2007) (*Agro Dutch*)).

[52] *See* KTV's Case Brief at 15-18.

[53] *Id.* at 15-16 (citing *Carbon Steel Wire Rod from Poland; Preliminary Negative Countervailing Duty Determination*, 49 FR 6768, 6771 (February 23, 1984); *Aluminum Extrusions from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 76 FR 18521 (April 4, 2011), and accompanying IDM at

9

- o Although Congress specifically considered legislation that would have overturned Commerce's practice and required currency manipulation to be treated as a countervailable subsidy, it assigned authority to address exchange rate manipulation to the Treasury Department, and not to Commerce.[54]
- o The courts have held that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change," that "{o}nce Congress has ratified a statutory interpretation through reenactment, agencies no longer have discretion to change this interpretation," and "if Commerce believes that the law should be changed, the appropriate approach is to seek legislative change."[55]

*Petitioner's Rebuttal Brief*:
- Commerce's currency undervaluation regulations comply with the statute.[56]
  - o The currency regulations are a permissible exercise of agency authority to interpret terms that already do exist in the statute, which is a key function of any administrative agency.[57]
  - o The currency regulations interpret two statutory concepts: specificity and benefit.[58]
  - o Commerce has promulgated specific rules to provide guidance on identifying and measuring a benefit such as detailed instructions for numerous programs not specified in the benefit portion of the statute, such as grants, debt forgiveness, direct and indirect tax and duty benefits, worker-related subsidies, internal transport and freight charges, and export insurance.[59]

**Commerce's Position:** Commerce addressed the respondents' concerns in the *Final Rule*, noting that Congress authorized Commerce, through the CVD law, to countervail injurious subsidies, regardless of what form they take.[60] That Congress intended for Commerce to have the authority to address currency undervaluation is evidenced by the Trade Agreements Act of 1979, which authorized Commerce to administer CVD investigations. As Commerce indicated in the *Final Rule*, the House Ways and Means Committee has explained "this shift 'will give these functions high priority within a Department whose principal mission is trade.'"[61] Therefore, Congress has decided that because Commerce's principal mission is trade, it should administer the CVD laws.

We disagree with the GOV's reliance on the court cases it cites to support the proposition that Commerce's promulgation of the currency regulation is outside of its legal authority because

---

comment 33; and *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75 FR 59213 (September 27, 2010), and accompanying IDM at comments 5-7).

[54] *Id*. at 17-18 (citing Appellate Body Report, *US – Large Civil Aircraft (2nd Complaint)*, WTO Doc. WT/DS353/AB/R, paragraph 662).

[55] *Id*. at 17 (citing *Lorillard v. Pons*, 434 U.S. 575, 580 (1978); and *GPX Int'l Tire Corp. v. United States*, 666 F.3d 732, 740 (Fed. Cir. 2011)).

[56] *See* Petitioner's Rebuttal Brief at 21-24.

[57] *Id*. at 21-22.

[58] *Id*. at 22-23.

[59] *Id*. at 23-24.

[60] *See Final Rule*, 85 FR at 6031.

[61] *Id.*

Congress has not amended the Act to expressly include currency undervaluation as a countervailable subsidy. Unlike the parties in *FAG Italia*, the GOV did not point to any evidence in the Congressional record to support its claim that Congress felt compelled to act on currency because Commerce did not have the statutory authority to countervail currency-related subsidies. Indeed, the fact that these proposals failed could simply show that Congress believed Commerce already had the authority to countervail subsidies resulting from currency undervaluation and, thus, did not feel the need to institute an amendment permitting this. The Supreme Court supported this interpretation of statutory authority in *Central Bank of Denver*, holding that "Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change."[62] Contrary to the Court's holding in *Agro Dutch* (that Commerce has "literally no power to act… unless and until Congress confers power upon it"),[63] the Supreme Court has explained that "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute."[64] Therefore, consistent with the *Final Rule*,[65] we continue to find that Commerce had statutory authority to promulgate the currency regulations.

**Comment 3: Whether an Exchange of Currency Constitutes a Financial Contribution**

*GOV's Case Brief*:
- The preliminary determination that the exchange of U.S. dollars (USD) for VND provides a financial contribution is contrary to law.[66]
  - Currency exchange is not an enumerated financial contribution, nor is it an example of a direct transfer of funds.[67]
  - Commerce's financial contribution analysis is misguided.[68]
    - Commerce has not made any attempt to link the GOV's exchange rate policies to the alleged provision of a financial contribution.[69]
    - The financial institutions that are exchanging currency are not providing any financial contribution themselves but are just exchanging currency at the market rate.[70]
    - Although Commerce mentions numerous times in its analysis that the exchange rate must be within the established band set by the State Bank of Vietnam (SBV), Commerce has not explained why this fact demonstrates that there is a financial contribution.[71]
    - The exchange of currency is not a one-sided transaction where the financial institution simply hands out money to any company or individual who asks for it; rather, those companies and individuals provided the financial institution with

---

[62] *See Central Bank of Denver*, 511 U.S. at 187.
[63] *See Agro Dutch*, 508 F. 3d at 1033.
[64] *Id.*
[65] *See Final Rule*, 85 FR at 6034.
[66] *See* GOV's case brief at 23-30.
[67] *Id.* at 23-24.
[68] *Id.* at 24-28.
[69] *Id.* at 24.
[70] *Id.*
[71] *Id.*

11

USD that was equivalent to the same amount of VND as determined by a market exchange rate.[72]

- There is a clear distinction between the examples enumerated in the statute as "direct transfer of funds" and the exchange of currency, and Commerce's analysis failed to take this into account.[73]
- Commerce's conclusion that all exchanges of currency somehow constitute a financial contribution also ignores legislative history and the negotiating history of Article 1 of the SCM Agreement.[74]
- Commerce has effectively conflated the concepts of financial contribution and benefit as it is viewing a financial contribution as an effect of alleged currency undervaluation.[75]

o The facts relied upon by Commerce to find that private banks with whom respondents exchanged currency are government authorities that provided financial contributions is erroneous.[76]

- Commerce mischaracterizes the descriptions of the types of activities that are conducted by authorized credit institutions and erroneously states that it is a "requirement" that is "dictated."[77]
- There is no evidence that the GOV has entrusted or directed private banks to subsidize companies via an undervalued currency.[78]

o Commerce has not explained how the exchange of currency constitutes a financial contribution in the form of the direct transfer of funds.[79]

*Petitioner's Rebuttal Brief*:
- Currency undervaluation provides a financial contribution.[80]
  o The GOV ignores the fact that Vietnamese laws and regulations require private banks to exchange currency within a very narrow range of the exchange rate dictated by the State Bank of Vietnam, thus entrusting or directing private banks to provide VND at an undervalued rate.[81]
  o When a financial institution provides VND to Vietnamese firms engaged in buying or selling goods internationally, it is providing a direct transfer of funds.[82]
  o It is immaterial to the question of financial contribution whether the financial institution also receives anything in exchange for the direct transfer of funds.[83]
  o There are many financial contributions where the government receives something in return from the recipient, including interest payments on a government loan, equity in

---

[72] *Id.* at 25.
[73] *Id.*
[74] *Id.* at 26.
[75] *Id.* at 27.
[76] *Id.* at 28-29.
[77] *Id.* at 29 (citing *Preliminary Determination* PDM at 22).
[78] *Id.*
[79] *Id.* at 30.
[80] *See* Petitioner's Rebuttal Brief at. at 24-25.
[81] *Id.* at 24.
[82] *Id.* at 25.
[83] *Id.*

12

> exchange for government debt forgiveness, and payments for the government provision of goods or services.[84]
>
> o If the exchange were truly at a market rate, there would still be a financial contribution, but there would be no benefit.[85]

**Commerce's Position:**  The GOV argues that despite Commerce's preliminary determination, an exchange of currency is "not an enumerated financial contribution, nor is it an example of a direct transfer of funds."  The GOV goes on to claim that Commerce is mistreating the exchange of currency as a direct transfer of funds when it is not a one-sided transaction; however, the exchange of currency is an equivalent exchange of different currencies between companies and financial institutions where each party is exchanging an equivalent commodity.  The GOV directs Commerce to the WTO Appellate Body in US-Large Civil Aircraft's (2nd Complaint), where the Appellate Body stated the "inclusion of specific examples {in Article 1.1(a)(1)(i)} nevertheless provides an indication of the types of transactions intended to be covered by the more general reference to 'direct transfer of funds.'"[86]  The GOV contends that the exchange of currency is unlike any of the illustrative examples of a direct transfer of funds enumerated in Article 1.1(a)(1) of the SCM Agreement and section 771(5)(D) of the Act.  According to the GOV, currency exchange is not a grant, loan or equity infusion, nor is it a loan guarantee, and, although Article 1.1(a)(1)(i) and section 771(5)(D)(i) of the Act do not provide an exhaustive list of all possible "direct transfer of funds," these examples and the calculation methodologies for these specific examples set forth in the SCM Agreement and the Act indicate that exchange of currency is not a contemplated financial contribution.

We disagree with the GOV's notion that because the exchange of currency is reciprocal in nature it cannot constitute a direct transfer of funds within the meaning of section 771(5)(D)(i) of the Act, as the GOV's arguments seem to suggest.  Loans and equity infusions are examples of financial contributions that are characterized by reciprocity in some fashion, where a government provides funds in exchange for money in the form of interest payments at a later date (*i.e.*, loans) or provides funds in exchange for shares of stock (*i.e.*, equity infusions).  The GOV appears to be reading a requirement into the statute that only grant-like transfers can constitute a direct transfer of funds – a requirement that plainly does not exist *via* the inclusion of loans and equity infusions as specifically enumerated examples of direct transfers of funds.  As we stated in the *Final Rule*, "{t}he word 'transfer suggests a conveyance, passing or exchange of something from one person to another.  The word 'funds' suggests money or some monetary resource."[87]  An exchange of currency clearly falls within this common meaning of the terms "transfer" and "funds."  Indeed, the SAA elaborates that "{s}ection 771(5)(D) of the Act, lists the four broad generic categories of government practices that constitute a 'financial contribution,'" and that "{t}he examples of particular types of practices falling under each of the categories are not intended to be exhaustive."[88]  The SAA goes on to explain that "{t}he Administration believes

---

[84] *Id.*

[85] *Id.*

[86] *See* GOV's Case Brief at 10 (citing Appellate Body Report, *US – Large Civil Aircraft (2nd Complaint)*, WTO Doc. WT/DS353/AB/R, paragraph 613).

[87] *See Final Rule*, 85 FR at 6034.

[88] *See* SAA at 927.  The GOV's arguments regarding Article 1.1(a)(1)(i) of the SCM Agreement and the Appellate Body report in *US – Large Civil Aircraft (2nd Complaint)* fail for the same reason.  It is clear that the examples of direct transfers of funds in that Article are only examples, and that the list is non-exhaustive.

13

APPX000381

that these generic categories are sufficiently broad so as to encompass the types of subsidy programs generally countervailed by Commerce in the past, although determinations with respect to particular programs will have to be made on a case-by-case basis."[89]

Furthermore, we find the GOV's argument that Commerce did not demonstrate how the State Bank of Vietnam's (SBV) set exchange rate demonstrates a financial contribution to be unpersuasive.  As fully explained in the *Preliminary Determination*, the SBV is the government authority that handles foreign exchange activities through various laws and decrees.[90] Commerce also detailed that only after an Authorized Credit Institution (ACI) receives approval from the SBV is it allowed to engage in the foreign exchange activities.[91]  Authorized Credit Institutions include the Vietinbank and Vietcombank, which have been found to be state-owned commercial banks (SOCBs).[92]  Furthermore, the record in this investigation confirms that Vietinbank and the Vietcombank are SOCBs with 64.46 percent and 74.8 percent majority government ownership respectively.[93]

As stated in the Financial Sector Memorandum, many high-ranking government or Communist Party of Vietnam (CPV) officials serve on the board of directors in an official government capacity to actively manage the banks' daily activities and ensure they are consistent with GOV policies and objectives.[94]  Furthermore, the memorandum goes on to explain that state ownership and control has been observed at the highest level of SOCBs' corporate structures and according to Vietcombank's annual report, these CPV officials are "armed with the confidence and expectations of the Central Party" and together with the leaders of Agribank and Vietinbank[95] work under the guidance and direction of the GOV and the SBV as principal managers of all aspects of the banks' operations.[96]  Accordingly, the banks are vested with government authority. Therefore, for all foreign currency exchange transactions involving the Vietinbank and Vietcombank, we find a direct financial contribution by an "authority" under section 771(5)(B) of the Act in the form of a direct transfer of funds within the meaning of section 771(5)(D)(i) of the Act.

The GOV claims that Commerce has effectively "conflated" the concepts of financial contribution and benefit by viewing a financial contribution as an effect of alleged undervalued currency undervaluation.  This is incorrect, and it is unclear from where in Commerce's *Preliminary Determination* or *Final Rule* the GOV is drawing such a conclusion.  As stated in the *Preliminary Determination*, for "all foreign currency exchange transactions involving the Vietinbank and Vietcombank, we preliminarily find a direct financial contribution by an 'authority' under section 771(5)(B) of the Act in the form of a direct transfer of funds within the meaning of 771(5)(D)(i)."[97]  The exchange of currency, *i.e.*, the transfer of funds, is the financial contribution, and it occurs regardless of whether the domestic currency is undervalued.  If

---

[89] *Id.*
[90] *See Preliminary Determination* PDM at 20.
[91] *Id.*
[92] *Id.*
[93] *Id.*
[94] *Id.*
[95] *Id.* at 20-21.
[96] *Id.* at 21.
[97] *Id.*

14

anything, it is the GOV who is conflating the concepts of financial contribution and benefit, as can be seen by references to a financial contribution as an effect of the alleged currency undervaluation. As we stated in the *Final Rule*, "we disagree that the question of whether 'equivalent value' was exchanged is relevant to a financial contribution analysis. If anything, this relates to the determination of benefit."[98]

Lastly, the GOV argues that there is no evidence that the GOV entrusted or directed private banks to exchange currency with the respondents. The GOV also mistakenly states that Commerce found the private banks to be government authorities and has also mischaracterized the types of activities that are conducted by the ACIs. Commerce disagrees with the GOV's arguments on the finding of entrustment or direction. As demonstrated in the *Preliminary Determination* with respect to private banks, under section 771(5)(B)(iii) of the Act, a subsidy exists when, *inter alia*, a government "makes a payment to a funding mechanism to provide a financial contribution, or entrusts or directs a private entity to make a financial contribution if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments," and a benefit is thereby conferred.

The SAA states that, "the Administration intends that the 'entrusts or directs' standard shall be interpreted broadly," and "plans to continue its policy of not permitting the indirect provision of a subsidy to become a loophole when unfairly traded imports enter the United States and injure a U.S. industry."[99]

The record evidence establishes that pursuant to Ordinance No. 28/2005/PL-UBTVQH11, of December 13, 2005, the State Bank of Vietnam's objective is to "carry out the purchase and sale of foreign currency on the domestic foreign currency market in order to achieve the objectives of the national monetary policy."[100] Article 30 of this law defines the SBV involvement to be applicable to the Vietnam dong supply and demand.[101] Specifically, Article 30 states that "{t}he exchange rate mechanism applicable to the Vietnamese dong shall be determined on the basis of supply and demand for the foreign currency market as regulated by the State.[102] The State Bank of Vietnam shall determine the exchange rate applicable to the Vietnamese dong in accordance with specific macro-economic objectives …"[103] Through the government's legislation, private banks, like GOV state-owned banks, must exchange USD for dong for any party wishing to do so, and the rates for that exchange must be within the SBV established rate of +/ – 3 percent to +/-1 percent.[104] As noted above, the SBV sets the official exchange rate within this narrow band.[105] Article 39 of the Consolidated Ordinance on the Foreign Exchange states that authorized credit institutions are responsible for meeting the demand for foreign currency of the

---

[98] *See Final Rule*, 85 FR at 6034.
[99] *See* SAA at 926.
[100] *See* Petition at Exhibit VI-53.
[101] *Id.*
[102] *Id.*
[103] *Id.*
[104] *Id.* at Exhibit VI-49.
[105] *Id.*

15

residential institutions or individuals for their payment of current transactions abroad.[106] Article 17 of Decree 70/2014/ND-CP stipulates that, "{w}ithin the existing amount of foreign currency, authorized credit institutions are responsible to satisfy the demand of residents and non-residents for foreign currency to perform current payment transactions, depending on the actual demand of each transaction."[107] This requirement is again dictated under Article 17, which states that "authorized credit institutions are responsible to satisfy the demands of residents and non-residents for foreign currency to perform current payment transactions, depending on the actual demand for each transaction."[108] We found that based on the GOV's implementation of law and decrees, the GOV requires private banks to exchange currency within a narrow exchange rate, thereby entrusting or directing private banks to provide dong at an undervalued rate. Vietnamese law itself recognizes that the supply and demand for foreign currency is heavily influenced by a state-controlled market.[109]

In short, by requiring private banks to exchange currency with any party wishing to do so, the GOV entrusts or directs private banks to provide this financial contribution. We further find that providing the contribution "would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments," within the meaning of section 771(5)(B)(iii) of the Act. This is because, as the GOV itself states, the private banks are engaging in the same practice as the government-owned banks like Vietinbank and Vietcombank, all within the parameters set by the GOV to engage in a "government subsidy function" within the meaning of section 771(5)(B)(iii) of the Act.[110] Accordingly, we find that KTV's and Sailun's exchanges of currency constitute financial contributions from "authorities" within the meaning of section 771(5)(B) of the Act and from private entities that were entrusted or directed by the GOV.

**Comment 4: Whether the Currency Program Is Specific**

*GOV's Case Brief*:
- Commerce's preliminary determination that the exchange of USD for VND is specific is not supported by substantial evidence and is contrary to law.[111]
  - Commerce's specificity analysis is inconsistent with its own regulation because it fails to include enterprises that buy goods internationally and instead focuses only on sellers of goods internationally.[112]
    - Commerce determined that "enterprises that buy or sell goods internationally are the predominant users of the GOV's currency undervaluation subsidy, and, therefore, this program is de facto specific under section 771(5A)(D)(iii)(II) of the Act."[113]

---

[106] *See* GOV Letter, "Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: GOV's Initial Questionnaire Response," dated August 24, 2020 (GOV IQR), at Exhibit F-3.
[107] *Id*. at Exhibit F-2.
[108] *Id*.
[109] *See Preliminary Determination* PDM at 22 (citing Petition at Exhibit VI-56).
[110] *See Hynix Semiconductor, Inc. v. United States*, 425 F. Supp. 2d 1287, 1305-7 (CIT 2006).
[111] *See* GOV's Case Brief at 30-34.
[112] *Id*. at 30-31.
[113] *Id*. (citing *Preliminary Determination* PDM at 24).

Filed By: Thomas Schauer, Filed Date: 5/24/21 1:05 PM, Submission Status: Approved

- Commerce only examined four channels of inflows and left out a key portion of the traded goods sector: those who buy goods internationally but do not sell goods internationally.[114]
- Commerce's failure to collect and analyze data on buyers of goods internationally renders its specificity analysis unsupported by substantial evidence and otherwise not in accord with law.[115]
- If Commerce is going to undergo an analysis of the traded goods sector, then it needs to at least analyze all members of that alleged group.[116]
  - Commerce's specificity determination is thus inconsistent with the purpose of the specificity test under WTO and U.S. precedent because the traded goods sector is too broad to constitute a specific group of enterprises.[117]
    - Commerce's analysis did not look at the industries or enterprises within the goods exports category to determine if the alleged currency subsidy was widely available and dispersed throughout the economy.[118]
    - The traded goods sector encompasses virtually all of the industries listed in the Statistical Summary Book of Vietnam for 2019, which demonstrates that there are over 750 thousand enterprises established in Vietnam operating in at least 18 different industries.[119]
    - Thus, the traded goods sector accounts for a significant portion of the Vietnamese economy, since members of the traded goods sector are in virtually all industries of the Vietnamese economy and thus any alleged subsidy provided to such a group would be spread throughout the entire Vietnamese economy, rendering it not specific.[120]
    - The Court of International Trade (CIT) has held that Commerce has an obligation to compare the industries receiving the subsidy to the industry makeup of the country at issue as a whole.[121]
    - The WTO has stated that while the word "group" does not indicate a numerical threshold pointing to a minimum or maximum number, the word suggests that the relevant enterprises must be "known and particularized."[122]
    - There is nothing known and particularized about all of the companies in Vietnam that buy and sell goods internationally.[123]

*KTV's Case Brief*:
- The alleged currency undervaluation program is not specific.[124]

---

[114] *Id.* at 31.
[115] *Id.*
[116] *Id.*
[117] *Id.* at 31-34.
[118] *Id.* at 31-32.
[119] *Id.* at 32.
[120] *Id.* at 32-33.
[121] *Id.* at 33 (citing *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1330 (CIT 2018)).
[122] *Id.* at 33 (citing, *e.g.*, Appellate Body Report, *United States – Countervailing Measures on Certain Hot-Rolled Carbon Steel Flat Products from India*, WTO Doc. WT/DS436/AB/R (adopted December 19, 2014), paragraph 4.365)).
[123] *Id.* at 34.
[124] *See* KTV's Case Brief at 14-15.

17

  o Classifying all exporters as a group of enterprises or industries is contrary to the statutory scheme.[125]

*Petitioner's Rebuttal Brief*:
- Currency undervaluation is specific.[126]
  - o The GOV's argument that Commerce erred by supposedly relying only on data regarding exports of goods, and not also imports of goods, is incorrect.[127]
    - Commerce adjusted the value of exports downward to account for intermediary imported inputs, thus arriving at a net export figure that took into account both exports and imports.[128]
  - o Commerce should reject the GOV's argument that the group of enterprises that buy and sell goods internationally is simply too broad to be specific.[129]
    - The statute and regulations contain no thresholds nor bright line rule regarding the number or size of industries or enterprises that may comprise a "group" for specificity purposes.[130]
    - Commerce's regulations clarify that there is no requirement to establish that there are shared characteristics among the enterprises that comprise a "group" for specificity purposes.[131]

**Commerce's Position:**  We disagree with the GOV's argument that the exchange of USD for VND is not specific, and we disagree with the GOV's argument that any such finding would be contrary to law.  We continue to find, based on the record evidence, that the exchange of USD for VND is specific within the meaning of section 771(5A)(D)(iii)(II) of the Act because the traded goods sector is the predominant user of the subsidy.  As we explained in the *Preliminary Determination*, the traded goods sector accounts for 71.94 percent of USD inflows into Vietnam, and therefore it is the predominant user of the subsidy.

The GOV argues that Commerce has limited its specificity analysis to sellers of goods internationally and therefore has failed to include enterprises that buy goods internationally in the traded goods sector.  However, this argument is contrary to fact.  In our *Preliminary Determination*, due to the GOV's inability to provide certain information which we requested for our evaluation, we based our specificity determination on information submitted to the IMF by the State Bank of Vietnam, which we placed on the record.[132]  Due to the fact that the State Bank of Vietnam does not collect USD inflows or USD trading by field or sector, we relied on USD inflows to Vietnam as a proxy for currency conversions.[133]  Using the State Bank of Vietnam data which was reported to the IMF, we calculated the total portion of USD inflow into the Vietnamese economy via exports of goods, exports of services, various forms of portfolio and direct investment, and earned income from abroad.  Additionally, in order to account for USD

---

[125] *Id.* at 15.
[126] *See* Petitioner's Rebuttal Brief at 26-27.
[127] *Id.*
[128] *Id.*
[129] *Id.* at 27.
[130] *Id.*
[131] *Id.*
[132] *See Preliminary Determination* PDM at 23.
[133] *Id.*

inflows which may not have resulted in currency conversion, we discounted Vietnam's exports of goods by the amount of intermediary goods inputs.[134]

Despite the GOV's arguments, this approach was guided by the specificity and currency provisions of the *Final Rule*. We note that our regulations state that "the Secretary normally will consider whether a benefit is conferred from the exchange of United States dollars for the currency of a country under review or investigation," or in this case USD for VND.[135] In other words, this subsidy program benefits companies exchanging USD for VND, not companies exchanging VND for USD. In this case, the GOV was unable to provide data on USD trading by field or sector. As a result, we relied upon USD inflows to Vietnam as a proxy for this information. Because companies that buy goods internationally are unlikely to be exchanging USD for VND, we have determined that it would not be appropriate to incorporate them into our analysis of USD inflows to Vietnam as a proxy for USD conversions to VND. In other words, since the subsidy in question benefits companies which exchange USD for VND, we relied upon the data available to us in this investigation to estimate the subsection of the overall users of this subsidy who could reasonably be determined to be in the internationally traded goods sector. As stated above, the record demonstrates that 71.94 percent of USD inflows into Vietnam were accounted for by companies that sell goods internationally adjusted to account for the impact of intermediary imported goods; including companies that primarily buy goods internationally in this analysis would not substantially change this percentage, because they do not bring USD into Vietnam. Therefore, despite the GOV's claims, Commerce did not err in its decision not to include companies which exclusively buy goods internationally in its analysis of the predominant users of this subsidy. However, that does not mean that companies, which buy goods internationally, were not included in our specificity analysis at all.

Commerce did consider the impact of companies engaged in international trade which buy intermediary imported goods. These companies that buy and sell goods internationally are included in Commerce's analysis. This further contradicts the GOV's claims that we have only considered entities which sell goods internationally. In evaluating the portion of USD inflows attributable to exporters of goods, we have considered and adjusted this value to reflect the portion of these goods which is attributable to intermediary imported goods that are subsequently used for re-exportation. This adjustment is indicative of the reality that Commerce has included information about companies which are engaged in both the buying and selling of goods internationally in its analysis.

The GOV further argues that the traded goods sector is too broad to constitute a specific group of enterprises. According to the GOV, we must look at the specific industries and enterprises within the internationally traded goods sector as a whole to determine if the subsidy was widely available in the economy. However, in the preamble to the *Final Rule*, we noted that while we do not disagree with the argument that "enterprises that buy or sell goods internationally could come from a variety of different industries" we find that this argument is "irrelevant under our existing regulations, because 19 CFR 351.502(b) states that there need not be shared characteristics among the enterprises that comprise a group."[136] Because there need not be

---

[134] *Id.* at 24.
[135] *See* CFR 351.528(a)(1)
[136] *See Final Rule*, 85 FR at 6039.

shared characteristics among the enterprises that comprise a "group," it does not matter if these enterprises represent unrelated industries. Further, the preamble to the *Final Rule* states that there is "no bright line rule at which an enterprise or industry or group of enterprises or industries would be deemed a predominant user or a disproportionate beneficiary. Indeed, in determining whether an enterprise or industry (or group thereof) is a disproportionate or predominant beneficiary of a subsidy, Commerce evaluates the relative share of the benefits received, as opposed to the absolute share of the benefit," on a case-by-case basis as we have done here.

With respect to the GOV's argument that the subsidy beneficiaries included in the group of entities that buy or sell goods internationally are not "known or particularized," we disagree. As we have demonstrated in our analysis of USD inflows into Vietnam's economy, the subset of companies that either sell goods internationally or that buy goods internationally is known to account for a particular portion of USD inflow in the Vietnamese economy. Further, our finding that companies that buy or sell goods internationally comprise a "group" for specificity purposes is consistent with Commerce's interpretation of the term "group" in other contexts. For example, we have found that state-owned enterprises comprise a "group" and that foreign-invested enterprises comprise a "group."[137]

With respect to KTV's argument that treating exporters as a "group" for domestic subsidy purposes turns the statutory scheme on its head, we acknowledge our statement to that effect from more than ten years ago. However, it is a fundamental principle of administrative law that an agency is allowed to change its practice, provided the change is reasonable and explained.[138] As explained in the *Final Rule*, upon further consideration of the statutory scheme and section 771(5A)(D) of the Act, treating companies that buy or sell goods internationally as a "group" is entirely consistent with the Act. The term "group" is not defined in the Act, and our finding in this investigation is consistent with the broad approach to that term that is reflected in 19 CFR 351.502(b) and our past practice. As explained in the SAA, the purpose of the specificity test "is to function as an initial screening mechanism to winnow out *only* those foreign subsidies which truly are broadly available *and* widely used throughout an economy."[139] Even if exchanges of USD for VND are broadly available in Vietnam, when nearly 72 percent of those exchanges benefit one particular sector of the economy, it cannot be said that the subsidy is widely used throughout the economy. Such concentrated usage of a subsidy is the opposite of wide usage, and the specificity test should not "winnow out" such a subsidy.

Thus, for the reasons enumerated above, we continue to find that companies that buy or sell goods internationally comprise a group that is the predominant user of this subsidy within the meaning of section 771(5A)(D)(iii)(II) of the Act, and therefore this subsidy is specific.

---

[137] *See Final Rule*, 85 FR at 6039 (citing Import Administration Policy Bulletin 10.1 and *Citric Acid and Certain Citrate Salts From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 74 FR 16836 (April 13, 2009), and accompanying IDM at Comment 16).
[138] *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also Huvis Corp v. United States*, 570 F. 3d 1347, 1354 (Fed. Cir. 2009).
[139] *See SAA* at 929 (emphasis added).

20

**Comment 5:  Whether the VND Was Undervalued During the POI**

*GOV's Case Brief*:

- The VND is not undervalued, and Commerce's preliminary determination of benefit is thus not supported by substantial evidence and is contrary to law.[140]
    - o Although the GOV provided detailed comments and information demonstrating the flaws in the Treasury Report,[141] Commerce did not address this information in the *Preliminary Determination*.[142]
    - o The Treasury Report is not sufficiently reliable for purposes of calculating a benefit.[143]
        - Treasury did not provide the data underlying its analysis, and thus its conclusions are unreliable for purposes of Commerce's benefit calculation.[144]
        - The Treasury Report suffers from a sense of false precision.[145]
            - · The exercise of valuing a currency is filled with uncertainty, and thus Treasury's estimate of 4.7 percent undervaluation, even with the uncertainty range of 4.2 percent to 5.2 percent, is not reliable.[146]
            - · There is no agreed-upon method to measure an equilibrium exchange rate, and multiple sources confirm that estimates of equilibrium exchange rates cannot be calculated with any certainty.[147]
            - · Evidence on the record shows that different models result in widely varying estimates of the degree of a single currency's undervaluation, with those estimates ranging from 0 percent to 56 percent.[148]
    - o Record evidence demonstrates that the VND is not undervalued.[149]
        - The GOV and other parties have placed evidence on the record from other, reputable sources that demonstrates that the VND is not undervalued.[150]
        - Commerce ignored the IMF's findings that the SBV intervened to limit depreciation and that Vietnam has made progress in responding to IMF recommendations regarding exchange rate flexibility.[151]
        - Other recent research supports that the VND has been fairly valued in recent years.[152]
            - · Sailun submitted a study which demonstrated that the VND was overvalued over the course of a 25-year period ending in 2017, including the period 2015 through 2017.[153]

---

[140] *See* GOV's Case Brief at 34-45.

[141] *See* Department of Treasury's Letter to Commerce, dated August 24, 2020 (Treasury Report).

[142] *See* GOV's Case Brief at 34.

[143] *Id*. at 35-41.

[144] *Id*. at 35-37.

[145] *Id*. at 37-41.

[146] *Id*. at 37.

[147] *Id*. at 37-38.

[148] *Id*. at 38.

[149] *Id*. at 41-45.

[150] *Id*. at 41.

[151] *Id*. at 42-43.

[152] *Id*. at 44-45.

[153] *Id*. at 44.

21

*KTV's Case Brief*:

- Commerce's preliminary finding that the GOV's practices resulted in the undervaluation of the VND is not supported by substantial evidence.[154]
    - Commerce cannot rely on the Treasury Report on alleged currency undervaluation when the data underlying the analysis in that report was not placed on the record of this proceeding or made available to the parties.[155]
        - The Treasury Report also makes clear that several key variables (including the variables for intervention in foreign exchange markets) were based on Treasury staff estimates and the data set used by Treasury had numerous undisclosed gaps.[156]
        - Due process required that Commerce obtain the full dataset purportedly relied upon by Treasury and place it on the record of this proceeding, so that the parties could have an opportunity to analyze the data, the gaps in the information, and the estimates that appear to have driven Treasury's conclusions.[157]
    - Treasury has admitted that the type of analysis underlying the Treasury Report does not provide an accurate or reliable measure of currency distortions.[158]
    - The Treasury Report identifies a range of possible results and does not provide any basis for choosing among them.[159]
        - The inconsistent magnitudes and signs of the foreign-exchange-intervention variables indicates that the predicted relationship between the foreign-exchange-intervention variables and exchange rates may be spurious.[160]

*Petitioner's Rebuttal Brief*:

- Currency undervaluation confers a benefit.[161]
    - The fact that there may exist different methods for measuring the benefit of a subsidy does not preclude Commerce from selecting a method to rely upon, as long as the method is reasonable.[162]
    - The research cited by GOV does not contradict Treasury's finding that VND was undervalued during the POI.[163]
        - The fact that the VND may have been overvalued as recently as 2017 cannot be used to predict the currency value in 2019, especially when the study itself has demonstrated constant fluctuations in VND valuation.[164]
    - KTV bases its claim that Treasury counseled against relying on an analysis such as was done in the Treasury Report on a 2007 paper which disclaimed that it was not a

---

[154] *See* KTV's Case Brief at 18-24.

[155] *Id*. at 18-20.

[156] *Id*. at 18-19.

[157] *Id*. at 19.

[158] *Id*. at 20-23.

[159] *Id*. at 23-24.

[160] *Id*.

[161] *See* Petitioner's Rebuttal Brief at 27-32.

[162] *Id*. at 28 (citing *Certain Softwood Lumber Products from Canada:  Final Results of the Countervailing Duty Administrative Review, 2017-2018*, 85 FR 77163 (December 1, 2020), and accompanying IDM at Comment 21).

[163] *Id*. at 28-29.

[164] *Id*.

> statement of U.S. Government, Department of the Treasury, or Administration policy and reflect solely the views of the authors.[165]
>
> o In no way did Treasury deny that analysis like the one used in the Treasury Report can provide an accurate or reliable measure of currency distortions as KTV claims.[166]
>
> o Although KTV claims that Treasury did not explain why it chose the model it did over alternative models, in fact, the alternate models served as a robustness check over the model in the Treasury Report, showing that the coefficient for foreign exchange intervention, is consistent in signs, significance, and magnitude across the range of models when estimators are changed.[167]

**Commerce's Position:** As an initial matter, our regulations at section 351.528(c) state that we will request that "Treasury provide its evaluation and conclusion" with respect to currency undervaluation. While Treasury provided detailed model information and support for its "evaluation and conclusion," the regulation does not require that Treasury provide all of the data that is used in its model and analysis. This is similar to other instances in the antidumping or CVD laws in which Commerce relies on expertise or advice from other agencies, or otherwise does not place underlying data on the record. For example, pursuant to 19 CFR 351.524(d)(2), Commerce relies on asset depreciation tables of the Internal Revenue Service for purposes of allocating non-recurring subsidies, without placing the IRS's underlying data on the record. Similarly, section 781(e) of the Act provides that in certain anti-circumvention inquiries, the U.S. International Trade Commission may provide advice to Commerce, but there is no requirement that the Commission provide to Commerce its underlying analysis or data upon which it bases this advice. As yet another analogy, 19 CFR 351.301(c)(3)(i) allows parties to submit benchmark information to measure the adequacy of remuneration, and there is no requirement that they submit specific underlying sale-by-sale data, rather than aggregate data. Along these lines, we note that the GOV did not place on the record the underlying data used in reports on which it relies, such as IMF reports. For this investigation, Treasury, consistent with section 351.528(c) of our regulations, provided its "evaluation and conclusion" as to whether the VND is undervalued in a manner that is compliant with the regulation.

The GERAF model used by Treasury in this proceeding to assess the VND's valuation is similar to existing equilibrium real effective exchange rate (REER) models – including, most notably, the multilaterally consistent Current Account balance model developed and used by the IMF in its External Balance Assessment (EBA) methodology.[168] The GERAF model builds upon the IMF's REER EBA model by adding a safe asset index variable measuring the relative safeness of currencies and government securities, by incorporating and quantifying the impact of foreign exchange intervention on current accounts across countries with varying degrees of capital account mobility, and by including various other macroeconomic variables.[169] The GERAF model also adds precision to under/over multilateral valuation assessments of currencies by also extending its analysis to include valuation assessments vis-à-vis the USD. Finally, the GERAF

---

[165] *Id.* at 28-29.
[166] *Id.* at 30.
[167] *Id.* at 30-31.
[168] *See* Treasury Report at 2.
[169] *Id.* at 2-4.

model adds an additional analytic element by estimating the depth to which the under/over valuation was attributable to government intervention.[170]

In response to the GOV's claim that record evidence demonstrates that the VND was not undervalued in 2019, Commerce notes that the IMF concluded in the Article IV Report on the record that the VND was undervalued by 8.4 percent in 2018, the year prior to the POI.[171]  The GOV claims that Commerce should consider the results of the IMF's equilibrium real exchange rate model, rather than the CA model, in assessing the level of VND undervaluation.[172]  However, the 2019 IMF Article IV report on the record showing 15.2 percent overvaluation in 2018 based on the multilateral real exchange rate model states that the fit (*i.e.*, the extent to which the data in the model accurately assess the VND's valuation) in the model is "poor" and that the IMF therefore relied on the results of the CA regression, where the level of undervaluation is 8.4 percent, for its assessment.[173]  In any event, the IMF undervaluation estimate on the record does not cover 2019.  Similarly, Sailun's report on the VND's value in the 25-year period preceding 2017 is not relevant to the POI of 2019.[174]  As such, despite the GOV's claims, the record evidence does not demonstrate that the VND was not undervalued in 2019.  Although not technically relevant to the POI, the record also fails to demonstrate that the VND was not undervalued in the years immediately preceding the POI.  In fact, the evidence on the record demonstrates that the opposite is true.

Concerning government action on the exchange rate, Commerce notes that the GOV's claim that any VND undervaluation during the POI is a function of supply and demand and not due to policies put in place by the GOV to undervalue the currency does not provide any record evidence supporting such a statement.[175]  Furthermore, Commerce acknowledges that the record evidence submitted by the GOV shows that the SBV intervened to limit depreciation and that Vietnam has made progress in responding to IMF recommendations regarding exchange rate flexibility but also recognizes that the record information supporting this claim is from an IMF report (the Article IV report) covering only the first quarter of 2019 and not the whole year.  Furthermore, the same IMF report found that the GOV intervened to influence the value of the VND to keep it within a narrow band yet provided no details on the extent of intervention in either direction in 2019.[176]  The IMF only noted that the GOV kept the VND "broadly stable" *vis-à-vis* the U.S. dollar in the first quarter of 2019.[177]  Lastly, Treasury explained that the GERAF model is able to isolate the effect of individual domestic policies (*e.g.*, government action on the exchange rate) and assess to what extent, if any, that policy contributed to the domestic currency's valuation, thereby allowing Treasury to disaggregate the effects of the GOV's intervention into actions that may have contributed to currency undervaluation.[178]  Thus, although the GOV may without any supporting documentation dispute the accuracy of the

---

[170] *Id.*
[171] *See* GOV Response to Treasury Report at Attachment 2 (IMF Article IV Report for Vietnam, July 2019), 36.
[172] *See* GOV's Case Brief at 44-45.
[173] *See* GOV Response to Treasury Report at Attachment 2 (IMF Article IV Report for Vietnam, July 2019), 36.
[174] *See* GOV's Case Brief at 44.
[175] *Id.* at 41-42.
[176] *See* GOV Response to Treasury Report at Attachment 2 (IMF Article IV Report for Vietnam, July 2019), 1.
[177] *Id.* at 12.
[178] *See* Treasury Report at 9 (Box 1).

24

estimate, its claim that the GERAF model cannot estimate the effect of government action on the exchange rate is not corroborated by the record evidence.

The GOV argues that the results of the GERAF model are ambiguous and unreliable because the model provides a range of possible results without providing any basis for choosing among them. However, the alternative estimators and extensions in Appendix C of Treasury's submission strengthen the results of the analysis by serving as robustness checks for the GERAF model adopted by Treasury (in Column 1 of Appendix C1). The GOV also claims that Treasury's own analysis of the six alternate estimators included in its submission indicate that the GERAF model is demonstrably less accurate than the alternative models provided in Appendix C. This claim is not corroborated by the facts on the record. Commerce acknowledges that the R-squared of the GERAF model (.385) is lower than the R squared of the other six alternative estimators in Table C1.[179] However, as pointed out by the petitioner, the root mean square error is the second lowest in the GERAF model (indicating relatively high absolute fit compared to the other estimators in Table C1).[180] In general, the P values of the GERAF model regressors are also comparatively low and the coefficient for the foreign exchange intervention (FXI/GDP) regressor is consistent in signs and magnitude and generally highly significant (at the 1 percent level) across the range of models in Tables C1-C3.[181] Therefore, despite the GOV's claims, the robustness indicators are generally consistent and not indicative of the GERAF model's inaccuracy when compared to the other iterations provided in Appendix C.

The comments in the GOV rebuttal report argue that Treasury overlooked certain aspects of Vietnam's economy or failed to consider other relevant facts and that, as a result, the results of its model may be inaccurate.[182] However, none of the concerns brought up by the GOV in its rebuttal demonstrate that Treasury's model is unusable or demonstrate any specific instances where the data or results are clearly flawed. The GOV also argues that there is no agreed-upon method used to measure an equilibrium exchange rate and puts multiple sources on the record claiming that estimates of equilibrium exchange rates cannot be calculated with any certainty.[183] Furthermore, KTV argues that Treasury has previously cautioned that, when assessing equilibrium exchange rates, multiple models should be considered and their results compared.[184] However, the Treasury paper cited to by respondents did not constitute an official U.S. government policy statement but rather reflected only the views of the authors.[185] As is the case with all undervaluation calculations, we recognize that the 4.7 percent bilateral undervaluation in the GERAF model used by Treasury in this proceeding is an assessment of the undervaluation (as evidenced by the uncertainty range included with the calculation).[186] While Commerce agrees with the GOV that there may be other methods of measuring an equilibrium exchange rate, we note that Treasury's analysis appears reasonable and the GOV has not provided any record information invalidating Treasury's model. Therefore, consistent with 19 CFR 351.528

---

[179] *Id.* at 25.
[180] *Id.*
[181] *Id.* at 26-27.
[182] *See* GOV's Case Brief at 35-41.
[183] *Id.* at 37-38.
[184] *See* KTV Case Brief at 20-22.
[185] *See* KTV's September 8 Submission at Attachment 7 ("McCown et al., "Equilibrium Exchange Rate Models and Misalignments: Occasional Paper No. 7," at 2 (Mar. 2007)).
[186] Treasury Report at 2.

25

and based on the facts on the record of this proceeding, Commerce finds that Treasury's model provides a reasonable and economically sound methodology for assessing the level of VND undervaluation due to government action on the exchange rate and will use the model as a basis for calculating the amount of benefit resulting from its undervaluation in this final determination.

**Comment 6:   Whether Countervailing Currency Exchanges Results in a Double Remedy**

*GOV's Case Brief*:
- Commerce's affirmative currency undervaluation determination results in a prohibited double remedy.[187]
    - Imposing a double remedy in the context of simultaneous AD and CVD investigations is unlawful, as was found by the WTO Appellate Body and the U.S. Court of Appeals for the Federal Circuit (CAFC).[188]
    - No element of the normal value reflects a value denominated in the local currency under Commerce's non-market economy (NME) methodology.[189]
    - Thus, it is not clear that any benefit to the respondent exporter from currency undervaluation remains when the alleged undervalued currency is not a part of the calculation of normal value.[190]
    - The surrogate value eliminates any benefit from any alleged currency undervaluation because it ignores any benefit that might be reflected in the cost or price of the subject merchandise by substituting a different value for each and every cost and price.[191]
    - Although the statute adjusts for double counting by reducing the amount of the AD duty by the amount of the countervailable benefit that is being double counted, it is not appropriate in the case of currency undervaluation because the methodology for determining normal value in an NME country eliminates any currency-derived benefits because the NME methodology itself eliminates currency as a factor and, therefore, any benefits that might be derived from an undervalued currency.[192]
    - When the current legislation was passed neither the United States nor any other WTO Member considered currency undervaluation to be a subsidy.[193]
    - At least with respect to NME countries that are subject to simultaneous AD and CVD investigations, one of the most essential elements of a countervailable subsidy, conferring a benefit, simply does not exist except as a hypothetical construction.[194]

**Commerce's Position:**  Congress amended the Act to add section 777A(f) of the Act to provide Commerce with the authority to provide adjustments for double remedies if any were determined to exist.  In antidumping proceedings, in applying section 777A(f) of the Act, Commerce

---

[187] *See* GOV's Case Brief at 45-48.
[188] *Id.* at 46 (citing Appellate Body Report, *United States – Definitive Anti-Dumping and Countervailing Duties on Certain Products from China*, WT/DS539/AB/R (March 11, 2011) (Appellate Body Report WT/DS539/AB/R); and *GPX International Tire Corp. v. United States*, 645 F. Supp. 2d 1231 (CIT 2009), *affirmed*, 666 F.3d 732 (Fed. Cir. 2011), *rehearing granted*, 678 F.3d 1308 (CAFC 2012) (*GPX*)).
[189] *Id.* at 47.
[190] *Id.*
[191] *Id.*
[192] *Id.* at 47-48.
[193] *Id.* at 48.
[194] *Id.*

examines the criteria enumerated in section 777A(f)(1)(A)-(C) of the Act; if a subsidy meets these criteria, Commerce reduces the dumping margin by the estimated amount of the increase in the weighted-average dumping margin due to a countervailable subsidy, subject to a specified cap.[195]

Thus, the statute provides for an accurate means of imposing CVDs on the goods of NME-designated countries, while at the same time using the NME AD methodology. Furthermore, because this concerns the dumping margin, and not the CVD subsidy rate, the appropriate venue for raising double-remedy issues is in the context of the concurrent AD investigation. Indeed, there is no statutory authority for adjusting the CVD subsidy rate to account for potential double remedies.

**Comment 7: How the Subsidy Rate for the Currency Program Should Be Calculated**

*Sailun's Case Brief*:
- Commerce used the wrong denominator in its calculation of the subsidy rate for currency undervaluation: the denominator should be Sailun's total sales, not USD sales.[196]
- Under 19 CFR 351.525, subsidies are either (1) export subsidies attributable to total export sales to all markets; (2) domestic subsidies that are "untied" and attributable to all sales; or (3) subsidies that are tied to particular markets or particular products.[197]
- Although Commerce must demonstrate with sufficient evidence that currency undervaluation is tied to USD sales in order to use this category of sales as the denominator, it conducted no such analysis in the *Preliminary Determination*.[198]
- There is no evidence on the record that at the time Sailun converted its USD holdings to VND that the purpose was to make or benefit USD sales; Sailun does not obtain USD from U.S. sales only, but also from loans.[199]
- Sailun receives dollars from a variety of sources, some of which it converts to VND and some of which it does not and there is no information on the record identifying the source of the USD that Sailun converted and, thus, there is no possible way for the authority that is converting the currency to know that USD came from exports sales, as opposed to other sources.[200]
- Further support for finding currency undervaluation to be an untied subsidy is Commerce's specificity analysis.[201]

*Petitioner's Rebuttal Brief*:
- Commerce tied the benefit to the correct sales denominator.[202]
  - Under 19 CFR 351.525(b)(4) and (5), Commerce will attribute a subsidy only to the products to which the relevant subsidy is tied.[203]

---

[195] *See* section 777A(f)(1)-(2) of the Act.
[196] *See* Sailun's Case Brief at 10-13.
[197] *Id*. at 10.
[198] *Id*. at 10-11.
[199] *Id*. at 11-12.
[200] *Id*. at 12.
[201] *Id*. at 12-13.
[202] *See* Petitioner's Rebuttal Brief at 32.
[203] *Id*.

o   In this case, the currency undervaluation subsidy is tied to earnings of USD, as respondents only benefit from the subsidy by the extent to which they have USD available to exchange for VND.[204]

**Commerce's Position:**  When Commerce promulgated the *Final Rule*, one commenter argued that, "if the benefit from an undervalued currency is limited to the excess domestic currency a firm receives in exchange for U.S. dollars, the sales denominator should also be limited to sales in U.S. dollars."[205]  In response, Commerce stated "{t}he essential concept, with which we agree, behind the argument of the first commenter is that the numerator and the denominator for our subsidy calculations must be on the same basis. This is the fundamental premise of our attribution regulation codified at 19 CFR 351.525."[206]  In attributing the benefit from the currency program to sales denominated in USD, we are guided by this fundamental "matching" principle.

In this investigation, Sailun provided an Excel spreadsheet listing receipt of all USD which it converted into local currency during the POI.[207]  Because the numerator is derived from the conversion of USD into VND, we conclude that the benefit received as a result of converting USD into VND should be divided by a denominator consisting of earnings of USD. Accordingly, it is appropriate to use the sales value of all sales which were denominated in USD as the denominator in the calculation of the subsidy rate.  Furthermore, we find it inappropriate to use total sales as the denominator as suggested by Sailun.  Sales denominated in currencies other than USD cannot result in a benefit under this subsidy program.

We further find Sailun's counterarguments to be unpersuasive.  Although Sailun observes that it had loans denominated in USD, it presumably did not borrow in USD merely to convert them to VND.  Indeed, the record indicates that Sailun had requirements for USD beyond conversion to VND.[208]  Accordingly, we conclude that the fact that Sailun had loans denominated in USD is not sufficient reason for using the value of all sales regardless of the currency in which they were denominated as the denominator instead of the value of the sales which actually generated the benefit, *i.e.*, sales denominated in USD.

Sailun further argues that there is no possible way for the authority that is converting the currency to know that USD came from export sales, as opposed to other sources.  However, we did not determine that currency undervaluation is an export subsidy.[209]  Moreover, we requested that Sailun report "the total sales value on an FOB basis for all sales which were denominated in U.S. dollars, including sales to the United States and sales in Vietnam or to third countries for

---

[204] *Id.*

[205] *See Final Rule*, 85 FR at 6036.

[206] *Id.* at 6037.

[207] *See* Sailun's Letter, "Sailun Initial Questionnaire Response in the Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires ("PVLT") From Vietnam (C-552-829)," dated August 24, 2020 (Sailun IQR), at 26 and Exhibit P.G.5.

[208] Because the information we are referring to is proprietary in nature, *see* Memorandum, "Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam; Sailun (Vietnam) Co., Ltd.; Analysis for the Final Determination," dated concurrently with this memorandum, for a discussion of this information.

[209] *See Preliminary Determination* PDM at 23-24; *see also* Comment 4, above.

28

which you received USD,"[210] and Sailun did so.[211]  Thus, the decisive factor is not whether they were export sales but whether they were denominated in USD.

Finally, we disagree with Sailun's contention that our specificity analysis indicates the subsidy is untied.  In fact, Sailun appears to have mischaracterized our specificity analysis in a way that leads to a conclusion which is opposite from the facts on the record.  As explained above, the predominant user of this subsidy is the group composed of enterprises that buy or sell goods internationally.  This is because companies that sell goods internationally accounted for approximately 72 percent of USD inflows into Vietnam.  When we look at what goes into a denominator, we are concerned with identifying sales which the GOV intended to incentivize.  It is unlikely that the undervaluation of the VND against the USD could be intended to subsidize entities which are not receiving USD and exchanging it for VND.  Furthermore, while the attribution rules at 351.525 do not specifically contemplate subsidies to sales denominated in a particular currency, our preamble does state that we "recognize that there may be many scenarios where these attribution rules do not fit precisely the facts of a particular case."[212]  Accordingly, it is only logical to attribute the benefit from this subsidy to sales denominated in USD.

Accordingly, we have not revised the denominator for the purpose of calculating the subsidy rate for this program.

**Comment 8:  Whether Import Duty Exemptions for Raw Materials Are Countervailable**

*KTV's Case Brief*:
- The import-duty exemptions received by KTV represent a non-countervailable refund of import duties on inputs that were consumed in the production of the exported product under the Vietnamese duty drawback system.[213]
- Commerce concluded that KTV's entire import-duty exemption for imported raw materials conferred a benefit, because the GOV's import-duty exemption program did not adequately account for resalable waste by providing an exemption for it.[214]
- Commerce found that the system did not meet the regulatory requirements under 19 CFR 351.519(a)(4)(i) for calculating a benefit on an amount other than the total amount of exempted duties.[215]
- The Vietnamese system permits duty exemptions on imported inputs that will be "lost" as scrap and sold and that inclusion does not provide a basis for classifying the entire duty exemption as a subsidy.[216]

---

[210] *See* Commerce's Letter, "Countervailing Duty Investigation on Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam," dated October 8, 2020, at 1 (emphasis added).

[211] *See* Sailun's Letter, "Sailun Second Supplemental Questionnaire Response in the Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires ("PVLT") From Vietnam (C-552-829)," dated October 19, 2020, at 1 and Exhibit SQ UV-1.

[212] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65400 (November 25, 1998).

[213] *See* KTV Case Brief at 25-29.

[214] *Id.* at 25.

[215] *Id.*

[216] *See* KTV Case Brief at 26 (citing 19 CFR 351.519(a)(1)(ii) ("In the case of an exemption of import charges upon export, a benefit exists to the extent that the exemption extends to inputs that are not consumed in the production of the exported product, making normal allowances for waste....")).

29

APPX000397

- o KTV was required by Vietnamese law to determine the normal usage and loss rates of imported inputs for each exported product code, and to maintain records of its calculations which are subject to periodic review by the Vietnamese Customs Authority.[217]
  - o Import-declaration forms use codes to indicate whether the imported materials will be used to manufacture goods destined for exportation or not, and those imported to be used to produce exports are exempted from duties.[218]
  - o At export, an exporter files a declaration which informs the Vietnamese Customs Authority that the declared products are manufactured from imported materials and inputs.[219]
  - o Exporters are required to submit (1) a year-end report to the Vietnamese Customs Authority listing the imported raw materials used to produce tires for export;[220]and (2) a separate annual report listing inventory of finished products.[221]
  - o The duty-exemption claims under this program are subject to verification by the GOV and KTV was verified, but not during the POI.[222]
- To the extent that the duty refunds were excessive, Commerce may only impose countervailing duties for the excess refund amount, and not for the full duty exemption.[223]
- The GOV's implementation of the duty-exemption program satisfies the first exception to the duty drawback benefit calculation provided 19 CFR 351.519(a)(4), because its system reasonably and effectively confirms the consumption of inputs in the exported products.[224]
- Even if that were not the case, the GOV's implementation would satisfy the second alternative, because the government "has carried out an examination of actual inputs involved to confirm which inputs are consumed in the production of the exported product, and in what amounts."[225]
- Under either alternative, Commerce is not permitted to countervail the entire amount of the duty exemption allowed by the GOV.[226]
- The GOV permitted KTV to claim an import exemption for the actual quantities consumed in its exported products, and an additional amount for waste losses.[227]

---

[217] *Id.* at 25 (citing GOV IQR at Appendix A-4-1).

[218] *Id.* at 26 (citing GOV IQR at 8; and Sailun IQR at 13).

[219] *Id.* (citing GOV IQR at 8).

[220] *Id.* (citing KTV Letter, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from Vietnam — Response to the Department's September 4 Supplemental Questionnaire," dated December 9, 2020 (KTV SQ1), at Appendix S-2).

[221] *Id.* (citing KTV SQ1 at Appendix S-3).

[222] *Id.* (citing GOV's Letter "Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: GOV's First Supplemental Questionnaire Response," dated October 6, 2020 (GOV SQ1), at 3 (This occurred outside the POI)).

[223] *Id.* at 27-28 (citing 19 C.FR 351.519(a)(4)).

[224] *Id.* at 28.

[225] *Id.*

[226] *Id.*

[227] *Id.*

*GOV Case Brief:*

- The GOV administers import duty exemptions in a reasonable and effective manner consistent with Vietnamese accounting standards, with which Commerce, at least in this investigation, has not taken issue, therefore Commerce should reverse its preliminary finding that the GOV's systems and procedures do not meet the requirements of 19 CFR 351.519(a)(4)(i).[228]
- In the *Preliminary Determination*, Commerce found that the GOV's administration of the import duty exemption program did not meet the requirements of 19 CFR 351.519(a)(4)(i) because "the GOV's system does not account for resalable waste, because such waste is exempt from duties."[229]
  - Citing *Hot-Rolled Steel from Thailand*, Commerce explained that it "consider{s} whether the production process produces resalable scrap to be essential to the calculation of normal allowance for waste."[230]
  - The production of resalable scrap may render an import duty exemption system unreasonably administered if the resalable scrap is not accounted for in calculating the company's waste, as in *Hot-Rolled Steel from Thailand*, but here there is no basis to find the system unreasonably administered simply because companies are allowed to sell scrap in the domestic market.[231]
- The GOV accounts for resalable scrap just as it accounts for and monitors all waste that is produced in the manufacture of exported goods.[232]
  - Commerce's *Preliminary Determination* rests on a misunderstanding of its analysis in *Hot-Rolled Steel from Thailand* in which it was concerned that the reported norm did not account for resalable scrap, a fact which immediately undermined the credibility of that norm and the Thai government's acceptance of the reported norm.[233]
  - Here, the GOV customs authority directly inspected the production norms reported by Sailun during the POI (and inspected KTV in a year prior to the POI).[234]
  - In *Hot-Rolled Steel from Thailand* the Thai government did not have a reasonable or effective system for monitoring because the system did not properly account for which inputs are consumed in the exported product and in what amounts.[235]
  - In contrast, the record evidence in this investigation shows that the GOV does account for resalable scrap sold by companies, just as it accounts for all waste, when monitoring companies' loss rates.[236]
- The GOV administers import duty exemptions in a reasonable and effective manner that is consistent with Vietnamese accounting standards.[237]

---

[228] *See* GOV Case Brief at 49.

[229] *Id.*

[230] *Id.* at 48-49 (citing *Preliminary Determination* PDM at 11 (citing *Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products from Thailand*, 66 FR 50410 (October 3, 2001) (*Hot-Rolled Steel from Thailand*), and accompanying IDM at "Duty Exemptions on Imports of Raw and Essential Materials Under IPA Section 36(1)")).

[231] *Id.* at 49.

[232] *Id.*

[233] *Id.* at 49-50.

[234] *Id.*

[235] *Id.* at 51 (citing *Hot-Rolled Steel from Thailand* at "Duty Exemptions on Imports of Raw and Essential Materials Under IPA Section 36(1)").

[236] *Id.*

[237] *Id.* at 53.

Filed By: Thomas Schauer, Filed Date: 5/24/21 1:05 PM, Submission Status: Approved

- The GOV accounts for resalable waste when ensuring that waste produced by companies does not exceed the normal allowances that companies register.[238]
- The Vietnamese Customs Authority bases its assessments on an evaluation of the importer's compliance with laws and the risk level of non-compliance as set forth in Article 14 of Decree 08/2015/ND-CP.[239]
- Vietnamese Customs also routinely conducts inspections of importers and exporters through examination of their import and export declaration forms so that the GOV can be sure that companies are importing what they are purporting to import and exporting what they are purporting to export.[240]
- Both mandatory respondents were inspected by Vietnamese Customs:  KTV prior to the POI and Sailun during the 2019 POI.[241]
- Even if Commerce were to wrongly conclude that the GOV does not have in place a reasonable, effective system per 19 CFR 351.519(4)(i), the fact that an inspection of one of the mandatory respondents occurred during the POI and that inspections of the other mandatory respondent occurred during the AUL period would provide for an exception under 19 CFR 351.519(4)(ii), which provides for an exception to the rule of considering the entire amount of an exemption to confer a benefit where "the government in question has carried out an examination of actual inputs involved to confirm which inputs are consumed in the production of the exported product, and in which amounts."[242]

*Petitioner's Rebuttal Comments:*
- Commerce should continue to countervail import duty exemptions for imported raw materials.[243]
- Under 19 CFR 351.519(a)(4), Commerce must countervail the total amount of duties exempted under this program if the GOV does not have a system or procedure in place that confirms which inputs are consumed in the production of exports and in what amounts.
  - The system must be reasonable, effective for the purposes intended, and based on generally accepted commercial practices in the country of export.[244]
  - Alternatively, in the absence of such a system, the government must demonstrate that it has in fact carried out an examination of actual inputs involved to confirm which inputs are consumed in the production of exported product, and in what amounts.[245]

---

[238] *Id*. at 53 (Further, it is universally accepted under the SCM Agreement that these import duty exemptions are non-countervailable so long as they are not excessive.  *See* SCM Agreement, Apr. 15 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1A, 1869 U.N.T.S. 14 (Not reproduced in I.L.M.) at Annex I(i) (providing that only the portion of the exemption that is in excess of the goods actually consumed in the production of the exported product (making normal allowance for waste) shall be considered an export subsidy).

[239] *Id*.

[240] *Id*. at 55.

[241] *Id*. at 56.

[242] *Id*.

[243] *See* Petitioner's Rebuttal Brief at 10.

[244] *Id.* at 11.

[245] *Id*.

Filed By: Thomas Schauer, Filed Date: 5/24/21 1:05 PM, Submission Status: Approved

- o The GOV system permits exporters to sell waste or scrap that results from the consumption of imported inputs in the domestic market without paying the import duty on those inputs.[246]
  - o The GOV system thus fails to ensure that import duty exemptions are only permitted for inputs consumed in the production of exports, so the entire amount of duty exemptions is countervailable.[247]
  - o Commerce's *Preliminary Determination* is consistent with *Wind Towers from Vietnam* and *Woven Sacks from Vietnam* in which Commerce found that the GOV's import duty exemptions program fails to meet the requirements of 19 CFR 351.519(a)(4)(i).[248]
  - o The Federal Circuit has upheld Commerce's determination "that a system that does not account for recoverable and saleable scrap is not a reasonable system" in *Royal Thai*.[249]
- The GOV argues that its production norms do accurately account for waste and do so in a manner consistent with Vietnamese accounting standards, and therefore constitute a reasonable and effective verification system.[250]
  - o This argument ignores the fact that the waste that is generated is nonetheless allowed to be sold on the domestic market without paying the import duty.[251]
- Commerce should continue to countervail the full amount of raw material import duty exemptions respondents benefitted from during the POI.[252]  The fact that the GOV verified respondents' use of this program is also unavailing.[253]

**Commerce Position:**  The GOV provides import duty exemptions for imported raw materials that are incorporated into exported goods, or directly used in the processing of such goods.[254] The amount of the exemption is equal to the amount of the duty corresponding to the value of imported materials actually used in the production of the finished goods that are exported.[255] This amount is determined or declared at the time of reporting to Vietnam's Customs agency on the use of imported raw materials for manufacture of exported goods, in accordance with customs regulations.[256]  The GOV argues that this mechanism tracks:  (1) the amount of imported material actually consumed for the production of export products, including scrap and discarded products that are lost in the production process (referred to as the "consumption

---

[246] *Id.*

[247] *Id.*

[248] *Id.* (citing, *e.g.*, *Utility Scale Wind Towers from the Socialist Republic of Vietnam:  Final Affirmative Countervailing Duty Determination and Negative Determination of Critical Circumstances*, 85 FR 40229 (July 6, 2020) (*Wind Towers from Vietnam*), and accompanying IDM at Comment 2); *see also*, *Laminated Woven Sacks from the Socialist Republic of Vietnam:  Final Affirmative Countervailing Duty Determination*, 84 FR 14647 (April 11, 2019) (*Woven Sacks from Vietnam*), and accompanying IDM at Comment 2.

[249] *See* Petitioner's Rebuttal Brief at 12 (citing *Royal Thai Government v. United States*, 436 F.3d 1330, 1339 (Fed. Cir. 2006) (*Royal Thai*)).

[250] *Id.*

[251] *Id.*

[252] *See* Petitioner's Rebuttal Brief at 12-13.

[253] *Id.* (citing GOV Case Brief at 56-57; and KTV Case Brief at 26-27).

[254] *See* GOV IQR at 8.

[255] *Id.* at 10.

[256] *Id.* at Exhibit A-4-1.

norm"); and (2) whether the exported products are actually exported.[257] Commerce's regulations at 19 CFR 351.519(a) explain that "{t}he terms 'remission or drawback' include full or partial exemptions and deferrals of import charges." Further, import duty exemptions on raw materials consumed in the production of exported goods, cannot exceed the amount of the duty levied; otherwise, the excess amounts exempted confer a countervailable benefit according to 19 CFR 351.519(a)(1)(i). Additionally, 19 CFR 351.519(a)(1)(ii) provides for "a normal allowance for waste" when calculating how much input corresponds to exports when applying duty exemptions, and declares that a benefit exists "to the extent that the exemption extends to inputs that are not consumed in the production of the exported product."

There are two exceptions to the rule that exemptions cannot exceed the amount of the duty levied available under 19 CFR 351.519(a)(4). The first is applicable when the "government in question has in place and applies a system or procedure to confirm which inputs are consumed in the production of the exported products and in what amounts and the system or procedure is reasonable, effective for the purposes intended, and is based on generally accepted commercial practices in the country of export." We have not applied this exception to the GOV's program because we do not find the GOV's system to be reasonable. The GOV's system allows scrap to be sold on the domestic market without the encumbrance of the import duties normally associated with entering goods into the market for scrap created during the production of products bound for export markets.[258] In the GOV's system, before manufacturing, the processor is required to estimate or construct consumption norms and rates of loss for each product code and maintain all the records associated with the consumption norms constructed or adjustment during the production process.[259] The processor takes legal responsibility for the accuracy of the norms and rates of loss applied when duty drawback is calculated.[260] According to Article 55 of Circular 38, norms for processing exported goods include material and supply consumption rates to produce a unit of exported good and a rate of loss including the "loss due to the formation of waste or rejects to the manufacturing norm or material/supplies consumption norm."[261] The GOV also reported that "waste or scrap within the norm can be recycled or sold in the domestic market without paying the import duty" pursuant to Article 71 of Circular 38.[262] Specifically, Article 71 states that "{w}hen rejects and waste within the norm for manufacture of goods for export (such as peanut shells) are sold domestically, customs procedures are exempt."[263]

The GOV argues that its system is reasonable because it makes an acceptable "allowance for waste" in accordance with 19 CFR 351.519(a)(1)(ii). Both KTV and the GOV conflate "waste" and "scrap" with respect to what we consider a "normal allowance for waste." Contrary to the GOV's arguments, we do not consider its norms to be inaccurate, and they appear to do what they intend to; however, its norms are overly inclusive. In *Hot-Rolled Steel from Thailand*, we explained that waste and resalable scrap are not synonymous, "{b}y the very definition of the term 'waste,' a company is unable to recover and use any waste incurred during the production process. Thus, recoverable and saleable scrap cannot be considered waste, as it does have value

---

[257] *Id.* at 9-10.
[258] *Id.* at 9.
[259] *Id.* at Exhibit A-4-1.
[260] *Id.*
[261] *Id.* at Exhibit A-4-2 at Article 55 of Circular 38/2015/TT-BTC.
[262] *Id.* at 9.
[263] *Id.* at Exhibit A-4-2 at Article 71 of Circular 38/2015/TT-BTC.

34

and can be sold."[264]  We also explained that "evidence on the record indicates that the {respondent} did not … consider in its analysis whether any of the scrap was recoverable and saleable.  We consider both of these elements to be essential in determining a normal allowance for waste."[265]  This resulted in our determination in *Hot-Rolled Steel from Thailand* that the exemptions in question were not "normal."[266]  In that decision, we also determined that the Thai government did not accurately match inputs to the production of exports.  The GOV argues that is not the case in this investigation but it ignores the fact that our decision in *Hot-Rolled Steel from Thailand* was based on both the inclusion of resalable scrap and the Thai government's inclusion of resaleable scrap.  Either problem is sufficient to find a system to be unreasonable.  In this investigation, the GOV's system is not reasonable because producers may sell recovered forms of "waste and rejects" that were created during the production of exported products, from imported inputs, without customs procedures (*i.e.*, paying duties) on that scrap even after making allowances for unrecoverable waste.[267]  Applying the logic from *Hot-Rolled Steel from Thailand* we find that the GOV's allowances for "scrap and rejects" under its production norms are not "normal" because the GOV's system does not differentiate between unrecoverable and recoverable scrap in order to exclude recoverable scrap from the amount of import duties exempted for inputs to the production of exports.  In *Royal Thai*, the Federal Circuit upheld Commerce's previous determination that a system that does not account for recoverable and saleable scrap is not a reasonable system.[268]

In previous investigations where this program was examined, Commerce concluded that the GOV does not have in place a system to confirm which inputs are consumed in the production of the exported products and in what amounts, including a normal allowance for waste.[269]  In this investigation, the GOV has stated that it has not made any changes to the system since the last time it was investigated in 2017; however the GOV argues that this situation differs from those in previous decisions with respect to this program because here the GOV conducted an examination of actual inputs involved to confirm which inputs are consumed in the production of the exported product.  Another exception is available under 19 CFR 351.519(a)(4) "{i}f the government in question does not have a system or procedure in place, if the system or procedure is not reasonable, or if the system or procedure is instituted and considered reasonable, but is found not to be applied or not to be applied effectively, the government in question has carried out an examination of actual inputs involved to confirm which inputs are consumed in the production of the exported product, and in what amounts."  The GOV reported that both respondents underwent verifications by the GOV's Department of Post-Clearance Audit under this program[270].  The GOV further reported that Sailun was verified during the POI, and KTV has been verified during the AUL, and as a result of those audits the GOV issued decisions on tax assessments to collect tax arrears, including import duties and value added taxes (VAT).[271]

---

[264] *See Hot-Rolled Steel from Thailand* at "Duty Exemptions on Imports of Raw and Essential Materials Under IPA Section 36(1)."

[265] *Id.*

[266] *Id.*

[267] *See* GOV IQR at 9.

[268] *See Royal Thai*.

[269] *See*, *e.g.*, *Wind Towers from Vietnam* IDM at Comment 2; and *Laminated Woven Sacks from Vietnam* IDM at Comment 2.

[270] *See* GOV SQ1 at 1.

[271] *Id.* at 1-3.

35

APPX000403

The GOV contends that this demonstrates that the GOV has carried out an examination of actual inputs involved to confirm which inputs are consumed in the production of the exported product, and in what amounts; however, exceptions for carrying out examinations of actual inputs can only alleviate inadequacies related to situations where "the system or procedure is instituted and considered reasonable, but is found not to be applied or not to be applied effectively."[272]  The GOV's system is not reasonable so it does not have access to the second exception.

For this final determination, we continue to find that this system does not meet the regulatory requirements under 19 CFR 351.519(a)(4)(i) for calculating a benefit on an amount other than the total amount of exempted duties.  This is consistent with our findings in *Wind Towers from Vietnam*, *Laminated Woven Sacks from Vietnam*, and *Royal Thai*.  In fact, the GOV concedes that there "have been no substantive changes to the GOV's system since 2017,"[273] which was the POI for *Laminated Woven Sacks from Vietnam*.  On this basis, we continue to find that the import duty exemptions used by the respondents under this program confer a benefit equal to the total amount of the duties exempted, in accordance with section 771(5)(E) of the Act and 19 CFR 351.519(a)(4).

**Comment 9:  Whether Commerce Should Revise the Benchmark for the Provision of Natural Rubber to KTV**

*Petitioner's Comments:*
- Commerce should revise the benchmark and recalculate the benefit for the provision of natural rubber to KTV.[274]
  - The benchmark Commerce used does not reflect a delivered price as required by 19 CFR 351.511(a)(2)(iv) because it does not include import duties or VAT.[275]

*KTV's Rebuttal Comments*:
- Commerce should confirm that KTV did not purchase natural rubber for LTAR.[276]
  - Because the benchmark used was based on import statistics, Commerce added freight expenses associated with moving merchandise from the port to the factory to the weighted-average import price.[277]
  - Commerce also added VAT to the benchmark prices for inputs purchased during the POI.[278]
- The petitioner's suggestion that import duties should be included in the benchmark price is contrary to the facts and requirements of Commerce's regulations.[279]
  - KTV would not pay import duties on natural rubber; (a) the most-favored-nation (MFN) rate for imports of natural rubber was 3 percent, (b) while the special preferential tariff rates applied to imports under various trade agreements with

---

[272] *See* 19 CFR 19 CFR 351.519(a)(4)(ii).
[273] *See* GOV SQR1 at 1.
[274] *See* Petitioner's Case Brief at 2-3.
[275] *Id.*
[276] *See* KTV's Rebuttal Brief at 2 and 9.
[277] *Id.*
[278] *Id.*
[279] *Id.* at 2-3.

Filed By: Thomas Schauer, Filed Date: 5/24/21 1:05 PM, Submission Status: Approved

countries such as those within the Association of Southeast Asian Nations (ASEAN) and countries such as China and Korea.[280]

- o The quantity of imports of natural rubber into Vietnam during 2019 totaled 198,426.646 metric tons and 99.9 percent of those imports (totaling 198,235.500 metric tons) came from ASEAN countries (*i.e.*, Myanmar, Cambodia, Indonesia, Laos, Malaysia, the Philippines, and Thailand), which have special preferential tariff rates and are not subject to the normal 3 percent tariff.[281]

- If KTV had used imported natural rubber in its products, its imports would have been exempt from import duties.[282]
- The prices paid by KTV were well above the benchmark, even if the benchmark is adjusted in the manner the petitioner has proposed.
  - o Commerce should base the benchmark on imports from the two largest suppliers, Cambodia and Laos, which accounted for 90.7 percent of Vietnam's total imports.[283]
  - o In some cases, Commerce has compared purchase prices to the benchmark on a transaction-specific basis.[284] This may be appropriate where the benchmark is calculated for a relatively short period, such as a month. However, when a benchmark for a longer period is used, a transaction-specific comparison may distort the results, especially where the evidence demonstrates that there were significant changes in the benchmark price during the year.[285]
  - o KTV's natural rubber prices are weighted monthly averages, including VAT.[286]
  - o When prices fluctuate monthly, a comparison of monthly prices to an annual average benchmark may give a distorted result. Prices that are well above the monthly benchmark values might be found to be below an annual average. KTV provided a variation on the previous chart that introduces the Petitioner's average annual price (including VAT and import duties) and which the pair of price curves fluctuate above and below during the POI.[287]
  - o Here, use of an annual benchmark would mask the real changes in the marketplace conditions that generated lower prices in certain months and higher prices in others.
  - o To avoid such distortions, Commerce should calculate the benefit from KTV's purchases of natural rubber by comparing the annual average price paid by KTV to the annual average import value.

**Commerce Position:** At the *Preliminary Determination*, we found that KTV had no purchases of natural rubber from private producers, nor did KTV import any natural rubber.[288] KTV reported all its purchases of natural rubber were from a producer that is majority-owned by

---

[280] *Id*. at 3.

[281] *Id*. at 3-4 (citing KTV's Letter "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from Vietnam – Benchmarks Submission," dated September 30, 2020 (KTV Benchmark Submission), at Appendix 1).

[282] *Id*.

[283] *Id*. at 5.

[284] *Id*. (citing, *e.g.*, *Final Results of Countervailing Duty Administrative Review: Certain Softwood Lumber Products from Canada*, 70 FR 73448 (December 12, 2005), and accompanying IDM at Comment 43).

[285] *Id*.

[286] *Id*. at 6.

[287] *Id*. at 9-10.

[288] *See Preliminary Determination* PDM at 18-19.

37

entities controlled by the GOV.[289]  In the *Preliminary Determination* we selected Comtrade import data, as the appropriate benchmark.  This data was supplied by KTV for 2019 Vietnamese imports of HTS 400122, natural rubber in sheets, plates, or strips.[290]

Commerce's regulations at 19 CFR 351.511(a)(2)(iv) require the benchmark to reflect a delivered price, "the price that a firm actually paid or would pay if it imported the product," and it should include "delivery charges and import duties."  The petitioner argues that we should add a VAT of 5 percent and import duties of 3 percent to create a benchmark that reflects a delivered price.  We agree with the petitioner; that the benchmark used in the *Preliminary Determination* did not include import duties or VAT.

KTV argues that we included a five percent VAT in the "benchmark prices."  Although we stated in the PDM that we included this VAT,[291] we inadvertently did not include it.  Specifically, we calculated the benchmark by first calculating the unit value, (by dividing the total value by the total quantity in USD per kilogram).  Then we converted this unit price to USD per metric ton (MT) and then to VND per MT.  Finally, we added an amount per MT for freight to arrive at a benchmark of 30,887,790 VND/MT.[292]  The benefit calculation was applied to all purchases because we are considering all producers that produced natural rubber purchased by KTV to be authorities.  The benchmark was applied on a transactions-specific basis because our preference is to compare the prices of individual transactions to the benchmark where possible.[293]  We calculated the benefit by deducting the per-MT benchmark from a per-unit value calculated for each transaction.  KTV's purchase data included VAT but did not include import duties because all its purchases were from domestic sources.[294]

In Vietnam, natural rubber products are subject to VAT at the rate of five percent, according to Clause 6, Article 10 of Circular No. 219/2013/TT-BTC dated December 31, 2013, of the Ministry of Finance.[295]  KTV also paid five percent VAT on its domestic purchases.[296]  The fact that KTV was required, by law, to pay VAT, substantiates the need to include that VAT in the benchmark, in accordance with 19 CFR 351.511(a)(2)(iv).

KTV argues that because the tires were bound for export, no import duties would have been collected on imports of inputs used in the production of those exports.  KTV bases its argument on the fact that, in the *Preliminary Determination*, Commerce found that import duties are not collected on the amount of imported material inputs that become scrap during the production of exported products.  As described in Comment 8, above, we found that the GOV's import tariff exemption program was not reasonable because it made this allowance for scrap.  Accordingly,

---

[289] *See* KTV IQR at Appendix 8-A; and KTV Preliminary Calculation Memorandum at 1.
[290] *See* KTV Benchmark Submission at Appendix 1 (Commodity 400122:  Rubber; technically specified natural rubber (TSNR), in primary forms or in plates, sheets or strip (excluding latex and smoked sheets).
[291] *See Preliminary Determination* PDM at 9.
[292] *See* in the Excel spreadsheet attached to the KTV Preliminary Determination Calculation Memorandum at the 'NR Benchmark PUBLIC' tab in cells in the range A10:C21.
[293] *See Certain Softwood Lumber Products from Canada:  Final Results of the Countervailing Duty Administrative Review, 2017-2018*, 85 FR 77163 (December 1, 2020), and accompanying IDM at Comment 11.
[294] *See* KTV IQR at Appendix 8-A.
[295] *See* GOV IQR at 33 and Exhibit E-5.
[296] *See* KTV IQR at Appendix 8-C.

Filed By: Thomas Schauer, Filed Date: 5/24/21 1:05 PM, Submission Status: Approved

we are not able to rely on the exemptions it provides to substantiate the fully loaded cost of entering natural rubber into Vietnam for use in production in accordance with 19 CFR 351.511(a)(2)(iv).

KTV also argues that imports of natural rubber into Vietnam would have been exempt from import duties on natural rubber because there were "special preferential" import tariff rates applied to imports from all the countries that Vietnam imports natural rubber from under various multilateral and bilateral trade agreements.[297] KTV argues that almost all of Vietnam's POI imports of natural rubber came from countries[298] which have "special preferential" tariff rates and, therefore, they were not subject to the three percent import tariff.[299] Although KTV argues that the benchmark should be based on imports from the two largest suppliers, Cambodia and Laos, which accounted for 90.7 percent of Vietnam's total imports,[300] our benchmark is based on all imports into Vietnam in order to avoid any distortions.

The GOV reported that the "preferential" import tax rate is three percent for natural rubber.[301] The GOV further reported that "import duties on rubber materials and rubber products is {sic} also applied according to the special preferential import tariff in several multilateral and bilateral agreements."[302] The GOV, however, fails to indicate which rate applies to "special preferential" import tariffs on the bilateral and multilateral agreements. Accordingly, we have applied the three percent rate to the benchmark which is the only rate reported by the GOV. The GOV does not state what any of the "special preferential" tariff rates are. KTV has not substantiated what these rates are either.

We agree with KTV that the benchmark includes freight expenses for moving merchandise from the port of entry to the factory in accordance with 19 CFR 351.511(a)(2)(iv). Accordingly, we have maintained those freight expenses in the calculation of the benchmark for purposes of this final determination. The petitioner did not comment on this aspect of the benchmark.

In this final determination we have continued to use the Comtrade import prices submitted by KTV as the basis for the benchmark, but have added five percent VAT in order to fix the inadvertent error described above and we have added import duties of three percent because all the trading partners represented in the Comtrade data receive this "preferential" tariff rate.

---

[297] *See* KTV's Rebuttal Brief at 3 (citing GOV IQR at 33).
[298] *See* KTV's Rebuttal Brief at 3-4 (citing KTV Benchmark Submission at Appendix 1). The quantity of imports of natural rubber into Vietnam during 2019 totaled 198,426.646 MT and, 99.9 percent of those imports (totaling 198,235.500 MT).
[299] *See* KTV's Rebuttal Brief at 3-4 (citing KTV Benchmark Submission at Appendix 1).
[300] *Id.* at 5 (citing KTV Benchmark Submission at Appendix 1. KTV's benchmark calculation includes the freight adjustment Commerce used in the preliminary determination benchmark calculations).
[301] *See* GOV IQR at 33.
[302] *Id.*

**Comment 10:  Whether KTV's Preferential Rent is Countervailable**

*KTV's Case Brief*:

- Commerce should disregard any alleged subsidies relating to KTV's acquisition of land-use rights because these rights were acquired prior to Vietnam's accession to the WTO (*i.e.*, January 11, 2007), and, as such, do not constitute a countervailable subsidy.[303]
- The record demonstrates that KTV's land-use rights were acquired in the in-principle agreement concluded in 2006.[304]
    o KTV received the rights to use the land on which its head office and main factory were located through a lease agreement dated April 28, 2006, between KTV's parent company and the Vietnamese land-development company Becamex IDC Corporation (Becamex).[305]
    o The April 2006 agreement was negotiated and signed by KTV's parent company because KTV had not yet been established; in fact, the agreement was subject to the parent company applying for and obtaining an investment license establishing KTV.[306]
    o The April 2006 Agreement describes the land leased to KTV; describes the rent (with a one-time initial payment and subsequent annual payments), maintenance and management fees, and sewage/waste treatment fees to be paid by KTV; and commits Becamex and KTV to sign a land sublease contract that will contain terms consistent with the original agreement.[307]
- The 2012 restatement of KTV's land-use rights in the land lease agreement was adopted pursuant to the requirements of the 2006 in-principle agreement and did not modify the material terms of the 2006 agreement.[308]
    o The difference of two months in the termination dates described in the 2006 in-principle agreement and 2012 land lease agreement, resulted from the recalculation of the 50-year maximum lease term described in Vietnamese law, and not from any renegotiation.[309]
    o Both Becamex and KTV (through its parent) were obligated by the terms of the 2006 in-principle agreement to enter into an agreement with the same terms as the 2006 in-principle agreement, but with KTV becoming a direct party to the rights and obligations previously established by the previous agreement.[310]
- The "six amendments" referenced in the 2012 land-use certificate pertain to amendments to KTV's investment certificate, and not KTV's land-use rights.[311]

---

[303] *See* KTV's Case Brief at 1-8.
[304] *Id.* at 3-4.
[305] *Id.* at 3.
[306] *Id.*
[307] *Id.* at 3-4.
[308] *Id.* at 4-6.
[309] *Id.* at 5.
[310] *Id.* at 5-6.
[311] *Id.* at 6-8.

40

*Petitioner's Rebuttal Brief*:
- Commerce should continue to countervail KTV's land lease.[312]
  - Commerce has explained that it typically relies on the date of the land-use contract, or a later date if there are any subsequent material changes to the contract.[313]
  - Commerce should find that the essential terms and conditions were not fixed until 2012, at the earliest.[314]
  - Becamex did not acquire the land use right certificate for the property until January 17, 2007 (*i.e.*, after Vietnam's January 11, 2007 accession to the WTO) and, thus, did not have the right to sublease it to KTV until after the cut-off date.[315]

The petitioner's remaining rebuttal arguments, which are proprietary in nature, are summarized and addressed in the KTV Final Analysis Memorandum.

**Commerce's Position:** The record demonstrates that Becamex, the entity from whom KTV leased the land at issue,[316] obtained its land use rights certificate on January 17, 2007.[317] In the Land Memorandum, we found that "{l}and-use rights in Vietnam are legally recognized by the issuance of land-use rights certificates" and "holding land-use rights certificates significantly improves land-use rights security."[318]

Based on this information, Becamex, by law, could not lease land to KTV until January 17, 2007 – after Vietnam's accession to the WTO on January 11, 2007.[319] Accordingly, we determine that the provision of KTV's land did not occur until after Vietnam's accession to the WTO, regardless of when Becamex and KTV's parent agreed upon the terms of the lease.

Moreover, despite KTV's argument that the terms of its 2012 land lease with Becamex are consistent with those of the 2006 "in principle" agreement with KTV's parent company, the fact remains that KTV and KTV's parent are different entities. Accordingly, we find that one of the material terms of the land lease (*i.e.*, the parties to the lease) was not established until KTV *itself* signed the lease in 2012. Therefore, the date that land use rights were conferred under even the earliest agreement and given the totality of the changes between the "in principle" agreement and the actual lease, we continue to find the program to be countervailable.

---

[312] *See* Petitioner's Rebuttal Brief at 3-6.

[313] *Id*. at 3 (citing, *e.g.*, *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Negative Determination of Critical Circumstances*, 73 FR 40480 (July 15, 2008) (*OTR Tires from China*), and accompanying IDM at 26; and *Wire Decking from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75 FR 32902 (June 10, 2010) (*Wire Decking from China*), and accompanying IDM at Comment 14).

[314] *Id*. at 4.

[315] *Id*.

[316] *See* KTV's Letter, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from Vietnam – Response to November 23 Supplemental Questionnaire," dated December 14, 2020, at 3 and Appendix 2.

[317] *Id*. at 3-4 and Appendix 3.

[318] *See* Memorandum, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Analysis of Vietnam's Land-Use Rights," dated October 30, 2020 (Land Memorandum), at 22.

[319] *See* *Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination*, 75 FR 16428 (April 1, 2010) (*PRCBs from Vietnam*), and accompanying IDM at Comment 3.

Finally, because parts of our analysis concerning this issue are proprietary in nature, *see* the KTV Final Analysis Memorandum.

Accordingly, we continue to determine that KTV's land lease is countervailable.

**Comment 11:  Whether Sailun Used the Program on Preferential Rent**

*GOV's Case Brief*:
- Sailun did not receive preferential rental rates under Decision 189/2000/QD-BTC (Decision 189).[320]
- Sailun's land lease contracts were signed after Decision 189 ceased being effective in 2006.[321]

*Sailun's Case Brief*:
- Commerce's finding that Decision 189 applied to Sailun's land rental and that Sailun used this alleged program is not supported by substantial evidence and should be reversed for the final determination.[322]
- Although Commerce calculated a benefit and subsidy rate, this, in and of itself, is not evidence of Sailun's use of the program; there must be independent evidence that Sailun used the program before a benefit calculation can be made.[323]
- The record demonstrates that Sailun's land rental agreement was not subject to Decision 189, and, therefore, not countervailable.[324]
  - The GOV reported that Decree 142/2005/ND-CP (Decree 142) was in effect during the execution of Sailun's land rental agreements; none of the instances indicated in Decree 142 as warranting preferential rent apply to Sailun's land.[325]

*Petitioner's Rebuttal Brief*:
- Commerce should continue to find that the preferential rental rates for Sailun are specific and, therefore, countervailable.[326]
  - Contrary to Sailun's claims, the decree governing its land lease agreements provided for preferential rent for land in areas facing socio-economic difficulties.[327]
  - Tay Ninh, the province where Sailun's land is located, is designated as a province where every district is an area facing socio-economic difficulties or an area facing particular socio-economic difficulties.[328]

---

[320] *See* GOV's Case Brief at 58.
[321] *Id.*
[322] *See* Sailun's Case Brief at 2-6.
[323] *Id.* at 3.
[324] *Id.* at 3-6.
[325] *Id.* at 5-6.
[326] *See* Petitioner's Rebuttal Brief at 6-8.
[327] *Id.* at 7.
[328] *Id.* at 7-8.

Filed By: Thomas Schauer, Filed Date: 5/24/21 1:05 PM, Submission Status: Approved

**Commerce's Position:**   Although Decision 189 expired in 2006, prior to the signature date of Sailun's land lease contracts,[329] Decree 142 was in effect during this time period.[330]   Article 4(3) of Decree 142 provides that:

> For land in deep-lying, remote, highland or island regions, areas facing socio-economic difficulties, areas facing particular socio-economic difficulties; land used for agricultural production, forestry, aquaculture or salt production, land used as ground for production and/or business activities of projects in the domains entitled to investment encouragement or special investment encouragement, provincial-level People's Committee presidents shall decide on the promulgation of land rent units lower than the set land rent units, which, however, must not be lower than half the set rent unit specified in Clause 1 of this Article.[331]

Although Sailun argues that it pays rent that is well-above the preferential rate, that argument is based on the rental rates reflected in Decision 189, which expired  prior to the date of Sailun's contracts.[332]   Article 4(1) of Decree 142, which was in effect at the time Sailun signed its leases, specifies:

> The annual land rent unit shall be equal to 0.5% of the land price according to the use purpose of the rented land, promulgated by provincial/ municipal People's Committees (hereinafter referred to collectively as provincial-level People's Committees) in accordance with the Government's Decree No. 188/2004/ND-CP of November 16, 2004, on methods of determining prices and price brackets for assorted land categories.[333]

However, there is no record evidence of land rent units or prices promulgated by Tay Ninh province, or any municipalities located therein, applicable to the period in which Sailun signed its leases.

That said, Sailun's land is located in Tay Ninh province.[334]   The GOV reported that the list of regions facing socio-economic difficulties or facing extreme socio-economic difficulties during the period in which Sailun's land contracts were signed was stipulated in Appendix II of Decree 108/2006/ND-CP (Decree 108).[335]   Appendix II of Decree 108 identifies Tay Ninh province as

---

[329] *See* GOV's Letter, "Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam:  GOV's Fifth Supplemental Questionnaire Response," dated January 28, 2021 (GOV SQR5), at 1.

[330] *Id*.; *see also* Sailun's Letter, "Sailun Third Supplemental Questionnaire Response in the Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires ("PVLT") From Vietnam (C-552-829)," dated October 21, 2020, at 1 and 3.

[331] *See* GOV SQR5 at Exhibit B-5.

[332] *See* Sailun's Case Brief at 4-5.

[333] *See* GOV SQR5 at Exhibit B-5.

[334] *See* Sailun's Letter, "Sailun Initial Questionnaire Response in the Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires ("PVLT") From Vietnam (C-552-829)," dated August 24, 2020, at 4.

[335] *See* GOV SQR5 at 2-3.

an area with difficult socioeconomic conditions.[336]  Thus, Sailun paid rent on land in an area for which Decree 142 specifies that the provincial-level People's Committee presidents "shall" promulgate land rent units *lower* than the set land rent units.  Accordingly, we find that Sailun received preferential rent on the land it leased for its facilities.

Based on this information, we continue to determine that the GOV provides preferential rent to areas with difficult socio-economic conditions such as the area in which Sailun's facilities are located.  Accordingly, we determine that the preferential rents available to Sailun are specific within the meaning of section 771(5A)(D)(iv) of the Act.  Moreover, we determine that the preferential rents constitute a financial contribution in the form of the provision of a good (*i.e.*, land) within the meaning of section 771(5)(D)(iii) of the Act.  Finally, we determine that this program provides a benefit equal to the difference between the market rate for rent in the locality and the actual rent paid pursuant to section 771(5)(E) of the Act and 19 CFR 351.511(a)(1).  We calculated the benefit in the same manner as in the *Preliminary Determination*.[337]

**Comment 12:  Whether Commerce Should Revise the Benchmark for Preferential Rent for KTV**

*Petitioner's Case Brief*:
- Commerce should revise the benchmark for preferential rent for KTV.[338]
- Commerce only included rental rates for the first half of 2019, and not rental rates for the second half of 2019 that are also on the record.[339]

*GOV's Case Brief*:
- Commerce's use of out-of-country land benchmarks is unlawful because land in India is not available to companies in Vietnam.[340]
- The statute requires that a determination of LTAR be made in relation to prevailing market conditions in the country subject to investigation.[341]
- The CIT has also held that benchmark methodology be grounded in the reality of prevailing market conditions for the good or service being provided; benchmarks from India cannot be used in this reason.[342]

*KTV's Case Brief*:
- If Commerce continues to find that a subsidy was conferred in connection with KTV's acquisition of land-use rights, it should revise the benchmark for measuring subsidy benefits under this program.[343]

---

[336] *Id*. at Exhibit B-6.

[337] *See Preliminary Determination* PDM at 27; *see also* Memorandum, "Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam; Preliminary Determination Calculations for Sailun (Vietnam) Co., Ltd.," dated October 30, 2020.

[338] *See* Petitioner's Case Brief at 3.

[339] *Id.*

[340] *See* GOV's Case Brief at 58-59.

[341] *Id*. at 59 (citing section 771(5)(E)(iv) of the Act).

[342] *Id*. (citing *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1335 (CIT 2015).

[343] *See* KTV's Case Brief at 8-14.

44

- o The use of an Indian rental rate as a benchmark is contrary to Commerce's regulations, which require use of a price that would have been available to purchasers in the country under investigation.[344]
- o The subsidy benefit should measure the difference between the general, non-specific rental rate set by the GOV (which is not the subject of any subsidy allegation) and the actual rental rate paid by KTV.[345]
- If Commerce uses Indian land rental prices as the benchmark, it should select the rate for Indian Areas with population density similar to those where the relevant KTV facility is located.[346]
  - o Commerce erred by using rental rates from a city whose population density is greater than that of the province and town in which KTV's facility is located.[347]
  - o It would be reasonable to use an average land-rental rate for an area in India with a population density similar to that for Ben Cat Town, the town in which KTV's facility is located, based on information that is on the record.[348]
    - Record evidence shows that the population density for the micro-markets included in the rental rate estimates for Hyderabad was similar to Ben Cat Town.[349]

*Petitioner's Rebuttal Brief*:
- Commerce correctly relied upon an external benchmark to measure the benefit of the preferential rent program.[350]
  - o The respondents do not contest that the GOV retains ultimate ownership of all land in Vietnam and that government-determined land prices provide the starting point for all land prices in Vietnam, thus making market-determined benchmarks for land within Vietnam unavailable.[351]
  - o Commerce has previously rejected claims that it cannot use a benchmark for land from outside of Vietnam.[352]
  - o Commerce routinely relies on out-of-country benchmarks where government predominance and distortions make it impossible to identify a market-based benchmark within the country.[353]
- Commerce should continue to rely upon rental rates from the Indian provinces relied upon in the preliminary results, with one correction.[354]
  - o KTV's comparison for Ben Cat Town and Hyderabad is based on data from two different years, 2011 and 2019.[355]

---

[344] *Id.* at 9.

[345] *Id.* at 9-11.

[346] *Id.* at 12-14.

[347] *Id.* at 12.

[348] *Id.* at 13.

[349] *Id.*

[350] *See* Petitioner's Rebuttal Brief at 8-9.

[351] *Id.* at 8.

[352] *Id.* (citing *PRCBs from Vietnam* IDM at Comment 9; and *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination*, 78 FR 50387 (August 19, 2013) (*Shrimp from Vietnam*), and accompanying IDM at Comment 6.

[353] *Id.* at 8-9.

[354] *Id.* at 9-10.

[355] *Id.* at 9.

45

o The micro-markets that KTV used for calculating the population density for Hyderabad appear to be villages that are 20 to 115 kilometers away from the city of Hyderabad.[356]
o The data on the record do not allow a proper comparison between Kolkata and Hyderabad.[357]

*KTV's Rebuttal Brief*:
- The petitioner's proposed adjustment is unnecessary and incorrect.[358]
  o The benchmark data reported an average rental price based on the lowest and highest rental rates reported for the year in each micro market, considering both halves of 2019.[359]
  o For Kolkata, the lowest and highest rates for the year corresponded to the lowest and highest rates for the first half.[360]
  o Thus, the rates for the first half were used not because Commerce only considered the first half, but because the highest and lowest rates happened to occur in the first half.[361]

**Commerce's Position:** Section 771(5)(E) of the Act instructs that, for purposes of clause (iv), which specifies how to calculate the benefit in the case where goods or services are provided, "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review." Section 351.511(a)(2) of Commerce's regulations sets forth the basis for identifying comparative benchmarks for determining whether a government good or service is provided for LTAR. These potential benchmarks are listed in hierarchical order by preference: (1) market prices from actual transactions within the country under investigation; (2) world market prices that would be available to purchasers in the country under investigation; or (3) an assessment of whether the government price is consistent with market principles. However, as we explained in the *Preliminary Determination*, "the GOV retained ultimate ownership of all land in Vietnam and that the government-determined land prices, which are set by decree, provided the starting point for all land prices in Vietnam, regardless of what valuation methods were utilized, and that the resulting rates were not market-determined."[362] Therefore we find there is no suitable "first-tier" land benchmark during the POI. We now move to the "second-tier" and consistent with our regulations, we continue to find that land prices outside of Vietnam would not be available to purchasers inside the country of investigation. The GOV and KTV fail to cite any record evidence to counter these preliminary findings. Accordingly, we continue to find that the use of external, "third-tier" benchmarks is necessary. We further observe that we have rejected similar arguments in the past.[363]

---

[356] *Id.* at 9-10.
[357] *Id.* at 10.
[358] *See* KTV's Rebuttal Brief at 10-11.
[359] *Id.* at 11.
[360] *Id.*
[361] *Id.*
[362] *See Preliminary Determination* PDM at 11.
[363] *See PRCBs from Vietnam* IDM at Comment 9; and *Shrimp from Vietnam* IDM at Comment 6.

Filed By: Thomas Schauer, Filed Date: 5/24/21 1:05 PM, Submission Status: Approved

With respect KTV's arguments as to which specific "third-tier" benchmark to use for KTV, we determine that the best available information on the record with which to measure the adequacy of remuneration for KTV's land is the rental rate for the Hyderabad Western Corridor Micro-Market. We agree with KTV that the record shows that the population density of Kolkata[364] is much greater than that of Ben Cat Town,[365] the town in which KTV is located.[366]

We acknowledge that KTV's comparison for Ben Cat Town and Hyderabad is based on data from two different years. However, that was also true of our preliminary selection of West Bengal (the province in which Kolkata is located) as the benchmark.[367] Moreover, the record shows that the population density of Kolkata was 24,252 per square kilometer in 2011, which was significantly higher than the population density of Ben Cat Town in 2019 (1,292 per square kilometer in 2019). There is no record evidence to suggest that the population of Kolkata might have decreased since 2011 such that its 2019 population density would be comparable to that of Ben Cat Town, especially in light of record evidence that the population density of West Bengal increased from 2011 to 2019.[368]

We also acknowledge that the micro-markets that KTV used for calculating the population density for Hyderabad appear to be villages that are 20 to 115 kilometers away from the city of Hyderabad.[369] However, these micro-markets are the very locations from which the Hyderabad benchmarks were derived.[370] Accordingly, it is proper to compare the population densities of these micro-markets to the population density of Ben Cat Town in order to determine the appropriateness of the benchmarks derived from these micro-markets for use in determining the adequacy of remuneration for the land rented by KTV.

The information on the record indicates that there are four micro-markets in the Hyderabad area,[371] with population densities ranging from 377 per square kilometer to 10,060 per square kilometer.[372] The population density of the Western Corridor (913 per square kilometer) is closest to that of Ben Cat Town of the four micro-markets.[373] Therefore, we determine that the rental rate for the Hyderabad Western Corridor Micro-Market constitutes the best information on the record with which to measure the adequacy of remuneration for KTV's land, and we have recalculated the net countervailability for KTV accordingly.

---

[364] *See* KTV's Letter, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from Vietnam – Rebuttal Factual Information," dated November 16, 2020 (KTV RFI Submission), at Appendix 1.
[365] *Id*. at Appendix 3-A.
[366] *See* KTV's Letter, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from Vietnam –Response to Section III of Questionnaire," dated August 24, 2020, at 5.
[367] *See* Memorandum, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Placement of Additional Information on the Record," dated October 30, 2020 (Additional Information Memorandum), at Attachments 1 and 2.
[368] *See* KTV RFI Submission at Appendix 4.
[369] *Id*. at Appendix 5.
[370] *See* KTV Benchmark Submission at Appendix 2-A.
[371] *Id*.
[372] *See* KTV RFI Submission at Appendix 5.
[373] *Id*. at Appendices 3-A and 5.

47

Finally, because the rental rates for the Hyderabad Western Corridor Micro-Market did not change between the two halves of 2019,[374] the petitioner's suggestion that we should include rates from both the first half and second half of 2019 is moot.

## VII.    RECOMMENDATION

We recommend approving all of the above positions.  If these positions are accepted, we will publish the final determination in the *Federal Register* and will notify the U.S. International Trade Commission of our determination.

☒                                        ☐
_____                      _____
Agree                               Disagree

5/21/2021

X _____

Signed by: CHRISTIAN MARSH

_____
Christian Marsh
Acting Assistant Secretary
  for Enforcement and Compliance

---

[374] *See* KTV Benchmark Submission at Appendix 2-A.

48

Addendum 3

*Kumho Tire (Vietnam) Co. v. United States*,
Slip Op. 24-115 (Ct. Int'l Trade 2024)

Slip Op. 24-115

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **KUMHO TIRE (VIETNAM) CO., LTD.,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant,<br><br>and<br><br>**UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,**<br><br>Defendant-Intervenor. | **Before: Timothy M. Reif, Judge**<br><br>**Court No. 21-00397**<br>**PUBLIC VERSION** |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part Commerce's Final Determination.]

Dated: October 18, 2024

<u>Vi N. Mai</u> and <u>Jeffrey M. Winton</u>, Winton & Chapman PLLC, of Washington, D.C., argued for plaintiff Kumho Tire (Vietnam) Co., Ltd.

<u>Elizabeth A. Speck</u>, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States. With her on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, and <u>Patricia M. McCarthy</u>, Director. Of counsel on the brief was <u>Rachel Bogdan</u>, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>Saad Y. Chalchal</u> and <u>Elizabeth J. Drake</u>, Schagrin Associates, of Washington, D.C., argued for defendant-intervenor the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC. With them on the brief was <u>Roger B. Schagrin</u>.

APPX000065

PUBLIC VERSION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 3

BACKGROUND ................................................................................................... 4

JURISDICTION AND STANDARD OF REVIEW ............................................... 9

LEGAL FRAMEWORK ...................................................................................... 10

DISCUSSION ..................................................................................................... 11

I.   Whether Commerce's determination that KTV's acquisition of land-use
     rights was a countervailable subsidy is supported by substantial evidence . 12

     A.   Legal framework ................................................................................ 12

     B.   Analysis ............................................................................................. 13

          1.   Standard of review ..................................................................... 14

          2.   Whether Becamex could lease to KTV prior to first obtaining
               the LURC .................................................................................... 17

II.  Whether the determination by Commerce that the currency undervaluation
     program of the Government of Vietnam is a countervailable subsidy is in
     accordance with law. ................................................................................... 20

     A.   Legal framework relevant to analysis of Commerce's authority to
          determine whether undervaluation of currency is a countervailable
          subsidy ............................................................................................... 20

     B.   Analysis ............................................................................................. 22

          1.   Whether Commerce has the authority to determine that undervaluation
               of currency is a countervailable subsidy ................................... 22

          2.   Whether legislative developments and Commerce's practice affect
               Commerce's authority to determine that currency undervaluation is a
               countervailable subsidy .............................................................. 26

III. Whether the determination by Commerce that KTV was a specific
     beneficiary of a financial contribution provided by Vietnam's currency
     undervaluation program was supported by substantial evidence and in
     accordance with law. ................................................................................... 68

     A.   Legal framework ................................................................................ 68

     B.   Analysis ............................................................................................. 71

          1.   Financial contribution ................................................................ 71

          2.   Specificity ................................................................................... 77

          3.   Benefit ...................................................................................... 102

CONCLUSION ................................................................................................. 135

**PUBLIC VERSION**

Court No. 21-00397                                                          Page 3

Reif, Judge:   This action pertains to the final determination of the U.S.

Department of Commerce ("Commerce") in the countervailing duty ("CVD") investigation

on passenger vehicle and light truck ("PVLT") tires from the Socialist Republic of

Vietnam ("Vietnam") for the period of investigation ("POI") January 1, 2019, through

December 31, 2019.  *See Passenger Vehicle and Light Truck Tires from the Socialist*

*Republic of Vietnam: Final Affirmative Countervailing Duty Determination* ("*Final*

*Determination*"), 86 Fed. Reg. 28,566 (Dep't of Commerce May 27, 2021), PR 476, and

accompanying Issues and Decision Memorandum ("IDM"), PR 468.

Plaintiff Kumho Tire (Vietnam) Co., Ltd. ("KTV"), a foreign manufacturer and

exporter of PVLT tires and "interested party" under 19 U.S.C. § 1677(9)(A), challenges

Commerce's Final Determination in a motion for judgment on the agency record with

respect to: (1) whether KTV's acquisition of land-use rights at preferential rent rates was

a countervailable subsidy; and (2) whether the Government of Vietnam's ("GOV")

currency undervaluation program constituted a countervailable subsidy.  Compl. ¶¶ 3, 9-

10(1)-(2), ECF No. 15[1]; *see* Pl.'s Mot. for J. on Agency R. ("Pl. Br."), ECF No. 30-31;

*see also* IDM at 4.  Defendant United States ("defendant" or the "Government") and

defendant-intervenor the United Steel, Paper and Forestry, Rubber, Manufacturing,

Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (the

"USW") assert that Commerce's determination is supported by substantial evidence and

---

[1] In the complaint, KTV also challenged "Commerce's determination that Plaintiff received countervailable subsidies under the GOV's Import-Duty Exemptions Program for Imported Inputs Used in Exported Products."  Compl. ¶ 10(3).  However, this issue is not discussed by KTV in the motion for judgment on the agency record or reply brief or by the Government or the USW in the responsive briefs.  *See generally* Pl. Br.; Def. Br.; Def.-Intervenor Br.

Court No. 21-00397                                                                                          Page 4

is otherwise in accordance with law.  Def.'s Resp. in Opp'n to Pl.'s Mot. for J. on Agency

R. ("Def. Br.") at 1, ECF No. 36-37; *see* Def.-Intervenor's Resp. in Opp'n to Pl.'s Mot. for

J. on Agency R. ("Def.-Intervenor Br.") at 2, ECF No. 38-39.

As discussed herein, the court sustains in part and remands in part Commerce's

Final Determination.

## BACKGROUND

On May 13, 2020, the USW filed a CVD petition on PVLT tires from Vietnam.

Petition for the Imposition of Countervailing Duties pursuant to Sections 701 and 731 of

the Tariff Act of 1930, as amended (May 13, 2020), PR 9, PJA Tab 1.  On June 29,

2020, Commerce initiated the CVD investigation.  *Passenger Vehicle and Light Truck*

*Tires from the Socialist Republic of Vietnam: Initiation of Countervailing Duty*

*Investigation*, 85 Fed. Reg. 38,850 (Dep't of Commerce June 29, 2020), PR 92, PJA

Tab 3.

On July 8, 2020, Commerce selected KTV and Sailun (Vietnam) Co., Ltd. as

mandatory respondents and issued initial questionnaires.  *See* Letter from Minoo

Hatten, Program Manager, AD/CVD Operations, Office I, U.S. Department of

Commerce, to Bui Huy Son, Representative of Embassy of the Socialist Republic of

Vietnam Embassy of Vietnam - Trade Office, re: *Countervailing Duty Investigation of*

*Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam* (July 8,

2020), PR 98-99, PJA Tab 4.  The parties provided responses between July and

October 2020.  *Passenger Vehicle and Light Truck Tires from the Socialist Republic of*

*Vietnam: Preliminary Affirmative Countervailing Duty Determination and Alignment of*

*Final Determination With Final Antidumping Duty Determination* ("*Preliminary*

Court No. 21-00397                                                                                Page 5

*Determination*"), 85 Fed. Reg. 71,607 (Dep't of Commerce Nov. 10, 2020) and accompanying Preliminary Decision Memorandum ("PDM"), C-552-829 (Dep't of Commerce Oct. 30, 2020) at 2-3, PR 296, PJA 22.  In addition to issuing respondent questionnaires, Commerce requested a report from the U.S. Department of the Treasury ("Treasury") on "whether Vietnam's currency was undervalued during the period of investigation."  PDM at 3.  On August 24, 2020, Commerce received the Treasury report.  *Id.*  Commerce requested and received supplemental information from Treasury on September 24, 2020.  *Id.*

Commerce postponed the deadline to issue its preliminary decision until October 30, 2020.  *Id.* (citing 19 U.S.C. § 1671b(c)(1)(A); 19 C.F.R. § 351.205(b)(2)).  Prior to this deadline, on September 21, 2020, the USW "submitted two timely new-subsidy allegations."  *Id.* at 4.  Commerce initiated investigations into these additional allegations on October 2, 2020, and received responses to the additional questionnaires from KTV and other respondents on October 13 and October 16, 2020.  *Id.*

On October 30, 2020, Commerce issued its PDM and a memorandum analyzing Vietnam's land-use rights.  *See* PDM; Memorandum, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Analysis of Vietnam's Land-Use Rights" ("Land Mem.") (Oct. 30, 2020), PR 298-302, PJA Tab 23.  On November 10, 2020, Commerce published its preliminary determination for PVLT tires from Vietnam, determining the countervailable subsidy rate for KTV to be 10.08 percent.  *Preliminary Determination*, 85 Fed. Reg. at 71,608.

On December 14, 2020, and February 4, 2021, KTV provided supplemental questionnaire responses.  *See* KTV's December 14, 2020 Supplemental Response

("KTV Dec. Supp. Resp."), CR 138-140, PR 417-418, PJA Tab 29; KTV's February 4,

2021 Supplemental Response ("KTV Feb. Supp. Resp."), CR 170-171, PR 433-434,

PJA Tab 30.  On February 26, 2021, KTV also provided a submission responding to

Commerce's "In Lieu of Verification Questionnaire."  KTV's February 26, 2021

Submission, CR 174-177, PR 447-448, PJA Tab 31.

On March 9, 2021, KTV, the GOV and the USW filed case briefs.  IDM at 2 n.3.

KTV and the USW filed rebuttal briefs on March 24, 2021.  IDM at 2 n.4.

On May 21, 2021, Commerce issued both its IDM and its Final Analysis

Memorandum.  *See* IDM; Countervailing Duty Investigation of Passenger Vehicle and

Light Truck Tires from the Socialist Republic of Vietnam: Final Determination Analysis

Memorandum for Kumho Tire (Vietnam) Co., Ltd. (May 21, 2021), CR 190, PR 471, PJA

Tab 36 (hereinafter, "Final Analysis Memorandum").  On May 27, 2021, Commerce

issued its Final Determination, determining the countervailable subsidy rate for KTV to

be 7.89 percent.  *Final Determination*, 86 Fed. Reg. at 28,567.  Commerce found that

KTV received six countervailable subsidies, including a 5.16 percent subsidy rate for the

"preferential rent for areas with difficult socio-economic conditions" program and 1.69

percent for the "currency exchanges" program.  IDM at 4.  Between its Preliminary and

Final Determinations, Commerce changed its "benchmark" for evaluating KTV's

"adequacy of remuneration" for its land use from Kolkata, India, to Hyderabad, India, to

reflect more accurately population density, and "recalculated the net countervailability

for KTV accordingly."  *Id.* at 46-47.  Commerce made no other changes to its

methodology for calculating the subsidy rates for these programs.  *Id.* at 3-4.

On the question of whether KTV's acquisition of land-use rights was countervailable, Commerce found that KTV could not have acquired its land-use rights before January 11, 2007, because under Vietnamese law, Becamex IDC Corporation ("Becamex")[2] could not have leased the land to KTV before Becamex's own rights were "legally recognized by the issuance of [a] land-use rights certificate[]" ("LURC"), which occurred on January 17, 2007.  IDM at 41 (quoting Land Mem. at 22 (citing 2013 Land Law, Art. 26.2; OECF, *Agricultural Policies in Viet Nam* (2015), 210)).  Commerce noted that "holding certification of one's land-use rights is necessary to transact the land." Land Mem. at 22.  In addition, Commerce rejected KTV's argument that the terms of its 2012 land lease with Becamex ("2012 Agreement") were "consistent with those of the 2006 'in principle' agreement with KTV's parent company" ("2006 Agreement"), stating:

> the fact remains that KTV and KTV's parent are different entities. Accordingly, we find that one of the material terms of the land lease (*i.e.*, the parties to the lease) was not established until KTV *itself* signed the lease in 2012.  Therefore, the date that land use rights were conferred under even the earliest agreement and given the totality of the changes between the "in principle" agreement and the actual lease, we continue to find the program to be countervailable.

IDM at 41.[3]

---

[2] Becamex is a "government-controlled land development company" in Vietnam.  Pl. Br. at 7; *see* PDM at 25 (stating that "the GOV reported" that Becamex "is majority owned by the Binh Duong Provincial People's Committee").  On April 28, 2006, KTV's parent company and Becamex entered into an "in-principle" lease agreement ("2006 Agreement") for the land on which KTV's "head office and main factory were located." IDM at 40.

[3] Commerce noted that its analysis involving proprietary information was contained in the Final Analysis Memorandum.  IDM at 42; *see* Final Analysis Mem.

In addition, Commerce concluded that there were "*at least two* material changes" between the 2006 Agreement and the 2012 Agreement and that, therefore, "[[      ]] of the essential terms and conditions of KTV's land use agreement were established prior to January 11, 2007."  Final Analysis Mem. at 2-3 (discussing the [[

]] and the [[

]]).

Commerce also addressed five comments related to its preliminary determination that the GOV's currency undervaluation program was a countervailable subsidy.[4]  IDM at 5-26.  Specifically, Commerce discussed: (1) "Whether International and U.S. Law Permits Commerce to Countervail Exchanges of Undervalued Currency"; (2) "Whether Commerce's Promulgation of the Currency Regulations in the Absence of Legislative Authority is Outside its Legal Authority"; (3) "Whether an Exchange of Currency Constitutes a Financial Contribution"; (4) "Whether the Currency Program Is Specific"; and (5) "Whether the Vietnamese Dong [("VND")] was Undervalued During the POI."  *Id.* at 1-2 (corresponding to Comments 1 through 5).  On each of these issues, Commerce in its Final Determination made no changes to the position it took in its Preliminary Determination.  *See id.* at 7-26.

On July 19, 2021, Commerce issued its CVD order for PVLT tires from Vietnam. *Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Countervailing Duty Order*, 86 Fed. Reg. 38,013 (Dep't of Commerce July 19, 2021), PR 487, PJA Tab 38.

---

[4] Commerce's findings on currency undervaluation are discussed *infra* Section III.

Court No. 21-00397                                                     Page 9

KTV brought this action on August 11, 2021, Summons (Aug. 11, 2021), ECF No. 1, seeking remand, Compl. ¶ 11.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to sections 516A(a)(2)(A) and 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(A) and (a)(2)(B)(i) (2018), and 28 U.S.C. § 1581(c) (2018).[5]

The court will uphold Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  The substantial evidence standard "requires 'more than a mere scintilla'" of evidence "but is satisfied by 'something less than the weight of the evidence.'"  *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (first quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); and then quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)).  "When an agency changes its practice, it is obligated to provide an adequate explanation for the change."  *SKF USA Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983)); *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he agency must show that there are good reasons for the new policy."); *see also Huvis Corp v. United States*, 570 F.3d 1347, 1354 (Fed. Cir. 2009).

---

[5] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition.

**PUBLIC VERSION**

"Courts interpret statutes, no matter the context, based on the traditional tools of statutory construction, not individual policy preferences." *Loper Bright Enters. v. Raimondo,* 144 S. Ct. 2244, 2268 (2024).

"[I]n an agency case in particular, the reviewing court will go about its task with the agency's 'body of experience and informed judgment,' among other information, at its disposal." *Id.* at 2267 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). An agency's interpretation of a statute "cannot bind a court," but may be especially informative "to the extent it rests on factual premises within [the agency's] expertise." *Id.* (alteration in original) (quoting *Bureau of Alcohol, Tobacco and Firearms v. FLRA,* 464 U.S. 89, 98 n.8 (1983)).

## LEGAL FRAMEWORK

Commerce will impose a countervailing duty when: (1) Commerce "determines that the government of a country or any public entity within the territory of a country" has subsidized the "manufacture, production, or export of" such merchandise; and (2) the U.S. International Trade Commission ("Commission") determines that a U.S. industry has been "materially injured" or "threatened with material injury" or "the establishment of a[] [U.S.] industry is materially retarded" due to the subsidized imports.  19 U.S.C. § 1671(a)(1)-(2).

A subsidy is countervailable when "an authority . . . provides a financial contribution" that confers a benefit to a specific entity, industry, or group of entities or industries.  19 U.S.C. § 1677(5)(B); *see* § 1677(5A).  The statute further defines "authority" as "a government . . . or any public entity within the territory of [a] country." *Id.* § 1677(5)(B).  In addition, the statute lists four types of "financial contributions" that

APPX000074

Court No. 21-00397                                                                 Page 11

can be countervailable subsidies: (1) "the direct transfer of funds"; (2) "foregoing or not collecting revenue that is otherwise due"; (3) "providing goods or services"; and (4) "purchasing goods."  *Id.* § 1677(5)(D).  Commerce will treat a benefit as conferred, "in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration."  *Id.* § 1677(5)(E)(iv).  Commerce will make its determination with reference to the "prevailing market conditions," including "price, quality, availability, marketability, transportation[] and other conditions of purchase or sale."  *Id.* § 1677(5)(E).  A domestic subsidy must also be specific to a "foreign enterprise or foreign industry" or "a group of such enterprises or industries."  *Id.* § 1677(5A)(D).

## DISCUSSION

The court addresses first the issue of whether Commerce's determination that KTV's acquisition of land-use rights was a countervailable subsidy is supported by substantial evidence and is in accordance with law.  Second, the court addresses whether Commerce's determination that the GOV's currency undervaluation subsidy is a countervailable subsidy is supported by substantial evidence and is in accordance with law.  Third, the court addresses whether Commerce's determination that KTV was the beneficiary of the countervailable subsidy of currency undervaluation is supported by substantial evidence and is in accordance with law.  The court concludes that Commerce's determination that the GOV's currency practices constitute a countervailable subsidy does not provide a basis for the court to conclude that the determination is supported by substantial evidence.

**I.    Whether Commerce's determination that KTV's acquisition of land-use rights was a countervailable subsidy is supported by substantial evidence**

**A.    Legal framework**

Commerce is not required to impose a countervailing duty on merchandise "imported . . . into the United States from a nonmarket economy country if [Commerce] is unable to identify and measure subsidies provided by the government . . . or a public entity" in that "country because the economy of that country is essentially comprised of a single entity." *Id.* § 1671(f)(2).

On January 11, 2007, Vietnam acceded to the World Trade Organization ("WTO"). *See* PDM at 5 (citing *Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 16,428 (Dep't of Commerce Apr. 1, 2010) ("*PRCBs from Vietnam*") and accompanying IDM at cmt. 3). Subsequently, Commerce determined that January 11, 2007, is the cut-off date before which alleged subsidies are not countervailable in Vietnam, a non-market economy ("NME"). *See id.*; *PCRBs from Vietnam* at cmt. 3.[6] Therefore, Commerce does not countervail transactions whose "essential terms and conditions are established prior to the . . . cut-off date." *Wire Decking from the People's Republic of China: Final Affirmative Countervailing Duty Determination* ("*Wire Decking from China*"),

---

[6] This Court has remanded for further explanation Commerce's use of a uniform cut-off date in cases with respect to an NME country. *TMK IPSCO v. United States*, 40 CIT __, __, 179 F. Supp. 3d 1328 (2016) ("Commerce has not explained why China's accession date was the first date where subsidies were identifiable and measurable, although the statute requires Commerce to countervail subsidies when they can be identified and measured."). In the instant case, neither petitioners before Commerce nor parties to the instant proceeding have challenged Commerce's use of the date of Vietnam's accession to the WTO as a cut-off date after which Commerce could "identify and measure" subsidies. 19 U.S.C. § 1671(f)(2). As a consequence, the court does not address the issue.

75 Fed. Reg. 32,902 (Dep't of Commerce June 10, 2010) and accompanying IDM at cmt. 14 (June 3, 2010); *see also* Pl. Br. at 6 (citing *Wire Decking from China* IDM at cmt. 14; *Certain New Pneumatic Off-the-Road Tires (OTR Tires) from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Negative Determination of Critical Circumstances* ("*Certain OTR Tires from China*"), 73 Fed. Reg. 40,480 (Dep't of Commerce July 15, 2008) and accompanying IDM at section IV.D, "Programs Determined To Be Not Used" (July 7, 2008)).  However, Commerce does consider material changes in determining the date on which the essential terms were established.  *See, e.g.*, *Certain Steel Wire Garment Hangers from the Socialist Republic of Vietnam* ("*Hangers from Vietnam*"), 77 Fed. Reg. 75,973 (Dep't of Commerce Dec. 26, 2012) and accompanying IDM at cmt. 2 (using the date of a new lease contract).

Rule 44.1 of the Rules of the U.S. Court of International Trade governs the determination of foreign law.  The rule states that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  USCIT R. 44.1.  In addition, "[t]he court's determination must be treated as a ruling on a question of law."  *Id.*

### B.    Analysis

The court assesses Commerce's conclusion that Becamex could not have leased the land prior to January 11, 2007 — the date after which Commerce stated that it was able to "identify and measure" subsidies — because Becamex did not have a LURC until January 17, 2007.  For the reasons discussed below, the court concludes that

Commerce's determination to countervail KTV's acquisition of land-use rights is supported by substantial evidence and in accordance with law.

### 1.    Standard of review

Before the court considers the significance of Becamex's LURC, the court addresses its standard of review of Commerce's interpretation of Vietnamese law.

KTV invokes USCIT Rule 44.1 and argues that the court is required to treat an agency's interpretation of foreign law as a question of law.  Pl. Br. at 17 n.46 (citing *Bugliotti v. Republic of Argentina*, 952 F.3d 410, 413 (2d Cir. 2020)).  In addition, KTV contends that the court does not owe any deference to the agency's interpretation of Vietnamese law because the underlying issue is not the meaning of the countervailing duty statute itself but rather "the rights and obligations arising from a contract made under Vietnamese law."  Reply Br. of Kumho Tire (Vietnam) Co. ("Pl. Reply Br.") at 18.

According to defendant, Commerce "regularly relies on foreign laws in support of its countervailing duty determinations because such information, particularly during investigations, routinely is placed on the agency record as factual information."  Def. Br. at 41 (citing 19 C.F.R. § 351.102(b)).  Defendant cites a previous countervailing duty investigation in which Commerce explained that it "does not rely on foreign laws in countervailing duty proceedings 'for the purpose of making legal arguments concerning U.S. law or international obligations, but for the purpose of determining relevant facts.'"  *Id.* (citing *Certain OTR Tires from China* IDM at cmt. F.13).  Defendant adds that this Court "has also recognized that '[t]he agency's determination on the record of the meaning and operation of foreign law is one of fact.'"  *Id.* at 41-42 (citing *Rebar Trade Action Coal. v. United States*, Slip Op 16-88, 2016 WL 5122639, at *3 (CIT Sept. 21,

**PUBLIC VERSION**

Court No. 21-00397                                                    Page 15

2016)).  The USW adds that, even if the court is required to treat the issue of

Vietnamese law as a question of law, the court should defer to Commerce's

interpretation "because Commerce considered Vietnamese law for purposes of

administering the CVD law."  Def.-Intervenor Br. at 16 n.6 (citing *Bamberger v. Clark*,

390 F.2d 485, 488 (D.C. Cir. 1968); *Nuove Industrie Elettriche di Legnano S.p.A. v.

United States*, 14 CIT 334, 337-42, 739 F. Supp. 1567, 1571-74 (1990)).

     USCIT Rule 44.1 requires the court to treat an issue of foreign law as a question

of law.  USCIT Rule 44.1 provides:

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing.  In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  *The court's determination must be treated as a ruling on a question of law*.

(emphasis supplied).  KTV has properly raised the issue of foreign law in its brief.  *See*

Pl. Br. at 4 (statement pursuant to Rule 44.1).

     This Court and the Federal Circuit have noted that federal courts review an

agency's interpretation of foreign law as a question of law under USCIT Rule 44.1.  *See,*

*e.g.*, *Nuove Industrie*, 14 CIT at 339, 739 F. Supp. at 1572; *Merck & Co., Inc. v. U.S.*

*Int'l Trade Comm'n*, 774 F.2d 483 (Fed. Cir. 1985) ("[I]n the federal courts foreign law is

a question of law to be determined by expert evidence or any other relevant source.").

For example, in *Nuove Industrie*, the court examined whether it could consider

attachments to plaintiff's motion for judgment on the agency record.  14 CIT at 337, 739

F. Supp. at 1570.  The attachments consisted of the opinion of an Italian law firm as to a

matter of Italian corporate law, as well as additional Italian legal documents.  *Id.*

Defendant asserted that the attachments "represent[ed] an impermissible attempt to

amend or supplement the administrative record" and moved the court to strike the

attachments.  *Id.*  The court noted first that the Italian law in question was properly

raised before the agency and then determined that the rules permitted the court to

consider the attachments under USCIT Rule 44.1, stating:

> [The government's] argument would be of moment were those papers
> directed at the substantial-evidence-on-the-record review of section
> 1516a(b)(1)(B), . . . for the record here cannot be supplemented and the
> court cannot freely substitute its views thereof for those of the ITA.  But the
> papers attempt to address the accordance-with-law standard of that
> section, and, while the traditional rule that "[q]uestions of law are reviewed
> under the non-deferential, de novo standard" may not apply under that
> standard in the light of *Bamberger v. Clark* . . . that case certainly does not
> preclude full and fair consideration of plaintiff's argument by this court.

*Id.* at 339, 739 F. Supp. at 1572 (footnotes omitted).

Therefore, the court will treat Commerce's interpretation of Vietnamese law as a

question of law under USCIT Rule 44.1.[7]

---

[7] Parties disagree as to whether the court is required to interpret Vietnamese law de novo or may defer to the agency's interpretation.  *Compare Kaho v. Ilchert*, 765 F.2d 877 (9th Cir. 1985) ("The provisions of Rule 44.1 indicate that a deferential standard of review on a question of foreign law is inappropriate."), *with Bamberger v. Clark*, 390 F.2d 485, 488 (D.C. Cir. 1968) (addressing foreign law and stating that "in the context of an administrative record . . . in some instances at least a court will defer to an agency's view"), *and Valkia Ltd. v. United States*, 28 CIT 907, 919 (2004) (stating that "[t]he Court must defer to the agency's interpretation" of an issue of foreign law "in the absence of proof that it was unlawful").  The court need not address this issue, as the result is the same regardless of the standard of review.  The 2003 Land Law is clear on its face; Becamex could not lease the land to KTV until after Becamex obtained its LURC. *Bullcreek v. Nuclear Regulatory Comm'n*, 539 F.3d 536, 541 (D.C. Cir. 2004) (holding that the question of deference to the agency's interpretation was "moot . . . because the result [was] the same whether the court applies de novo review [or] deference").

**2.      Whether Becamex could lease to KTV prior to first obtaining the LURC**

Under 19 U.S.C. § 1671(f)(2), Commerce cannot impose countervailing duties where it "is unable to identify and measure subsidies provided by the government of the nonmarket economy country . . . because the economy of that country is essentially comprised of a single entity."  Commerce treats the date of an NME country's accession to the WTO as the "cut-off" date from which Commerce may "identify and measure" subsidies in that country.  *See PRCBs from Vietnam* IDM at cmt. 3 (applying Vietnam's January 11, 2007, accession to the WTO as the date from which Commerce may countervail subsidies in Vietnam).

Commerce determined that KTV did not obtain its land-use rights in the instant case until after January 11, 2007.  IDM at 41.  Commerce reached this conclusion because Becamex, the company from which KTV claimed it leased the subsidized land, did not obtain its LURC until January 17, 2007.  *Id.*  Because, according to Commerce, Becamex "by law[] could not lease land to KTV until" Becamex received the LURC, Commerce concluded that "the provision of KTV's land did not occur until after Vietnam's accession to the WTO."  *Id.*

Before the court, KTV relies on the statements placed on the agency record of a Vietnamese lawyer and argues that a LURC only "confirms the holder's existing rights and interests" but that "[n]othing in the law prevents the holder of land-use rights from leasing land to another entity before such a certificate was issued."  Pl. Br. at 17-18.  According to KTV, its "acquisition of land-use rights was governed by the agreements with [Becamex]" and not by "any land-use rights certificate."  *Id.* at 16.  Because KTV and Becamex entered into the 2006 Agreement prior to January 11, 2007, KTV

maintains that the provision of that land to KTV for less than adequate remuneration is not countervailable.  *Id.*

Defendant responds that under the Land Law of Vietnam, "holding a land-use certificate is necessary to transact land."  Def. Br. at 39.  Defendant points out that Becamex did not receive its LURC until January 17, 2007 — after Vietnam's accession to the WTO.  *Id.* at 40 (citing Land Mem. at 22 (citing KTV's Dec. Supp. Resp. at 3-4, apps. 2-3)).  Defendant concludes for this reason that "Becamex's rights to the land it leased to KTV in 2012 attained legal significance only after Vietnam's January 11, 2007 WTO accession date, regardless of when Becamex and KTV-HK had agreed upon the lease terms."  *Id.*  According to defendant, "[o]n this basis alone Commerce was lawfully permitted to countervail this subsidy."[8]  *Id.*

The court concludes that under Vietnamese law Becamex was not able to lease the land to KTV prior to first obtaining the LURC.[9]  As a result, KTV did not receive its land-use rights until after Vietnam's accession to the WTO, and, for that reason, under Commerce's existing practice KTV's preferential rent was countervailable.

In Vietnam, "[l]and belongs to the entire people," with "the State acting as the owner's representative."  2003 Land Law, Art. 5.1.  The state may grant "land use rights" to individuals or organizations through "land use rights certificates."  2003 Land

---

[8] The USW adds that Vietnam's Land Law "plainly states" that land users may lease land only after first obtaining a LURC.  Def.-Intervenor Br. at 15, 15 n.5.

[9] In reaching a determination as to the meaning of Vietnamese law, the court has considered the text of the 2003 Vietnamese Land Law, KTV's submissions to the administrative record and parties' arguments before the court.  *See* USCIT R. 44.1 (allowing the court to "consider any relevant material or source").

**PUBLIC VERSION**

Court No. 21-00397                                                      Page 19

Law Arts., 50 (individuals), 52.1 (organizations); *see also* 2003 Land Law, Art. 10.1

("The State shall issue certificates of land use right [sic] to land users.").  Such

certificates are issued "for every land plot[]."  2003 Land Law, Art. 48.3.

The terms of the 2003 Vietnamese Land Law are clear.[10]  Article 106 establishes

four conditions that must be met — one of which is that a land user first acquire a LURC

— before a land user may lease land:[11]

> 1. The land users are entitled to exercise their rights to exchange, transfer, *lease*, sublease, inherit, present or donate the land use rights . . . when the following conditions are met:
>
> a) *They have land use rights certificates*;
> b) The land is free from disputes;
> c) Their land use rights are not inventoried to ensure the execution of judgments;
> d) Their land use duration has not yet expired.

(emphases supplied).

---

[10] The court notes that in the IDM and Land Memorandum Commerce cited to the 2013 Land Law and not the 2003 Land Law, which was the version of the law in effect at the time of the 2006 Agreement.  IDM at 41; Land Mem. at 22; *see* Oral Arg. Tr. at 73:17-25, 76:13-21.  In addition, Commerce did not cite to the relevant provisions of the 2013 Land Law that establish that obtaining a LURC is a precondition to transacting one's land-use rights in Vietnam.  IDM at 41; Land Mem. at 22.  However, the 2003 Land Law was placed on the record.  Land Mem., Attach. 1, CR 298-302, PJA Tab 23.  As a result, the court is able to reach its own independent determination of the meaning of Vietnamese law.

[11] KTV argues also Commerce's conclusion that Becamex "lacked authority" to enter into the 2006 Agreement prior to obtaining the LURC "is inconsistent with [Commerce's] finding that Becamex is a government 'authority' for purposes of imposing countervailing duty [sic]."  Pl. Reply Br. at 22.  However, KTV did not identify in the 2003 Land Law, and the court has not found, any exception for government-affiliated entities to the requirement of Article 106 that land users obtain a LURC prior to leasing the land.  For that reason, KTV's argument fails.

**PUBLIC VERSION**

Court No. 21-00397                                                                                  Page 20

Here, Commerce observed correctly that Becamex did not receive its LURC until January 17, 2007. *See* Pl. Dec. Supp. Resp., App. 3 (stating that Becamex received its LURC on January 17, 2007). As a matter of Vietnamese law, Becamex could not lease the land to KTV until that date. Accordingly, Commerce's conclusion that KTV could not have obtained its preferential rent until after Vietnam's accession to the WTO is supported by substantial evidence and in accordance with law.[12]

**II. Whether the determination by the Department of Commerce ("Commerce") that the currency undervaluation program of the Government of Vietnam ("GOV") is a countervailable subsidy is in accordance with law**

Commerce's determination that currency undervaluation may be and in this case is a countervailable subsidy is consistent with the statute.

**A. Legal framework relevant to analysis of Commerce's authority to determine whether undervaluation of currency is a countervailable subsidy**

Commerce imposes countervailing duties when: (1) Commerce — as the "administering authority" — "determines that [a foreign] government or any public entity within th[at] . . . country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States"; and (2) the U.S. International Trade Commission ("Commission") determines that a U.S. industry is "materially injured" or "threatened with material injury," or the establishment of a U.S. industry is materially impacted, due to the imports. 19 U.S.C. § 1671(a).

---

[12] Because the court has sustained Commerce's conclusion that KTV did not obtain its land-use rights until after Vietnam's accession to the WTO, the court does not address KTV's other arguments challenging Commerce's decision to countervail KTV's preferential rent.

As discussed, a subsidy is countervailable when a government or public body provides a financial contribution that confers a benefit to the recipient and is specific to an enterprise, industry or group of enterprises or industries.  19 U.S.C. § 1677(5)(B), 5(D), 5(E), (5A).  Commerce is the "administering authority" for countervailing and antidumping duties.  19 U.S.C. § 1677(1).

In 2020, Commerce promulgated a new regulation, 19 C.F.R. § 351.528, which establishes the process for Commerce to determine whether undervaluation of a currency constitutes a countervailable subsidy.  *See Modification of Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings* ("*Final Rule*"), 85 Fed. Reg. 6,031 (Dep't of Commerce Feb. 4, 2020).  Commerce promulgated this regulation to "fill [the] gap" in both the Tariff Act of 1930 and existing Commerce countervailing duty ("CVD") regulations on the issue of "how to determine the existence of a benefit or specificity when Commerce is examining a potential subsidy resulting from the exchange of currency under a unified exchange rate system."  *Id.*  Commerce explained that it created 19 C.F.R. § 351.528 to "govern the determinations of undervaluation and benefit when examining potential subsidies resulting from the exchange of an undervalued currency."  *Id.*  Commerce explained also that "[t]he regulatory modifications do not address financial contribution under section 771(5)(B) and section 771(5)(D) of the [Tariff Act of 1930]."  *Id.*  However, Commerce added that "[t]he receipt of domestic currency from an authority . . . in exchange for U.S. dollars could constitute a financial contribution under section 771(5)(D) of the [Tariff Act of 1930]," but noted that such a finding "will depend upon the facts on the record of the proceeding."  *Id.* (alterations in original).

19 C.F.R. § 351.528 provides that Commerce will "consider whether a benefit is conferred from the exchange of United States dollars for the currency of a country under review or investigation under a unified exchange rate system only if that country's currency is undervalued during the relevant period" and "normally will make an affirmative finding" of undervaluation only if "government action on the exchange rate . . . contributes to an undervaluation of the currency." 19 C.F.R. § 351.528(a)(1)-(2). The regulation also states that Commerce will "take into account the gap between the country's real effective exchange rate (REER) and the real effective exchange rate that achieves an external balance over the medium term that reflects appropriate policies (equilibrium REER)." *Id.* § 351.528(a)(1).

## B.   Analysis

The court addresses first whether Commerce had the authority under U.S. law to promulgate its new regulation and, consequently, in this case to apply the regulation to determine that the GOV's undervaluation of currency was a countervailable subsidy. The court addresses in turn (a) the text of the CVD statute, taking into account (b) applicable legislative history and (c) past practice. The court concludes that Commerce had the authority to promulgate the regulation and to apply it in this case.

### 1.   Whether Commerce has the authority to determine that undervaluation of currency is a countervailable subsidy

#### a.   Text of the CVD statute

The text of the U.S. CVD statute authorizes Commerce to determine whether a subsidy is countervailable. 19 U.S.C. §§ 1671(a), 1677. As stated *supra* Section II.A, the statute establishes three requirements for Commerce to find that a subsidy provided by a foreign government or public body constitutes a countervailable subsidy: (1) the

provision of a financial contribution; (2) the conferral of a benefit; and (3) that the subsidy is specific to an enterprise, industry or group of enterprises or industries.  19 U.S.C. § 1677(5), (5A).  There are no further statutory requirements or restrictions.  *See generally id.* (providing no supplemental limitations on the types of subsidies that Commerce can determine to be countervailable).  The statute does not exclude, expressly or otherwise, the undervaluation of currency from the definition of a countervailable subsidy.  *See id.* § 1677(5).

Plaintiff argues that congressional delegations of authority to Treasury in the area of currency valuation and manipulation preclude Commerce from exercising its statutory authority in that area.  *See* Pl. Br. at 29 (citing Trade Act of 1988, Pub. L. No. 100-418, §§ 3004-3005, 22 U.S.C. §§ 5304-5305; Title VII Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125, Title VII (2016); H.R. Rep. No. 114-376, at 75-79 (2015) (conference committee report); 161 Cong. Rec. H9,296-97 (daily ed. Dec. 11, 2015) (adoption of conference committee recommendations)).

The U.S. CVD statute does not create an exception to Commerce's authority for practices that might be considered similar, parallel or related to those as to which another federal agency, such as Treasury, may itself have authority under a different statute.  Commerce explained that its actions were not only "permissible" given its authority under the CVD statute, but that Commerce had the *duty* to investigate and impose countervailing duties in any circumstance in which the three requirements for a countervailable subsidy had been met.  *See Final Rule*, 85 Fed. Reg. at 6,032 ("If the domestic industry petitions Commerce alleging that a foreign currency is a mechanism for subsidizing an imported product, Commerce generally must investigate the

Court No. 21-00397                                                                                            Page 24

allegations, despite the fact that other agencies have an interest in U.S. policy towards

foreign currencies."); *see also* 19 U.S.C. § 1671(a).

In sum, the text of the CVD statute authorizes Commerce to determine whether a

currency undervaluation program is a countervailable subsidy and does not preclude

Commerce from countervailing a practice that other agencies may address by other

means.

### b.    Legislative history

The legislative histories of trade statutes enacted since 1979 buttress these

conclusions.

In the Trade Agreements Act of 1979 ("1979 Act"), Congress addressed the

definition of a countervailable subsidy and expanded upon an illustrative list of domestic

subsidies.  There is no indication in committee reports that Congress sought to limit the

authority of the administering authority, which at that time was Treasury, to countervail

currency undervaluation.  S. Rep. No. 96-249 at 85 (1979); H.R. Rep. No. 96-317 at 74

(1979).  To the contrary, the legislative history of the 1979 Act indicates that Congress

intended the law to authorize the administering authority to countervail even those

practices not listed as subsidies in the legislation so long as those practices met the

statutory definition for a subsidy.  S. Rep. No. 96-249 at 85 (1979) ("The administering

authority may expand upon the list of specified subsidies consistent with the basic

definition."); H.R. Rep. No. 96-317 at 74 (1979) ("The Committee does not intend for this

to be a comprehensive, exclusive enumeration of domestic practices which will be

considered subsidies.  It is a minimum list . . . of those practices which are definitely

subsidies.").  In short, the legislative history of the 1979 Act does not contain a limitation

**PUBLIC VERSION**

on the ability of the administering authority to countervail currency undervaluation, so long as it otherwise meets the definition of subsidy.

More recently, the Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act states that the Agreement on Subsidies and Countervailing Measures ("SCM Agreement") "strengthens discipline on trade distorting subsidies" and, along with other World Trade Organization measures, provides "substantive and procedural tools for addressing . . . subsidized competition [from abroad]." *Uruguay Round Agreements Act Statement of Administrative Action*, H.R. Doc. No. 103-316, Vol. I, at 911 (1994); *see Nucor Fastener Div. v. United States*, 34 CIT 1380, 1382 n.1, 751 F. Supp. 2d 1327, 1329 n.1 (2010) (providing that the SAA is regarded as "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the Uruguay Round Agreements] Act in any judicial proceeding in which a question arises concerning such interpretation or application." (quoting 19 U.S.C. § 3512(d))).[13]  The

---

[13] In 1980, Commerce became the administering authority for CVD cases.  *See* Reorganization Plan No. 3 of 1979 (effective Jan. 2, 1980).  The adverse report of the House Committee on Government Operations on a resolution to disapprove the reorganization plan stated that the shift "will give [antidumping and CVD] functions high priority within a Department whose principle mission is trade."  H.R. Rep. No. 96-585, at 6 (1979).  Congress made clear that these actions were taken due to what it considered was inadequate enforcement of "the countervailing and antidumping duty laws": "The Committee feels very strongly that both the countervailing and antidumping duty laws have been inadequately enforced in the past, including the lack of resources devoted to this important area of law."  H.R. Rep. No. 96-317, at 48 (1979).  When Commerce became the administering authority in 1980, the House Committee on Government Operations explained its frustrations with earlier administration of the CVD statute: "In the past agencies have arbitrarily set a course of administration of [countervailing duty] statutes contrary to congressional intent.  Dilatory practices in countervailing duty proceedings, policy changes, failure to adequately countervail, arbitrary failure to collect antidumping duties imposed have been cited as reasons justifying the transfer of these operations."  *Id*.

SAA states: "It is the Administration's view that . . . section 771(5)(B)(iii) encompass[es] indirect subsidy practices like those which Commerce has countervailed in the past, and that these types of indirect subsidies will continue to be countervailable, provided that Commerce is satisfied that the standard under section 771(5)(B)(iii) has been met." SAA at 926.  The SAA notes further: "To comply with this article, Commerce will issue regulations setting forth the details of the methodologies used to identify and measure the benefit of a subsidy."  *Id.* at 928.

In sum, the legislative histories of the relevant amendments to the CVD law since 1979 do not support plaintiff's argument that the CVD law contains a limitation on Commerce's ability to countervail currency undervaluation.  Moreover, there is no indication in the legislative history that Congress intended to limit Commerce's ability to countervail practices that might also be within the purview of other agencies.

2.   **Whether legislative developments and Commerce's practice affect Commerce's authority to determine that currency undervaluation is a countervailable subsidy**

KTV presents two main arguments that, it alleges, lead to the conclusion that Commerce does not have the authority to countervail currency undervaluation.  *See* Pl. Br. at 23-30.  KTV considers that (1) Commerce's administrative practice, and (2) Congress' action or inaction on legislation involving countervailing currency undervaluation, support the conclusion that Commerce does not have the authority to countervail currency undervaluation.  *See id.*

To address these arguments, the court considers in turn: (1) Commerce's practice as to currency undervaluation; (2) unsuccessful legislative proposals to address currency undervaluation under the CVD statute; (3) the pertinence of amendments to

APPX000090

Court No. 21-00397                                                                        Page 27

the CVD statute in trade acts since 1979; and (4) legislation on currency undervaluation as it pertains to Treasury's authorities to address currency undervaluation matters under other provisions of law.

### a.   Commerce's practice as to currency undervaluation

KTV argues that Treasury before 1980 and Commerce from 1980 to 2019 had an administrative practice that currency undervaluation was not a countervailable subsidy. *Id.* at 23-28. In support of this contention, KTV cites a 1971 decision of the United States Court of Customs and Patent Appeals ("CCPA") — *United States v. Hammond Lead Prods., Inc.*, 440 F.2d 1024,1030-31 (CCPA 1971) — and five administrative decisions by Commerce in 1981, 1983, 1984, 2010 and 2011, to argue that Commerce had a clear and established practice in which Congress acquiesced. *Id.* at 23-30; *see also* Pl. Reply Br. at 8. KTV asserts that Commerce's regulation is invalid because it is "directly inconsistent" with Commerce's purported longstanding administrative practice and "[c]ongressional acquiescence" in that practice. Pl. Br. at 4. Therefore, KTV maintains that Commerce could not "unilaterally alter[] its approach." *Id.* at 30.

The court concludes that: (1) Commerce did not have an administrative practice, let alone a longstanding one, not to countervail currency undervaluation; and (2) even if there had been such a practice, there was no congressional acquiescence in or ratification of any such practice. The court considers in this section whether there was a practice, and in Section II.B.2.b through Section II.B.2.d *infra*, the issue of congressional acquiescence in or ratification of such practice.

### (1)    The *Hammond* case

The court examines first KTV's reliance on *Hammond* as evidence of a longstanding practice that currency undervaluation is not countervailable under the CVD law.[14]  *See* Pl. Br. at 23-25 (quoting *Hammond*, 440 F.2d at 1030-31); *see also* Pl. Reply Br. at 2-7.  KTV's reliance on the *Hammond* decision is puzzling because the issue of currency undervaluation was not before the administrative agency (at that time, Treasury), the U.S. Customs Court ("Customs Court") or the CCPA.

In the *Hammond* decision, the CCPA, in a jurisdictional ruling, held that the Customs Court did not have jurisdiction over a protest by a U.S. manufacturer under 19 U.S.C. § 1516(b) that challenged a 1967 determination by Treasury.  440 F.2d at 1027; *see Hammond Lead Prods., Inc. v. United States*, 306 F. Supp. 460, 462 n.2 (Cust. Ct. 1969) (relying on a prior holding in the same case and concluding again that the court had jurisdiction); *see Hammond Lead Prods., Inc. v. United States*, 289 F. Supp. 533 (Cust. Ct. 1968) (concluding that the court had jurisdiction over the protest).  In its decision, Treasury found that the Government of Mexico "did not pay or bestow a bounty or grant upon exportation."  *Hammond*, 306 F. Supp. at 462 n.2 (citing T.D. 67-142 (1967)).  The alleged bounty or grant involved the application of export taxes of the Government of Mexico to refined lead and litharge.  *See id.* at 468.

As noted, the issue of whether currency undervaluation constituted a countervailable subsidy was not before Treasury, the Customs Court or the CCPA.  For reasons that are unclear, the CCPA took "judicial notice" that "Mexico devalued the

---

[14] In the *Final Rule*, DOC said that it does not have an "established practice."  *Final Rule*, 85 Fed. Reg. at 6,033.

peso," and after issuing its holding, then proceeded to state in manifest dicta that: "[W]e do not assess countervailing duties against countries because they devalue their currencies." *Hammond*, 440 F.2d at 1031. In generating this gratuitous statement, the CCPA did not cite to any Treasury determinations to support the statement. *Id.* In an even more bizarre twist, the CCPA then opined — again in dicta and in apparent contradiction to its impromptu comments about currency devaluation — that the court should "abstain if possible from passing on controversies not essentially judicial in nature," such as a CVD determination. *Id.* at 1030. The court added that "[i]n the assessment of a countervailing duty, the determination that a bounty or grant is paid necessarily involves judgments in the political, legislative, or policy spheres." *Id.*

As the Supreme Court has stated: "Dictum settles nothing, even in the court that utters it." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 351 n.12 (2005). It is difficult for this court to imagine a more apparent example of dicta.

### (2)    Determinations prior to 2010

The court turns next to the administrative determinations to which KTV cites for its position that Commerce had a practice of not countervailing currency undervaluation. KTV alleges that certain preliminary and final determinations of Commerce in 1981, 1983 and 1984 were pursuant to a practice not to countervail currency undervaluation. Pl. Br. at 25-27. KTV argues further that Congress subsequently ratified that practice in the Uruguay Round Agreements Act ("URAA") and the Omnibus Trade and Competitiveness Act of 1988 ("OTCA"). *Id.* at 28. The court examines in turn each of the determinations to which KTV cites.

The first administrative decision to which KTV refers is Commerce's 1981 preliminary determination in *Lamb Meat from New Zealand*. *Id.* at 25 (citing *Lamb Meat from New Zealand; Preliminary Affirmative Countervailing Duty Determination*, 46 Fed. Reg. 58,128, 58,131 (Dep't of Commerce Nov. 30, 1981)). In that instance, petitioner withdrew its petition and Commerce terminated the investigation, leading Commerce to conclude: "By virtue of the withdrawal of the petition and termination of the investigation, the preliminary determination and all preliminary conclusions reached therein, as to whether the programs investigated do or do not constitute subsidies are without legal force or effect." *Lamb Meat from New Zealand; Termination of Countervailing Duty Investigation*, 47 Fed. Reg. 1,316 (Dep't of Commerce Jan. 12, 1982); *see also* Def.-Intervenor Br. at 27. KTV's reliance on the conclusions reached in a preliminary determination — which Commerce stated were "without force or legal effect" — for evidence of an administrative practice of Commerce is unpersuasive.

The second instance that KTV presents is *Pork Rind Pellets from Mexico*. Pl. Br. at 25-26 (citing *Pork Rind Pellets from Mexico; Final Negative Countervailing Duty Determination*, 48 Fed. Reg. 39,105, 39,107 (Dep't of Commerce Aug. 29, 1983)). In *Pork Rind Pellets*, Commerce addressed the allegation that "the dual level exchange rate system existing in Mexico constitutes a [countervailable] benefit to the pork rind pellet industry." *Pork Rind Pellets from Mexico*, 48 Fed. Reg. at 39,107. Commerce found that the "operation of the Mexican exchange rate system does not confer an export bounty or grant on pork rind pellets because eligibility to use the controlled rate for making import purchases of pork skins is not contingent upon export performance." *Id.* In addition, Commerce found that Mexico's dual rate exchange system did not

confer a domestic subsidy.  *Id.*  Specifically, Commerce explained that the system did

not benefit a specific industry or enterprise because "all firms may import many different

goods using the controlled exchange rate."  *Id.*

There are three substantial differences between *Pork Rind Pellets* and the

present case.  First, in *Pork Rind Pellets*, Commerce examined the program as an

*export bounty or grant* and concluded that the program did *not* confer such bounty or

grant because the program lacked export contingency.  *Id.*  In this case, Commerce

stated expressly that it "did *not* determine that currency undervaluation is an export

subsidy."  IDM at 28 (emphasis supplied); *see also Final Rule*, 85 Fed. Reg. at 6,040.

Hence, the *Pork Rind Pellets* inquiry into export contingency is not relevant to this case,

*compare* 19 U.S.C. § 1677(5A)(B), *with* 19 U.S.C. § 1677(5A)(D), *and Pork Rind Pellets*

*from Mexico*, 48 Fed. Reg. at 39,107, and Commerce's conclusion as to export

contingency in *Pork Rind Pellets* is inapposite.

The second difference is that Commerce's *Final Rule* and the facts of this case

concern a *unified* exchange rate system, not a *dual level* system as in the *Pork Rind*

*Pellets* case.  *Final Rule*, 85 Fed. Reg. at 6,031, 6,033; 19 C.F.R. § 351.528(a)(1); *see*

IDM at 15 (noting that the State Bank of Vietnam "sets the official exchange rate"); *see*

*also* Def. Br. at 11; Def.-Intervenor Br. at 27-28.

The third difference is that in *Pork Rind Pellets*, after Commerce concluded that

the program was not export contingent, Commerce then found that the program was not

*specific* because the Mexican government's tariff list had not "singled out for benefit a

specific industry or enterprise" or group thereof.  48 Fed. Reg. at 39,107; *see* Def.-

Intervenor Br. at 27-29.  In this case, by contrast, Commerce determined that the

currency undervaluation subsidy was specific. *See* IDM at cmt. 4; *see also infra* Section

III.B.2.  For these reasons, the court finds that the *Pork Rind Pellets from Mexico*

determination is inapposite.

Finally, it is notable that in reaching its determination, Commerce did not rely on

any purported agency practice of not countervailing alleged currency undervaluation.

*Pork Rind Pellets from Mexico*, 48 Fed. Reg. at 39,107.

The third example that KTV raises is Commerce's preliminary determination in

*Carbon Steel Wire Rod from Poland*.  Pl. Br. at 26 (citing *Carbon Steel Wire Rod from*

*Poland; Preliminary Negative Countervailing Duty Determination*, 49 Fed. Reg. 6,767,

6,771 (Dep't of Commerce, Feb. 23, 1984)).  Importantly, Commerce's final

determination in that investigation relied upon Commerce's decision at that time that a

"bounty or grant" cannot be found in an NME country (in that case, Poland) — rather

than on a conclusion as to whether currency undervaluation is countervailable.  *Carbon*

*Steel Wire Rod from Poland from Poland; Final Negative Countervailing Duty*

*Determination* ("*Carbon Steel Wire Rod Final Determination*"), 49 Fed. Reg. 19,374,

19,375-78 (Dep't of Commerce May 7, 1984); *see Final Rule*, 85 Fed. Reg. at 6,033;

Def. Br. at 11-12.

This Court has stated: "It has long been recognized that Commerce is not bound

by the positions taken or the methodologies employed in its preliminary

determinations."  *U.S. Steel Corp.*, 34 CIT at 281, 712 F. Supp. 3d at 1355 (citing

*Peer Bearing Co. v. United States,* 22 CIT 472, 481-82, 12 F. Supp.

2d 445, 456 (1998)); *see, e.g.*, *Carbon Activated Tianjin Co. v. United States*, 45 CIT

__, __, 503 F. Supp. 3d 1278, 1286-87 (2021); *Timken Co. v. United States*, 22 CIT

621, 628, 16 F. Supp. 2d 1102, 1108 (1998) (citing *Peer Bearing Co.*, 22 CIT at 481-82;

*Asociación Colombiana de Exportadores de Flores v. United States*, 22 CIT 173, __, 6

F. Supp. 2d 865, 879-80 (1998)); *Ferro Union, Inc. v. United States*, 23 CIT 178, 199,

44 F. Supp. 2d 1310, 1330-31 (1999) (citing *NTN Bearing Corp. v. United States*, 74

F.3d 1204, 1208 (Fed. Cir. 1995); *Tehnoimportexport v. United States*, 15 CIT 250, 254-

55, 766 F. Supp. 1169, 1174-75 (1991)); *see also Final Rule*, 85 Fed. Reg. at 6,033

(citing *Carbon Steel Wire Rod from Poland Final Determination*, 49 Fed. Reg. at 19,375)

(stating that Commerce's preliminary statements were "moot"); *see generally NTN*

*Bearing Corp.*, 74 F.3d at 1208 ("[P]reliminary determinations are 'preliminary' precisely

because they are subject to change.").  Further, Commerce itself clarified in its 2010

and 2011 determinations in *Certain Coated Paper* and *Aluminum Extrusions* that

Commerce's "assessment in the *Carbon Steel Wire Rod* preliminary determination that

no subsidy existed in the context of a unified rate is only informative, and not

dispositive, in the present case."  *Certain Coated Paper Suitable for High-Quality Print*

*Graphics Using Sheet-Fed Presses from the People's Republic of China: Final*

*Affirmative Countervailing Duty Determination* ("*Certain Coated Paper*"), 75 Fed. Reg.

59,213 (Dep't of Commerce Sept. 27, 2010), and accompanying IDM at cmt. 7;

*Aluminum Extrusions from the People's Republic of China: Final Affirmative*

*Countervailing Duty Determination* ("*Aluminum Extrusions*"), 76 Fed. Reg. 18,521 (Dep't

of Commerce Apr. 4, 2011), and accompanying IDM at cmt. 33.

For the reasons noted above, the court concludes that, like the other

determinations discussed above, Commerce's preliminary determination in *Carbon*

*Steel Wire Rod from Poland* is inapposite.

PUBLIC VERSION

Court No. 21-00397                                                                        Page 34

### (3)    The 2010 and 2011 determinations

The court considers next the fourth and fifth determinations presented by KTV. Those determinations pertain to two decisions by Commerce not to initiate an investigation into allegations that currency undervaluation was an export subsidy or a domestic subsidy.  *See Certain Coated Paper* IDM at cmts. 5-7*; Aluminum Extrusions* IDM at cmt. 33.

Commerce's conclusion in those earlier initiation decisions was that it "was not required to initiate an investigation of a currency allegation that was not reasonably supported by the facts alleged by the Petitioners." *Certain Coated Paper* IDM at cmt. 5; *Aluminum Extrusions* IDM at cmt. 33.  In memoranda addressing the subsidy allegations related to currency in each respective case, Commerce found that there was an insufficient basis to support the allegations.  KTV's September 8, 2020 Submission, Attach. 2-3 (Memorandum from Team to R. Lorentzen re: Countervailing Duty Investigation: Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China, New Subsidy Allegation – Currency, Aug. 30, 2010 ("Certain Coated Paper Currency Memo"); Memorandum from Team to R. Lorentzen re: Countervailing Duty Investigation: Aluminum Extrusions from the People's Republic of China, Subsidy Allegation, Aug. 30, 2010 ("Aluminum Extrusions Currency Memo"), CR 76-80, PR 202-203, PJA Tab 12 (collectively, "Currency Memos")).

In its IDM in each case, Commerce reiterated that foreign invested enterprises (FIEs) do not convert the "vast majority of their foreign exchange earnings" and that, as to exporters, the unified exchange rate in China "applies to all enterprises and

APPX000098

individuals in the economy." *Certain Coated Paper* IDM at cmts. 6-7; *Aluminum Extrusions* IDM at cmt. 33. Commerce added that the cases raised by petitioners "addressed only multiple exchange rate regimes." *Certain Coated Paper* IDM at cmt. 7; *Aluminum Extrusions* IDM at cmt. 33. Commerce explained further that the petitioners relied on a requirement in China — that had since been terminated — to surrender "foreign exchange earned from export activities [to] be converted to RMB at the government-prescribed rate and only at government-owned banks or government-authorized exchange facilities." Certain Coated Paper Currency Memo at 2; Aluminum Extrusions Currency Memo at 2; *see Certain Coated Paper* IDM at cmt. 5; *Aluminum Extrusions* IDM at cmt. 33.

The court concludes that *Aluminum Extrusions* and *Certain Coated Paper* do not reflect a practice of Commerce that currency undervaluation is not countervailable under the CVD law.

To start, as Commerce noted in the *Final Rule*, 85 Fed. Reg. at 6,033, the prior determinations are procedurally distinct from the instant determination and are, as a consequence, governed by a section of the statute with a different legal standard than applies in the instant case.[15] In both prior determinations, Commerce decided not to *initiate* an investigation based on *allegations* made by petitioners on the ground that

---

[15] Commerce in the 2010 and 2011 determinations "determined not to initiate on subsequent currency undervaluation subsidy allegations because [Commerce] determined that the petitioners' allegations *in those particular proceedings* were unsupported by reasonably available information regarding the statutory elements for imposition of a CVD." *Final Rule*, 85 Fed. Reg. at 6,033 (emphasis supplied); *see also Aluminum Extrusions* IDM at cmt. 33 (Commerce "was not required to initiate an investigation of a currency allegation that was not reasonably supported by the facts alleged by Petitioners"); *see Certain Coated Paper* IDM at cmts. 5, 7; *see also* Def. Br. at 12-13; Def.-Intervenor Br. at 30-31.

those *allegations* were not reasonably supported by the facts alleged in the petition. *Certain Coated Paper* IDM at cmts. 6-7; *Aluminum Extrusions* IDM at cmt. 33; *see also* 19 U.S.C. § 1671a(b)(1). Section 1671a(b)(1), which governs the requirements for initiation of CVD proceedings, requires that such a petition allege the elements necessary for the imposition of countervailable duties. The statute requires also that petitions include "information reasonably available to the petitioners supporting those allegations." *Id.* In the 2010 and 2011 determinations, Commerce declined to initiate an investigation because petitioners failed to satisfy the requirements for initiation: namely, "Petitioners' allegations relied on factual assertions about China's currency regime that were contradicted by Petitioners' own information." *Certain Coated Paper* IDM at cmt. 6; *see also Aluminum Extrusions* IDM at cmt. 33; Aluminum Extrusions Currency Memo at 4-5; Certain Coated Paper Currency Memo at 4-5.

By contrast, the instant case involves an investigation and final determination by Commerce, which are governed by 19 U.S.C. § 1671d. Section 1671d provides that Commerce "shall make a final determination of whether or not a countervailable subsidy is being provided with respect to the subject merchandise." *See also* IDM at cmt. 1. This legal standard is distinct on its face from the initiation standard at issue in the *Aluminum Extrusions* and *Certain Coated Paper* cases in which Commerce found that the facts alleged by petitioners did not reasonably support their allegations.

Accordingly, the court concludes that the 2010 and 2011 Commerce decisions not to initiate an investigation into the subsidy allegations in those cases do not reflect a practice that currency undervaluation is not countervailable under the CVD law.

KTV maintains that in *Aluminum Extrusions* and *Certain Coated Paper* Commerce considered that treating currency undervaluation as countervailable was "contrary to both the statute and to Commerce's established practice." Pl. Reply Br. at 15. In support of its position, KTV relies on a single statement of Commerce in the Currency Memos in which Commerce stated that "treating exporters as a 'group' for purposes of finding a domestic subsidy" would "set [the statutory scheme] on its head." *Id.* at 14 (citing Aluminum Extrusions Currency Memo at 5; Certain Coated Paper Currency Memo at 5).

KTV's reliance on this statement to support a purported practice that currency undervaluation is not countervailable under the CVD law is not persuasive. Commerce's analysis in the IDM and Commerce's response to parties' arguments belie KTV's view that Commerce declined to initiate due to an administrative interpretation that currency undervaluation is not countervailable.[16] To the contrary, Commerce's language makes clear that Commerce conducted a fact-specific inquiry of petitioners' allegations and concluded that those allegations were not supported by facts reasonably available as required by 19 U.S.C. § 1671a(b)(1) for Commerce to initiate an investigation of an alleged countervailable subsidy. For example, in reference to the Currency Memos, petitioners "object[ed] to the Department's assertion that currency subsidies only exist in multiple exchange rate systems." *Aluminum Extrusions* IDM at cmt. 33; *Certain Coated Paper* IDM at cmt. 7. Petitioners cited also to the *Carbon Steel Wire Rod Preliminary Determination*, in which, according to petitioners, Commerce

---

[16] The court addresses whether Commerce adequately explained its ostensible change in its definition of "group" in the context of currency undervaluation *infra* Section III.B.2.b.

indicated that countervailable subsidies may exist in the context of a multiple exchange rate system, but not a unified rate system. *Aluminum Extrusions* IDM at cmt. 33; *Certain Coated Paper* IDM at cmt. 7. In response to these arguments, Commerce first rejected the notion that Commerce ever stated in the Currency Memos that only multiple exchange rate systems may include countervailable subsidies. *Aluminum Extrusions* IDM at cmt. 33 ("In the Currency Memorandum, the Department did not state that the CVD law only applied to countries with multiple exchange rate regimes."). And, in response to petitioners' reference to the *Carbon Steel Wire Rod Preliminary Determination*, Commerce rejected also the proposition that Commerce's statements in that preliminary determination precluded Commerce from countervailing the unified exchange rate regime in *Aluminum Extrusions* and *Certain Coated Paper*. *Aluminum Extrusions* IDM at cmt. 33; *Certain Coated Paper* IDM at cmt. 7. Specifically, Commerce stated that "the Department's assessment that no subsidy existed in the context of a unified rate is only informative, not dispositive, in the present case." *Aluminum Extrusions* IDM at cmt. 33; *Certain Coated Paper* IDM at cmt. 7.

Similarly, the Government of China ("GOC") argued that "currency manipulation allegations are not within the jurisdiction of [Commerce]." *Certain Coated Paper* IDM at cmt. 5; *see also Aluminum Extrusions* IDM at cmt. 33. In this way, the GOC invited Commerce to adopt the position — advocated by KTV in the instant case — that Commerce could not countervail currency undervaluation under the CVD law. *Certain Coated Paper* IDM at cmt. 5; *see also Aluminum Extrusions* IDM at cmt. 33. As with petitioners' broad brush assertions, Commerce notably did not endorse this argument or otherwise respond to it. *Certain Coated Paper* IDM at cmt. 5; *see also Aluminum*

**PUBLIC VERSION**

Court No. 21-00397                                                                    Page 39

*Extrusions* IDM at cmt. 33.  Instead, Commerce engaged in a fact-specific inquiry and

concluded that the petitioners' allegations were not supported by facts reasonably

available.  *Certain Coated Paper* IDM at cmt. 5; *see also Aluminum Extrusions* IDM at

cmt. 33.  The court considers Commerce's silence in response to this invitation to be a

further indication that Commerce did not, in fact, rely on a purported practice that

currency undervaluation is not countervailable under the CVD law.

Accordingly, the statements of Commerce in the 2010 and 2011 determinations

not to initiate fall far short of either establishing or reflecting a uniform practice on the

issue.[17]

### (4)    Conclusion as to prior practice

In sum, the above five unrelated and factually distinct decisions over 40 years do

not comprise a practice by Commerce that currency undervaluation "is not within the

purview of the countervailing duty laws."  *See* Pl. Br. at 30.  As this Court recently

---

[17] KTV argues also that in promulgating the *Final Rule* Commerce "did not address" comments citing *Aluminum Extrusions* and *Certain Coated Paper* as evidence of a prior practice of Commerce that currency undervaluation is not countervailable.  Pl. Br. at 28. To the contrary, Commerce responded specifically to commenters' arguments that *Certain Coated Paper* and *Aluminum Extrusions* supported the existence of a prior practice:

> [C]ontrary to this commenter's claims that this alleged "practice" was further upheld in subsequent determinations by Commerce not to initiate on currency undervaluation allegations, Commerce determined not to initiate on subsequent currency undervaluation subsidy allegations because we determined that the petitioners' allegations in those particular proceedings were unsupported by reasonably available information regarding the statutory elements for imposition of a CVD.  Commerce's determinations not to initiate were not based on any practice regarding currency-related subsidies.

*Final Rule*, 85 Fed. Reg. at 6,033 (citing *Certain Coated Paper* IDM at cmts. 5-7; *Aluminum Extrusions*, 76 Fed. Reg. at 18,521).

stated: "'isolated investigations [do] not prove the existence of past practice[]' but rather only that 'Commerce thought differently on different facts and [at] different times.'" *Ancientree Cabinet Co., Ltd. v. United States*, 46 CIT __, __, 565 F. Supp. 3d 1373, 1381 (2022). The decisions and determinations presented by KTV addressed different kinds of programs (e.g., multiple versus unified exchange rate systems), reached conclusions on different legal issues (e.g., treatment of a subsidy in an NME country rather than treatment of the particular possible currency undervaluation subsidy in that country), applied distinct legal standards (e.g., the initiation standard versus the final determination standard) and emphasized the factually distinct nature of the alleged subsidy programs under consideration. These sundry and sporadic instances do not comprise a practice.

Based on the foregoing, the court concludes that Commerce did not have a practice against countervailing the undervaluation of currency.

> **b.  Whether there was congressional *acquiescence* in a Commerce practice — in particular, unsuccessful legislative proposals to address currency undervaluation under the CVD law**

The CVD law grants authority to Commerce to countervail any practice that meets the statutory definition of a countervailable subsidy under 19 U.S.C. § 1677(5). *See supra* Section II.B.1.a-b. Commerce has the authority to countervail a practice that provides a financial contribution, confers a benefit, and is specific. *See* 19 U.S.C. § 1677. There is no limitation in the text or legislative history of the law to Commerce's ability to countervail currency undervaluation should such practice meet the statutory definition of a countervailable subsidy. *See supra* Section II.B.1.a-b.

Notwithstanding the CVD law's plain language, KTV argues that Congress failed to enact legislative proposals that would have "overturned Commerce's practice and required 'currency manipulation' to be treated as a countervailable subsidy." Pl. Br. at 29. KTV asserts further that by failing to enact these legislative proposals, Congress acquiesced to a purported Commerce practice not to countervail currency undervaluation. *Id.* at 24-25, 28-30. According to KTV, "[t]his [c]ongressional acquiescence . . . precludes Commerce from unilaterally altering its approach." *Id.* at 30.

As noted above, the court concludes that Commerce did not have a practice with respect to currency undervaluation. As a consequence, there was no practice to which Congress could have acquiesced.

Nonetheless, assuming for the sake of argument that Commerce had a practice, the court examines KTV's arguments in light of the Supreme Court's consistent conclusion that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one," *Wright v. West*, 505 U.S. 277, 295 n.9 (1992) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980)), and that "subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history

prior to its enactment."[18]  *Doe v. Chao*, 540 U.S. 614, 626-27 (2004) (quoting *Consumer Prod. Safety Comm'n*, 447 U.S. at 118 n.13 (1980)).  Therefore, as "subsequent history is less illuminating than the contemporaneous evidence," KTV "fac[es] a difficult task in overcoming the plain text and import" of the CVD law.  *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps. of Engineers*, 531 U.S. 159, 170 (2001); *Butterbaugh v. Dep't of Justice*, 336 F.3d 1332, 1342 (Fed. Cir. 2003) ("[C]ongressional inaction is perhaps the weakest of all tools for ascertaining legislative intent . . . ."); *see also supra* Section II.B.1.a-b.

The Supreme Court has outlined on repeated occasions the parameters for application — to be done with "extreme care," *Solid Waste Agency of N. Cook Cnty.*, 531 U.S. at 169 — of the doctrine of acquiescence "as an expression of congressional intent":

> [The Court's] observations on the acquiescence doctrine indicate its limitations as an expression of congressional intent.  "It does not follow . . . that Congress' failure to overturn a statutory precedent is reason for this Court to adhere to it.  It is 'impossible to assert with any degree of assurance that congressional failure to act represents' affirmative congressional approval of the [courts'] statutory interpretation . . . .  Congress may legislate, moreover, only through the passage of a bill which is approved by

---

[18] *See* Barrett, *Statutory Stare Decisis in the Courts of Appeals*, 73 Geo. Wash. L. Rev. 317, 337 (2004-2005) (quoting *Consumer Prod. Safety Comm'n*, 447 U.S. at 118) (footnotes omitted):

> As the Supreme Court has explained, "'[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'"  Yet the acquiescence rationale relies not on the intent of the enacting Congress, but on the intent of subsequent Congresses whose inaction may ratify the Court's statutory gloss.  If the intent of the enacting Congress is what counts, why should a court take account of what later Congresses think or whether they decline to act?  The supposed acquiescence of a later Congress is simply irrelevant.

both Houses and signed by the President.  Congressional inaction cannot amend a duly enacted statute."

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164, 186 (1994) (second alteration in original) (quoting *Patterson v. McLean Credit Union,* 491 U.S. 164, 175, n.1 (1989)); *see also id.* (first citing U.S. Const., Art. I, § 7, cl. 2; and then citing *Helvering v. Hallock,* 309 U.S. 106, 121 (1940) (Frankfurter, J.) ("[W]e walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle.")).  The Supreme Court has added: "A bill can be proposed for any number of reasons, and it can be rejected for just as many others."  *Solid Waste Agency of N. Cook Cnty.*, 531 U.S. at 170.

Similarly, the Supreme Court has explained: "Although we have recognized congressional acquiescence to administrative interpretations of a statute in some situations, we have done so with extreme care."  *Id.* at 169; *cf. Rapanos v. United States*, 547 U.S. 715, 750 (2006) ("[W]e have sometimes relied on congressional acquiescence when there is evidence that Congress considered and rejected the '*precise* issue' presented before the Court." (citing *Bob Jones Univ. v. United States*, 461 U.S. 574, 600, (1983) (emphasis in original))); *Bob Jones Univ.*, 461 U.S. at 599 (noting "an unusually strong case of legislative acquiescence in and ratification by implication of" two IRS rulings where Congress was "acutely aware" of them and where there had been "vigorous and widespread debate" on the pertinent issue before the Court).

In *Central Bank of Denver*, the Supreme Court described three bills that failed to pass and concluded that "failed legislative proposals are 'a particularly dangerous ground on which to rest an interpretation of a prior statute.'"  511 U.S. at 186-87

(quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990)).  The

Court reiterated: "Congressional inaction lacks persuasive significance because several

equally tenable inferences may be drawn from such inaction, including the inference

that the existing legislation already incorporated the offered change."  *Id.* at 187 (quoting

*Pension Benefit Guar. Corp.*, 496 U.S. at 650) (internal quotation marks omitted) (citing

*United States v. Wise*, 370 U.S. 405, 411 (1962)); *see* Barrett, *supra*, at 335

("Congressional silence is meaningless.").

    In this case, the circumstances involving subsequent legislative proposals to

address currency undervaluation constitute precisely such a "particularly dangerous

ground on which to rest an interpretation" of the CVD statute.  *Cent. Bank of Denver*,

511 U.S. at 186-87 (quoting *Pension Benefit Guar. Corp.*, 496 U.S. at 650).  In

particular, KTV has failed for three reasons to demonstrate congressional acquiescence

to any purported practice.

    First, as discussed above, the determinations on which KTV relies were not

pursuant to an administrative practice by Commerce in which it found that it lacked the

authority under the CVD law to countervail currency undervaluation.  *See supra* Section

II.B.2.a.  The Supreme Court's acquiescence cases demonstrate that, to find implied

congressional acquiescence, there must be "consistent administrative construction" of

the act in question.  *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 382 (1969); *see*

*also Bob Jones Univ.*, 461 U.S. at 599-601 (holding that Congress had acquiesced to

two IRS rulings that interpreted § 501(c)(3) of the tax code to exclude racially

discriminatory institutions from tax exempt status); *United States v. Riverside Bayview*

*Homes, Inc.*, 474 U.S. 121, 135-36 (1985) (finding that "Congress acquiesced in the

administrative construction"); *Schism v. United States*, 316 F.3d 1259, 1297 (Fed. Cir. 2002) ("[T]he Supreme Court has repeatedly made clear that an important foundation of acquiescence is that Congress as a whole was made aware of the administrative construction or interpretation . . . .").  The determinations raised by KTV do not reflect a "consistent administrative construction" that Commerce lacked the authority to countervail currency undervaluation under the CVD statute.  *See supra* Section II.B.2.a. Therefore, that the 2010 and 2011 bills were not enacted into law does not limit the authority of Commerce to countervail currency undervaluation.

Second, the House Report accompanying the House bill, as well as statements of Senators surrounding the Senate's consideration of its bill, indicate that Congress considered that the bills were to *clarify* that Commerce had the authority to countervail currency undervaluation under existing legislation.  *See United States v. Craft*, 535 U.S. 274, 287 (2002) (rejecting acquiescence argument because the legislative history of a failed amendment "indicate[d] that the House intended the amendment to be nothing more than a 'clarification' of existing law").

On September 29, 2010, the House passed the Currency Reform for Fair Trade Act.  *See* H.R. 2378, 111th Cong. (2010).  The stated purpose of the bill was to "amend title VII of the Tariff Act of 1930 *to clarify* that countervailing duties may be imposed to address subsidies relating to a fundamentally undervalued currency of any foreign country."  H.R. 2378 at 1 (emphasis supplied); *see* H.R. Rep. No. 111-646, at 6-7 (2010) (explaining that the "provision provides certain clarifications").  H.R. 2378 would have clarified the definition of "export subsidy" and added language to 19 U.S.C. § 1677 to define "fundamentally undervalued currency" and "real effective exchange rate

undervaluation" and to describe the benefit from such practice.  H.R. 2378 § 2(a)-(d).

The Senate did not take up the legislation in the remaining months of the 111th

Congress.[19]

In addition, the Ways and Means Committee report supporting the bill stated

expressly that the bill was intended to "clarify" U.S. law:

> This legislation *clarifies* that maintenance by a foreign government of a fundamentally undervalued currency can be considered to be contingent upon exportation, and so to constitute a countervailable export subsidy, notwithstanding that the subsidy is also available in circumstances other than export.  The change responds to the determinations described above, in which Commerce found that the receipt of potential subsidies through China's currency regime was not contingent upon exportation, because such subsidies were provided not only to exporters, but also to parties not engaged in exportation.

H.R. Rep. No. 111-646, at 7-8 (emphasis supplied).

On October 11, 2011, the Senate passed the Currency Exchange Rate Oversight

Reform Act.  *See* S. 1619, 112th Cong. (2011).  As it pertained to Commerce, the bill

would have: (1) amended 19 U.S.C. § 1671a(c) to clarify that Commerce initiate an

investigation as to whether currency undervaluation provided a countervailable subsidy

when an adequate petition is filed; and (2) defined calculation methodologies by which

Commerce would determine the percentage of undervaluation and the benefit to the

recipient.  S. 1619 §§ 2-5, 10-11, 14-15.  The bill also would have clarified the definition

of export subsidy to specify that the provision of a subsidy "in circumstances that do not

---

[19] 157 Cong. Rec. 14,603 (2011) (statement of Sen. Carl Levin) ("Last Congress, the House of Representatives passed a bill, H.R. 2378, the Currency Reform For Fair Trade Act.  That narrower currency manipulation bill made it clear that the Department of Commerce is to fight the illegal subsidization of foreign currencies by using U.S. countervailing duty laws.  Unfortunately, the Senate ran out of time at the end of the session and we did not take up the bill.")

involve export, shall not, for that reason alone, mean that the subsidy cannot be considered contingent upon export performance." *Id.* § 11(c).  The House did not take up the bill.

The Senate Finance Committee did not file a report with its bill; however, numerous senators, include Senators Sherrod Brown and Dianne Feinstein, noted that the legislation "makes it clear" that Commerce has such authority.  157 Cong. Rec. 14,601 (2011) (statement of Sen. Sherrod Brown) ("Some argue the Commerce Department already has the authority to treat currency manipulation as an export subsidy and apply countervailing duties."); 157 Cong. Rec. 14,998 (2011) (statement of Sen. Dianne Feinstein) ("This bill does not mandate any countervailing tariffs due to an undervalued currency.  It simply restates that Commerce has the authority to investigate whether such duties are appropriate if a domestic company provides the proper documentation.").  Similarly, Senator Carl Levin explained that the bill "clarifies that U.S. countervailing duty laws can address currency undervaluation."[20]  157 Cong. Rec. 14,603 (2011) (statement of Sen. Levin).  As with the 2010 House bill, the legislative history of the 2011 Senate bill makes clear that it was intended to clarify, not expand, Commerce's authority under the CVD statute.

---

[20] Other senators expressed similar views.  *See* 157 Cong. Rec. 14,436 (statement of Sen. Chuck Schumer) ("Commerce already has the authority under U.S. law . . . ."); 157 Cong. Rec. 14,452 (statement of Sen. Olympia Snowe) (stating that "Commerce has failed to use its authority" and that the bill would "make clear that Commerce has the ability to investigate"); 157 Cong. Rec. 14,599 (2011) (statement of Sen. Robert P. Casey, Jr.) ("[The bill] doesn't put into place a new rule for international trade . . . ."); 157 Cong. Rec. 14,692 (2011) (statement of Sen. Ben Cardin) ("[T]his legislation will allow U.S. manufacturers . . . to use existing countervailing duty laws . . . .").

**PUBLIC VERSION**

Court No. 21-00397                                                                 Page 48

These legislative histories demonstrate that Congress did not consider and reject proposed legislation that would have overridden a purported Commerce practice of which Congress disapproved.  Rather, the House committee report and statements of Senators evince a congressional intent to make plain that Commerce had the authority to countervail currency undervaluation under existing law — despite Commerce's decisions in two instances that petitioners' allegations were unsupported by reasonably available information.

KTV's acquiescence argument, attenuated as it is by the lack of any established practice of Commerce, is weakened further by Congress' apparent recognition that Commerce did in fact have the authority under existing law to countervail currency undervaluation.  *Craft*, 535 U.S. at 287 (stating that where subsequent legislative history "indicate[d] that the House intended" a proposed amendment "to be nothing more than a 'clarification' of existing law," the Senate's rejection of the amendment as superfluous "lack[ed] persuasive significance"); *see also Central Bank of Denver, N.A.*, 511 U.S. at 187 ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change.").

The third reason that KTV's acquiescence argument is not persuasive is that the content and circumstances of the House and Senate bills do not support KTV's argument that Congress "considered and rejected the '*precise* issue,'" *Rapanos*, 547 U.S. at 750 (quoting *Bob Jones Univ.*, 461 U.S. at 600) — namely, Commerce's authority to countervail currency undervaluation as a domestic subsidy.  As to the House bill, the language of the bill, reinforced by the report of the Ways and Means

Committee, addressed the issue of export contingency for an alleged *export* subsidy, not any issue related to identification or measurement of currency undervaluation as a *domestic* subsidy. *See* H.R. Rep. No. 111-646, at 6-9; H.R. 2378 § 2(b). By contrast, the 2020 *Final Rule* and the changes under it that Commerce effected to 19 C.F.R. § 351.502 provide for the consideration of currency undervaluation as a *domestic subsidy*. *See Final Rule*, 85 Fed. Reg. at 6,040 (declining "to opine on the one commenter's statement that treating currency undervaluation as an export subsidy is never proper under international law"); IDM at 28 (stating that Commerce "did not determine that currency undervaluation is an export subsidy" (citing PDM at 23-24; IDM at cmt. 4)). Therefore, H.R. 2378 did not address the issue that Commerce later distilled in its regulations in 2020.

The court notes that the Senate bill was far broader than the House bill and sought to address alleged currency undervaluation of foreign trading partners through multiple different mechanisms. For example, the Senate bill would have, among other things, required the Secretary of the Treasury to "analyze on a semiannual basis the prevailing real effective exchange rates of foreign currencies" and "consult bilaterally" with a country maintaining a currency that Treasury designates as "fundamentally misaligned." S. 1619 §§ 2-5. To find congressional acquiescence, the court would be required to assume that the Senate bill was not enacted into law because of opposition to the CVD-related currency undervaluation provisions rather than to other provisions. The court declines to make that assumption because "[t]o explain the cause of non-action by Congress when Congress itself sheds no light is to venture into speculative

**PUBLIC VERSION**

Court No. 21-00397                                                      Page 50

unrealities." *Helvering*, 309 U.S. at 119-20; *see also Solid Waste Agency of N. Cook Cnty.*, 531 U.S. at 169 n.5.[21]

Finally, KTV contrasts the instant case with *Solid Waste Agency*, in which the Supreme Court declined to find congressional acquiescence because "the agency offered no persuasive evidence that the failed legislation was proposed in response to the agency expanding its jurisdiction under the statute."  Pl. Reply Br. at 9-10 (citing *Solid Waste Agency of N. Cook Cnty.*, 531 U.S. at 170-71).  According to KTV, "[i]n this case, by contrast, its [sic] is clear Congressional [sic] acquiescence came years *after* the policy was first adopted by the relevant agency."  *Id.*  KTV asserts that, as a consequence, "there is no bases [sic] for Defendant's suggestion that Congress was unaware of the agency practice."  *Id.*

KTV is correct that the 2010 bill and part of the 2011 bill appear to have been at least in part in response to Commerce's decision not to initiate investigations into alleged currency undervaluation in *Aluminum Extrusions* and *Certain Coated Paper*. *See* H.R. Rep No. 111-646, at 7.  However, the court has concluded that there was no administrative construction of the CVD statute to which Congress could have acquiesced.  *See supra* Section II.B.2.a.  In addition, there is no indication in the 1979 Act, the OTCA or the URAA that Congress was aware of any ostensible practice of Commerce not to countervail currency undervaluation.  *See infra* Section II.B.2.c.  The awareness by Congress of the 2010 and 2011 determinations — or that certain Members of Congress disapproved of Commerce's decision not to initiate an

---

[21] *See* Barrett, *supra*, at 335 ("A host of explanations other than congressional approval of an opinion may account for legislative inaction.").

investigation in the two instances — cannot give rise to congressional acquiescence in the absence of a consistent administrative construction of the CVD statute that Commerce did not have the authority under existing law to countervail currency undervaluation. *Bob Jones Univ.*, 461 U.S. at 600-01; *Schism*, 316 F.3d at 1297.

In sum, the court concludes that Congress did not acquiesce to any purported practice of Commerce that it lacked the authority to countervail currency undervaluation under the CVD statute.

> ### c. Whether there was congressional *ratification* of judicial decisions or a Commerce interpretation or practice — in particular, ratification through legislative actions to the CVD statute in trade acts since 1979

KTV argues next that Congress was aware of and *ratified* what KTV argues are administrative or judicial interpretations of the CVD statute in which Commerce concluded or the courts decided that currency undervaluation is not a countervailable subsidy. *See* Pl. Br. at 25, 29-30.[22]  KTV's argument is that Congress, aware of what KTV describes as Commerce's administrative practice that Commerce did not have the authority to countervail currency undervaluation, amended the CVD statute in 1979, 1994, 2015 and 2016, but did not, according to KTV, amend the law to provide such authority to Commerce to countervail currency undervaluation. *See id.* at 29-30 (quoting *Lorillard*, 434 U.S. at 580; *GPX Int'l Tire Corp.*, 666 F.3d at 740) (citing *Forest*

---

[22] KTV quotes the Federal Circuit's statement in *GPX*: "Once Congress has ratified a statutory interpretation through reenactment, agencies no longer have discretion to change this interpretation."  Pl. Br. at 30 (citing *GPX Int'l Tire Corp. v. United States*, 666 F.3d 732, 740 (Fed. Cir. 2011)).  KTV attempts later to assert that it does not base its argument on ratification. *See* Pl. Reply Br. at 8.  However, given KTV's initial argumentation and additional reliance on *Lorillard v. Pons*, 434 U.S. 575 (1978), in its reply brief, the court addresses both doctrines.

*Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-240 (2009); *Faragher v. City of Boca Raton*, 524 U.S. 775, 792 (1998)).  KTV argues further that, because of Congress' supposed ratification, Commerce "no longer [has] discretion" to countervail currency undervaluation.  *Id.* at 30 (quoting *GPX Int'l Tire Corp.*, 666 F.3d at 740).

As noted above, the court concludes that Commerce did not have a practice with respect to currency undervaluation.  Similarly, there were no court decisions on the matter.  As a consequence, there was no interpretation or practice that Congress could have ratified.

Nonetheless, assuming for the sake of argument that there was such an interpretation or practice that Congress could have ratified, the court concludes that no such ratification occurred.

> **(1)   Congressional ratification of judicial or administrative interpretation**

To support its ratification argument, KTV relies on decisions of the Supreme Court in which the Court stated that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."  Pl. Br. at 30 (citing *Lorillard*, 434 U.S. at 580).  However, the Supreme Court has stated also that this presumption of congressional awareness requires that there be a "settled judicial construction," *Jama*, 543 U.S. at

APPX000116

351, or a "longstanding administrative interpretation,"[23] *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986).  Similarly, the Supreme Court has held that where "the record of congressional discussion preceding reenactment makes no reference" to the agency's purported interpretation, and where "there is no other evidence to suggest that Congress was even aware" of the agency's "interpretive position," the reenactment is "without significance."  *Brown v. Gardner*, 513 U.S. 115, 121 (1994) (quoting *United States v. Calamaro*, 354 U.S. 351, 359 (1957)); *see also Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) (observing that "[a]ll indications are that Congress was well aware of the position taken by [the agency] when enacting the ADA and intended to give that position its active endorsement").

In addition, the Supreme Court has also cautioned that where "Congress has not comprehensively revised a statutory scheme but has made only isolated amendments . . . 'it is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval'" of the prior interpretation.  *Alexander v. Sandoval*, 532 U.S. 275, 292-93 (2001) (quoting *Patterson*, 491 U.S. at 175 n.1).

### (2)    The 1979 Act

KTV argues that the *Hammond* decision by the CCPA and subsequent determinations of Commerce evince a "longstanding administrative practice" of not

---

[23] For example, in *NLRB v. Gullet Gin Co., Inc.*, 340 U.S. 361, 365-66 (1951), the Supreme Court addressed the role of a past practice followed for "many years" by the National Labor Relations Board: "During this period, the Board's practice had been challenged before the courts in only two cases, and in both, the Board's position was sustained."  Because Committee reports demonstrated that "Congress considered in great detail the provisions of the earlier legislation as they had been applied by the Board," the Supreme Court concluded that it was "a fair assumption" that "Congress accepted the construction placed [on the statute] by the Board and approved by the courts" when Congress reenacted the provision without pertinent change.  *Id.*

countervailing currency undervaluation. Pl. Br. at 23-24. KTV notes also that the CVD

statute was "amended on several occasions" after the *Hammond* decision, most notably

in 1979 to implement the results of the Tokyo Round of multilateral negotiations, and

again in 1994 in the URAA. *Id.* KTV argues on this basis that "Congress was fully

aware" of the ostensible practice and "made no effort to overturn it." As a consequence,

KTV maintains, Commerce lacked the authority to modify that purported practice. *Id.* at

24-25.

    As noted, for Congress to ratify a judicial interpretation of a statute, the Supreme

Court has established a requirement that there be a "settled judicial construction." *See*

*Jama*, 543 U.S. at 351 (holding that "the decisions of two Courts of Appeals" were "too

flimsy to justify that Congress endorsed [the interpretation] when the text and structure

of the statute are to the contrary").[24] Here, only one court, on one occasion, in 1971,

discussed in dicta whether currency undervaluation could be a countervailable

subsidy.[25] *See Hammond*, 440 F.2d at 1030-31; *see also supra* Section II.B.2.a(1).

Even setting aside the non-germane and in any event non-precedential nature of the

dicta in that case (as noted previously), a single case by itself is "too flimsy" to constitute

a "settled judicial construction" in this instance. *Jama*, 543 U.S. at 351-52; *see Pierce v.*

---

[24] In *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414 n.8 (1975), the Supreme Court cited the "unanimous" views of *six* federal courts of appeal as support for the conclusion that "Congress plainly ratified [the considered] construction" of Title VII of the Civil Rights Act of 1964 after rejecting a contrary provision during the later consideration of the Equal Employment Opportunity Act of 1972. Unlike in *Albemarle Paper Co.*, only one opinion addressed, in dicta, the countervailability issue presented here. *See Hammond*, 440 F.2d at 1030-31.

[25] Justice Barrett also argues: "A court of appeals opinion does not represent settled law; it represents developing law." Barrett, *supra*, at 334.

Court No. 21-00397                                                                Page 55

*Underwood*, 487 U.S. 552, 567 (1988) (distinguishing the situation before the Supreme Court in that case from one "in which Congress reenacted a statute that had in fact been given a consistent judicial interpretation").

Congress in the 1979 Act changed core provisions of U.S. countervailing duty law in part to implement the Tokyo Round.  Congress in that act also expressed dissatisfaction with the work of the Department of the Treasury in administering the law and transferred authority to the Department of Commerce.  *See, e.g.,* H.R. Rep. 96-317, at 24; *see also* Reorganization Plan No. 3 of 1979, 44 Fed. Reg. 69,273, 93 Stat. 1381, *as amended* Pub. L. No. 97-195, § 1(c)(6).  There is no indication in the language of the act or its legislative history that Congress was even aware of, let alone sought to ratify, the 1971 *Hammond* decision, which reversed the Customs Court on jurisdictional grounds and commented in dicta on currency undervaluation.  440 F.2d at 1030-31.  Accordingly, the *Hammond* decision neither provides nor contributes to a basis for Congress to have ratified any purported practice, or judicial or administrative interpretation prior to the 1979 Act.

### (3)    The OTCA and URAA

KTV argues next that in the Omnibus Trade and Competitiveness Act of 1988 ("OTCA") and the Uruguay Round Agreements Act of 1994 ("URAA") Congress ratified Commerce's alleged practice against countervailing currency undervaluation because, according to KTV, in those laws "Congress did not direct Commerce to modify its treatment of currency valuation in countervailing duty cases."  Pl. Br. at 28-30; Pl. Reply Br. at 7-10.  As with KTV's reliance on the 1979 Act, there is no support for KTV's ratification argument in either the OTCA or the URAA.

**PUBLIC VERSION**

As stated, there was neither a "settled judicial construction" nor a "longstanding administrative interpretation" that Commerce did not have the authority to countervail currency undervaluation. As discussed, the *Hammond* case does not constitute "settled judicial construction." *Supra* Section II.B.2.c(2).

Similarly, there was no "long-standing administrative interpretation," an important factor to which courts have turned to assess whether Congress was aware of a purported practice. *Id.*; *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000) (stating that Congress had "effectively ratified the FDA's long-held position"); *Schor*, 478 U.S. at 845-46.

For example, in *Fogarty v. United States*, 780 F.2d 1005, 1008-10 (Fed. Cir. 1986), plaintiff alleged that "the IRS improperly changed a 60-year administrative practice" that "had acquired the force of law" and could not be reversed "absent a change by Congress in the statute." The Federal Circuit noted that "[l]ongstanding treasury [sic] regulations that have not been affected by subsequent reenactment or amendment of the underlying statutes are deemed to have acquired the force of law." *Id.* at 1012. However, the court concluded that the alleged practice of Treasury in that case was insufficient to support congressional ratification because "the prior administrative practice at most was expressed in revenue rulings and private letter rulings interpreting or applying an office decision." *Id.*; *see also Schor*, 478 U.S. at 846; *Bernardo ex rel. M & K Eng'g, Inc. v. Johnson*, 814 F.3d 481, 489 (1st Cir. 2016) (distinguishing instances in which the agency had "declared by *regulation* its interpretation" from the isolated decisions of the agency before the court, which were

"plainly insufficient" to conclude that "Congress knew of and endorsed" any agency interpretation).

Likewise, in the instant case, there was no regulation *at all* that Commerce could not countervail currency undervaluation and there were only scattered Commerce determinations. These determinations did not constitute a uniform interpretation by Commerce that it could not determine that currency undervaluation constitutes a countervailable subsidy. *See supra* Section II.B.2.a; *see also Gullett Gin Co.*, 340 U.S. at 365 (noting that the NLRB "had for many years been following the practice"); *Schor*, 478 U.S. at 846 (describing a "longstanding administrative interpretation without pertinent change"); *Nat'l Lead Co. v. United States*, 252 U.S. 140, 146-47 (1920) (noting an "established usage," that "the practice was continued" for 24 years and was "constantly employed" and the government had "widely applied" a rule); *GPX Int'l Tire Corp.*, 666 F.3d at 734, 744 (mentioning that "Congress legislatively ratified earlier consistent administrative and judicial interpretations" and characterizing the practice of not applying CVD law to NME countries to be "longstanding").[26]

Moreover, even supposing that the interpretation of the CVD statute alleged by plaintiff existed, Congress did amend the operative CVD provisions after the *Hammond* decision. In this regard, plaintiff has not directed the court's attention to any indication in the legislative history of those amendments that Congress was aware of and sought

---

[26] Further, the circumstances in this case differ from those in *Lorillard*, on which plaintiff relies. Unlike the law considered in *Lorillard*, Congress did not incorporate part of one law for which there was an established interpretation into a separate, new law. *See Lorillard*, 434 U.S. at 580. Instead, Congress simply considered, on occasions, amendments to the CVD statute.

to ratify any purported longstanding interpretation or practice of Commerce not to countervail currency undervaluation.

Where "the record of congressional discussion preceding reenactment makes no reference to the . . . [interpretation at issue], and there is no other evidence to suggest that Congress was even aware of the [agency's] interpretive position," the Supreme Court has stated that "the . . . re-enactment [is] without significance." *Brown*, 513 U.S. at 121. By contrast, where "legislative history shows that Congress was fully aware of the agency regulations and practices at the time of legislating in their area, . . . absent some special circumstance the failure to change or refer to existing practices is reasonably viewed as ratification thereof*.*" *San Huan New Materials High Tech, Inc. v. Int'l Trade Comm'n*, 161 F.3d 1347, 1355 (Fed. Cir. 1998). For example, in *San Huan New Materials High Tech, Inc.*, 161 F.3d at 1355, the Federal Circuit held that a Senate report "[left] no doubt that Congress was aware of, and approved of," the Commission's "long-standing practice of imposing civil penalties for violations of consent orders," such that by enacting the OTCA, Congress had effectively ratified those rules and practices. The rules in controversy had been in place "since at least 1981" and continued to the time of the enactment of the OTCA. *Id.* Moreover, the Senate report accompanying the bill cited to the Commission's practice and stated that the proposed legislation "is intended to put to rest any doubts regarding the Commission's authority to terminate investigations by issuance of consent orders." *Id.* Therefore, because the Senate report referred approvingly to the Commission's rules, this legislative history established "that Congress was fully aware of the agency regulations and practices at the time" Congress passed the OTCA. *Id.* The court held that the "failure [of the OTCA] to

change or refer to existing practices is reasonably viewed as ratification thereof." *Id.* As in *Brown* — and in contrast to the facts in *San Huan New Materials High Tech, Inc.* — "there is no . . . evidence to suggest that Congress was even aware of the [agency's] interpretive position." *Brown*, 513 U.S. at 121.

Likewise, KTV's reliance on the Federal Circuit's decision in *GPX*, *see* Pl. Br. at 30 n.78, is not only unavailing, it proves the opposite of KTV's argument. In *GPX*, 666 F.3d at 734, the Federal Circuit held that Congress had ratified Commerce's practice of not imposing countervailing duties on imports from NME countries. In reaching its holding, the Federal Circuit first noted the overwhelming evidence in the legislative history of three separate statutes that Congress was aware of both (1) a Commerce practice that the CVD law did not apply to NMEs and (2) a Federal Circuit decision affirming that practice. *Id.* at 741-43. In particular, the Federal Circuit observed that in the conference report for the OTCA, Congress referenced expressly that court's previous decision in *Georgetown Steel*, the holding of which the conference report cited as "present law." *Id.*

The Federal Circuit in *GPX* noted further that after three additional Commerce investigations in which the agency declined to apply the CVD law to NMEs, Congress passed the URAA. *Id.* at 743. The Federal Circuit noted the express reference to *Georgetown Steel* in the URAA SAA, a further indication that Congress was aware of both Commerce's practice and the Federal Circuit's express affirmance of that

practice.[27]  *Id.* at 743; *see also Kemira Fibres Oy v. United States*, 61 F.3d 866, 873-74 (Fed. Cir. 1995) (holding that language in the SAA endorsing Commerce's interpretation of the regulation meant that "when Congress enacted the current antidumping statute, it ratified Commerce's position").

By contrast, KTV has not pointed to any legislative history in either the OTCA or the URAA that indicates that Congress was aware of any ostensible practice not to countervail currency undervaluation.  *See Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1311-12 (Fed. Cir. 2001) (declining to find ratification because plaintiff "presented no evidence that Congress, when it amended the antidumping statute, was aware of Commerce's interpretation of the pertinent provisions of the pre-URAA statute"); *Bernardo ex rel. M & K Eng'g, Inc.*, 814 F.3d at 489 ("[H]ere we have no evidence that Congress was even aware of the purported administrative interpretation, let alone intended to adopt it.").

---

[27] The Federal Circuit noted additional evidence of Congress' awareness of Commerce's interpretation.  For example, in 1984, soon after Commerce determined for the first time that the CVD law could not be applied to NMEs, Commerce informed Congress of its interpretation in a hearing before the Senate Subcommittee on International Trade.  *GPX Int'l Tire Co.*, 666 F.3d at 740-41.  In addition, in the Trade and Tariff Act of 1984, Congress "rejected provisions that would have affected trade remedies on NME imports," and explained that Commerce's interpretation was "pending judicial resolution."  *Id.* at 741 (citing Trade and Tariff Act of 1984, Pub. L. No. 98-573, 98 Stat. 2948; 130 Cong. Rec. 30,453 (1984)).  The Federal Circuit stated also that Congress again considered applying the CVD law to NMEs in the OTCA but ultimately decided "to retain the 'present law,' which was described simply as the holding of *Georgetown Steel*."  *Id.* at 741-43 (citing H.R. Rep. No. 100-576, at 628 (1988) (Conf. Rep.), *as reprinted in* 1988 U.S.C.C.A.N. 1547, 1661).  Given the clear evidence of congressional ratification of Commerce's interpretation in *GPX*, as opposed to the lack of any indication in the 1979 Act, the OTCA or the URAA that Congress was aware any purported interpretation in the instant case, KTV's reliance on *GPX* is unavailing.

Rather, KTV presents only the following quotation from Congress' findings in the OTCA that:

> Policy initiatives by some major trading nations that manipulate the value of their currencies in relation to the United States dollar to gain competitive advantage continue to create serious competitive problems for United States industries.

Pl. Br. at 28 (citation omitted).  KTV submits that this quotation demonstrates that, prior to the OTCA and prior to the URAA, Congress was aware of the issue of currency undervaluation.  *Id.* (citing Pub. L. No. 100-418, § 3002(6), 102 Stat. 1107, 1372, 22 U.S.C. § 5302(6)).  The court is prepared to accept that conclusion.  However, to succeed in a ratification argument, KTV would have to have shown that Congress was aware of a *judicial or administrative interpretation or practice* not to *countervail* currency undervaluation.  KTV has not done so.  That is because there is no indication that, in enacting either the OTCA or the URAA, Congress was aware of and endorsed any purported practice that currency undervaluation was not countervailable.  Therefore, the court "do[es] not assume that Congress silently intended to adopt" that purported practice.  *Micron Tech., Inc.*, 243 F.3d at 1311.

In sum, the court may not and does not draw an assumption or inference that such legislation ratified a judicial or administrative interpretation or practice of not countervailing currency undervaluation.  Rather, the court concludes that Congress did not ratify in the 1979 Act, the OTCA or the URAA any ostensible administrative or judicial interpretation that currency undervaluation is not countervailable under the CVD law.

### (4)    TPEA and TFTEA

KTV points finally to the Trade Preferences Extension Act of 2015 ("TPEA") and the Trade Facilitation and Trade Enforcement Act of 2015 ("TFTEA"), arguing for the court to find "congressional acquiescence" based also on those enactments.[28]  *See* Pl. Br. at 29 (citing TPEA, Pub. L. No. 114-27, 129 Stat. 362, 383-87 (2015); TFTEA, Pub. L. No. 114-125, 130 Stat. 122, 156-61 (2016)).  KTV maintains that Congress again amended the CVD statute but "has not altered the definition of subsidy" or addressed currency undervaluation as a potential subsidy.  *Id.* (citing 161 Cong. Rec. 6,570-71 (2015) (text of Senate Amendment 1224); Pub. L. No. 114-27, 129 Stat. 362, 383-87; Pub. L. No. 114-125, 130 Stat. 122, 156-61).

The court concludes for two reasons that KTV's ratification argument as to the TPEA and TFTEA is not persuasive.  First, there was no settled judicial construction or longstanding administrative interpretation or practice not to countervail currency undervaluation that Congress could have ratified in those laws.  Second, even assuming that there had been such a construction, interpretation or practice, the terms

---

[28] KTV raises the TPEA and TFTEA as evidence of congressional acquiescence.  *See* Pl. Br. at 29-30.  However, the doctrine of congressional acquiescence addresses the impact of congressional *silence* on the weight of prior judicial or administrative interpretations of a previously enacted statute.  *See supra* Section II.B.2.b.  By contrast, KTV's argument concerning the TPEA and the TFTEA pertains to the impact of *enacted legislation* on prior judicial or administrative interpretation of the CVD law.  *See* Pl. Br. at 29-30 ("[A]lthough Congress has reenacted the relevant provisions of the countervailing duty statute in 2015 and 2016, it has not altered the definition of subsidy to overturn Commerce's longstanding practice.")  Therefore, the court considers that the relevance of the TPEA and TFTEA is appropriately analyzed under the doctrine of congressional ratification.  *See* William N. Eskridge Jr., *Interpreting Legislative Inaction*, 87 Mich. L. Rev. 67, 79 (1988) ("[A]cquiescence . . . is closely related to the reenactment rule, which the Court generally treats as a separate doctrine.").

**PUBLIC VERSION**

Court No. 21-00397                                                                 Page 63

of the TPEA and the TFTEA do not support KTV's argument that Congress ratified any

such construction, interpretation or practice in either statute or even in the two statutes

taken together.

The Supreme Court has stated that the doctrine of congressional ratification

applies only to instances in which "Congress comprehensively revised the statutory

scheme but did not amend" the ostensibly ratified provision. *Sandoval*, 532 U.S. at 292

(citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 381-82

(1982)). By contrast, where Congress "has made only isolated amendments . . . '[i]t is

impossible to assert with any degree of assurance that [a] congressional failure to act

represents affirmative congressional approval'" of the prior interpretation. *Id.* (quoting

*Patterson*, 491 U.S. at 175 n.1).

Both the TPEA and TFTEA consisted of "only isolated amendments," at best,

with respect to the CVD law. *Id.*

Turning first to the TPEA, Congress did not, in that law, amend *any* aspect of

Commerce's countervailing duty methodology. Rather, Congress amended: (1) the

definition of "material injury" in 19 U.S.C. § 1677(7); and (2) three provisions that affect

Commerce's *antidumping* methodology.[29] *See* Pub. L. No. 114-27, Title V, § 503-505,

129 Stat. at 384-85. The TPEA also changed two *procedural* provisions that apply to

both AD investigations and reviews and CVD investigations and reviews — use of facts

available under 19 U.S.C. § 1677e and the number of voluntary respondents under 19

---

[29] With respect to antidumping methodology, the TPEA amended the definition of "ordinary course of trade" in 19 U.S.C. § 1677(15), the definitions of "normal value" and "constructed value" and certain language related to price or cost distortion in 19 U.S.C. § 1677b. *See* Pub. L. No. 114-27, Title V, §§ 503-505.

**PUBLIC VERSION**

U.S.C. § 1677m.  *Id.* §§ 502 (facts otherwise available), 506 (number of voluntary

respondents), 129 Stat. at 383, 386.  Isolated amendments such as these that were

unrelated to CVD methodology do not provide a basis for the court to draw an inference

of congressional ratification.  *Sandoval*, 532 U.S. at 292 (citation omitted).[30]

Accordingly, the TPEA did not affect the authority of Commerce to countervail

subsidies.  *See supra* Section II.B.1.

Similarly, Subtitle A of the TFTEA, "Actions Relating to Enforcement of Trade

Remedy Laws," did not amend any provision of Commerce's countervailing duty

methodology either.  Pub. L. No. 114-125, subtit. A, §§ 411-415, 130 Stat. 122, 156-61.

Rather, Congress, inter alia, added provisions to address evasion of antidumping and

countervailing duty orders under the Enforce and Protect Act ("EAPA"), included trade

enforcement provisions not related to the administration of the CVD law and established

enhanced engagement on currency exchange rates outside of the context of the CVD

law.  *Id.* §§ 401-433, 601-611, 701-702, 130 Stat. at 155-171, 180-194, 195-198.  The

content and context of these amendments make clear that Congress' passage of the

TFTEA did not ratify any ostensible practice not to countervail potential currency

undervaluation.  *See Sandoval*, 532 U.S. at 292 (noting the strong disinclination of the

Court to read meaning into congressional inaction when "Congress has not

comprehensively revised a statutory scheme but has made only isolated amendments"

(quoting *Patterson*, 491 U.S. at 175 n.1)).

---

[30] As discussed above, when Congress wanted to amend a provision of the CVD law related to subsidy identification and measurement, Congress knew exactly how to do so.  *Supra* Section II.B.2.c.

In sum, due to the absence of a settled judicial construction or longstanding administrative interpretation of the CVD law as to currency undervaluation, *Bragdon v. Abbott*, 524 U.S. 624, 645, and because "Congress [did] not comprehensively revise[ ] [the] statutory scheme but . . . made only isolated amendments," *Sandoval*, 532 U.S. at 292, Congress did not ratify any such practice in the TPEA or TFTEA.

> **d.    Legislation on currency undervaluation as it pertains to Treasury**

KTV next submits that U.S. law accords exclusive authority to Treasury to address currency undervaluation matters, including in the trade context.  Pl. Br. at 29 (citing Pub. L. No. 114-125, Title VII (2016); H.R. Rep. No. 114-376, at 75-79 (2015) (conference committee report); 161 Cong. Rec. H9,296-97 (daily ed. Dec. 11, 2015) (adoption of conference committee recommendations)).  KTV maintains that, for this reason as well, Commerce does not have authority under the CVD law to address currency undervaluation.  *See* Oral Arg. Tr. at 13:9-14:6.

There is no basis in the statute or legislative histories of CVD law enactments including and since 1974 to support this contention.

First and foremost, the U.S. CVD statute does not create an exception to Commerce's authority for areas in which another federal government agency, such as Treasury, may have authority under a different statute.  19 U.S.C. §§ 1671, 1677 (enumerating no restrictions beyond those pertaining to financial contribution, benefit and specificity); *see Final Rule*, 85 Fed. Reg. at 6,037-38 ("Commerce makes its determination regarding CVDs pursuant to a different legal authority from Treasury's

statutory currency determinations, and for a different statutory purpose."); *see supra* Section II.B.1.[31]

In addition, Congress has given a large number of entities — including the Chairman of the Board of Governors of the Federal Reserve System, the Secretary of State, the Comptroller General of the United States, the U.S. Trade Representative ("USTR"), and other parts of the Commerce Department *in addition to* Treasury — roles in addressing currency undervaluation.  Treasury responsibilities related to currency undervaluation in the OTCA (Pub. L. No. 100-418, § 1124, 102 Stat. at 1146 (codified at 22 U.S.C. § 5304); Pub. L. No. 100-418, § 3004(b), 102 Stat. at 1373; Pub. L. No. 100-418, § 3005(a)-(b)(1), 102 Stat. at 1374), in the TFTEA (Pub. L. No. 114-125, § 701(a), 130 Stat. at 195; *Id.* § 701(b), 130 Stat. at 196; *Id.* § 702(a)(2), 130 Stat. at 198 (codified at 19 U.S.C. § 4422)); President and executive agencies and departments other than Treasury responsibilities (Bipartisan Congressional Trade Priorities and Accountability Act of 2015, Pub. L. 114-26, § 102(b)(11)-(12), 129 Stat. 319, 320 (codified at 19 U.S.C. § 4201(b)(11)-(12)), the Trade Act of 2002 Pub. L. No. 107-210, § 2102(c)(12), 116

---

[31] Commerce addressed this issue directly in its *Final Rule*:

> Congress gave Commerce the authority to remedy injurious subsidies, regardless of what form they take.  The CVD law gives U.S. domestic producers the right to petition Commerce to investigate allegedly injurious foreign subsidies, and it requires Commerce to conduct such investigations (provided that the applicable requirements for initiation are met).  This is true even with respect to issues in which other U.S. Government agencies or international bodies may have an overlapping interest . . . . Commerce routinely investigates programs involving, e.g., export credits and equity infusions, which are potential forms of subsidization that may also be practices monitored by other governmental and international entities.

*Final Rule*, 85 Fed. Reg. at 6,032.

Stat. 933, 1003 (2002) (codified at 19 U.S.C. § 3802(c)(12)), the OTCA, Pub. L. No.

100-418, § 3004(a), 102 Stat. at 1373 (codified at 22 U.S.C. § 5304), and the TFTEA,

Pub. L. No. 114-125, § 701(c), 130 Stat. at 196).[32]  None of these authorities diminishes

Commerce's mandate under 19 U.S.C. § 1671(a) and § 1677(5) to investigate alleged

subsidy practices that meet the requirements of those provisions.

Accordingly, the court concludes that U.S. CVD law provides the authority for

Commerce to promulgate its regulations in 2020 and to apply them in the context of

investigations and reviews.

---

[32] Even within the Treasury's 1988 Act reporting requirement, Treasury is required to consult with the Chairman of the Board of Governors of the Federal Reserve System. Pub. L. No. 100-418, § 3005(a), 102 Stat. at 1374 (codified at 22 U.S.C. § 5305(a)); *see* Conf. Rep. 100-576 at 845.  In fact, the Board of Governors was also given a reporting requirement on "the impact of the exchange rate of the dollar on [economic] trends." Pub. L. No. 100-418, § 3005(c), 102 Stat. at 1375 (codified at 12 U.S.C. § 225a (1988)). More recently, in the TFTEA, when reporting on trade enforcement by Customs, the Comptroller General of the United States must provide a report that includes "a description of trade enforcement activities to address undervaluation."  Pub. L. No. 114-125, § 102(b), 130 Stat. 129 (codified at 19 U.S.C. § 4311).  Congress also instructed Commerce to chair an interagency trade data advisory committee and establish the National Trade Data Bank, with data on average exchange rates.  Pub. L. No. 100-418, §§ 5402(c), 102 Stat. at 1464; 5406(a), (b)(3)(B) (codified at 15 U.S.C. §§ 4902(c); 4906(a), (b)(3)(B)).  To add to the various executive agencies above, Congress also gave the Secretary of State the responsibility to provide country reports to Congress on policies that affect countries' exchange rates.  Pub. L. No. 100-418, § 2202, 102 Stat at 1327 (codified at 15 U.S.C. § 4711 (repealed)).  Last, the TFTEA established the Trade Enforcement Trust Fund under Treasury, but which would provide, inter alia, capacity building funds for the USTR in areas that include "foreign currency manipulation."  Pub. L. No. 114-125, § 611(d)(1)(D), 130 Stat. at 193 (codified at 19 U.S.C. § 4405(d)(1)(D)).

**III.    Whether the determination by Commerce that KTV was a specific beneficiary of a financial contribution provided by Vietnam's currency undervaluation program was supported by substantial evidence and in accordance with law**

###### A.    Legal framework

Commerce imposes countervailing duties when: (1) Commerce — as the "administering authority" — "determines that [a foreign] government or any public entity within th[at] . . . country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States"; and (2) the U.S. International Trade Commission ("Commission") determines that a U.S. industry is "materially injured" or "threatened with material injury," or the establishment of a U.S. industry is materially retarded, due to the imports.  19 U.S.C. § 1671(a).

A subsidy is countervailable when "an authority . . . provides a financial contribution" — or otherwise "entrusts or directs a private entity to make a financial contribution, if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments" — that confers a benefit to a specific enterprise, industry or group of enterprises or industries.  19 U.S.C. § 1677(5)(B), 5(D), 5(E); *see id.* § 1677(5A).  The statute further defines "authority" as "a government . . . or any public entity within the territory of [a] country."  *Id.* § 1677(5)(B).  In addition, the statute defines four categories of "financial contribution": (1) "the direct transfer of funds, *such as* grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees"; (2) "foregoing or not collecting revenue that is otherwise due"; (3)

"providing goods or services"; and (4) "purchasing goods." *Id.* § 1677(5)(D) (emphasis supplied).

A domestic subsidy must also be specific to an "enterprise or industry" or "a group of such enterprises or industries." *Id.* § 1677(5A)(D).  With respect to the determination of a "group," Commerce "is not required to determine whether there are shared characteristics among the enterprises or industries that are eligible for, or actually receive, a subsidy."  19 C.F.R. § 351.502(b).  Further, Commerce "normally will consider enterprises that buy or sell goods internationally to comprise such a group." *Id.* § 351.502(c).  A subsidy is *de facto* specific if, inter alia, an "enterprise or industry is a predominant user of the subsidy."  19 U.S.C. § 1677(5A)(D)(iii)(II).

Commerce will treat a benefit as conferred "where there is a benefit to the recipient." *Id.* § 1677(5)(E).

In addition, 19 C.F.R. § 351.528 defines the process that Commerce is to use to determine currency undervaluation and benefit for a potential countervailable subsidy. The regulation provides:

§ 351.528 Exchanges of undervalued currencies.

(a) Currency undervaluation—

(1) In general.  The Secretary normally will consider whether a benefit is conferred from the exchange of United States dollars for the currency of a country under review or investigation under a unified exchange rate system only if that country's currency is undervalued during the relevant period.  In determining whether a country's currency is undervalued, the Secretary normally will take into account the gap between the country's real effective exchange rate (REER) and the real effective exchange rate that achieves an external balance over the medium term

that reflects appropriate policies (equilibrium REER).

(2) Government action.  The Secretary normally will make an affirmative finding under paragraph (a)(1) of this section only if there has been government action on the exchange rate that contributes to an undervaluation of the currency.  In assessing whether there has been such government action, the Secretary will not normally include monetary and related credit policy of an independent central bank or monetary authority.  The Secretary may also consider the government's degree of transparency regarding actions that could alter the exchange rate.

(b) Benefit—

(1) In general.  Where the Secretary has made an affirmative finding under paragraph (a)(1) of this section, the Secretary normally will determine the existence of a benefit after examining the difference between:

(i) The nominal, bilateral United States dollar rate consistent with the equilibrium REER; and

(ii) The actual nominal, bilateral United States dollar rate during the relevant time period, taking into account any information regarding the impact of government action on the exchange rate.

(2) Amount of benefit.  Where there is a difference under paragraph (b)(1) of this section, the amount of the benefit from a currency exchange normally will be based on the difference between the amount of currency the firm received in exchange for United States dollars and the amount of currency that firm would have received absent the difference referred to in paragraph (b)(1) of this section.

(c) Information sources.  In applying this section, the Secretary will request that the Secretary of the Treasury provide its evaluation and

conclusion as to the determinations under paragraphs (a) and (b)(1) of this section.

19 C.F.R. § 351.528.

### B.    Analysis

#### 1.    Financial contribution

The first question presented in this case is whether Commerce's determination that the exchange of USD for Vietnamese *dong* constitutes a "direct transfer of funds," and, therefore, a financial contribution, is supported by substantial evidence and is in accordance with law.

The *Final Rule* provides that the exchange of currency may constitute a financial contribution. *Final Rule*, 85 Fed. Reg. at 6,034 (citing *Modification of Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings; Proposed Rule and Request for Comments*, 84 Fed. Reg. 24,406, 24,408 (Dep't of Commerce May 28, 2019)). In the Preliminary Determination in this case, Commerce found that, on the facts before it, the exchange of currency constituted a "financial contribution," whether the exchange was handled by a state-owned commercial bank ("SOCB") or a private bank entrusted or directed by the GOV. PDM at 20-21. In the Final Determination, Commerce concluded again that the exchange of USD for Vietnamese *dong* constituted a financial contribution. IDM at 13-16.

KTV disagrees with Commerce's conclusion, arguing that "[c]urrency conversion is not like any of those transactions" that are presented as "examples" of direct transfers of funds set forth in § 1677(5)(D)(i). Pl. Br. at 37-38. KTV adds that "currency

conversion is simply an exchange (at some exchange rate) of one currency into another, transferring one store of value into a different one." *Id.* at 38.

The court concludes based on the analysis below that the determination by Commerce that the exchange of currency in this case was a direct transfer of funds — and, consequently, constituted a financial contribution — is in accordance with the statute.

The language of the statute is clear. There are four types of financial contributions; the examples offered as to the first type are illustrative: "The term 'financial contribution' means — the direct transfer of funds, *such as* grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, *such as* loan guarantees . . . ." 19 U.S.C. § 1677(5)(D)(i) (emphasis supplied).

The use of the term "such as" means that the list set out at § 1677(5)(D)(i) is illustrative. *See id.*[33] The SAA underscores this point: "The examples of particular types of practices falling under each of the categories are not intended to be exhaustive." SAA at 927; *see* IDM at 13 (quoting SAA at 927). At oral argument,

---

[33] For other direct transfers of funds that are distinct from the four examples in the statute, see *Forged Steel Fluid End Blocks from India: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 79,999 (Dep't of Commerce Dec. 11, 2020) and accompanying IDM (Dep't of Commerce Dec. 7, 2020) at cmt. 8 (renewable energy certificates); *Coated Free Sheet Paper from Indonesia: Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,642 (Dep't of Commerce Oct. 25, 2007) and accompanying IDM (Dep't of Commerce Oct. 17, 2007) at cmt. 27 (repayment of debt by assets with no market value); *Preliminary Affirmative Countervailing Duty Determination: Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 68 Fed. Reg. 16,766, 16,776 (Dep't of Commerce Apr. 7, 2003), unchanged in *Final Affirmative Countervailing Duty Determination: Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 68 Fed. Reg. 37,122 (Dep't of Commerce June 23, 2003) and accompanying IDM (Dep't of Commerce June 16, 2023) at cmt. 1 (debt-for-equity swaps and extensions of debt maturities).

**PUBLIC VERSION**

Court No. 21-00397                                                                                            Page 73

plaintiff conceded that the list is not exhaustive.  *See* Oral Arg. Tr. at 41:9-11 ("I don't think you can say that a direct transfer of funds is limited to the four instances."). Moreover, in conjunction with the note in the SAA that the examples listed were not intended to be "exhaustive," the SAA explains that the "generic categories," one of which is "direct transfer of funds," were intended to be "sufficiently broad so as to encompass the types of subsidy programs generally countervailed by Commerce in the past, although determinations with respect to particular programs will have to be made on a case-by-case basis."  SAA at 927.  Accordingly, Commerce's finding that currency undervaluation is a direct transfer of funds is further supported by the SAA.[34]

Commerce explained that "[a]n exchange of currency clearly falls within th[e] common meaning of the terms 'transfer' and 'funds.'"  IDM at 13; *see Final Rule*, 85 Fed. Reg. at 6,034 ("The word 'transfer' suggests a conveyance, passing or exchange of something from one person to another.  The word 'funds' suggests money or some monetary resource.").  Commerce noted that a direct transfer of funds can exist

---

[34] Before Commerce, the GOV attempted to use WTO jurisprudence to support its view that currency conversion does not constitute a direct transfer of funds.  IDM at 13 (citing Government of Vietnam's March 10 Case Brief (Mar. 10, 2021) at 10, PR 456, CR 186, PJA Tab 33 (citing Appellate Body Report, *United States – Large Civil Aircraft (2nd Complaint)*, WTO Doc. WT/DS353/AB/R (Mar. 23, 2012), ¶ 613)).  First, WTO jurisprudence is not pertinent to the decision of the court.  *See Hyundai Elecs. Co. v. United States*, 23 CIT 302, 311, 53 F. Supp. 2d 1334, 1343 (1999).  Second, even if WTO jurisprudence were pertinent, Commerce nonetheless explained that the list of examples is not exhaustive and that there is a parallel between the reciprocity in the instant case and reciprocity in the context of loans and equity infusions — both of which are listed in the statute — such that reciprocity is not a characteristic that disqualifies the exchange of currency from constituting a direct transfer of funds.  IDM at 13 n.88; *see* 19 U.S.C. § 1677(5A)(D)(i).

regardless of whether it is reciprocal.  IDM at 13.[35]  Commerce also stated that the exchange of currency is "like," Pl. Br. at 37 — in the sense of being similar to — loans and equity infusions, albeit not grants.  IDM at 13; *see* Def.-Intervenor Br. at 41; *see also* Def.-Intervenor's Resp. Ct. Questions at 8, ECF No. 63 (asserting that loans and equity infusions are reciprocal).[36]

In the *Final Rule*, as reiterated in the IDM, Commerce also disagreed that "the question of whether 'equivalent value' was exchanged is relevant to a financial contribution analysis."  85 Fed. Reg. at 6,034; *see* IDM at 15.  The consideration by Commerce as to whether there was a *financial contribution* is separate from the

---

[35] Commerce stated:

> We disagree with the GOV's notion that because the exchange of currency is reciprocal in nature it cannot constitute a direct transfer of funds within the meaning of section 771(5)(D)(i) of the Act, as the GOV's arguments seem to suggest.  Loans and equity infusions are examples of financial contributions that are characterized by reciprocity in some fashion, where a government provides funds in exchange for money in the form of interest payments at a later date (*i.e.*, loans) or provides funds in exchange for shares of stock (*i.e.*, equity infusions). The GOV appears to be reading a requirement into the statute that only grant-like transfers can constitute a direct transfer of funds – a requirement that plainly does not exist *via* the inclusion of loans and equity infusions as specifically enumerated examples of direct transfers of funds.

IDM at 13.

[36] Other instances of direct transfers of funds with an element of reciprocity include debt forgiveness and corporate restructuring.  *See Ilva Lamiere E. Tubi S.R.L. v. United States*, 26 CIT 380, 381, 196 F. Supp. 2d 1347, 1350 (2002).  In addition, reciprocity appears in the purchase or provision of goods sold to companies by a foreign government (or a body entrusted or directed by a government) for less than adequate remuneration, another category of "financial contribution" under the statute.  *See RZBC Grp. Shareholding Co. v. United States*, 39 CIT __, __, 100 F. Supp. 3d 1288, 1302 (2015).  These examples demonstrate generally that transactional relationships between a foreign government and enterprises or industries are not incompatible with financial contributions.

**PUBLIC VERSION**

consideration by Commerce of any *benefit* that KTV and similarly situated Vietnamese exporters would receive, as discussed *infra* Section III.B.3.a.  As Commerce stated, such financial contribution "occurs regardless of whether the domestic currency is undervalued."  IDM at 14.

KTV also challenges Commerce's determination that Vietnamese banks were entrusted or directed by the GOV.  Pl. Br. at 38-39 (arguing that "Commerce's complaint was with the overall impact of *all* sales and purchases in the foreign-currency markets, not the purchases of foreign currency from one individual exporter.  Consequently, Commerce's imposition of countervailing duties is not based on any actual 'transfers' from the [GOV], but instead on net transfers by the [GOV] with numerous other parties.").

Under 19 U.S.C. § 1677(5)(B)(iii), a financial contribution may be made by a public body or private entity that has been entrusted or directed by the government to take such action.  *See generally* SAA at 926 ("[T]he Administration intends that the 'entrusts or directs' standard shall be interpreted broadly.  The Administration plans to continue its policy of not permitting the indirect provision of a subsidy to become a loophole when unfairly traded imports enter the United States and injure a U.S. industry.").

Commerce explained that the currency exchanges handled by the SOCBs and private banks constituted a "direct transfer of funds."  IDM at 14, 16.  Specifically, Commerce described that the SOCBs are required to receive approval from the State Bank of Vietnam ("SBV") to exchange currency.  *Id.* at 14.  Commerce noted further that Vietinbank and Vietcombank are SOCBs with majority government ownership.  *Id.*

**PUBLIC VERSION**

Court No. 21-00397                                                      Page 76

Commerce determined that the banks "are vested with government authority" based on the broad government control "observed at the highest level of SOCBs' corporate structures." *Id.* In addition, Commerce concluded that the GOV "entrust[ed] or direct[ed] private banks to provide dong at an undervalued rate" because the currency handled by private banks "must be [exchanged] within the SBV established rate of +/ – 3 percent to +/-1 percent." *Id.* at 15 (citing Petition – Volume VI (May 12, 2020) at Ex. VI-49, PR 9); *see also id.* at 16 ("[B]y requiring private banks to exchange currency with any party wishing to do so, the GOV entrusts or directs private banks to provide this financial contribution."); *see* Def.-Intervenor Br. at 41 (citing IDM at 14-16) (noting the "very narrow range of the exchange rate set by the [SBV]"). In sum, Commerce's conclusion that the control and influence of the GOV over the exchange rates used by SOCBs and private banks satisfies the "entrusts or directs" provision of the statute is supported by substantial evidence and in accordance with law.

Last, KTV argues that "Commerce's finding of a 'financial contribution' in this case based on net purchases and sales with entities other than KTV is not consistent with the statute":

> Commerce's complaint was with the overall impact of *all* sales and purchases in the foreign-currency markets, not the purchases of foreign currency from one individual exporter. Consequently, Commerce's imposition of countervailing duties is not based on any actual "transfers" from the Government of Vietnam, but instead on net transfers by the Government with numerous other parties. Because the statutory definition requires that subsidies be evaluated in terms of a specific "recipient," Commerce's finding of a "financial contribution" in this case based on net purchases and sales with entities other than KTV is not consistent with the statute.

Pl. Br. at 39 (footnote omitted).

KTV's characterization of Commerce's decision is not correct.  Commerce considered net purchases as part of the benefit determination,[37] *see* Letter from Treasury to Commerce ("Treasury Report") (Aug. 24, 2020) at 1-2, PR 165, PJA Tab 7 (concluding that "net purchases of foreign exchange [undertaken by the GOV] had the effect of undervaluing Vietnam's REER by 4.2%"); IDM at 24, and for the predominant user determination, *see* IDM at 18-20.

As described previously, Commerce found that there was a financial contribution for KTV because there was a direct transfer of funds under the statute.  *See* IDM at 16. In the Preliminary Determination, Commerce found on the facts before it that the exchanges of currency at issue "constitute[d] financial contributions in the form of direct transfers of funds to KTV."  PDM at 22.  In the Final Determination, Commerce concluded that "*KTV's* . . . exchanges of currency constitute financial contributions." IDM at 16 (emphasis supplied).

In view of the foregoing, Commerce's determination that KTV's exchange of USD for Vietnamese *dong* constitutes a financial contribution under 19 U.S.C. § 1677(5)(D)(i) is supported by substantial evidence and in accordance with law.

### 2.  Specificity

Commerce determined that Vietnam's currency undervaluation subsidy was specific based on two core findings: (1) the traded goods sector was a group; and (2)

---

[37] With respect to benefit, Commerce also noted preliminarily: "For each POI currency exchange transaction of USD to VND, KTV . . . reported the total value of USD exchanged, the exchange rate used for each of these transactions, and the authorized credit institution which processed the currency exchange transaction."  PDM at 25 (citing KTV August 24 Submission (Aug. 24, 2020) at App. 9-A, CR 34, PR 160, PJA Tab 6).

the traded goods sector was the predominant user of the currency undervaluation

subsidy.  PDM at 23-24; IDM at 16-20.

To determine whether a subsidy "may be specific as a matter of fact," §

1677(5A)(D)(iii)(II) directs Commerce to examine whether "[a]n enterprise or industry [or

group of such enterprises or industries] is a predominant user of the subsidy."  The SAA

provides that the purpose of the specificity test "is to function as an initial screening

mechanism to winnow out only those foreign subsidies which truly are broadly available

and widely used throughout an economy."[38]  SAA at 929; *see also* IDM at 20 (quoting

same (with emphasis)).  A group need not be limited in number for a benefit to be

conferred:

> [G]iven the purpose of the specificity test as a screening mechanism, the
> weight accorded to particular factors will vary from case to case.  For
> example, where the number of enterprises or industries using a subsidy is
> not large, the first factor alone would justify a finding of specificity . . . .  On
> the other hand, where the number of users of a subsidy is very large, the
> predominant use and disproportionality factors would have to be assessed.
> Because the weight accorded to the individual *de facto* specificity factors is
> likely to differ from case to case, clause (iii) makes clear that Commerce
> shall find *de facto* specificity if one or more of the factors exists.

SAA at 931.

As discussed *infra* Section III.B.2.b, Commerce may find that a subsidy is

specific in fact if a large group is a predominant user of the subsidy.

Further, the SAA makes clear that the numerator and denominator can shift

depending on the number of users of the subsidy.  SAA at 931.  If the number is

---

[38] Congress has provided that the SAA "shall be regarded as an authoritative
expression by the United States concerning the interpretation and application of the
Uruguay Round Agreements and this Act in any judicial proceeding in which a question
arises concerning such interpretation or application."  19 U.S.C. § 3512(d).

smaller, then the first factor is the most relevant to the analysis, whereas if the number is larger, the other factors of disproportionality and predominant use come into play, as they do in the instant action. *Id.* In fact, the SAA explains that the specificity test was intended to function as a "rule of reason":

> The specificity test was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, the benefit of the subsidy is spread throughout an economy. Conversely, the specificity test was not intended to function as a loophole through which narrowly focussed [sic] subsidies provided to or used by discrete segments of an economy could escape the purview of the CVD law.

SAA at 930.

Based on the analysis below, the court is unable to ascertain whether Commerce's determination that Vietnam's currency undervaluation subsidy was specific is supported by substantial evidence and in accordance with the statute. Accordingly, the court remands aspects of Commerce's determination, as specified below.

### a.    Commerce determination

Commerce noted at the outset that the provision on the traded goods sector in its regulation on specificity, 19 C.F.R. § 351.502(c), is consistent with the statute because the traded goods sector constitutes a "subset of companies that either sell goods internationally or that buy goods internationally [and] is known to account for a particular portion of USD inflow in the Vietnamese economy." IDM at 20; Def. Br. at 23 (citing *Final Rule*, 85 Fed. Reg. at 6,031, 6,039). Commerce explained further that this regulatory modification was similar to prior interpretations of the statutory term "group" in prior determinations. IDM at 20 (citing *Final Rule*, 85 Fed. Reg. at 6,039; Import Administration Policy Bulletin 10.1, "Specificity of Subsidies Provided to State-owned

Enterprises," 2010; *Citric Acid and Certain Citrate Salts from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 74 Fed. Reg. 16,836 (Dep't of Commerce Apr. 13, 2009) and accompanying IDM ("*Citric Acid* IDM") (Dep't of Commerce Apr. 6, 2009) at cmt. 16).[39]

Commerce explained that using these data and applying the statute and its regulations, Commerce determined that "companies that buy or sell goods internationally comprise a group . . . within the meaning of section 771(5A)(D)(iii)(II) of the Act." IDM at 20. Commerce added that its finding that companies that buy or sell goods internationally comprise a "group" for specificity purposes is consistent with Commerce's interpretation of the term "group" in other contexts. *Id.* For example, Commerce stated, "we have found that state-owned enterprises comprise a 'group' and that foreign-invested enterprises comprise a 'group.'" *Id.*

Commerce then continued as per § 1677(5A)(D)(iii)(II) to assess whether the traded goods sector "group" was a "predominant user." The predominant user factor calls for a comparative analysis. In this case, Commerce found that the numerator, as noted, was the group of enterprises or industries comprising the "traded goods sector" and the denominator was "USD currency conversions." PDM at 23. Since SBV did not provide Commerce with USD inflows or trading by field or sector, Commerce relied on USD inflows to Vietnam as a proxy for currency conversions, IDM at 18, and determined

---

[39] In *Citric Acid*, Commerce concluded that FIEs — across a variety of sectors — comprised a "group" of enterprises under § 1677(5A)(D). *Citric Acid* IDM at cmt. 16. This finding demonstrates that a group may be comprised of enterprises from multiple sectors for a specificity analysis, lending support to Commerce's conclusion in the instant case, notwithstanding that *Citric Acid* involved a *de jure* subsidy. *See id.*

that the universe of annual currency conversions would be comprised of "four major channels of exchange: (a) exports of goods, (b) exports of services, (c) various forms of portfolio and direct investment, and (d) earned income from abroad." PDM at 23-24.

The court next sets out the steps Commerce appears to have taken — based on the PDM and IDM, Commerce questionnaires and the GOV's IQR, SQR2 and SQR3 — to develop data sets representing (1) the traded goods sector, which Commerce identified as the group or numerator for Commerce's predominant use comparative analysis, and (2) the universe of all currency conversions, which Commerce identified as the denominator for that analysis. *See* GOV Initial Questionnaire Response ("GOV IQR") (Aug. 25, 2020), Ex. F-1, PR 166, CR 51, PJA Tab 8; GOV Second Supp. Questionnaire Response ("GOV SQR2") (Oct. 13, 2020), PR 272-273, PJA Tab 19; GOV Resp. to Third Supp. Questionnaire ("GOV SQR3") (Oct. 19, 2020), PR 287, CR 121, PJA Tab 21. Commerce's first step was to request from the GOV "total USD inflow from the 'traded goods sector,'" and how much came from (i) "the traded services sector" and (ii) "utilized FDI and inbound portfolio investment." PDM at 23 (citing to GOV IQR, Ex. F-1 at 4).

The GOV did not provide the requested information, stating: "the State Bank does not collect data of USD capital inflows or USD trading by field and by sector." GOV IQR, Ex. F-1 at 7. Instead, the GOV "reported the 'total USD inflow'" in several categories including "net commodity trade," "One-way money transfers of the net private sector," "FDI in Vietnam," "PI in Vietnam" and "Net Foreign debt." *Id.* at 4.

Commerce responded, again requesting the specific categories of information as well as seeking an explanation from the GOV for its data as reported:

Please explain how these numbers were obtained and what went into these calculations and report all original values requested including total USD inflow from the traded goods sector and the traded services sector along with a citation for where this info was obtained.

GOV SQR3 at 1, Question 2.

The GOV responded with bulleted specifications for net commodity trade (sourced by the Vietnam General Department of Customs statistics), one-way money transfer data (compiled by the SBV), FDI data (sourced from the Foreign Investment Department in the Ministry of Planning and Investment), data for PI (sourced from the State Securities Commission in the Ministry of Finance), net foreign loans data from the Ministry of Finance and enterprises' disbursement and repayments by authorized credit institutions. GOV SQR3 at 1-3. Notably, the GOV did not account for the original values requested, including total USD inflow concerning the traded goods sector and the traded services sector in particular. *Id.*; PDM at 23; IDM at 18.

Commerce then stated that, in the absence of the data that Commerce had requested from the GOV but which the GOV had not provided, "we relied upon the available data regarding USD inflows to Vietnam as a *proxy* for USD currency conversions."[40] PDM at 23 (emphasis supplied); *see also* IDM at 18. Commerce

---

[40] In reaching this conclusion, Commerce appears to have been relying on facts available on the basis that necessary information as requested by Commerce on multiple occasions was not on the record. However, notably, Commerce did not cite to any statutory authority that would allow it to rely on this information. For example, Commerce did not invoke § 1677e(a)(2)(B) for determinations on the basis of facts available or § 1677e(b) if Commerce considered that it was applying adverse facts available and if so, why it was doing so or why under the circumstances it chose not to do so but to rely only on facts available. Instead, it appears that Commerce relied on § 1677e(c) in which Commerce was just corroborating secondary information. The court directs Commerce to state clearly the statutory authority under which it relied on these data.

explained that while its "Initial Questionnaire requested that the GOV provide us with total USD inflow from the 'traded goods sector,' 'the traded services sector and utilized FDI and inbound portfolio investment,' . . . the GOV reported values on a different basis as explained below." PDM at 23. That basis was "net commodity trade." *Id*. (citing GOV SQR3 at 3). Commerce therefore determined to consider "information placed on the record by Commerce, which reflects data submitted by the State Bank of Vietnam to the IMF." *Id.*

Commerce then added: "To add precision to the amount of USD inflows received from Vietnam's exports [sic] of goods, we discounted Vietnam's exports [sic] of goods value by the amount of intermediary imported inputs (based on OECD estimates) to arrive at a reasonable estimate of exports that earned foreign exchange." *Id.* at 24.

Following this statement, Commerce then pivoted to announce that it "estimated the total proportion of USD inflows Vietnam has received in the POI through the following four major channels of exchange: "(a) exports of goods, (b) exports of services, (c) various forms of portfolio and direct investment, and (d) earned income from abroad." *Id.* 23-24.

What is clear from Commerce's description is that it repeatedly requested certain information from the GOV, which the GOV repeatedly declined to provide. What is less clear, in some cases lacking altogether in explanation, are the following four points: (1) a clear statement of what precisely Commerce considered to be missing from the record; and (2) the reasons that the alternative information provided by the GOV was not useable to perform the necessary analysis. Specifically on these two points, the court takes note that Commerce in its supplemental questionnaire asked the GOV to

take three steps with respect to each of the four requested categories: (1) "explain how these numbers were obtained"; (2) "what went into these calculations"; and (3) "report all original values requested." GOV SQR3 at 1. However, Commerce did not provide specific reasons that it did not use the GOV response, including whether the response met or did not meet each of the three elements of Commerce's request quoted above. *See* PDM at 23-24; IDM at 18-19. The court notes further that the GOV offered six elements for a number to comprise total USD inflows. GOV SQR3 at 3. Commerce did not explain why it did not accept these data and how the data relate to Commerce's use of the four categories to comprise an economy wide surrogate number for currency conversions. In sum, Commerce did not explain in a manner that allows the court to determine if Commerce's finding that the four major channels of exchange represent the denominator with which the traded goods sector should be compared in the predominant use test is supported by substantial evidence or is in accordance with law.

The third point that is not clear in Commerce's explanation is how these missing data related to Commerce's next steps; in particular, what were the reasons that Commerce designated the four major channels of exchange as the correct basis for "estimat[ing] the total proportion of USD inflows" that Vietnam received during the POI, PDM at 23-24 (citing IMF/OECD Mem. (Oct. 7, 2020) at attach. 2, PR 254, PJA Tab 17), and the reason that Commerce did not use the other data supplied by the GOV that were also detailed by Commerce in the PDM and in GOV's supplemental questionnaire response. *See* PDM at 23; GOV SQR3 at 1.

The fourth point that requires a more clear and detailed explanation by Commerce is its comment that "there [we]re certain places where [the GOV] was unable

**PUBLIC VERSION**

to provide the information we requested for our evaluation."[41] PDM at 23. Commerce did not describe or explain adequately: (1) how, precisely, Commerce utilized the "information placed on the record by Commerce, which reflects data submitted by the State Bank of Vietnam to the IMF" *to derive the four channels analysis*; (2) what data were not provided in connection with Commerce's development of that analysis; and (3) why, together, these elements prevented Commerce from using those data in its four channels analysis. *Id.* The court is aware that the failure of the GOV to provide the requested data required that Commerce develop an alternative. The court does not, however, understand *how* the missing GOV information led Commerce to identify and rely upon the four major channels of exchange as Commerce did. Hence, the court is not able to conclude at this time whether Commerce's determination on this aspect is supported by substantial evidence and in accordance with law.

In sum, the court concludes that Commerce has not explained sufficiently how or why those four major channels of exchange represent the denominator with which the traded goods sector should be compared in the predominant use test.

---

[41] The GOV described as follows the IMF data on USD inflow from the traded goods sector that the GOV provided to the IMF:

> Data regarding net commodity trade is calculated from the General Department of Customs statistics for imported and exported goods, and the survey results on insurance and freight for international trade of goods are used to convert CIF values of imported goods to FOB values[.]

GOV SQR3 at 2.

### b.   KTV's challenges

KTV presents five principal arguments challenging Commerce's decision.  The court addresses each in turn.

<u>KTV Argument #1: Commerce's definition of "group" is tautological</u>

KTV's first argument is that Commerce's classification of "exporters as a whole" as a "group" of enterprises for the purpose of analyzing whether the GOV's currency undervaluation subsidy was "specific" under 19 U.S.C. § 1677(5A)(D) is "contrary to . . . the statute."  Pl. Br. at 42.  KTV states that "if the 'group' is defined (as in this case) to encompass virtually all users in the manufacturing and agricultural sectors, the use of the program by that 'group' will necessarily constitute a relatively high percentage of overall use."  Resp. Kumho Tire (Vietnam) Co., Ltd. Ct.'s Questions ("KTV Resp. Ct. Questions") at 5, ECF No. 62.  KTV adds: "As a matter of mathematics . . . Commerce's finding is simply a reflection of its overbroad definition of the relevant 'group.'"  *Id.* at 4.  As KTV stated at oral argument: "[Y]ou can define a group of industries in such a way . . . [as] everyone who uses the subsidy.  Therefore, that group is the predominant user of the subsidy.  [T]hat to me is a tautology[;] that's not an independent finding."  Oral Arg. Tr. at 66:6-10.

KTV mischaracterizes Commerce's determination, as discussed above. Commerce determined that the numerator was the dollar inflows accounted for by the traded goods sector, while the denominator was all inflows not just from the traded goods sector but also from exports of services, various forms of portfolio and direct investment and earned income from abroad.  IDM at 18.

Further, as the SAA contemplates expressly, the specificity provisions of the statute provide a "rule of reason" approach due to the highly fact-specific determinations that Commerce is required to make.  SAA at 930.  For example, if 10 years from now Vietnam's economy were to shift to become a predominant exporter of services, then Commerce's determination of a numerator in this case might well not meet the predominant user standard.[42]  This example further illustrates that Commerce's formulation is fact dependent, not tautological.

KTV argues next that Commerce should have but did not treat the traded goods sector the same way that Commerce treats the agricultural sector.  KTV Resp. Ct. Questions at 5; 19 C.F.R. § 351.502(e) ("The Secretary will not regard a subsidy as being specific . . . solely because the subsidy is limited to the agricultural sector (domestic subsidy).").  This argument conflicts with the plain and express language of Commerce's regulations.  Commerce decided this case under § 351.502(c), which pertains to the "traded goods sector" and specifically *contemplates* that Commerce normally will treat the traded goods sector as a group.  By contrast, Commerce decides cases pertaining to "[a]*gricultural subsidies*" under § 351.502(e), which expressly *proscribes* Commerce from "regard[ing] a subsidy as being specific under section

---

[42] The USW states:

> [E]ach economy is different.  In Costa Rica or New Zealand, to take hypothetical examples, tourism (the export of a service) and remittances (income from abroad), may account for more dollar inflows than net exports of goods, and the traded goods sector thus would not be the predominant user of any currency undervaluation program that either country may employ."

Def.-Intervenor's Resp. Ct. Questions at 11, ECF No. 63.

771(5A)(D) of the Act solely because the subsidy is limited to the agricultural sector (domestic subsidy)."

Finally, KTV states further that "the foregoing analysis of the relationship between the definition of the 'group' and the calculation of usage by the group is based on the assumption that use is spread relatively evenly throughout various sectors of the economy." KTV Resp. Ct. Questions at 5. The court does not understand the relevance of the point. If related to the consideration in a specificity analysis of the economic diversity of the economy of Vietnam, the court notes that Commerce addressed this point, described extensive information on the record, and stated: "the level of economic diversification in Vietnam does not detract from finding a program to be *de facto* specific where other information so indicates in accordance with section 771(5A)(D)(iii) of the Act (*e.g.*, where the number of recipients are [sic] limited in number)." PDM at 19. Put differently, information on the record demonstrated that Commerce's finding that the currency program is *de facto* specific was not due merely to the lack of economic diversification in Vietnam. *See id.*; *see also* Def.'s Resp. Ct. Questions at 7, ECF No. 61. Further, the issue of widespread use throughout the economy is one about which Commerce sought information in the context of the diversification of economic activities. *See* GOV IQR. The court remands so that Commerce may ensure to address KTV's argument fully. Specifically, the court instructs Commerce to specify whether Commerce made the assumption in its determination that use of the currency undervaluation subsidy is spread evenly in the traded goods sector.

KTV Argument #2: Inconsistent with Commerce practice I

KTV's second argument relies on a recent Commerce determination involving fertilizer from Russia. KTV maintains that this determination demonstrates that "Commerce has held that the analysis of *de facto* specificity requires a comparison of use by the defined group to overall use by the *manufacturing sector*" and that therefore "a comparison of use of currency conversions by the 'traded goods' sector to overall use in all sectors . . . is not consistent with the statute. Instead, the comparison should have been between use by the 'traded goods' sector and . . . [the] 'manufacturing sector.'" KTV Resp. Ct. Questions at 3-4 (citing *Urea Ammonium Nitrate Solutions from the Russian Federation: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 37,836 (Dep't of Commerce June 24, 2022) and accompanying IDM ("*Urea Ammonium Nitrate Solutions from Russia* IDM") (Dep't of Commerce June 17, 2022) at cmt. 7).

Commerce's determination in *Urea Ammonium* is inapposite to the instant case. In that determination, Commerce *excluded* data from non-manufacturing sectors to obtain a specificity analysis that Commerce concluded was required by the statute, noting:

> [T]he agro-chemical industry's share of natural gas consumption is also likely understated because it is calculated on the basis of total consumption data that includes [sic] non-manufacturing sectors such as household consumers, the housing and utilities sector, and electricity and heat generators, which comprise a combined majority of total natural gas consumption.[43]

---

[43] The data showed that "the largest consumers of natural gas in Russia were electricity and heat generators (33 percent), household consumers (11 percent), the oil industry (ten percent), the housing and utilities sector (eight percent), the agrochemical industry (seven percent), and metallurgy (six percent)." *Urea Ammonium Nitrate Solutions from Russia* IDM at cmt. 6.

**PUBLIC VERSION**

*Urea Ammonium Nitrate Solutions from Russia* IDM at cmt. 6 (footnotes omitted).

Therefore, Commerce explained that "[its] analysis reasonably *excludes natural gas*

*consumption by non-manufacturing sectors*." *Id.* (emphasis supplied). Commerce

stated further that "[t]his approach is consistent with prior CVD Russia proceedings." *Id*.

(citing *Phosphate Fertilizers from the Russian Federation: Final Affirmative*

*Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Dep't of Commerce Feb. 16,

2021) and accompanying IDM (Dep't of Commerce Feb. 8, 2021) at cmt. 3d;

*Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the*

*Russian Federation: Final Affirmative Countervailing Duty Determination and Final*

*Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (Dep't of

Commerce July 29, 2016) and accompanying IDM (Dep't of Commerce July 20, 2016)

at cmt. 2).

In *Urea*, Commerce *excluded* non-manufacturing sectors to pare down the

denominator so that Commerce might ascertain whether an enterprise or industry, or

group thereof — in that case, the agrochemical industry — was a predominant user of

the subsidy. *Id.* The decision illustrates one instance in which, based on the facts

before Commerce, it determined that the language of the statute as buttressed by the

SAA's "rule of reason" approach required Commerce to exclude certain non-trade-

involved sectors — in that case, non-manufacturing sectors of the economy. As

discussed above, the statute does not specify how Commerce is to determine either the

numerator or the denominator in ascertaining a group or analyzing its use of a subsidy.

19 U.S.C. § 1677(5A)(D)(iii). Accordingly, the *Urea* determination does *not* stand for the

proposition, as KTV advocates, that the manufacturing sector is the correct denominator

Court No. 21-00397                                                                Page 91

in all cases.[44]  In this respect, Commerce's selection of the traded goods sector to the

economy as a whole is consistent with the statute.

        <u>KTV Argument #3: Inconsistent with Commerce Practice II</u>

        KTV's third argument is that Commerce classification of "exporters as a whole"[45]

as a "group" of enterprises is "contrary to . . . Commerce's established practice" in two

Commerce determinations from 2010 and 2011.  Pl. Br. at 42 (citing Certain Coated

Paper Currency Memo at 5; Aluminum Extrusions Currency Memo at 5); *see also* Pl.

Reply Br. at 14-15.  In its argument, KTV relies primarily on the following quotation from

a staff memorandum that accompanied both determinations:

> Petitioners are also incorrect in framing their allegations regarding exporters
> as a "group" receiving domestic subsidies.  Under the statutory scheme,
> subsidies to exporters are countervailable as export subsidies. . . .  That
> scheme is set on its head by treating exporters as a "group" for purposes of
> finding a domestic subsidy under section 771(5A)(D) of the Act.

Pl. Reply Br. at 14 (quoting Certain Coated Paper Currency Memo at 5; Aluminum

Extrusions Currency Memo at 5).

---

[44] Indeed, KTV then concedes that "[s]uch a comparison would . . . be tautological, because the 'traded goods' sector necessarily encompasses the manufacturing sector." KTV Resp. Ct. Questions at 4

[45] Addressing the "exporters of goods" as a group, Commerce stated:

> In evaluating the portion of USD inflows attributable to exporters of goods,
> we have considered and adjusted this value to reflect the portion of these
> goods which is attributable to intermediary imported goods that are
> subsequently used for re-exportation.  This adjustment is indicative of the
> reality that Commerce has included information about companies which are
> engaged in both the buying and selling of goods internationally in its
> analysis.

IDM at 19.

Commerce addressed KTV's argument directly, "acknowledge[d] [the] statement" made in the Currency Memos and noted that "it is a fundamental principle of administrative law" that an agency is allowed to change its practice, provided "the change is reasonable and explained":

> With respect to KTV's argument that treating exporters as a "group" for domestic subsidy purposes turns the statutory scheme on its head, we acknowledge our statement to that effect from more than ten years ago. However, it is a fundamental principle of administrative law that an agency is allowed to change its practice, provided the change is reasonable and explained. As explained in the *Final Rule*, upon further consideration of the statutory scheme and section 771(5A)(D) of the Act, treating companies that buy or sell goods internationally as a "group" is entirely consistent with the Act. The term "group" is not defined in the Act, and our finding in this investigation is consistent with the broad approach to that term that is reflected in 19 CFR § 351.502(b) and our past practice.

IDM at 20 (footnote omitted).

Commerce made an ostensible shift in its approach to defining a group in the context of currency undervaluation — from its statement in the Currency Memos but not in the PDM or IDM, which were framed around whether the statutory requirements of the initiation standard had been met — to the determination before the court.[46] *Compare* Certain Coated Paper Currency Memo at 4, *and* Aluminum Extrusions Currency Memo at 3-4, *with Final Rule*, 85 Fed. Reg. at 6,039. It is well-established that an agency may change prior practice so long as two requirements are met: (1) the agency adequately explains the reasons for the change; and (2) the change in practice

---

[46] Commerce in the Currency Memos stated that it would not treat exporters as a "group" for purposes of a de facto domestic subsidy analysis. In the IDMs in those determinations, Commerce's analysis was limited to whether the petitioners' allegations were sufficient to initiate an investigation into whether the currency undervaluation programs at issue constituted an export subsidy. *Certain Coated Paper* IDM at cmts. 5-7; *Aluminum Extrusions* IDM at cmt. 33; *see supra* Section II.B.2.a.

Court No. 21-00397                                                                           Page 93

is in accordance with the statute.  *Huvis Corp. v. United States*, 570 F.3d 1347, 1353

(Fed. Cir. 2009) (Commerce's change in practice will not be disturbed if "its

methodology is permissible under the statute and . . . it had good reasons for the new

methodology"); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

In this case, Commerce's actions meet both requirements.  Commerce provided

a clear roadmap to its determination, including a reasoned explanation for its shift in

practice, provided in the context of a notice-and-comment rulemaking.  *Final Rule* at

6,039-40; IDM at 20; *see Fox Television*, 556 U.S. at 515; *see also Huvis Corp.*, 570

F.3d at 1354.

In addition, Commerce's shift in practice is consistent with the statute.  *See* 19

U.S.C. § 1677(5A).  There is no limitation in the statute on the size of a "group of . . .

enterprises or industries," nor is there a requirement that there be shared characteristics

among such a group.  *Id.*  As Commerce stated in the *Final Rule*, enterprises that buy

and sell goods internationally are "an identifiable set of enterprises" that "constitute a

subset of all economic actors within a country."  85 Fed. Reg. at 6,039; *see also supra*

Section III.B.2 (citing the SAA and emphasizing the function of the specificity test "as an

initial screening mechanism to winnow out only those foreign subsidies which truly are

broadly available and widely used throughout an economy"); SAA at 931 ("[W]here the

number of users of a subsidy is very large, the predominant use and disproportionality

factors would have to be assessed.").

Commerce's conclusion in the instant case is consistent also with Commerce's

definition of a "group of . . . enterprises or industries" in previous determinations.  *See,*

*e.g.*, *Citric Acid* IDM at cmt. 16.  In *Citric Acid*, as discussed above, Commerce

concluded that FIEs — across a variety of sectors — comprised a "group" of enterprises under § 1677(5A)(D).  *Id.*

In sum, the court's reading of the statute is that the traded goods sector is comprised of a "group of . . . enterprises or industries" within the meaning of § 1677(5A)(D*).  See Loper Bright*, 144 S. Ct. at 2266 (holding that there is a best reading of a statute, which is "'the reading the court would have reached' if no agency were involved").[47]

KTV Argument #4: Currency undervaluation is an export subsidy

KTV argues also that treating "exporters as a whole" as a "'group' for purposes of finding specificity" is contrary to the statute because "'subsidies to exporters are countervailable as export subsidies.'"  Pl. Reply Br. at 14-15 (quoting Certain Coated Paper Currency Memo; Aluminum Extrusion Currency Memo).

KTV's argument is not supported by the statute.  The court starts with the language of the statute.  As discussed, § 1677(5) requires that Commerce determine

---

[47] In *Loper Bright*, the Supreme Court reiterated that the agency's position "constitute[s] . . . informed judgment" to which the court can "properly resort":

> [I]n *Skidmore v. Swift*, 323 v. Swift & Co., 323 U.S. 134, 65 S. Ct. 161, 89 L.Ed. 124 (1944), the Court explained that the "interpretations and opinions" of the relevant agency, "made in pursuance of official duty" and "based upon . . . specialized experience," "constitute[d] a body of experience and informed judgment to which courts and litigants [could] properly resort for guidance," even on legal questions.  "The weight of such a judgment in a particular case," the Court observed, would "depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all of those factors which give it power to persuade, if lacking power to control."

144 S. Ct at 2259 (internal citations omitted) (alterations in original).

that three elements are present to find the existence of a countervailable subsidy: a financial contribution, specificity and a benefit conferred.  Section 1677(5A)(A) sets forth multiple ways for Commerce to find specificity, of which two are discussed by the parties: "a subsidy is specific if it is an export subsidy described in subparagraph (B) . . . or if it is *determined* to be specific pursuant to subparagraph (D)."  (emphasis supplied).  Section 1677(5A)(B) in turn provides that "[a]n export subsidy is a subsidy that is, in law or in fact, *contingent upon export performance*."  Section 1677(5A)(D) establishes four different ways for Commerce to identify a domestic subsidy.

In this respect, this Court's decision in *Gov't of Sri Lanka v. United States*, 42 CIT __, __, 308 F. Supp. 3d 1373, 1378 n.2 (2018), is instructive:

> Section 1677 defines the various categories of specific subsidies in the alternative, e.g., a subsidy can be specific if it is *either* an export subsidy *or* a qualifying domestic subsidy.  19 U.S.C. § 1677(5A)(A).  Having found that substantial evidence supports Commerce's conclusion that the TCENTP program constituted an export subsidy, the court need not assess GSL's arguments regarding the degree to which the TCENTP program satisfied the definition of a domestic subsidy.

The Court there continued: "Export subsidies are one class of specific subsidy."  *Id.* at __, 308 F. Supp. 3d at 1378.  In that case, the Court affirmed a decision of Commerce based on the specific facts of that determination: "[T]he fact that the subsection under which [plaintiff] qualified was contingent upon export performance demonstrates that the TCENTP program constituted an export subsidy *as applied to*

[*plaintiff*], and was thus specific for purposes of Section 1677(5A)." *Id.* (emphasis supplied).[48]

Similarly, in this case, Commerce made a determination that the undervaluation of the *dong* satisfied the specificity requirements of subsection (D) by providing benefits to KTV — and was, therefore, specific for purposes of § 1677(5A)(D). IDM at 19. The requirements of subsection (D) are different from those of subsection (B). As the *Sri Lanka* decision illustrates, the statute provides that an export subsidy under subsection (B) is per se specific so long as the subsidy is "contingent upon export performance." By contrast, the statute stipulates that for the domestic subsidy program at issue in this case — currency undervaluation — specificity does not exist per se but must be *determined* by Commerce under the provisions of § 1677(5A)(D).

---

[48] In *Gov't of Sri Lanka*, the subsidy program under review was a government program that provided tax concessions for the following "specified undertakings":

> (i) the export of non-traditional goods, manufactured, produced or purchased by such undertaking; or
> (ii) the performance of any service of ship repair, ship breaking repair and refurbishment of marine cargo containers, provision of computer software, computer programs, computer systems or recording computer data, or such other services as may be specified by the Minister by Notice published in the Gazette, for payment in foreign currency.

*Id.* at __, 308 F. Supp. 3d at 1378.

The Court held that subsection (i) of the program was "clearly contingent upon export performance" because it explicitly iterated tax concessions for the export of non-traditional goods. *Id.* "The statute does not require that exporters be the only foreseeable beneficiaries of the [financial contribution], or that the number of exporters impacted be limited, in order for it to be classified as an export subsidy vis-à-vis [the beneficiary]." *Id.*

For the currency undervaluation program at issue in this case, any party that is a potential beneficiary, regardless of whether they export, is eligible to receive the subsidy. Commerce found that the traded goods sector of which KTV is a part comprised "71.94 percent of USD inflows into Vietnam" and therefore constituted "the predominant user of the subsidy." IDM at 19.

Commerce defined the group consistent with the statute. *See supra* Section III.B.2.b. Commerce rendered a fact-specific determination based on the record before it to conclude that the traded-goods sector constitutes a "group of enterprises" and further constitutes a predominant user of the subsidy. IDM at 18-19. The court is required to decide whether this record determination by the administering authority is consistent with the statute. Whether the currency undervaluation program with the traded goods sector as the predominant user might be determined to be countervailable in the future is not, as KTV would have it, a foregone conclusion invalidating Commerce's application of § 1677(5A)(D) to the group of enterprises in this case; rather, any such future determination would depend on a number of variables. For example, were Vietnam to shift the composition of its exports heavily toward services as Vietnam continued to climb the ladder of economic development, it is quite possible that the traded goods sector would no longer qualify as a predominant user. In that circumstance, contrary to KTV's proffered view, it would be unlikely that Commerce would be able to determine that the subsidy was specific as to the traded goods sector. Rather, Commerce would have to assess whether one of the other provisions of subsection (D), such as subsections (D)(iii)(III)-(IV), might apply. If none applied, the subsidy would be a non-specific domestic subsidy and not countervailable. By contrast,

were the program determined to be an export subsidy, it would be per se specific. Further, in the scenario noted, the Vietnam services sector would receive potentially substantial benefits from the program but not export a single pallet of goods.

Converse to the Court's finding in *Sri Lanka*, the court is not in a position to assess KTV's arguments that someday a hypothetical similar subsidy program to the one before the court as applied to KTV under section (D) could be considered specific under subsection (B).

In sum, there is no indication in the statute that application of one subsection of § 1677(5A) precludes application of another. Congress knows how to draft to achieve that result if it wants to. *See* Senate Office of the Legislative Counsel, Legislative Drafting Manual § 302 (1997) (instructing drafters to "use 'or' . . . to indicate that a thing is included in the class if it meets *1 or more* of the criteria" (emphasis supplied)); *see also New York v. Arm or Ally, LLC*, No. 22-CV-6124 (JMF), 2024 WL 756474, at *6 (S.D.N.Y Feb. 23, 2024) ("Disjunctive clauses separated by 'or' are normally read to be inclusive, not mutually exclusive.").

In addition, Congress has made clear that the countervailing duty statute is remedial in nature. SAA at 877 (emphasizing the "remedial effect" of AD and CVD orders); 19 U.S.C. § 1671(a) (directing Commerce to calculate a CVD "*equal to* the amount of the net countervailable subsidy") (emphasis supplied); *Guangdong Wireking Housewares & Hardware Co. v. United States*, 745 F.3d 1194, 1203 (Fed. Cir. 2014) ("The congressional intent behind the enactment of [the] countervailing duty . . . law generally was to create a civil regulatory scheme that remedies the harm unfair trade practices cause."). The statute is intended to provide a remedy to address subsidies so

long as the three core conditions are met.  The remedial nature of the statute would appear to apply with particular force in the case of the subsidy program at issue in this case, which, Commerce concluded in its *Final Rule*, "distorts international trade on a systemic basis with the same direct adverse impact on trade as the simultaneous provision of import-substitution and export subsidies" (both of which U.S. law treats as per se specific).  *Final Rule,* 85 Fed. Reg. at 6,039.[49]   The decisions of this Court and the Federal Circuit have consistently upheld that the trade remedy laws are "generally remedial in nature."  *GPX Int'l Tire Corp. v. United States*, 37 CIT 19, 29-30, 893 F. Supp. 2d 1296, 1309-10 (2013), *aff'd,* 780 F.3d 1136 (Fed. Cir. 2015); *Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1103-04 (Fed. Cir. 1990); *Badger-Powhatan, Div.*

---

[49] Commerce explained that the currency undervaluation subsidy is both distinct from the categories of export contingent and import competing subsidies identified under U.S. law and international rules, as well as being a grossly trade-distorting subsidy whose impacts are precisely the kinds that U.S. law and those rules were written to address:

> [S]ection 771(5A)(A) of the Act deems export subsidies and import-substitution subsidies to be specific per se, without regard to whether there is a narrow or diverse array of industries or companies reflected by the recipients of those two categories of subsidies, or whether there are any other common characteristics among those recipients. The SCM Agreement not only likewise deems these two categories of subsidies to be specific, but also prohibits them outright.  Specifically in the context of undervalued currency, moreover, we note that if an exchange rate is too low or undervalued, it underprices exports and overprices imports. This directly distorts international trade on a systemic basis with the same direct adverse impact on trade as the simultaneous provision of import-substitution and export subsidies. Accordingly, treating importers and exporters of goods as a group for specificity purposes is entirely consistent with the international trade focus and remedial purposes of the trade remedy laws.

*Final Rule,* 85 Fed. Reg. at 6,039 (footnote omitted).

**PUBLIC VERSION**

*of Figgie Int'l, Inc. v. United States,* 9 CIT 213, 216-17, 608 F. Supp. 653, 656-57 (1985).

The court concludes that subsection (D) as applied in this case is consistent with the statute.  KTV argues that the application of subsection (D) in this case precludes per se application of subsection (B) and, therefore, Commerce's action is inconsistent with the statute.  It is not for the court to determine whether a hypothetical subsidy program similar to the one before the court and determined by Commerce to be specific under section (D) could in the alternative be considered specific under subsection (B).  That case is not before the court.[50]

Just because the traded goods sector is benefitting from a domestic subsidy by exporting its goods does not convert the subsidy into a subsidy that is contingent on export under § 1677(5A)(B).  Other sectors also benefit that do *not* export goods.

KTV Argument #5: Conversion

KTV's fifth argument is that Commerce's "focus on the actual conversions of foreign currency into *dong* fails to address the actual impact of the exchange rate on

---

[50] The court notes that no party to this action challenges the consistency of 19 C.F.R. § 351.528 with § 1677(5A).

economic actors in Vietnam." Pl. Br. at 41-42 (citing IDM at 19).[51] KTV adds that

nowhere in the record does Commerce show that the industries or enterprises in the

traded goods sector are "compelled to convert their U.S. dollars to *dong*." Pl. Reply Br.

at 12. Instead, KTV maintains, these industries or enterprises "may choose to retain

their U.S. dollars for other operational reasons." *Id.* In sum, KTV avers that Commerce

erred in relying on USD inflows as a proxy for unavailable field- or sector-related USD

trade data because "exporters do not have to convert their U.S. dollar export earnings

into *dong*." *Id.* at 11-14.

As a threshold matter, the conversion issue at its core appears to relate to

whether the company actually received a benefit at the time of the conversion. This

issue is addressed *infra* Section III.B.3.

Next, the issue raised by KTV arises only because the GOV did not provide the

data that Commerce required. PDM at 23. As discussed above, Commerce explained

that it had requested data from the Government of Vietnam that would have provided

"USD inflows or USD trading by field or sector." IDM at 18; PDM at 23. Those data in

turn would have enabled Commerce to ascertain conversion numbers with greater

precision. However, the GOV stated in its initial questionnaire response that the SBV

---

[51] The USW argues that plaintiff failed to present this line of argument in the administrative review and therefore waived the issue before this court. Def.-Intervenor Br. at 32, 41-42, 44. The court concludes that plaintiff did not waive its argument because it expands on prior argumentation. *Juancheng Kangtai Chemical Co., v. United States*, Slip Op. 15-93, 2015 WL 4999476, at *42 (CIT Aug. 21, 2015) ("The exhaustion doctrine does not prevent a plaintiff from expanding on an argument based on the final record before the court, and an argument raised below does not need to be worded exactly as it is to the court."). Notably, the substance of the argument does not alter the court's ultimate decision with respect to this aspect of Commerce's determination.

does not collect those data.  GOV IQR, Ex. F-1 at 6-7.  Accordingly, Commerce had to

rely on substitute data comprising overall USD inflows as a proxy for USD currency

conversions.  IDM at 18; PDM at 23; *see also* discussion at *supra* Section III.B.2.a.

Third, Commerce included in its analysis companies that buy and sell goods

internationally, including companies in Vietnam that "buy intermediary imported goods."

IDM at 19.  Commerce noted that it "adjusted the [portion of USD inflows attributable to

exporters of goods] to reflect the portion of these goods which is attributable to

intermediary imported goods that are subsequently used for re-exportation."  *Id*.

The court finds Commerce's points to be persuasive.  Defendant in its

submissions to the court noted further that businesses in the traded goods sector

typically have obligations related to their in-country operations, including wages, and

purchases of inputs that need to be paid in *dong*.  Def. Br. at 25.  Conversely, KTV

asserts that "KTV and its suppliers also make extensive purchases in foreign currency."

Pl. Br. at 40.  This point would appear highly relevant, including to both conversion and

benefit issues, and merits further discussion.  The court is not able to take defendant's

point into account in evaluating Commerce's determination because Commerce does

not appear to have discussed the point in the IDM or in other related documents during

the administrative proceedings.  *See generally* IDM; *see also* PDM.

### 3.    Benefit

The third required statutory element to impose countervailing duties is whether

Commerce's determination that the undervaluation of Vietnamese *dong* conferred a

benefit to KTV.  19 U.S.C. § 1677(5)(B)(iii).  KTV challenges two core points: (a)

Court No. 21-00397                                                                 Page 103

Commerce's finding of undervaluation based on Treasury's evaluation and conclusion; and (b) KTV's receipt of a benefit.  Pl. Br. at 32-36, 40; *see* IDM at 25-26.

For the reasons discussed below the court is unable to conclude that Commerce's determination as to the benefit received by the recipient is supported by substantial evidence and is in accordance with § 1677(5)(E) and 19 C.F.R. § 351.528.

### a.   Finding of undervaluation

KTV presents two arguments that Commerce's determination of undervaluation was not supported by substantial evidence or in accordance with law: (1) Commerce "outsourc[ed]" the finding of undervaluation to Treasury; and (2) the Commerce determination that the Vietnamese *dong* was undervalued during the POI was not supported by substantial evidence.  Pl. Br. at 31-36.  Separately, the USW argues that KTV did not exhaust its administrative remedies with respect to its outsourcing argument.  *See* Def.-Intervenor Br. at 32-33; Pl. Reply Br. at 15-17.  The court addresses each of these arguments.

### (1)   Whether KTV exhausted administrative remedies

The court addresses first the procedural question of whether KTV exhausted administrative remedies for its outsourcing argument.  *See* Def.-Intervenor Br. at 32-33; Pl. Reply Br. at 15-17.  The court concludes that the USW's argument that KTV failed to exhaust administrative remedies lacks merit.

"[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  Under 19 C.F.R. § 351.309(c)(2), "[t]he case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination."  And, "[b]oth the

Court No. 21-00397                                                                        Page 104

Federal Circuit and this court have held that failure to raise a specific argument in a case brief, even if the general issue is addressed, constitutes a failure to exhaust administrative remedies." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 33 CIT 533, 545, 616 F. Supp. 2d 1354, 1366 (2009), *aff'd in part*, 596 F.3d 1365 (Fed. Cir. 2010) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990); *Unemployment Comp. Comm'n. of Alaska v. Aragon*, 329 U.S. 143, 155 (1946); *Paul Muller Industrie GmbH & Co. v. United States*, 31 CIT 1084, 1087-88, 502 F. Supp. 2d 1271, 1274-75 (2007), *aff'd*, 283 F. App'x 789 (Fed. Cir. 2008)).  However, "[t]he exhaustion doctrine does not prevent a plaintiff from expanding on an argument based on the final record before the court, and an argument raised below does not need to be worded exactly as it is to the court." *Juancheng Kangtai Chem. Co. v. United States*, Slip. Op 15-93, 2015 WL 4999476, at *42 (CIT Aug. 21, 2015).  "The determinative question is whether Commerce was put on notice of the issue, not whether Plaintiff's exact wording below is used in the subsequent litigation." *Tr. Chem Co. v. United States*, 35 CIT 1012, 1023 n.27, 791 F. Supp. 2d 1257, 1268 n.27 (2011).

KTV asserts that its "outsourcing" argument is an outgrowth of arguments presented in the underlying proceeding and falls under an exception to the exhaustion requirement because "countervailing currency undervaluation is a purely legal question."  Pl. Reply Br. at 16-17 (citing KTV's March 9 Case Brief ("KTV Case Br.") at 10-11, PR 454, CR 184, PJA Tab 32; *Tr. Chem Co.*, 35 CIT at 1023 n.27, 791 F. Supp. 2d at 1268 n.27; *Juancheng Kangtai Chem. Co.*, 2015 WL 4999476, at *42; *Rhone Poulenc, S.A. v. United States*, 7 CIT 133, 135, 583 F. Supp. 607, 610 (1984)).  In KTV's case brief before Commerce, KTV stated that Commerce's undervaluation finding

"was based entirely on" the Treasury Report and that "any finding of currency undervaluation must be made by the Department based on the evidence on the record of this proceeding."  KTV Case Br. at 18, 20 (citing PDM at 24).  KTV set out such statements, albeit as part of its broader argument that Commerce "[c]annot [r]ely on the Treasury Department [r]eport," and, therefore, that the undervaluation finding was not supported by substantial evidence.  *Id.* at 18-20; *see infra* Section III.B.3.a(3).

Both arguments — on Commerce's treatment of the Treasury Report, and on whether Commerce's finding of undervaluation is supported by substantial evidence — are an appropriate reflection of KTV's statements in the underlying proceeding.[52]  *See* Pl. Br. at 32, 34.

### (2)    Commerce's consideration of Treasury's evaluation and conclusion

The court turns next to the substance of KTV's "outsourcing" argument: whether Commerce fulfilled its obligations under the statute and Commerce's regulations as the "administering authority" with respect to the determination of benefit under §§ 1671b(b)(1), 1671d(a)(1), 1677(1), or whether it "outsourced" that determination to Treasury.  *See* Pl. Br. at 31-32.

Commerce's 2020 regulation provides the following as to the determination of whether a benefit has been conferred:

> (b) Benefit—
>
>> (1) In general.  Where the Secretary has made an affirmative finding under paragraph (a)(1) of this section, the Secretary normally will determine the

---

[52] Because the court concludes that KTV's argument is otherwise properly before the court, it does not consider KTV's argument that the exhaustion argument does not apply because KTV presented a "purely legal" argument.  Pl. Reply Br. at 16-17.

existence of a benefit after examining the difference between:

(i) The nominal, bilateral United States dollar rate consistent with the equilibrium REER; and

(ii) The actual nominal, bilateral United States dollar rate during the relevant time period, taking into account any information regarding the impact of government action on the exchange rate.

(2) Amount of benefit.   Where there is a difference under paragraph (b)(1) of this section, the amount of the benefit from a currency exchange normally will be based on the difference between the amount of currency the firm received in exchange for United States dollars and the amount of currency that firm would have received absent the difference referred to in paragraph (b)(1) of this section.

(c) Information sources.   In applying this section, the Secretary will request that the Secretary of the Treasury provide its evaluation and conclusion as to the determinations under paragraphs (a) and (b)(1) of this section.

19 C.F.R. § 351.528(b)-(c).

In regard to subsection (c), the regulation provides further that Commerce is to receive Treasury's submission in the same way that any federal agency would receive "advice and policy recommendations":

In recognition of Treasury's experience in the area of evaluating currency undervaluation, Commerce will defer to Treasury's expertise, but we will not delegate to Treasury the ultimate determination of whether currency undervaluation involves a countervailable subsidy in a given case.   It is lawful for one federal agency to turn to another for "advice and policy recommendations" in an area where that other agency might have particular expertise.   Accordingly, we intend to defer to Treasury's expertise with respect to currency undervaluation.

*Final Rule*, 85 Fed. Reg. at 6,038 (footnote omitted) (citing *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 568 (D.C. Cir. 2004)),[53] *cert. denied*, 543 U.S. 925 (2004); *Bellion Spirits, LLC v. United States*, 393 F. Supp. 3d 5, 15-17 (D.D.C. 2019)).  Commerce added: "We expect that we will normally follow Treasury's evaluation and conclusion regarding undervaluation, and any departure from Treasury's evaluation and conclusion will be based on substantial evidence on the administrative record."  *Id.*

The issues presented by KTV are whether Commerce "outsourc[ed]" the currency valuation issue to Treasury.  The court concludes, as explained below, that Commerce made such determinations with an appropriate level of outreach to Treasury consistent with Commerce's statutory responsibilities as the "administering authority" under §§ 1671b(b)(1), 1671d(a)(1), 1677(1), and as provided in paragraph (c) of the regulation.

To assess Commerce's actions, the court sets forth the following brief chronology of the actions taken by Commerce in respect of its determination of undervaluation.

On July 8, 2020, Commerce requested that Treasury provide its "evaluation and conclusion" with respect to paragraphs (a) and (b)(1) of 19 C.F.R. § 351.528 and "the underlying information on which Treasury's evaluation and conclusion rely."  Letter from Commerce to Treasury (July 8, 2020) at 1, PR 101, PJA Tab 5.  Commerce also invited the parties to the underlying proceeding "to submit factual information to rebut, clarify or

---

[53] Commerce in the *Final Rule* attributed this decision to a 2017 decision of the U.S. District Court for the District of Columbia, *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 382 (D.D.C.  2017) (per curiam).  *See Final Rule*, 85 Fed. Reg. at 6,038 n.27.  However, the reporter information, reporter page and sentence that Commerce quoted in its explanatory parenthetical correspond instead to the 2004 decision of the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") cited herein.

correct Treasury's submission." *Id.* at 2; *see also* 19 C.F.R. § 351.301(c)(4).  On

August 24, 2020, Treasury complied with Commerce's request and instructions and

provided its submission to Commerce.  *See* Treasury Report.

On August 25, 2020, the GOV submitted a July 2019 IMF report on Vietnam.

*See* GOV IQR at Ex. 2 (Vietnam 2019 Article IV Consultation—Press Release; Staff

Report; and Statement by the Executive Director for Vietnam, IMF Country Report No.

19/235 (July 2019)).  On August 28, 2020, KTV also submitted a 2019 IMF report on the

external balance assessment methodology and a 2006 IMF report on exchange rate

assessments.  *See* KTV's Sept. 8, 2020 Submission at Ex. 10 (Luis Cubeddu et al.,

2019, "The External Balance Assessment Methodology: 2018 Update," IMF Working

Paper 19/65, International Monetary Fund: Washington, DC) and Ex. 11 (International

Monetary Fund, Methodology for CGER Exchange Rate Assessments, November 8,

2006), CR 76-80, PR 202-203, PJA Tab 12.

On September 17, 2020, Commerce posed additional questions to Treasury

about its report.  Commerce Clarification Questions (Sept. 17, 2020), PR 215, PJA Tab

14.  On September 24, 2020, Treasury provided supplemental responses pertaining to

its evaluation and conclusion.  Treasury Supp. Resp. (Sept. 24, 2020), PR 227, PJA

Tab 15.

On November 10, 2020, Commerce issued the Preliminary Determination.

*Preliminary Determination*, 85 Fed. Reg. at 71,607; *see* PDM; *see also* 19 U.S.C. §

1671b(b)(1).  On May 27, 2021, Commerce issued the Final Determination.  *Final

Determination*, 86 Fed. Reg. at 28,566; *see* IDM at 25-26; *see also* 19 U.S.C. §

1671d(a)(1).

At the outset, it is notable that KTV does not offer any precedent — binding or persuasive — for its outsourcing argument. *See generally* Pl. Br. at 31-32. By contrast, Commerce relied in its *Final Rule* on *U.S. Telecom Association* and *Bellion Spirits* to demonstrate that requesting "advice and policy recommendations" from another agency, such as Treasury, does not amount to "delegat[ing] . . . the ultimate determination" of an issue. *Final Rule*, 85 Fed. Reg. at 6,038 n.27; *see also* Def. Br. at 14-15; Def.-Intervenor Br. at 32-35; *see also City of Boston Delegation v. FERC*, 897 F.3d 241, 255 (D.C. Cir. 2018) (citation omitted) (second alteration in original) (rejecting plaintiff's challenge to an agency's reliance on another federal agency's expert conclusion because "[a]gencies can be expected to 'respect [the] views of such other agencies as to those problems' for which those 'other agencies are more directly responsible and competent'").

In *U.S. Telecom Association*, the D.C. Circuit acknowledged that there are "three specific types of legitimate outside party input into agency decision-making processes: (1) establishing a reasonable condition for granting federal approval; (2) fact gathering; and (3) advice giving." *U.S. Telecom Ass'n*, 359 F.3d at 566.

The *U.S. Telecom Association* court ultimately held that the order of the Federal Communications Commission ("FCC") in that case did not fall into any of these categories. *Id.* However, with respect to the third category, the D.C. Circuit stated that "a federal agency may turn to an outside entity for advice and policy recommendations, provided the agency makes the final decisions itself." *Id.* at 568. "An agency may not, however, merely 'rubber-stamp' decisions made by others under the guise of seeking their 'advice.'" *Id.* (quoting *Assiniboine & Sioux Tribes v. Bd. of Oil & Gas*, 792 F.2d

782, 795 (9th Cir. 1986)).  Moreover, the D.C. Circuit noted: "nor will vague or inadequate assertions of final reviewing authority save an unlawful subdelegation."  *Id.* (citing *Nat'l Park & Conservation Ass'n v. Stanton,* 54 F. Supp. 2d 7, 19, 20-21 (D.D.C. 1999)).

The *Bellion Spirits* court distinguished *U.S. Telecom Association* on the grounds that in that case the FCC had "entirely outsourced" its decision-making authority "without retaining the ability to review those decisions," whereas in *Bellion Spirits* the Treasury's Alcohol and Tobacco Tax and Trade Bureau ("TTB") appropriately sought agency input.  *Bellion Spirits*, 393 F. Supp. 3d at 15-16 (quoting *U.S. Telecom Ass'n*, 359 F.3d at 564-66).  Specifically, the *Bellion Spirits* court stated that, in adopting the Food and Drug Administration's factual determinations, the TTB "explained why those determinations were, in its view, apposite to the analysis of Bellion's petition, and it enumerated why it agreed with each finding it adopted."  *Id.* at 16 (citing to the record and noting the TTB's appropriate outreach to "'other agencies as to those problems' for which those 'other agencies are more directly responsible and more competent'" (quoting *City of Boston Delegation*, 897 F.3d at 255)).

This Court and the Federal Circuit have applied pertinent aspects of the *U.S. Telecom Association* opinion in the past.  *See, e.g.*, *Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023, 1031 (Fed. Cir. 2016) (quoting *U.S. Telecom Ass'n*, 359 F.3d at 565); *Selivanoff v. U.S. Sec'y of Agric.*, 30 CIT 567, 574 (2006) (citing *U.S. Telecom Ass'n*, 359 F.3d at 564-568); *see also Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 641-43 (5th Cir. 1983); *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974), *cert. denied*, 421 U.S. 994 (1975); *Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1349

Court No. 21-00397                                                                    Page 111

(Fed. Cir. 2003).  For example, in *Selivanoff*, which involved a question of whether the

U.S. Department of Agriculture ("USDA") subdelegated to the IRS a determination as to

net income, this Court explained that it "cannot discern from the record whether [the

Foreign Agricultural Service] actually undertook analysis."  30 CIT at 574.  Moreover, in

another case involving USDA's determination of net income, this Court observed that

"something more than simply looking, and citing to, a line on a tax return is necessary"

and that "both *Steen* and *Selivanoff* seem to contemplate a certain level of analysis in

order for the Secretary to make a *determination*."  *Lady Kim T. Inc. v. U.S. Sec'y of*

*Agric.*, 30 CIT 1948, 1953, 469 F. Supp. 2d 1262, 1266-67 (2006) (citing *Steen v.*

*United States*, 468 F.3d 1357, 1364 (Fed. Cir. 2006); *Selivanoff*, 30 CIT at 571).

In the instant case, the record demonstrates that Commerce (i) scrutinized the

Treasury Report, (ii) issued a supplemental questionnaire to Treasury requesting

clarifications in five areas, (iii) explained Commerce's decision to use the Treasury

Report and methodology rather than a different report and (iv) responded to parties'

concerns about the Treasury GERAF model.  *See* Commerce Clarification Questions at

3-4; IDM at 23-26.  After receiving Treasury's evaluation and conclusion, Commerce

issued a supplemental questionnaire to Treasury to seek clarification in five areas.

Commerce Clarification Questions at 3-4.  First, Commerce *inquired* as to the reasons

that Treasury included two indices in the GERAF model and excluded a specific

variable.  *Id.*  Second, Commerce then queried the existence of any impact from any

government action taken before the POI.  *Id.*  Third, Commerce asked Treasury to

address also the percent of undervaluation that Treasury reported in its instant report in

light of other percentages of undervaluation and appreciation noted in Treasury's

January 2020 report, entitled "*Macroeconomic and Foreign Exchange Policies of Major Trading Partners of the United States*" ("January 2020 Report").  *Id.* (citation omitted).  Fourth, Commerce asked Treasury to clarify specific aspects of the data and information in the table that Treasury provided.  *Id.* at 3-4; *see* Treasury Supp. Resp.  Fifth, Commerce requested that Treasury confirm its view that "the difference between (i) the nominal, bilateral United States dollar rate consistent with the equilibrium REER, and (ii) the actual nominal, bilateral United States dollar rate during calendar year 2019 was 4.7 percent."  Commerce Clarification Questions at 3.

After receiving Treasury's supplemental response, Commerce stated in its Final Determination: "Treasury's model provides a reasonable and economically sound methodology for assessing the level of VND undervaluation due to government action on the exchange rate."  IDM at 25-26.  Commerce added that it had determined to "use the model as *a basis* for calculating the amount of benefit resulting from its undervaluation in this final determination."  *Id.* (emphasis supplied).

Commerce's actions demonstrate that it probed Treasury's initial report to ascertain whether to use it in reaching a determination.  *See* Commerce Clarification Questions at 3-4; IDM at 23-26.  In addition, Commerce explained the reasons that it followed Treasury's findings.  *See Bellion Spirits*, 393 F. Supp. 3d at 16-17 (quoting *City of Boston Delegation*, 897 F.3d at 255).[54]  Specifically, in the IDM, Commerce examined and noted several important aspects of the GERAF model that supported using its conclusions: its similarity to other models, its incorporation of an additional variable and

---

[54] Moreover, Commerce has acknowledged that Treasury "has expertise in currency-related matters."  *Final Rule*, 85 Fed. Reg. at 6,038.

**PUBLIC VERSION**

"an additional analytic element" and its increased "precision" because it "extend[s] its analysis to include valuation assessments vis-à-vis the USD." IDM at 23-24, 26.

The record demonstrates further that Commerce did more than take a cursory look at the Treasury Report. *See Lady Kim T. Inc.*, 30 CIT at 1953, 469 F. Supp. 2d at 1266. Rather, Commerce "actually undertook analysis." *Selivanoff*, 30 CIT at 574. Commerce explained the reasons that it declined to consider conclusions based alternatively on the equilibrium real exchange rate model of the IMF and the reasons that the GERAF model was effective at assessing government action. IDM at 24-25. In addition, Commerce scrutinized the model and its metrics and parameters as shown by Commerce's comparison of the "alternative estimators and extensions" for the GERAF model and the statistical values for the GERAF model to conclude that "the robustness indicators are generally consistent and not indicative of the GERAF model's inaccuracy when compared to the other iterations provided in Appendix C." *Id.* at 25.

Commerce also responded to parties' critiques of the GERAF model and its statistical measures to conclude that the GOV had not shown that the GERAF model was "invalid[]" or "unusable" or that "the data or results are clearly flawed." *Id.* For instance, Commerce noted the lack of support in the record for the GOV's claims as to the cause of undervaluation. *Id.* at 24. Commerce also explained the way in which the statistics and alternatives in Appendix C of the Treasury Report "strengthen the results" of the GERAF model. *Id.* at 25. Commerce added that "[w]hile Commerce agrees with the GOV that there may be other methods of measuring an equilibrium exchange rate, we note that Treasury's analysis appears reasonable and the GOV has not provided any record information invalidating Treasury's model." *Id.*

APPX000177

**PUBLIC VERSION**

Court No. 21-00397                                                               Page 114

"Where the evidence is reasonably reliable, the court 'will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology.'" *China First Pencil Co. v. United States*, 30 CIT 1200, 1202, 427 F. Supp. 2d 1236, 1239 (2006) (quoting *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404-05, 636 F. Supp. 961, 966 (1986), *aff'd* 810 F.2d 1137 (Fed. Cir. 1987)); *see Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834, 837, 159 F. Supp. 2d 714, 718 (2001), *aff'd sub nom. Shandong Huarong Gen. Grp. Corp. v. United States*, 60 F. App'x 797 (Fed. Cir. 2003).

In sum, KTV's assertions that Commerce "outsourc[ed]" its determination to Treasury, Pl. Br. at 31-32, "rubber-stamp[ed]" Treasury's findings, *U.S. Telecom Ass'n*, 359 F.3d at 568 (quoting *Assiniboine & Sioux Tribes*, 792 F.2d at 795), or that Commerce ceded its ability to review those findings, *Bellion Spirits*, 393 F. Supp. 3d at 15-16 (quoting *U.S. Telecom Ass'n*, 359 F.3d at 564-66), are contradicted by the record. To the contrary, Commerce fulfilled its responsibilities as the administering authority under § 1677(1) and consistent with the decisions of the Federal Circuit, this Court and other courts by reviewing, questioning and conducting analysis of the information and conclusions provided by Treasury.

### (3)   Substantial evidence for Commerce's determination

KTV next argues that Commerce lacked substantial evidence for its determination as to the undervaluation of the Vietnamese *dong* during the POI because: (1) Treasury did not include on the record data underlying its report and Commerce "failed to obtain the information from Treasury that would be needed to assess the validity and reliability of Treasury's analysis"; and (2) Commerce did not explain the

reason that the GERAF model was "more reliable than the other iterations provided by Treasury." Pl. Br. at 32-36.

Commerce obtained from Treasury, an agency with pertinent expertise, extensive information on the record relating to each of the two core elements of the Treasury Report: (1) the data sources for the report and their reputability; and (2) the validity and reliability of the GERAF model and the resultant calculations that Treasury employed for the instant evaluation and conclusion of undervaluation. *See* IDM at 23-26; *see also* Treasury Report. In addition, Commerce addressed expressly in the IDM Commerce's reasons for accepting Treasury's use of the GERAF model rather than other alternatives, including those noted in the Treasury Report. *See* IDM at 23-26.

Accordingly, Commerce's determination that there was 4.7 percent undervaluation of the Vietnamese *dong* against the U.S. dollar during the POI is adequately explained and supported by substantial evidence. IDM at 4, 25; PDM at 24; *see PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761 (Fed. Cir. 2012) ("[C]ourts must not improperly intrude upon an agency's power to implement and enforce proper procedures for constructing an agency record.").

### i. Basis for Commerce's determination

The question presented is whether the record, including the Treasury Report and supplemental response, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477-78 (1951)). "Where the evidence is reasonably reliable, the court 'will not impose its own views as to the sufficiency of the agency's investigation or question the

**PUBLIC VERSION**

agency's methodology.'" *China First Pencil Co.*, 30 CIT at 1202, 427 F. Supp. 2d at

1239 (quoting *Ceramica Regiomontana, S.A.*, 10 CIT at 404-05, 636 F. Supp. at 966).

Commerce explained in the *Final Rule* its approach to reviewing Treasury's

contributions: "All information and evidence on the administrative record will be

reviewed, and all estimates of REER gaps, U.S. dollar exchange rate gaps and the

underlying methodologies and data will be assessed after receiving any input from

Treasury and in light of interested party comments." *Final Rule*, 85 Fed. Reg. at 6,035.

To reach its determination in the instant case, Commerce requested initially that

Treasury "provide the underlying information on which Treasury's evaluation and

conclusion rely." Letter from Commerce to Treasury at 1. Commerce noted that it

would "treat the information . . . as if it is information placed on the record by Commerce

under 19 C.F.R. 351.301(c)(4)." *Id.*; *see* 19 C.F.R. § 351.301(c)(4) ("The Department

may place factual information on the record of the proceeding at any time.").

In response, Treasury provided its evaluation and conclusion on undervaluation.

*See* Treasury Report. The Treasury Report included a literature review, a discussion of

the facets and contributions of GERAF to currency valuation, a description of Treasury's

GERAF calculations, an explanation of the way that exchange rate gaps are derived

from current account gaps, lists of data sources and countries included and "robustness

checks and regression extensions" for the GERAF model. *Id.* at 6, App. C; *see id.* at 3

(describing role of data from 51 countries in creating a "panel series"), 22-23 (including

details as to methodology and variable construction relative to other sources). In its

report, Treasury provided "[c]alculations supporting Treasury's conclusions," as well as

the values calculated based on its application of the various steps of the GERAF

Court No. 21-00397                                                    Page 117

methodology to the instant case.  *Id.* at 2.  Specifically, Treasury also included the

calculations underlying the GERAF methodology in general and as applied to the instant

case and identified the sources from which it derived different variables for Treasury's

model.  *See id.* at 3, 3-12, App. A.  Treasury and Commerce also noted that GERAF

"builds" on the IMF model.  *Id.* at 3; IDM at 23 (noting that GERAF "is similar to existing

equilibrium [REER] models" (citing Treasury Report at 2)).  Both Treasury and

Commerce described the specific "contributions" that GERAF makes beyond the IMF

methodology.[55]  Treasury Report at 2-3; *see* IDM at 23-24 (citing Treasury Report at 2-

4).  In addition, as described above, Commerce then sought and Treasury provided

further information on five aspects of the Treasury Report and its conclusions.  *See*

*supra* Section III.B.3.a(2); *see also* Commerce Clarification Questions at 1-4; Treasury

Supp. Resp.

   KTV requested thereafter that "the data utilized by . . . Treasury . . . be put on the

record . . . to allow interested parties a meaningful opportunity to review and respond

fully to the information included in the Treasury Memorandum."  KTV's August 28, 2020

Letter at 1 (citing Treasury Report), PR 187, PJA Tab 10.  Notably, KTV's letter did not

state what information — or even categories of information — provided by Treasury to

Commerce was insufficient or in error; KTV also did not specify what information *not*

provided was sought.  *Id*.

   Treasury provided Commerce detailed information about its findings, including

calculations, sources, variables and robustness checks.  *See, e.g.*, Treasury Report at

---

[55] The parties have not alleged that Treasury included on any unreliable data sources.
*See generally* IDM at 23-26; Pl. Br. at 32-36.

**PUBLIC VERSION**

Court No. 21-00397                                                                                    Page 118

1-3 (letter and table), 3-32 (using a "panel series of 51 countries (comprising 91% of world GDP in 2018)"), Apps. A-C.  As described above, in addition to receiving and analyzing the Treasury Report, Commerce sought and received supplemental responses from Treasury.  *See* Commerce Clarification Questions at 3-4; *see* Treasury Supp. Response at 1-5.  Commerce also explained the reason that the GERAF model was sound and responded to comments from parties about the GERAF model and its statistical measures.  *See* IDM at 23-26.

On August 24, 2020, Treasury submitted its report to Commerce.  Treasury Report.  On September 17, 2020, Commerce issued a supplemental questionnaire to Treasury, which included the following detailed follow up questions pertaining to Treasury's application of the GERAF model:

> (1) Please confirm that, in Treasury's view, the difference between (i) the nominal, bilateral United States dollar rate consistent with the equilibrium REER, and (ii) the actual nominal, bilateral United States dollar rate during calendar year 2019 was 4.7 percent.

Commerce Clarification Questions at 3.  Treasury responded that it "assesses that the difference between (i) the nominal, bilateral United States dollar rate consistent with the equilibrium REER, and (ii) the actual nominal, bilateral United States dollar rate during calendar year 2019, taking into account the impact of government action on the exchange rate, was 4.7%.  The uncertainty range around this assessment, based on one standard error, spans from bilateral undervaluation of 4.2% to 5.2%."  Treasury Supp. Resp. at 1.

Commerce continued: "The GERAF model used by Treasury in this proceeding to assess the VND's valuation is similar to existing equilibrium real effective exchange rate (REER) models – including, most notably, the multilaterally consistent Current

**PUBLIC VERSION**

Court No. 21-00397                                                                            Page 119

Account balance model developed and used by the IMF in its External Balance

Assessment (EBA) methodology." *Id.*

Commerce also noted that the GOV put forth an IMF Article IV Report for

Vietnam. Commerce explained the reasons that that it did not consider the report to be

reliable. IDM at 24.

On October 30, 2020, Commerce issued its Preliminary Determination, in which

Commerce determined based on the information and analysis in the Treasury Report

that "Vietnam's currency vis-à-vis the U.S. dollar was undervalued during the period of

investigation by 4.7 percent" due to government action. PDM at 24-25. Commerce

reached its conclusion after examining Treasury's model, Treasury's application of the

model, and extensive amounts of information provided on the record to Commerce by

Treasury related to the information used in the model. *See* Treasury Report; *see also*

Commerce Clarification Questions; Treasury Supp. Resp. In this context, Commerce

noted that Treasury was able to ascertain the impact of government action through a

"complex and interdependence [sic] country economic model":

> With respect to government action on the exchange rate within the meaning
> of 19 CFR 351.528(a)(2), Treasury also determined that Vietnam's
> undervaluation in the POI was exclusively a result of GOV action. It did so
> by analyzing the GOV's purchase and sales of foreign exchange reserves
> over the POI. Using a complex and interdependence [sic] country economic
> model, where the sale of foreign exchange reserves in one country affected
> changes in the stock of foreign exchange in more than 50 other considered
> countries, Treasury was able to estimate that all of the undervaluation of the
> dong was attributable to changes in the stock of Vietnam's foreign exchange
> reserves.

PDM at 24-25 (citing Treasury Report).

Commerce then applied the model to the information that KTV itself reported —

"the total value of USD exchanged, the exchange rate used for each of these

transactions, and the authorized credit institution which processed the currency

exchange transaction" — to calculate benefit under 19 C.F.R. § 351.528(b)(2).  PDM at

25 (citing KTV IQR at App. 9-A).  Specifically, Commerce relied on the GERAF model

and "appl[ied] the 4.7 percent undervaluation reported by Treasury to each currency

exchange transaction reported by KTV and Sailun during the POI," and "then

aggregated the total benefits in USD based on the sum of . . . individual transactional

[sic] during the POI."  *Id.* (citing USD Inflow Calculation Mem. (Nov. 4, 2020), PR 303,

PJA Tab 24).  Commerce ultimately determined the subsidy rate to be 1.69 percent *ad*

*valorem* for KTV.  IDM at 4 (citing KTV Final Analysis Mem.).

### ii.    Underlying information

KTV presents four arguments as to why Commerce's decision is not supported

by substantial evidence.  All of the arguments are based on the fact that Commerce did

not have certain data on which Treasury relied in preparing its report and consequently,

according to KTV, Commerce's determination was not supported by substantial

evidence.  *See* Pl. Br. at 33 n.85.  As elaborated below, the court does not find KTV's

arguments persuasive.

KTV's first argument is that "several key variables (including the variables for

intervention in foreign exchange markets) were based on Treasury staff estimates," that

Treasury's use of assumptions based on those estimates was not reasonable and that

"Treasury has failed to articulate what these assumptions might have been."  *Id.*

Treasury provided detailed explanations of its use of "estimates" in applying the GERAF model.[56]  Treasury Report at 6.  Further, the GERAF estimates themselves are well established and are ones on which Treasury relies in a variety of contexts and are "consistent with the methodology used in Treasury's Report to Congress on Macroeconomic and Foreign Exchange Policies of Major Trading Partners of the United States."  *Id.* at 3.  Moreover, Treasury did identify the values as to which it made assumptions and provided context about the estimates that were derived from those assumptions.  *Id.* at 6 (noting that estimates may be "based on valuation-adjusted foreign exchange reserves" and referring to "estimations of transactions in foreign exchange derivatives markets").  Commerce discussed Treasury's model, noting in particular that it "builds upon the IMF's REER EBA model . . . by incorporating and quantifying the impact of foreign exchange intervention on current accounts across countries with varying degrees of capital account mobility."  IDM at 23.  Commerce indicated that it was satisfied with this approach as reflected in Treasury's model, noting that Commerce understood that the GERAF model is "an assessment" with an "uncertainty range," but that "Treasury's analysis appears reasonable."  *Id.* at 25; *see* Treasury Supp. Resp. at 1 ("The uncertainty range around this assessment, based on

---

[56] Treasury clarified the derivation of estimates for the GERAF model, elaborating that:

> Estimates are normally based on publicly available data for intervention on foreign asset purchases by authorities or estimated based on valuation-adjusted foreign exchange reserves.  This adjustment requires assumptions about both the currency and asset composition of reserves in order to isolate returns on assets held in reserves and currency valuation moves from actual purchases and sales, including estimations of transactions in foreign exchange derivatives markets.

Treasury Report at 6.

one standard error, spans from bilateral undervaluation of 4.2% to 5.2%."); *see also*

Treasury Report at pdf 3 (chart); IDM at 23 ("[T]he regulation does not require that

Treasury provide all of the data that is used in its model and analysis."), 26; *see also*

*City of Boston Delegation*, 897 F.3d at 255; *Bellion Spirits*, 393 F. Supp. 3d at 15-17

(stating that "to the extent the FDA standards in question pertain to assessing the

credibility of scientific evidence, reliance on those standards seems necessarily entailed

in consulting FDA on whether the studies at issue are reliable").  To the extent that

Treasury applies its methodology to the determination of undervaluation, reliance on

such methodology — and any assumptions involved therein — "seems necessarily

entailed," *Bellion Spirits*, 393 F. Supp. 3d at 17, in seeking Treasury's "evaluation and

conclusion," 19 C.F.R. 351.528(c).

KTV argues second that Treasury's data set "had numerous undisclosed gaps"

because Treasury included only 1,273 sets of observations in its Summary Statistics

table instead of 1,632 sets of observations for 51 countries over 32 years.  Pl. Br. at 33;

*see id.* at 33 n.86.  However, as the Summary Statistics table notes, the average

number of years of data for each variable was 25.  *See* Treasury Report at 6, 16 tbl. 1.

Twenty-five years of data would yield 1,275 sets of observations; however, as the

column heading in the table notes, the data are for an *average* number of years.  *Id.* at

16 tbl. 1.  The 1,273 sets of observations that Treasury used for the GERAF baseline

regression specification reflect almost precisely the sets of observations for 25 years.

It is well established that an agency's dataset need not be flawless.  *Hisp. Affs.*

*Project v. Acosta*, 901 F.3d 378, 392 (D.C. Cir. 2018) ("The mere fact that a 'dataset

was less than perfect' . . . 'does not amount to arbitrary decision-making.'" (quoting *Dist.*

*Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46,61 (D.C. Cir 2015))); *Home Meridian Int'l Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014) ("The data on which Commerce relies . . . must be the 'best available information,' but there is no requirement that the data be perfect."); *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1052 (D.C. Cir. 2001) (per curiam) ("That a model is limited or imperfect is not, in itself, a reason to remand agency decisions based upon it."). KTV has made no suggestion that the use of 1,273 observations — as opposed to 1,632 — rendered invalid, unusable or unreasonable the data sets used over a 32-year period.

KTV's third argument is that there were "inconsistencies with other Treasury Reports." Pl. Br. at 33. As an illustrative example, KTV claims that there is an inconsistency between the Treasury Report and the Treasury's January 2020 Foreign Exchange Report to Congress. *Id.* at 33 n.87. In that report, Treasury noted: "The Vietnamese authorities have credibly conveyed to Treasury that net purchases of foreign exchange were 0.8 percent of GDP over the four quarters through June 2019." January 2020 Report at 8. KTV says that that percentage equates to "roughly $2.1 Billion." Pl. Br. at 33 n.87. In the Treasury Report, KTV recounts, Treasury concluded that "the Vietnamese government—through the State Bank of Vietnam—undertook net purchases of foreign exchange in 2019 totaling about $22 billion." *Id.* (quoting Treasury Report at 1). The inconsistency between the $22 billion reported in the Treasury Report and the $2.1 billion reported in Treasury's January 2020 Report represents to KTV an issue which Commerce failed to address in the Final Determination.

To the extent that the values of net purchases differ between these two reports, Commerce maintains that it is reasonable that the six-month time difference is one

**PUBLIC VERSION**

Court No. 21-00397                                                                 Page 124

cause for the differential (e.g., different data may be involved).  Def.-Intervenor Br. at

39.

Commerce explained more generally in the *Final Rule* that Treasury's analysis

for the reports to Congress are distinct from Treasury's analysis for reports on

undervaluation in a CVD proceeding:

> We therefore agree with those commenters who argue that the statutory
> provisions pursuant to which Treasury conducts its analysis differ from the
> statutory provisions governing Commerce's CVD analysis. Accordingly,
> whereas the analysis in Treasury's semiannual reports examining possible
> currency manipulation may have relevance to Commerce's determination,
> Treasury's analysis in its semiannual reports is distinct from the analysis as
> to whether there is undervaluation for purposes of a CVD proceeding.  In
> other words, Treasury conducts a different analysis, pursuant to a different
> statutory authority and subject to different statutory criteria, in its
> semiannual reports.

*Final Rule*, 85 Fed. Reg. at 6,038; *see, e.g.*, January 2020 Report at 2-3 (explaining that

Treasury provides the semiannual reports to Congress pursuant to Section 3004 of the

Omnibus Trade and Competitiveness Act of 1988 and Section 701 of the Trade

Facilitation and Trade Enforcement Act of 2015).  Last, in response to a request from

Commerce for supplemental information, Treasury explained that the IMF's REER

estimate in 2018 in Treasury's January 2020 Report "was made without regard to the

question of 'government action on the exchange rate' as described in 19 C.F.R.

351.528(a)(2)."  Treasury Supp. Resp. at 3.

The court recognizes that the different figures that KTV has identified did not

correspond to a precisely overlapping period of time, and, moreover, that the differing

figures may be a result of differing methodologies.  However, due to the size of the

apparent discrepancy — $22 billion versus $2.1 billion — the court considers

Commerce's explanation insufficient.  For that reason, the court remands to Commerce to provide a more clear and more thorough explanation.  In particular, the court orders Commerce to provide an explanation of the size of the discrepancy between the two reports in net purchases in foreign currency and how — if that is the case — the six-month non-overlapping period could have accounted for the discrepancy.

Last, KTV insists that "[t]here may also have been mathematical or model-specification errors that have been hidden by the lack of transparency."  Pl. Br. at 33.  To support this point, KTV quotes a 2007 "occasional paper" written by three Treasury officials who describe the potential for exchange rate modeling inadequacies or shortcomings.  *Id.* at 33 n.88 (quoting T. Ashby McCown, Patricia Pollard and John Weeks, Department of the Treasury, "Equilibrium Exchange Rate Models and Misalignments: Occasional Paper No. 7," March 2007 ("McCown"), at 1).[57]

KTV does not provide any basis for its allegation that there may have been errors in the GERAF model.  *See* Pl. Br. at 33 n.88.  As to the paper authored by three Treasury economists and cited to by respondents, Commerce stated in the IDM that the paper "did not constitute an official U.S. government policy statement but rather reflected only the views of the authors."  IDM at 25 (citing KTV's September 8 Submission, Attach. 7 (McCown) at 2).

For the foregoing reasons, the court is not persuaded that Commerce failed to seek underlying data with respect to any hypothetical errors in the GERAF model.

---

[57] Before Commerce, KTV cited the same 2007 paper to argue that "Treasury has long counseled against reliance on a single model to address such [modeling] issues."  KTV Case Br. at 20-22 (citing McCown at 1-2, 7, 10, 18); *see* IDM at 25 (citing KTV Case Br. at 20-22).

### iii.    Commerce's treatment of input from other agencies and entities

Commerce's acceptance and use of the "detailed model information and support" from Treasury parallels Commerce's acceptance and use of information from other agencies and entities.  IDM at 23.  The court reviews four such circumstances that Commerce referenced in the IDM and two additional noted by the Government in its response brief.  The court concludes that Commerce's use of the Treasury Report is consistent with the statute and Commerce's regulations.  Neither requires that Commerce place all underlying data on the record when Commerce relies on another agency's inputs.

The first example to which Commerce points in its IDM pertains to Commerce's treatment under 19 C.F.R. § 351.524(d)(2) of IRS asset depreciation tables: "Commerce relies on asset depreciation tables of the Internal Revenue Service for purposes of allocating non-recurring subsidies, without placing the IRS's underlying data on the record."  *Id.*  That regulation addresses allocation of non-recurring benefits over time, and states that Commerce is to use IRS tables to establish average useful life ("AUL"), unless a party demonstrates that those tables "do not reasonably reflect" the company or country data, and that the difference is "significant."  19 C.F.R. § 351.524(d)(2)(i).

Notably, in the case of the asset depreciation tables, the presumption and burden on the objecting party is to "claim and establish" a reason for Commerce not to use the IRS table in a particular case.  *Id.*  There is no requirement that the IRS provide to Commerce or the parties the data underlying the tables and result.  The IRS publishes the tables for the public but does not publish or provide the data underlying the tables. *See, e.g.*, *IRS Publication 946 (2023), How To Depreciate Property*, at App. B — Table

of Class Lives and Recovery Periods (Sept. 9, 2024),

https://www.irs.gov/publications/p946#en_US_2023_publink1000107773; *see also*

*Toscelik Profil ve Sac Endustrisi A.S. v. United States*, 38 CIT 1534, 1535 n.1 (2014)

(noting that the associated IDM referenced Table B-2 from Publication 946 for 2008).

Further, Commerce regulations provide that it is to presume the correctness of the data

unless a party is able to show that the data are significantly different from those relating

to the party's.[58]  *See* 19 C.F.R. § 351.524(d)(2)(i).

In sum, both the IRS tables and the Treasury Report are non-confidential

sources that Commerce takes into consideration to measure countervailable subsidies.

*See* 19 C.F.R. § 351.524(d); *see id.* § 351.528(c).  Neither regulation requires that the

agency that provides the information and analysis to Commerce also provide all of the

data underlying the other agency's calculations and analysis.  *See id.* § 351.524(d); *id.* §

---

[58]  19 C.F.R. § 351.524(d)(2) provides in part:

> [Commerce] will presume the allocation period for non-recurring subsidies to be the AUL of renewable physical assets for the industry concerned as listed in the Internal Revenue Service's ("IRS") 1977 Class Life Asset Depreciation Range System (Rev. Proc. 77–10, 1977–1, C.B. 548 (RR–38)), as updated by the Department of Treasury.  The presumption will apply unless a party claims and establishes that the IRS tables do not reasonably reflect the company-specific AUL or the country-wide AUL for the industry under investigation, subject to the requirement, in paragraph (d)(2)(ii) of this section, that the difference between the company-specific AUL or country-wide AUL for the industry under investigation and the AUL in the IRS tables is significant. If this is the case, [Commerce] will use company-specific or country-wide AULs to allocate non-recurring benefits over time (see paragraph (d)(2)(iii) of this section).

351.528(c).  Further, in both cases, Commerce regulations require that it use the data provided by Treasury.

The second example that Commerce offered in its IDM was Commerce's reliance on information submitted by parties with respect to the establishment of benchmarks to measure the adequacy of remuneration in a CVD investigation.  IDM at 23 (citing 19 C.F.R. § 351.301(c)(3)(i)).  Commerce noted that "19 CFR 351.301(c)(3)(i) allows parties to submit benchmark information to measure the adequacy of remuneration [with] no requirement that they submit specific underlying sale-by-sale data, rather than aggregate data."  *Id.*; *see generally Certain Steel Grating from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination*, 74 Fed. Reg. 56,796, 56,801 (Dep't of Commerce Nov. 3, 2009) (describing purchases that a party reported "as one aggregate number," after which Commerce then averaged monthly prices to calculate a benchmark).

There is a parallel between the evaluation and conclusion of Treasury on undervaluation and the aggregate data of the parties on adequacy of remuneration.  In both circumstances, there may be imperfect information and about what is embedded within the respective sets of information on the record.  Here, Treasury provided a table with the intermediate values that it calculated at each step of the GERAF methodology.  Treasury Report at pdf 3 (chart).  Treasury also provided further explanation about the information on which the table is based and the measurement of such information.  Treasury Supp. Resp. at 3-5.

Commerce presented a third analogy involving the lack of a comparable requirement under 19 U.S.C. § 1677j(e) for advice from the Commission in certain anti-circumvention inquiries.  IDM at 23.  Commerce stated: "Similarly, section 781e of the Act provides that in certain anti-circumvention inquiries, the U.S. International Trade Commission may provide advice to Commerce, but there is no requirement that the Commission provide to Commerce its underlying analysis or data upon which it bases this advice."  *Id*.  In fact, the Commission generally does not provide underlying information to Commerce.

Fourth, Commerce noted in the IDM that Commerce has also treated the data underlying reports from the IMF and World Bank in a similar way to the instant approach.  Commerce noted that "the GOV did not place on the record the underlying data used in reports on which it relies, such as IMF reports."  IDM at 23.  Moreover, the Court has upheld Commerce's reliance, without having the underlying data, on the World Bank Doing Business report "as a reliable and accurate source" of brokerage and handling in the context of a surrogate value determination.  *Aristocraft of Am., LLC v. United States*, 41 CIT __, __, 269 F. Supp. 3d 1316, 1328 (2017).[59]  Commerce's treatment of Treasury's evaluation and conclusion is similar to Commerce's treatment of such information from the IMF and World Bank.

The Government raises as another analogy Commerce's treatment of information relating to whether a firm receiving a loan is uncreditworthy under 19 C.F.R. §

---

[59] In that case, the court agreed with Commerce that "it may reasonably rely on the Doing Business reported [brokerage and handling] values without 'going behind the data' unless [the plaintiffs] can establish a precise breakdown of which costs they did not incur and what segment of the $115 document preparation cost is attributable to those specific costs."  *Aristocraft of Am., LLC*, 41 CIT at __, 269 F. Supp. 3d at 1329.

**PUBLIC VERSION**

Court No. 21-00397                                                                 Page 130

351.505(a)(4)(i)(D).  Def. Br. at 32.  The regulation states that Commerce "may examine, among other factors": "Evidence of the firm's future financial position, such as market studies, country and industry economic forecasts, and project and loan appraisals prepared prior to the agreement between the lender and the firm on the terms of the loan."  19 C.F.R. § 351.505(a)(4)(i)(D).  The regulation is silent as to whether data underlying such evidence should also be placed on the record.

Finally, the Government notes that Commerce's use of the USTR's "list of 'developing countries'" is similar to Commerce's use of Treasury's evaluation and conclusion in the instant case in that neither of the respective provisions requires the submission to Commerce of underlying data or analysis.  Def. Br. at 32.  Under 19 U.S.C. § 1671b(b)(4)(B), Commerce is required to use the USTR's list of developing countries as part of Commerce's preliminary determination on whether a countervailable subsidy is de minimis.

Commerce's reliance on USTR's conclusion is highly consequential.  That is because a country on USTR's developing country list could result in Commerce applying a substantially higher de minimis level (2.0 percent rather than 1.0 percent) for countervailable subsidies, resulting in a negative determination for that country.  19 U.S.C. § 1671b(b)(4)(A).  Notably, the statute does not require that USTR provide to Commerce the underlying data or analysis for its conclusions and Commerce has never requested those data or that analysis.

### (4)    Calculation of benefit conferred to KTV

The next and final issue before the court is whether Commerce's finding of a benefit — the existence of which Commerce considered due to the undervaluation of

**PUBLIC VERSION**

the Vietnamese *dong*, *see* 19 U.S.C. 351.528(a)(1) — is supported by substantial evidence and in accordance with law.  KTV argues that the alleged currency undervaluation does not confer a benefit under the statute because: (1) any additional income from conversions of U.S. dollars into Vietnamese *dong* was "balanced by increased costs (in *dong*) from converting input prices into *dong* at the same [allegedly] inflated rate"; and (2) under Commerce's past practice, "when the same exchange rate applies to both exports and imports by an exporter, there is no benefit."  Pl. Br. at 40 (citing Pl. Br. at 25-27).  The court is not persuaded by these arguments and concludes that Commerce's determination is supported by substantial evidence and is in accordance with law.

Commerce acted consistently with 19 U.S.C. § 1677(5)(E) and 19 C.F.R. § 351.528(b).  *See* IDM at 25-26; *see generally* 19 C.F.R. § 351.503 (stating that Commerce will follow any "specific rule for the measurement of a benefit" in Subpart E of its regulations).  In the Preliminary Determination, Commerce described the way in which its approach in this case followed the framework set forth in the regulation on "[e]xchanges of undervalued currencies":

> In order to determine the benefit provided to respondents by this currency undervaluation in a manner consistent with 19 CFR 351.528(b)(2), we calculated "the difference between the amount of currency the firm received in exchange for United States dollars and the amount of currency that a firm would have received absent the difference referred to in paragraph (b)(1) of this section" by applying the 4.7 percent undervaluation reported by Treasury to each currency exchange transaction reported by KTV and Sailun during the POI.  For each company, we then aggregated the total benefits in USD based on the sum of these individual transactional [sic] during the POI.

PDM at 25 (citing Prelim. Calc. Memo for KTV).  In the Final Determination, Commerce maintained its same methodology, IDM at 4, and "use[d] [Treasury's] model as a basis for calculating the amount of benefit resulting from [VND] undervaluation," *id.* at 25-26.

Further, § 1677 does not provide for Commerce to consider increased costs in *dong* for inputs that would allegedly offset any benefit.  By statute, there are only three kinds of values that Commerce "may subtract from the gross countervailable subsidy." 19 U.S.C. § 1677(6)(A)-(C).[60]  Increased costs of inputs due to currency-related issues is not among the three.  *See* 19 U.S.C. § 1677(6)(A)-(C); *see also Final Rule*, 85 Fed. Reg. at 6,037 (noting "such an offset is not contemplated by section 771(6) of the [Tariff] Act [of 1930]").

Commerce's decision in this case is consistent also with the decisions of the Federal Circuit and this Court.  *See Kajaria Iron Castings Pvt. Ltd. v. United States*, 156 F.3d 1163, 1174 (Fed. Cir. 1998) ("19 U.S.C. § 1677(6) provides the exclusive list of permissible offsets" (citing *Geneva Steel v. United States*, 20 CIT 7, 62-63, 914 F.

---

[60] 19 U.S.C. § 1677(6) provides the three kinds of values:

> For the purpose of determining the net countervailable subsidy, the administering authority may subtract from the gross countervailable subsidy the amount of—
>
> > (A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the countervailable subsidy,
> >
> > (B) any loss in the value of the countervailable subsidy resulting from its deferred receipt, if the deferral is mandated by Government order, and
> >
> > (C) export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received.

**PUBLIC VERSION**

Court No. 21-00397                                                Page 133

Supp. 563, 609-10 (1996); *IPSCO, Inc. v. United States*, 12 CIT 359, 367, 687 F. Supp.

614, 621-22 (1988)); *see also Canadian Solar Inc. v. United States*, Slip Op. 20-23,

2020 WL 898557, at *7 (CIT Feb. 25, 2020) (holding that Commerce acted consistently

with 19 U.S.C. § 1677(5)(E)(iv) by countervailing purchases made below less than

adequate remuneration ("LTAR") without an offset for "inputs at or above LTAR").

For example, in *Canadian Solar*, this Court stated:

Commerce's method assumes that countervailing duties are not assessed on purchases at or above the world market rate.  The government is correct that Canadian Solar functionally asks for the offsetting of its LTAR purchases with its at or above LTAR purchases.  The government's practice of not calculating a "negative benefit" is in accordance with the statute as a respondent still receives a countervailable benefit in situations where only some of its inputs were provided for less than adequate remuneration.  *See* 19 U.S.C § 1677(5)(e)(iv).  By countervailing only those purchases made below LTAR, Commerce is simply effectuating its statutory mandate.  At base, Canadian Solar has benefitted from receiving reduced-cost inputs and Commerce properly countervailed those benefits, regardless of whether Canadian Solar also purchased some inputs at or above LTAR.  A countervailable subsidy remains countervailable regardless of the extent of use by a respondent.

*Canadian Solar*, 2020 WL 898557, at *7.

**PUBLIC VERSION**

Court No. 21-00397                                                          Page 134

Moreover, even for *qualifying* costs, the regulation does not *require* that Commerce calculate such increased costs and offset that amount against the amount of a benefit.  *See* 19 C.F.R. § 351.528(b)(2); *see also Final Rule*, 85 Fed. Reg. at 6,036.[61]

Last, in *Aluminum Extrusions from China* and *Certain Coated Paper from China*, Commerce discussed documentation that demonstrated that a "vast majority" of "foreign exchange earnings" were not converted.  *Aluminum Extrusions from China* IDM at cmt. 33 (citing Aluminum Extrusions Currency Memo at 4-5); *Certain Coated Paper from China* IDM at cmt. 6 (citing Certain Coated Paper Currency Memo at 4-5).  Here, on the other hand, Commerce calculated the benefit based on actual conversions.  *See* PDM at 25 (citing Prelim. Calc. Memo for KTV; KTV August 24 Submission at App. 9-A); IDM at 4.  Specifically, Commerce "relied upon the available data regarding USD inflows to Vietnam as a proxy for USD currency conversions."  PDM at 23; *see* IDM at 18-19.[62] Therefore, the issue of whether conversion occurred based on foreign exchange

---

[61] The 1998 preamble to the CVD regulations explained that the benefit analysis concerns what a company receives and does not consider the net effect that a subsidy has on a company's bottom line:

> Thus, if there is a financial contribution and a firm pays less for an input than it otherwise would pay in the absence of that financial contribution (or receives revenues beyond the amount it otherwise would earn), that is the end of the inquiry insofar as the benefit element is concerned. The Department need not consider how a firm's behavior is altered when it receives a financial contribution that lowers its input costs or increases its revenues.

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,361 (Dep't of Commerce Nov. 25, 1998).

[62] As described *supra* in Section III.B.2.a as to whether the subsidy was specific, "in order to account for USD inflows which may not have resulted in currency conversion, [Commerce] discounted Vietnam's exports of goods by the amount of intermediary goods inputs."  IDM at 18-19 (citing PDM at 24).

Court No. 21-00397                                                                    Page 135

earnings, which arose in those determinations, is not relevant to Commerce's

consideration of benefit in this case.

In view of the foregoing, the court is unable to conclude that Commerce's benefit

determination was supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that on remand Commerce is to state clearly the statutory authority

under which it relied upon the available data regarding USD inflows to Vietnam as a

proxy for USD currency conversions.  Specifically, Commerce is ordered to explain

whether it relied on 19 U.S.C. § 1677e(a)(2)(B) for determinations based on facts

available, § 1677e(b) if Commerce considered that it was applying adverse facts

available, or § 1677e(c) if Commerce considered that it was merely corroborating

secondary information; it is further

**ORDERED** that on remand Commerce provide as to its specificity analysis (1) a

clear statement of what precisely Commerce considered to be missing from the record

as a result of the failure of the GOV to provide total USD inflows from the traded goods

sector, the traded services sector and utilized FDI and inbound portfolio investment; and

(2) the reasons that the alternative information provided by the GOV was not useable to

perform the necessary analysis.  Specifically with respect to (2), Commerce is provide:

(a) specific reasons that Commerce did not use the GOV's third supplemental

questionnaire response and whether that response met Commerce's request in its

questionnaire that GOV (i) "explain how" the numbers it provided were obtained; (ii)

explain "what went into [those] calculations"; and (iii) "report all original values

requested"; and (b) specific reasons that Commerce did not accept the six elements of

data that GOV provided to comprise total USD inflows and whether those data relate to

Commerce's use of the four major channels of exchange to comprise an economy wide

surrogate number for currency conversions; it is further

ORDERED that on remand Commerce (1) explain the reasons that Commerce

designated the four major channels of exchange as the correct basis for estimating the

total proportion of USD inflows that Vietnam received during the POI; (2) explain how,

precisely, Commerce utilized "the information placed on the record by Commerce,

which reflects data submitted by the State Bank of Vietnam to the IMF" to derive the

four channels analysis; (3) explain what data were not provided in connection with

Commerce's development of that analysis; and (4) explain why, together, these

elements prevented Commerce from using those data in its four channels analysis; it is

further

ORDERED that on remand Commerce specify whether Commerce made the

assumption in its specificity determination that use of the currency undervaluation

subsidy is spread evenly in the traded goods sector; it is further

ORDERED that on remand Commerce is to provide a more clear and thorough

explanation of the size of the discrepancy in net purchases in foreign exchange

between the Treasury Report and the Treasury's January 2020 Report, including how

the six-month non-overlapping period could have accounted for the discrepancy; it is

further

ORDERED that the remand results shall be due ninety (90) days following the

date of this Opinion and Order; it is further

**PUBLIC VERSION**

Court No. 21-00397                                                                              Page 137

      **ORDERED** that any comments on the remand results shall be submitted within

30 days of the filing of the results; and it is further

      **ORDERED** that any replies to the comments are due 15 days thereafter.


                                         /s/      Timothy M. Reif
                                         Timothy M. Reif, Judge

Dated:   October 18, 2024
         New York, New York

Addendum 4

Final Results of Redetermination Pursuant to Court Remand

C-552-829
Remand – Slip Op. 24-115
**Public Document**
E&C/OI: TES

***Kumho Tire (Vietnam) Co., Ltd. v. United States*,**
**Consolidated Court No. 21-00397, Slip Op. 24-115 (CIT October 18, 2024)**
**Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

**I.      SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT or

the Court) in *Kumho Tire (Vietnam) Co., Ltd. v. United States*, Court No. 21-00397, Slip Op. 24-

115 (CIT October 18, 2024) (*Remand Order*).  These final results of redetermination concern the

final determination of the countervailing duty investigation on passenger vehicle and light truck

tires from the Socialist Republic of Vietnam (Vietnam).[1]  The respondent in the underlying

investigation and plaintiff in this litigation is Kumho Tire (Vietnam) Co., Ltd. (KTV).

In the underlying investigation, Commerce determined that KTV's acquisition of land-

use rights at preferential rent rates was a countervailable subsidy and supported by record

evidence.  Additionally, Commerce determined that KTV's exchanges of U.S. dollars (USD) for

undervalued Vietnamese dong (VND) constituted countervailable subsidies.  KTV challenged

the *Final Determination.*  In its *Remand Order*, the Court held that Commerce's determination

that KTV's acquisition of land-use rights was a countervailable subsidy is supported by

substantial evidence.  The Court also affirmed most of Commerce's determination that KTV's

exchanges of USD for VND constitute countervailable subsidies under the Tariff Act of 1930, as

---

[1] *See Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam:  Final Affirmative Countervailing Duty Determination*, 86 FR 28566 (May 27, 2021) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).

amended (the Act), and Commerce's *Modification of Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings: Final Rule*, 85 FR 6031 (February 4, 2020) (*Final Rule*). However, in the *Remand Order*, the Court remanded Commerce to do the following:

- state clearly the statutory authority under which it relied upon the available data regarding USD inflows to Vietnam as a proxy for USD currency conversions. Specifically, Commerce is ordered to explain whether it relied on section 776(a)(2)(B) of the Act for determinations based on facts available, section 776(b) of the Act if Commerce considered that it was applying adverse facts available (AFA), or section 776(c) of the Act if Commerce considered that it was merely corroborating secondary information;

- provide as to its specificity analysis: (1) a clear statement of what precisely Commerce considered to be missing from the record as a result of the failure of the Government of Vietnam (GOV) to provide total USD inflows from the traded goods sector, the traded services sector and utilized foreign direct investment (FDI) and inbound portfolio investment (PI); and (2) the reasons that the alternative information provided by the GOV was not usable to perform the necessary analysis. Specifically with respect to (2), Commerce is provide: (a) specific reasons that Commerce did not use the GOV's third supplemental questionnaire response and whether that response met Commerce's request in its questionnaire that GOV (i) "explain how" the numbers it provided were obtained; (ii) explain "what went into {those} calculations"; and (iii) "report all original values requested"; and (b) specific reasons that Commerce did not accept the six elements of data that GOV provided to comprise total USD inflows and whether those data relate to Commerce's use of the four major channels of exchange to comprise an economy wide surrogate number for currency conversions;

- explain the reasons that Commerce designated the four major channels of exchange as the correct basis for estimating the total proportion of USD inflows that Vietnam received during the POI; (2) explain how, precisely, Commerce utilized "the information placed on the record by Commerce, which reflects data submitted by the State Bank of Vietnam to the IMF" to derive the four channels analysis; (3) explain what data were not provided in connection with Commerce's development of that analysis; and (4) explain why, together, these elements prevented Commerce from using those data in its four channels analysis;

- specify whether Commerce made the assumption in its specificity determination that use of the currency undervaluation subsidy is spread evenly in the traded goods sector; and

- provide a more clear and thorough explanation of the size of the discrepancy in net purchases in foreign exchange between the Treasury Report[2] and the Treasury's January 2020 Report,[3] including how the six-month non-overlapping period could have accounted for the discrepancy.[4]

---

[2] *See* U.S. Department of Treasury (Treasury)'s Letter to Commerce dated August 24, 2020 (Treasury Report).
[3] *See* KTV's Letter, "Submission of Factual Information in Response to Treasury Report," dated September 8, 2020 (KTV Treasury Rebuttal), at Attachment 17 (Treasury's January 2020 Report).
[4] *See Remand Order* at 1 and 4.

We have provided the explanations the Court requested in these final results of redetermination.

## II.    BACKGROUND

In the *Final Results*, Commerce determined, with respect to the Currency Exchanges program, that enterprises that buy or sell goods internationally are the predominant users of the GOV's currency undervaluation subsidy, and, therefore, the program is *de facto* specific under section 771(5A)(D)(iii)(II) of the Act.[5]  Commerce further determined, with respect to the Currency Exchanges program, that a benefit was provided based on the degree of undervaluation measured by Treasury in accordance with 19 CFR 351.528.[6]

Commerce released its draft results of redetermination on December 27, 2024.[7]  KTV submitted timely comments on the Draft Remand on January 3, 2025.[8]

## III.    ANALYSIS

### A.    Specificity

In the underlying investigation, Commerce investigated whether the respondents' exchanges, or conversions, of USD for VND with Vietnamese banks – either acting as authorities within the meaning of section 771(5)(B) of the Act or acting pursuant to government entrustment or direction within the meaning of section 771(5)(B)(iii) of the Act – constituted countervailable subsidies.  With respect to specificity under section 771(5A)(D)(iii) of the Act, Commerce examined whether an enterprise or industry, or group of enterprises or industries, was

---

[5] *See Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam:  Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 85 FR 71607 (November 10, 2020) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM) at 23-24, unchanged in *Final Determination*.

[6] *See Preliminary Determination* PDM at 24-25, unchanged in *Final Determination*.

[7] *See* Draft Results of Redetermination Pursuant to Court Remand, *Kumho Tire (Vietnam) Co., Ltd. v. United States*, Consolidated Court No. 21-00397, Slip Op. 24-115 (CIT October 18, 2024), dated December 27, 2024 (Draft Remand).

[8] *See* KTV's Letter, "Comments on Draft Redetermination on Remand," dated January 3, 2025 (KTV's Draft Remand Comments).

the predominant user of the subsidy or received a disproportionately large amount of the subsidy.[9] Pursuant to 19 CFR 351.502(c), Commerce considered the traded goods sector to be a group of enterprises or industries for specificity purposes.

Accordingly, Commerce sought information to determine whether the traded goods sector – in particular, companies that sell goods internationally in the context of this case – was the predominant user or received disproportionately large amounts of the subsidy resulting from the exchange or conversion of USD for VND. Ideally, Commerce would conduct this analysis by comparing the amount of USD converted into VND by exporters in Vietnam to the total amount of USD converted into VND by all entities in Vietnam during the 2019 period of investigation (POI). Commerce therefore requested the GOV to provide figures for the share of total USD inflow that was converted into VND throughout Vietnam and the share of these conversions attributable to the traded goods sector, the traded services sector, income earned from abroad, and utilized FDI and inbound PI.[10] However, the GOV unequivocally stated that it "does not maintain the total value of USD inflow converted into VND" and "is also unaware of any other sources that compile these data."[11]

In the absence of data pertaining to actual currency conversions in Vietnam, Commerce looked to data regarding USD inflows to Vietnam. Commerce placed on the record official data from the International Monetary Fund (IMF) regarding USD denominated inflows to Vietnam, figures which were reported to the IMF by the GOV. This aggregated set of data that the GOV provided the IMF was further decomposed by, among other things, USD inflows earned through

---

[9] *See Preliminary Determination* PDM at 23-24.
[10] *See* Commerce's Letters, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam," dated July 8, 2020 (Initial Questionnaire), at Government Currency Undervaluation Appendix Question 8; and, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam," dated September 24, 2020, at Question 5.
[11] *See* GOV's Letter, "GOV's Second Supplemental Questionnaire Response," dated October 13, 2020 (GOV SQR2), at 4.

exports of goods.[12]  The GOV in its questionnaire responses also reported its purported data on USD inflows.[13]  However, the GOV-provided data pertained to "net commodity trade" and were not broken down further.  Therefore, Commerce asked the GOV to "explain how these numbers were obtained and what went into these calculations and report all original values requested including total USD inflow from the traded goods sector and the traded services sector along with a citation for where this info was obtained."[14]  In its response, the GOV did not report the values that went into its "net commodity trade" figure, instead simply stating that the data came from the General Department of Customs statistics for imported and exported goods.[15]

Based on this record, in the *Preliminary Determination*, Commerce stated that it "relied upon the available data regarding USD inflows to Vietnam as a proxy for USD currency conversions."[16]  Commerce also explained that the GOV reported USD inflows on a different basis than requested, namely, on a "net commodity trade" basis.[17]  The GOV did not report USD inflows for the traded goods sector.  Therefore, Commerce relied upon the IMF data that it placed on the record, finding that, based on these data, 71.94 percent of USD inflows to Vietnam during the POI came from the export of goods.[18]  Accordingly, Commerce preliminarily found that the traded goods sector was the predominant user of the Currency Exchanges program and that the subsidy was *de facto* specific within the meaning of section 771(5A)(D)(iii)(II) of the Act.[19]

---

[12] *See* Memorandum, "International Monetary Fund and the Organization for Economic Co-operation and Development Data," dated October 8, 2020 (IMF/OECD Memorandum).

[13] *See* GOV's Letter, "GOV's Initial Questionnaire Response," dated August 24, 2020 (GOV IQR), at Exhibit F-1 at 4.

[14] *See* Commerce's Letter, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam," dated October 8, 2020 (GOV SQ3).

[15] *See* GOV's Letter, "GOV's Third Supplemental Questionnaire Response," dated October 19, 2020 (GOV SQR3) at 1-2.

[16] *See Preliminary Determination* PDM at 23.

[17] *Id.*

[18] *Id.* at 23-24.

[19] *Id.* at 24.

After the *Preliminary Determination*, the GOV argued that Commerce's preliminary specificity analysis and reliance on the IMF USD value for export of goods failed to account for companies that buy goods internationally.[20]  Commerce rejected this argument, explaining that the subsidy at issue was the exchange of USD for the undervalued VND and that buyers of goods internationally were not the beneficiaries of this subsidy.[21]  Therefore, Commerce did not use the GOV's figures, which included values for the import of goods, and instead relied on the IMF data.[22]  Commerce affirmed its preliminary specificity finding in the *Final Determination*.

The Court remanded portions of Commerce's final specificity determination and raised several questions concerning that determination.  We address each of these questions in turn below.

    1.        <u>Commerce's Statutory Authority for Relying on USD Inflows as a Proxy</u>

First, the Court ordered "that on remand Commerce is to state clearly the statutory authority under which it relied upon the available data regarding USD inflows to Vietnam as a proxy for USD currency conversions.  Specifically, Commerce is ordered to explain whether it relied on {section 776(a)(2)(B) of the Act} for determinations based on facts available, {section 776(b) of the Act} if Commerce considered that it was applying adverse facts available, or {section 776(c) of the Act} if Commerce considered that it was merely corroborating secondary information."[23]

There are two issues here:  (1) Commerce's use of USD inflows as a proxy for USD conversions in Vietnam; and (2) Commerce's use of the IMF data in place of the information submitted by the GOV in its questionnaire responses during the investigation.

---

[20] *See Final Determination* IDM at 18-19.

[21] *Id.*

[22] *Id.*  Commerce, however, did account for buyers of goods internationally when those buyers purchased intermediary inputs that were then subsequently used for re-exportation.  Commerce adjusted the IMF figures to account for imports of these intermediary inputs.

[23] *See Remand Order* at 135.

Filed By: Thomas Schauer, Filed Date: 1/16/25 10:46 AM, Submission Status: Approved

APPX000043

With respect to issue (1), as explained above, Commerce ideally would use data regarding conversions of USD into local currency for its specificity analysis.  This is because the subsidy at issue consists of the exchange of USD by a respondent with an "authority" bank or an entrusted or directed private bank for local currency when that local currency is undervalued within the meaning of 19 CFR 351.528.  The specificity analysis should compare the exchanges or conversions done by a particular enterprise or industry or group of enterprises or industries – in this case, exporters in Vietnam – with the total amount of exchanges or conversions in Vietnam.  However, the GOV reported that it does not maintain information on total currency conversions in Vietnam or conversions by the traded goods sector.[24]  Further, the IMF data placed on the record by Commerce did not contain information on actual currency conversions in Vietnam.  Rather, it contained data on USD denominated inflows to Vietnam.[25]

Accordingly, for issue (1), Commerce's statutory authority was section 776(a)(1) of the Act, which states that if "necessary information is not available on the record," Commerce may rely on the facts otherwise available to reach a determination.  As facts otherwise available in place of necessary information regarding currency conversions, Commerce "relied upon the available data regarding USD inflows to Vietnam as a proxy for USD currency conversions."[26] The GOV reported,[27] and KTV appears to have argued before the Court,[28] that Vietnamese exporters are not required to convert their earned USD into VND, so there may not be a one-to-one correlation between USD inflows and currency conversions.  But in the absence of necessary information regarding conversions, within the meaning of section 776(a)(1) of the Act, Commerce had no choice but to use a proxy, and we chose USD inflows to Vietnam.

---

[24] *See* GOV SQR2 at 4.
[25] *See* IMF/OECD Memorandum.
[26] *See Preliminary Determination* PDM at 23.
[27] *See, e.g.*, GOV SQR2 at 4.
[28] *See Remand Order* at 100-102.  The Court in this portion of the opinion recognized that "Commerce had to rely on substitute data comprising overall USD inflows as a proxy for USD currency conversions."

With respect to issue (2), Commerce's authority to use the IMF data in place of the GOV's data reported in its questionnaire responses resided in section 776(a)(2)(A) of the Act or, alternatively, section 776(a)(2)(B) of the Act. In the absence of data pertaining to USD conversions by exporters in Vietnam, Commerce needed data pertaining to USD inflows to Vietnam by exporters, *i.e.*, companies that sell goods internationally. Commerce requested this information from the GOV in the initial questionnaire.[29] The GOV responded with data on "net commodity trade."[30] The data the GOV provided appeared to represent the USD value of Vietnamese merchandise goods exports minus Vietnamese goods imports. In other words, they represented USD inflows *and* outflows, not solely USD inflows from companies that sell goods internationally.

Commerce therefore issued a supplemental questionnaire to the GOV that requested the GOV to "explain how these numbers were obtained and what went into these calculations and report all original values requested including total USD inflow from the traded goods sector and the traded services sector along with a citation for where this info was obtained."[31] In response, the GOV did not provide the figures that went into the "net commodity trade" data originally reported and did not report the original values for USD inflows from the traded goods sector. The GOV did not even provide reasonable estimates for the balance of inflows verses outflows. Rather, the GOV only stated that "{d}ata regarding net commodity trade is calculated from the General Department of Customs statistics for imported and exported goods, and the survey results on insurance and freight for international trade of goods are used to convert CIF values of imported goods to FOB values."[32] In other words, the GOV confirmed that it did not report USD inflows from Vietnamese exports but rather included both exports and imports in its "net" value

---

[29] *See* Initial Questionnaire at Government Currency Undervaluation Appendix Question 7.
[30] *See* GOV IQR at Exhibit F-1 at 4.
[31] *See* GOV SQ3.
[32] *See* GOV SQR3 at 1-2.

reporting without a reasonable basis from which to differentiate the two. Therefore, the GOV withheld information that was requested of it, within the meaning of section 776(a)(2)(A) of the Act.[33]

Alternatively, as the Court suggests, section 776(a)(2)(B) of the Act allowed Commerce to rely on the facts otherwise available because the GOV did not provide the requested information "in the form and manner" requested. As just described, despite Commerce's repeated requests for USD inflows from the traded goods sector, the GOV only reported "net commodity trade," without reporting the component values of this "net" value. This was not the only problem with the GOV's responses. Commerce also asked for USD inflows from the traded services sector, but the GOV only responded with a net figure for services.[34]

Section 776(a)(2)(B) of the Act is subject to section 782(c)(1) and (e) of the Act. In this case, section 782(c)(1) of the Act does not apply because the GOV never claimed any difficulties in responding to Commerce's requests for information. Further, section 782(e) of the Act does not apply because the information submitted by the GOV is so incomplete that it cannot serve as a reliable basis for reaching a determination on specificity. As described above, the GOV did not report USD inflows for the traded goods sector or for the traded services sector, but instead reported net values, which would have included underlying values for imports. The GOV's information was incomplete because it did not provide the additional detail requested by Commerce concerning the underlying values that went into the net values.[35]

The GOV objected during the investigation that Commerce's specificity calculations failed to include enterprises that buy goods internationally.[36] Commerce explained in the *Final*

---

[33] The GOV must have had information pertaining to total USD inflows from the traded goods sector within its possession because it reported that information to the IMF, as the GOV confirmed in its third supplemental questionnaire response. *See* GOV SQR3 at 1.

[34] *See* Initial Questionnaire at Government Currency Undervaluation Appendix Question 7; GOV SQ3; and GOV SQR3 at 1-3.

[35] *See* GOV SQR3 at 1-3.

[36] *See* GOV's Letter, "GOV's Case Brief," dated March 9, 2021, at 30-31.

*Determination* that "this subsidy program benefits companies exchanging USD for VND, not companies exchanging VND for USD."[37]  Commerce continued that "{b}ecause companies that buy goods internationally are unlikely to be exchanging USD for VND, we have determined that it would not be appropriate to incorporate them into our analysis of USD inflows to Vietnam as a proxy for USD conversions to VND."[38]  Therefore, the GOV's submissions, which incorporated import values into the "net" reported figures, could not be used within the meaning of sections 782(e) and 776(a)(2)(B) of the Act.

Finally, Commerce did not apply AFA pursuant to section 776(b) of the Act, and we are not doing so in this remand redetermination either, because we do not find that the GOV failed to cooperate by not acting to the best of its ability in responding to our requests for information. Further, Commerce did not rely on section 776(c) of the Act because we did not rely on secondary information in making our specificity determination, as that term is defined in 19 CFR 351.308(d).

2.   The Information Commerce Considered Missing from the Record and the Reasons the Alternative Information Provided by the GOV Was Not Useable

Second, the Court ordered on remand that:

Commerce provide as to its specificity analysis (1) a clear statement of what precisely Commerce considered to be missing from the record as a result of the failure of the GOV to provide total USD inflows from the traded goods sector, the traded services sector and utilized FDI and inbound portfolio investment; and (2) the reasons that the alternative information provided by the GOV was not useable to perform the necessary analysis.  Specifically with respect to (2), Commerce is provide:  (a) specific reasons that Commerce did not use the GOV's third supplemental questionnaire response and whether that response met Commerce's request in its questionnaire that GOV (i) "explain how" the numbers it provided were obtained; (ii) explain "what went into [those] calculations"; and (iii) "report all original values requested"; and (b) specific reasons that Commerce did not accept the six elements of data that GOV provided to comprise total USD inflows and whether those data relate to Commerce's use of the four major channels of

---

[37] *See Final Determination* IDM at 19.
[38] *Id.*

exchange to comprise an economy wide surrogate number for currency conversions.[39]

As explained above, the GOV failed to provide total USD inflows from exporters, *i.e.*, enterprises that sell goods internationally within the meaning of 19 CFR 351.502(c), and therefore this information was missing from the GOV's responses. Instead, the GOV only provided data regarding "net commodity trade," which represented the USD denominated value of merchandise exports minus imports.[40] The total USD inflows from exporters was necessary for Commerce's specificity analysis because it constitutes the numerator in the *de facto* specificity analysis. The traded goods sector, which in this case means companies that sell goods internationally,[41] was the "group" Commerce analyzed for specificity purposes to determine whether it was the predominant user of currency exchanges or received disproportionately large amounts of currency exchanges.

A similar problem existed with respect to the traded services sector. The GOV failed to provide total USD inflows from the traded services sector, instead only providing dollar denominated values for "net services" in its third supplemental questionnaire response.[42] This meant that information relating only to the value of the export of services (as opposed to the value of exports minus imports of services) was missing from the record. Commerce needed the USD value for the export of services because the export of services is a source of USD into the Vietnamese economy, and therefore constituted part of the denominator in the *de facto* specificity analysis.[43]

---

[39] *See Remand Order* at 135-36.
[40] *See* GOV IQR at Exhibit F-1 at 4; GOV SQR3 at 1-3.
[41] *See Final Determination* IDM at 19 (explaining that import values are not relevant in the context of this subsidy program).
[42] *See* GOV SQR3 at 3.
[43] We note that the GOV's reporting of "net services," if accepted, would actually *reduce* the value of the denominator in the *de facto* specificity calculation, compared to the value that Commerce used. *Compare* GOV SQR3 at 3 *with* Memorandum, "Calculation Based on USD Inflows Calculation," dated October 30, 2020 (Specificity Calculation Memorandum).

With respect to FDI and PI, there was nothing substantial missing from the record as a result of the GOV's responses. The USD values reported by the GOV in its questionnaire responses were identical to the values in the IMF data and were used by Commerce in the denominator in its specificity analysis.[44]

We now turn to the reasons that the alternative information provided by the GOV, and specifically the information in its third supplemental questionnaire response, was not useable. In that response, the GOV attempted to explain to Commerce "what went into {the} calculations" for USD inflows from the GOV's initial response and attempted to respond to Commerce's request for "all original values requested including total USD inflow from the traded goods sector and the traded services sector…"[45] The GOV also provided a table listing six elements of purported USD inflows to Vietnam.[46]

The GOV's third supplemental response did not satisfy Commerce's request to explain how the numbers from the GOV's initial response were obtained and "what went into" the calculations in the initial response. In the initial response, the GOV reported "Net commodity trade" in response to Commerce's request for total USD inflow from the traded goods sector.[47] As explained above, the "net" figure is based on the USD value of exports minus imports.[48] It is not the value of USD inflow of exports. In its third supplemental response, the GOV reported the same net figure and stated that "{d}ata regarding net commodity trade is calculated from the

---

[44] The GOV reported 2019 USD values of 16.12 billion for FDI and 3.0 billion for PI. *See* GOV SQR3 at 3. In the IMF data that Commerce placed on the record, the values are 16.12 billion for FDI and 2.995 billion for PI. *See* IMF/OECD Memorandum. In Commerce's calculations, it used 16.12 billion for FDI and 2.995 billion for PI. *See* Specificity Calculation Memorandum. The difference between 2.995 billion and 3.0 billion is likely due to rounding in the GOV's responses.

[45] *See* GOV SQR3 at 1.

[46] *Id.* at 3.

[47] *See* GOV IQR at Exhibit F-1 at 4.

[48] This is evident from the GOV's answer to the first question in its third supplemental response. In that answer, it explained the minor discrepancy between its reported net figure for 2019, 21.22 billion USD, and the net figure in the IMF data for 2019, 21.49 billion USD. *See* GOV SQR3 at 1. The net figure in the IMF data for 2019 is based on the value of exports minus the value of imports: 264,189.0 million USD in exports minus 242,694.8 million USD in imports equals 21,494.2 million USD, or 21.49 billion USD. *See* IMF/OECD Memorandum.

Filed By: Thomas Schauer, Filed Date: 1/16/25 10:46 AM, Submission Status: Approved

General Department of Customs statistics for imported and exported goods, and the survey results on insurance and freight for international trade of goods are used to convert CIT values of imported goods to FOB values."[49] Even if this is a cursory explanation of "how these numbers were obtained and what went into these calculations," it is not responsive to the fundamental question: what was the value of USD *inflows* from the traded goods sector? The GOV again did not provide this critical number; it did not provide "all original values requested including total USD *inflow* from the traded goods sector…" (emphasis added).

Commerce's regulation at 19 CFR 351.528(a)(1) states that any potential benefit "is conferred from the exchange of United States dollars for the currency of a country under review or investigation…." As Commerce explained in the *Final Determination*, "this subsidy program benefits companies exchanging USD for VND, not companies exchanging VND for USD," and thus it was appropriate not to include imports in the specificity analysis.[50] Further, in the *Final Determination*[51] and in the *Final Rule*,[52] Commerce explained its rationale for revisiting its prior statements that exporters cannot be considered a "group" for domestic specificity purposes, and the Court affirmed Commerce on this point.[53] Therefore, Commerce did not use the "Net commodity trade" information provided by the GOV in its third supplemental questionnaire response, because it was not information pertaining to USD inflows from the traded goods sector, *i.e.*, from exporters.

With respect to the traded services sector, similar problems existed in the GOV's third supplemental questionnaire response. Commerce requested inflows from the traded services sector, which means USD inflows from the export of services, but instead of reporting this

---

[49] *See* GOV SQR3 at 2.
[50] *See Final Determination* IDM at 19. Of course, Commerce did include imports in the analysis to the extent that it excluded from the specificity numerator the portion of exported goods "which is attributable to intermediary imported goods that are subsequently used for re-exportation." *Id.*; *see also Remand Order* at 91, 102.
[51] *See Final Determination* IDM at 20.
[52] *See Final Rule*, 85 FR at 6039-40.
[53] *See Remand Order* at 91-94.

Filed By: Thomas Schauer, Filed Date: 1/16/25 10:46 AM, Submission Status: Approved

figure, the GOV reported a net figure.[54]  Further, the GOV did not provide a detailed explanation of "what went into" this figure and only made a cursory statement that the net figure was obtained from the General Statistics Office.[55]  In any event, it is difficult to see how the GOV or KTV could object to Commerce's treatment of the traded services sector.  This information served as part of the denominator in the specificity calculation, and the figure used by Commerce, 16.65 billion USD,[56] is larger than the figure reported by the GOV, negative 1.19 billion USD.[57]  So if anything, Commerce's decision benefited the GOV and KTV.

With respect to FDI and PI, the GOV in its third supplemental response explained how these numbers were obtained.  Commerce used the numbers reported by the GOV in its calculation of the denominator for the specificity calculation, although Commerce used the more precise US$2.995 billion figure for PI rather than the rounded US$3.0 billion figure.[58]  These figures also appeared in the IMF data that the GOV supplied, and which are relied upon by Commerce.[59]

The Court also ordered Commerce to provide specific reasons why it did not use the six categories reported by the GOV on the third page of its third supplemental response.  We have explained above why Commerce could not use the figures for "net commodity trade" and "net services."  They are net figures, rather than amounts of USD inflows from the export of goods and the export of services.  We have also explained that Commerce did in fact use the figures reported for FDI and PI; they were the same as in the IMF data.

There are two other categories reported in the GOV's third supplemental response:  "Net One-way money transfers of the private sector" and "Net foreign debt."  It appears that the

---

[54] *See* GOV SQR3 at 1-3.
[55] *Id.* at 3.
[56] *See* Specificity Calculation Memorandum.
[57] *See* GOV SQR3 at 3.
[58] *Compare* Specificity Calculation Memorandum *with* GOV SQR3 at 3.
[59] *See* IMF/OECD Memorandum.

14

APPX000051

category "Net One-way money transfers of the private sector" relates to "Earned Income from Abroad," which is the category identified by Commerce based on the IMF data for primary and secondary income.[60] The record is less clear with respect to the GOV's reporting of "Net foreign debt" and how that relates to the IMF data for 2019 or to the four categories used by Commerce. It is worth noting that both of these categories appear to be plagued by the same problem as with goods and services, *i.e.*, they are net figures.

In short, Commerce did not use the six categories and figures reported by the GOV, except for FDI and PI, because the most important of those figures, covering the traded goods sector, was a net figure and not a figure representing total USD inflows from the export of goods. The IMF data, on the other hand, clearly provided USD inflows from the export of goods.[61] Similarly, the IMF data provided USD inflows from the export of services, rather than a net figure as reported by the GOV. At this point, given that two of the most important elements in the specificity calculation came from the IMF data, it would have made little sense for Commerce to use the GOV-reported information for the remainder.

In any event, even if Commerce had used the remainder of the information from the GOV's third supplemental response in the denominator calculation for the specificity analysis, the ultimate finding of predominant use would not have changed. Commerce found that the traded goods sector – in this case, the group of companies that sell goods internationally – accounted for 71.94 percent of USD inflows to Vietnam in 2019 and was the predominant user of the subsidy.[62] Below is a table representing the specificity denominator calculation if Commerce had used the GOV's information from the third supplemental response, except, of

---

[60] *See* Specificity Calculation Memorandum; IMF/OECD Memorandum. Commerce added primary income and secondary income to arrive at the USD inflow from Earned Income from Abroad for 2019.
[61] *See* IMF/OECD Memorandum. As the Court recognized, Commerce adjusted USD inflow for export of goods to account for intermediary imported inputs, based on OECD estimates. *See Remand Order* at 83; *Preliminary Determination* PDM at 24.
[62] *See* Specificity Calculation Memorandum; *see also Final Determination* IDM at 18.

course, for the information regarding "Net commodity trade" and "Net services," which, as explained above, could not be used.

| ITEM | 2019 VALUE (unit: billion USD) |
|---|---|
| Exports of Goods (Without Import Content) (Source: IMF and OECD) | 149.04 |
| Exports of Services (Source: IMF) | 16.65 |
| Net One-Way money transfers of the private sector (Source: GOV SQR3) | 9.08 |
| FDI in Viet Nam | 16.12 |
| PI in Viet Nam | 3.0 |
| Net foreign debt | 5.2 |
| TOTAL DENOMINATOR FOR USD INFLOWS | 199.09 |

This dataset yields a denominator of 199.09 billion USD. Of that, 149.04 billion USD is inflow from the export of goods. Therefore, even using some of the denominator information provided by the GOV in its third supplemental response, the traded goods sector would still be the predominant user of the subsidy, accounting for 74.86 percent of the USD inflows (149.04 divided by 199.09) to Vietnam. To be clear, Commerce is not using these calculations for purposes of this remand redetermination, because, as described above, we find that the IMF information is more reliable. Nonetheless, on remand we find much of the specificity denominator issue to be moot.

3.    Explanation of the "Four Channels" Analysis

Third, the Court ordered "that on remand Commerce: (1) explain the reasons that Commerce designated the four major channels of exchange as the correct basis for estimating the total proportion of USD inflows that Vietnam received during the POI; (2) explain how, precisely, Commerce utilized 'the information placed on the record by Commerce, which reflects data submitted by the State Bank of Vietnam to the IMF' to derive the four channels analysis; (3) explain what data were not provided in connection with Commerce's development of that

analysis; and (4) explain why, together, these elements prevented Commerce from using those data in its four channels analysis."[63]

Commerce based its four channels of analysis on the information from the IMF that Commerce placed on the record. Specifically, the IMF/OECD Memorandum at Attachment 1 details the balance of payments data for Vietnam during 2019. Commerce's four channels of analysis in the Specificity Calculation Memorandum are based on the IMF balance of payments line items for "Goods, credit (exports)," "Services, credit (exports)," "Primary income, credit," "Secondary income, credit," "Direct investment, liabilities," "Portfolio investment, liabilities," and "Other investment, liabilities."[64] The IMF is a credible international institution that tracks and disseminates international monetary and financial data, broadly from data it collects directly from its member countries, which in this case includes Vietnam. As such, Commerce appropriately can rely on such data and regularly relies on it in other contexts.[65] Further, as the Court affirmed, Commerce relies on similar information in other contexts, such as using the World Bank Doing Business Report as a source of brokerage and handling valuation in antidumping duty proceedings.[66] Finally, as the Court recognized, the IMF data used by Commerce was originally reported to the IMF by the State Bank of Vietnam.[67] Therefore, Commerce based its four channels of analysis for specificity on the IMF data.

We believe our explanations above have already answered items (3) and (4) in this particular section of the *Remand Order*. Nevertheless, for the sake of completeness, we reiterate

---

[63] *See Remand Order* at 136.

[64] *See* IMF/OECD Memorandum at Attachment 1. In the Specificity Calculation Memorandum, Commerce adjusted the "Goods, credit (export)" figure to deduct intermediary imported inputs, as reported by the OECD and as described elsewhere in this remand redetermination and in the *Remand Order*.

[65] *See, e.g.*, *Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 FR 29237 (June 1, 2021), and accompanying IDM at 39-40 (using IMF lending rates as benchmarks); and *Polyethylene Terephthalate Film, Sheet, and Strip from India: Final Results of Countervailing Duty Administrative Review*, 76 FR 76948 (December 9, 2011), and accompanying IDM at 4 (using lending rates from the IMF for the discount rate for non-recurring subsidies).

[66] *See Remand Order* at 129.

[67] *Id.* at 85.

17

that the GOV's questionnaire responses during the investigation never provided the critical number for USD inflows from the export of goods. By reporting "Net commodity trade," the GOV reported inflows and outflows, rather than inflows alone. As Commerce explained, "this subsidy program benefits companies exchanging USD for VND, not companies exchanging VND for USD."[68] Further, "{b}ecause companies that buy goods internationally are unlikely to be exchanging USD for VND, we have determined that it would not be appropriate to incorporate them into our analysis of USD inflows to Vietnam as a proxy for USD conversions to VND."[69] The GOV's reporting of "Net services" suffered from the same flaw, and Commerce therefore did not use the GOV's reported figure. However, Commerce did in fact use identical numbers (except for rounding) as the GOV reported for FDI and PI.

4. <u>Assumption that the Use of the Currency Subsidy Is Spread Evenly in the Traded Goods Sector</u>

Fourth, the Court ordered Commerce on remand to "specify whether Commerce made the assumption in its specificity determination that the use of the currency undervaluation subsidy is spread evenly in the traded goods sector."[70]

As an initial matter, we reiterate that only companies that sell goods internationally benefit from the exchange of USD for the undervalued VND. Therefore, it was essential that the numerator in the specificity calculation only include USD inflows from Vietnamese exporters. As Commerce noted in the *Final Determination*, the traded goods sector includes companies "that either sell goods internationally or that buy goods internationally;" in this case, it was the companies that sell goods internationally that benefited. This was the "group" within the meaning of section 771(5A)(D) of the Act.

---

[68] *See Final Determination* IDM at 19.
[69] *Id.*
[70] *See Remand Order* at 136.

Filed By: Thomas Schauer, Filed Date: 1/16/25 10:46 AM, Submission Status: Approved

Further, we have made no assumption, one way or the other, whether the subsidy usage was spread evenly within the traded goods sector, *i.e.*, within the group of companies that sell goods internationally.  With due respect to the Court's inquiry, we do not find this question relevant under section 771(5A)(D) of the Act.  A "group" within the meaning of section 771(5A)(D) of the Act is a unitary whole, similar to an "industry" or "enterprise."  The question under section 771(5A)(D) of the Act is not whether the subsidy is distributed or used evenly *within* the beneficiary group or industry or even enterprise, but rather whether it is distributed or used evenly *among* different groups or industries or enterprises.  For example, if the question is whether the steel industry is a predominant user, or receives a disproportionately large amount of, a subsidy, it does not matter whether the subsidy is distributed evenly within the steel industry.  Rather, what matters is whether the steel industry receives a predominant or disproportionate share compared to other industries.  The same principle holds true for a "group."  The issue is not the distribution of the subsidy within the group, but rather the distribution of the subsidy compared to other groups.

Perhaps KTV's real complaint is that a "group" composed of Vietnamese exporters is too large compared to the Vietnamese economy as a whole.  Yet the Court affirmed Commerce's finding that exporters can constitute a "group" within the meaning of section 771(5A)(D) of the Act.[71]  Further, Commerce found, and the Court agreed, that the Vietnamese economy is diversified such that a *de facto* specificity finding was not due merely to lack of economic diversification.[72]  In any event, as Commerce explained in the *Final Determination*, when nearly 72 percent of a subsidy benefits one particular group it the economy, "it cannot be said that the subsidy is widely used throughout the economy."[73]

---

[71] *Id.* at 91-94.
[72] *See Preliminary Determination* PDM at 19; *Remand Order* at 88.
[73] *See Final Determination* IDM at 20.

In sum, we have responded to the Court's questions and orders regarding our specificity determination, and we continue to find that currency exchanges are de facto specific because the traded goods sector – in this case, companies that sell goods internationally – was the predominant user of the subsidy.

B.      Benefit

In the underlying investigation, Commerce examined whether a benefit was conferred to KTV from its exchanges of USD for VND only to the extent that the VND was undervalued during the POI. In determining whether the VND was undervalued, Commerce requested Treasury's evaluation and conclusion as to whether there was a gap between Vietnam's real effective exchange rate (REER) and the equilibrium REER and, if so, whether there was government action on the exchange rate that contributed to this undervaluation, consistent with 19 CFR 351.528(a) and (c). Consistent with 19 CFR 351.528(b) and (c), Commerce also requested Treasury's evaluation and conclusion as to whether there was a difference between (1) the nominal, bilateral USD rate consistent with the equilibrium REER and (2) the actual nominal, bilateral USD rate during the POI, taking into account any information regarding the impact of government action on the exchange rate.

Treasury reported that the VND was undervalued during the 2019 POI, because there was a gap between Vietnam's REER and its equilibrium REER, and that the GOV's action on the exchange rate vis-à-vis all of Vietnam's trading partners contributed to this undervaluation.[74] Treasury also reported that the GOV's actions on the exchange rate had the direct effect of undervaluing the VND *vis-à-vis* the USD by 4.7 percent.[75] Therefore, Commerce found that the VND was undervalued in 2019 by 4.7 percent compared to the USD and calculated KTV's benefit from the Currency Exchanges program using this number.

---

[74] *See* Treasury Report; *see also Preliminary Determination* PDM at 24-25; and *Final Determination* IDM at 23-26.
[75] *See* Treasury Report; *see also Preliminary Determination* PDM at 25.

The Court affirmed most of Commerce's benefit determination and found Commerce's determination "that there was 4.7 percent undervaluation of the Vietnamese dong against the U.S. dollar during the POI is adequately explained and supported by substantial evidence."[76] However, the Court remanded the *Final Determination* on one specific issue, addressed below.

Discrepancy Between Treasury Reports

With respect to benefit, on remand the Court ordered Commerce "to provide a more clear and thorough explanation of the size of the discrepancy in net purchases in foreign exchange between the Treasury Report and the Treasury's January 2020 Report, including how the six-month non-overlapping period could have accounted for the discrepancy."[77]

The Court found that Commerce failed to address this discrepancy between the Treasury Reports in the *Final Determination*. Therefore, we clarify in this remand redetermination that the discrepancy in the net foreign exchange transactions is largely attributable to inconsistent time periods between the Reports. Treasury's information reported to Commerce in the context of the CVD investigation covers the entire 2019 POI (*i.e.*, January-December 2019).[78] By contrast, the 2020 Treasury Report "Macroeconomic and Foreign Exchange Policies of Major Trading Partners of the United States" only covered the first six months of the relevant POI (*i.e.*, January-June 2019), as well as six months prior to the POI.[79]

Neither the GOV nor KTV demonstrated why periods outside of the 2019 POI would be relevant to our benefit analysis. However, Commerce finds the non-overlapping period to be a critical factor in contributing to the size of the net foreign exchange discrepancy. In fact, there is

---

[76] *See Remand Order* at 115.
[77] *Id.* at 136.
[78] *See* Treasury Report; *see also* Treasury's Letter to Commerce dated September 24, 2020 (Treasury Supplement) at 4.
[79] *See* KTV Treasury Rebuttal at Attachment 17, containing Treasury January 2020 Report.

21

APPX000058

nothing in the Treasury January 2020 Report that detracts from our findings in this investigation. In that Report, Treasury stated:

> Vietnam intervened in both directions over the course of these four quarters: The authorities sold foreign exchange over the second half of 2018 as financial turbulence in a few large emerging markets led to a pullback from other smaller emerging markets and created downward pressure on many emerging market currencies, including the dong. As global financial conditions eased and holiday-related remittances increased in early 2019, the authorities shifted to purchasing foreign exchange, with net purchases over the first half of 2019 modestly outweighing net foreign exchange sales over the prior six months.[80]

In other words, the Treasury January 2020 Report explains that Vietnam was increasing its foreign exchange purchases during 2019, in contrast to its behavior during the last six months of 2018. This means that the inclusion of the 2018 information skewed the overall conclusion for the time period July 2018 through July 2019. If Treasury had only included the first six months of 2019 in its January 2020 Report to Congress, the result presumably would have been much different than the $2.1 billion net figure, which was weighed down by the 2018 data. The Court focuses on the "size of the apparent discrepancy – $22 billion versus $2.1 billion,"[81] but if the comparison were actually the first six months of 2019 to the entire 12 months of 2019, the discrepancy would be smaller, based on the above excerpt from the Treasury January 2020 Report.

Further, with respect to the entire 2019 POI, the majority of Vietnam's foreign exchange purchases occurred in the latter half of 2019. It is clear that the Treasury January 2020 Report did not take this time period into account when reporting the quantified net foreign exchange at 0.8 percent of GDP.[82] The sharp increase in net purchases of foreign reserves in the second half of 2019 is likely attributable to the GOV's efforts to depreciate the VND vis-à-vis the USD during the period leading up to and including the holiday season in the United States, the largest

---

[80] *Id.* at 37.
[81] *See Remand Order* at 124.
[82] *See* Treasury Report at 8, 19, 35-37.

consumer market for its goods. After all, a devalued VND will help make Vietnamese goods cheaper on U.S. markets, and therefore more competitive.

Finally, we note that the Court affirmed every other aspect of Commerce's benefit determination, including Commerce's reliance on the GERAF model in the Treasury Report.[83] Further, the *Final Rule* explains that Commerce "will defer to Treasury's expertise"[84] on currency undervaluation, and the Court affirmed that Commerce's reliance on Treasury is lawful.[85] In light of the Court's affirmance of our reliance on the GERAF model and our recognition of Treasury's expertise, we find that the discrepancy in net foreign exchange purchases – a discrepancy that is clearly due to the differing time periods and the GOV's increasingly aggressive role in foreign exchange purchases throughout 2019 – is not a basis to reverse our ultimate finding of benefit in this remand redetermination.

## IV. INTERESTED PARTY COMMENTS

### Comment 1: Specificity

The following is the entire argument submitted by KTV (internal citations omitted). KTV's entire argument consists of fewer words than the maximum word count limit for a public executive summary. KTV did not submit a separate executive summary.

*KTV's Argument:*

> The Draft Redetermination's finding that the exchange rate was used "disproportionately" by the "traded goods" sector appears to be based, in the end, on the mere assertion that the "traded goods" sector received more benefits from alleged government exchange-rate programs than other sectors. Thus, quoting the original Final Determination, the Draft Redetermination asserts that "when nearly 72 percent of a subsidy benefits one particular group in the economy, 'it cannot be said that the subsidy is widely used throughout the economy.'"

> That type of simplistic analysis has, however, been rejected by the Courts. For example, a recent CIT decision addressing Commerce's specificity analysis for Korean electricity usage explained that:

---

[83] *See Remand Order* at 115-130.
[84] *See Final Rule*, 85 FR at 6038.
[85] *See Remand Order* at 105-114.

> The term disproportionate refers to "having or showing a difference that is not fair, reasonable, or expected," and disproportionality exists when something is "too large or too small in relation to something {else}." Thus, when analyzing whether an industry or group of industries receives a disproportionate amount of the benefit conferred by the subsidy pursuant to 19 U.S.C. § 1677(5A)(D)(iii), receipt of a greater monetary benefit from the program than others is not determinative of disproportionality. Rather, the disproportionality inquiry involves a case-by-case analysis which assesses benefits, not in relation to the benefits of others, but in relation to some other comparator depending on the circumstances...

> Commerce elides the reality that programs designed to confer benefits on usage levels will necessarily result in larger users receiving a proportionally larger percentage of the subsidy. Disproportionality requires that an enterprise or industry is favored in some way (*i.e.*, it receives more than its fair share). Commerce must explain how the combined industries it identifies benefit more than would be expected, based on their usage given that the subsidy in question is designed to confer benefits on usage levels, or in relation to some other comparator.

Under the standard enunciated by the Court, the assertion that the "traded goods" sector received 72 percent of the benefits from alleged exchange-rate programs is insufficient. That assertion simply reflects the claim that the "traded goods" sector engaged in 72 percent of exchanges from U.S. dollars into Vietnamese dong. In order to find that the benefit to the "traded goods" sector is "disproportionate," {Commerce} must engage in further analysis to show that the "traded goods" sector "receive{d} more than its fair share." Since neither the original Final Determination nor the Draft Redetermination has made such a showing, the finding of "disproportionality" is unlawful.

No other party commented on this issue.

**Commerce's Position:** KTV's argument is based upon a fundamental misunderstanding of Commerce's finding. Commerce did not find that the traded goods sector received disproportionately large amounts of the Currency Exchanges program, but rather that the traded goods sector was the predominant user of this subsidy program. As we explained above, we find that the traded goods sector – in this case, companies that sell goods internationally – accounted for 71.94 percent of USD inflows to Vietnam during the POI. This constitutes predominant usage by the traded goods sector.[86]

---

[86] *See Predominant*, *Merriam-Webster's Dictionary*, https://www.merriam-webster.com/dictionary/predominant (last visit January 3, 2025) (defining "predominant" as "being most frequent or common"); *see also Predominant*, *Cambridge English Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/predominant (last visit January 3, 2025) (defining "predominant" as "more noticeable or important, or larger in number, than others").

The *Hyundai Steel* case cited by KTV in its comments is not on point.[87] That case involved a finding of disproportionality under section 771(5A)(D)(iii)(III) of the Act, not a finding of predominant usage under section 771(5A)(D)(iii)(II) of the Act. The Court found that under section 771(5A)(D)(iii)(III) of the Act, Commerce should have examined what the expected distribution of the subsidy should have been.[88] However, our specificity finding in this case, as described above, is based on section 771(5A)(D)(iii)(II) of the Act.

**Comment 2:** **Explanation of the Discrepancy in Vietnam's Purchases of Foreign Exchange Reported in Different Treasury Reports**

KTV did not provide an executive summary of its comments. For further details, *see* KTV's Draft Remand Comments.

No other party commented on this issue.

**Commerce's Position:** KTV's argument concerning the discrepancy between the Treasury Reports on Vietnam's foreign exchange purchases in 2018 and 2019 fails to address the relevance of data outside the 2019 POI and overlooks key facts on the record. The Treasury January 2020 Report included Q3 and Q4 of 2018 and only Q1 and Q2 of 2019 POI.[89] KTV has not provided any substantive reasoning for why 2018 data is relevant when reporting the quantified net foreign exchange at 0.8 percent of GDP, or why Commerce should rely on 2018 data when Treasury reported to Commerce the entire 2019 data. As noted above, it is clear that the Treasury January 2020 Report did not take the full 12-month POI time period into account when reporting the quantified net foreign exchange at 0.8 percent of GDP.[90] Again, the discrepancy between the two Treasury Reports noted by the Court arose from the inclusion of information that falls outside of the 2019 POI in the Treasury January 2020 Report.[91] The

---

[87] *See Hyundai Steel Company v. United States*, Slip Op. 24-135 (CIT December 12, 2024).
[88] *Id.* at 10-12.
[89] *See* Treasury January 2020 Report at 37.
[90] *Id.*
[91] *Id.*

inclusion of periods outside of the 2019 POI not only skewed the overall conclusion for the time period July 2018 through July 2019 but is also irrelevant to Commerce's 2019 POI.

With respect to the 2019 POI, the majority of Vietnam's foreign exchange purchases occurred in the latter half of 2019. As explained, the same Treasury January 2020 Report cited by KTV states that Vietnam significantly increased its foreign exchange purchases through 2019. Additionally, the record contains the IMF Balance of Payments table from 2019, which further supports Treasury's findings.[92] When Commerce originally put this information on the record during the investigation, the data for the fourth quarter of 2019 was inadvertently cut off.[93] During this remand, we completed the record by placing the complete version of the 2019 IMF Balance of Payments table, containing all quarterly data, on the record.[94] Under the column for Reserve Assets, the full IMF table shows that Vietnam's foreign currency reserves nearly increased four times from 2018 to 2019.[95] The IMF table also indicates that the GOV was increasing its foreign currency purchases in the latter half of 2019.[96] Contrary to KTV's arguments,[97] the IMF table shows that Vietnam had roughly 1.5 times more reserve assets in quarters 3 and 4 of 2019 than in quarters 1 and 2.[98] Therefore, KTV is mistaken in its assertion that there is no record support for the finding that Vietnam's foreign exchange purchasing behavior changed significantly from 2018 to 2019, including in the final two quarters of 2019.

---

[92] *See* Memorandum, "International Monetary Fund Data – Correction," dated January 10, 2025 (IMF Correction Memo).
[93] *See* IMF/OECD Memorandum.
[94] *See* IMF Correction Memo.
[95] *Id.* at Attachment.
[96] *Id.*
[97] *See* KTV's Draft Remand Comments at 4-5.
[98] *Id.*

## V.    FINAL RESULTS OF REDETERMINATION

In accordance with the Court's *Remand Order*, Commerce has provided the explanations requested by the Court.  However, Commerce has not revised its subsidy calculations for the Currency Exchanges program as a result of these final results of redetermination.  For the reasons explained above, we have made no changes to the *Final Determination*.

1/15/2025

X

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance

Addendum 5

*Kumho Tire (Vietnam) Co. v. United States*,
Slip Op. 25-109 (Ct. Int'l Trade 2025)

Slip Op. 25-109

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **KUMHO TIRE (VIETNAM) CO., LTD.,** | |
| Plaintiff, | |
| v. | **Before: Timothy M. Reif, Judge** |
| **UNITED STATES,** | |
| Defendant, | **Court No. 21-00397** |
| and | |
| **UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,** | |
| Defendant-Intervenor. | |

## <u>OPINION</u>

[Sustaining the remand results of the U.S. Department of Commerce in the countervailing duty investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam.]

Dated: August 22, 2025

<u>Jeffrey M. Winton</u>, Winton & Chapman PLLC, of Washington, D.C., argued for plaintiff Kumho Tire (Vietnam) Co., Ltd.  With him on the briefs were <u>Michael J. Chapman</u>, <u>Amrietha Nellan</u>, and <u>Vi N. Mai</u>.

<u>Sosun Bae</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States.  With her on the brief were <u>Yaakov M. Roth</u>, Acting Assistant Attorney General and <u>Patricia M. McCarthy</u>, Director.  Of counsel on the brief was <u>Paul H. Thornton</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of

Commerce, of Washington, D.C.

Elizabeth J. Drake, Schagrin Associates, of Washington, D.C., argued for defendant-intervenor the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC.  With her on the brief were Roger B. Schagrin and Saad Y. Chalchal.

Reif, Judge:  Before the court are the remand results of the U.S. Department of Commerce ("Commerce") concerning the countervailing duty ("CVD") investigation of passenger vehicle and light truck ("PVLT") tires from Vietnam.  Final Results of Redetermination Pursuant to Court Remand ("Remand Results"), ECF No. 91-1; *see also Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination* ("*Final Determination*"), 86 Fed. Reg. 28,566 (Dep't of Commerce May 27, 2021).  Plaintiff Kumho Tire (Vietnam) Co., Ltd. ("plaintiff") opposes certain aspects of the Remand Results and requests that the court remand to Commerce for reconsideration.  Defendant United States ("defendant") and defendant-intervenor the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO ("defendant-intervenor") assert that Commerce's Remand Results are supported by substantial evidence and are otherwise in accordance with law.

The court sustains Commerce's Remand Results, as described below.

## BACKGROUND

The court assumes familiarity with the facts of the instant case and recounts only what is necessary to resolve the issues before the court on remand.

In 2020, Commerce promulgated a new regulation, 19 C.F.R. § 351.528, which established the process for Commerce to determine whether a foreign country's undervaluation of its currency constitutes a countervailable subsidy.  *See Modification of*

*Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings* ("*Final Rule*"), 85 Fed. Reg. 6,031 (Dep't of Commerce Feb. 4, 2020).  Commerce also modified existing regulation 19 C.F.R. § 351.502 to add new subparagraph (c), "which explains that enterprises that buy or sell goods internationally . . . can comprise a 'group' of enterprises for specificity purposes."[1]  *Id.*

On May 27, 2021, Commerce issued its *Final Determination*, in which Commerce concluded that countervailable subsidies were being provided to producers of PVLT tires from Vietnam.  *Final Determination*, 86 Fed. Reg. at 28,566.  Commerce found that Vietnamese producers of PVLT tires benefited from a number of subsidy programs. Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam (May 21, 2021) ("IDM") at 3-4, PR 468.

In the *Final Determination*, Commerce concluded that plaintiff's exchanges of U.S. dollars ("USD") for Vietnamese dong ("VND") with Vietnamese banks constituted countervailable subsidies.  IDM at 4; Preliminary Decision Memorandum (Oct. 30, 2020) ("PDM") at 24-25, PR 296.  In reaching that determination, Commerce examined whether the currency undervaluation program of the Government of Vietnam ("GOV")

---

[1] As described below, plaintiff alleges that the currency undervaluation program of the Government of Vietnam is "not 'Specific' under the Statute."  Motion of Pl. Kumho Tire (Vietnam) Co., Ltd. for J. on the Agency R. ("Pl. Br.") at 40, ECF No. 30.  Plaintiff has not challenged Commerce's modification of 19 C.F.R. § 351.502(c) to "consider enterprises that buy or sell goods internationally to comprise . . . a group" as inconsistent with 19 U.S.C. § 1677(5A)(D).

was *de facto* specific under section 771(5A)(D) of the Tariff Act of 1930, 19 U.S.C. § 1677(5A)(D).[2]  PDM at 23.

Commerce concluded in reliance on § 351.502(c) that "companies that buy or sell goods internationally" — referred to as the "traded goods sector" — "comprise a group . . . within the meaning of section 771(5A)(D)(iii)(II)" of the CVD law.  *Kumho Tire (Vietnam) Co., Ltd. v. United States* ("*Kumho I*"), 48 CIT __, __, 741 F. Supp. 3d 1277, 1325 (2024) (quoting IDM at 20); IDM at 19-20 (citing 19 C.F.R. § 351.502(c)).  Commerce then proceeded according to 19 U.S.C. § 1677(5A)(D)(iii)(II) to assess whether the traded goods sector "group" was a "predominant user of the subsidy."  *Id.*  In making that assessment, Commerce sought to compare the amount of USD converted into VND during the period of investigation ("POI") by exporters in Vietnam — the numerator — to the total amount of USD converted to VND by all entities in Vietnam — the denominator.  *Id.*

To that end, Commerce requested from the GOV "total USD inflow from the traded goods sector, and how much came from . . . the traded services sector and . . . utilized FDI and inbound portfolio investment."[3]  *Id.* at __, 741 F. Supp. 3d at 1326 (internal quotation marks omitted) (quoting PDM at 23).  Commerce sought specifically "actual figures representing the share of total USD inflow which was converted into local currency" and "the share of these conversions attributable to the traded goods sector."

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of Title 19 of the U.S. Code, 2018 edition.

[3] "FDI" refers to "foreign direct investment."

GOV's Second Supplemental Questionnaire Response (Oct. 13, 2020) ("GOV SQR2")

at 4, PR 272-273.

The GOV did not provide the information as requested by Commerce because

the State Bank of Vietnam does not collect data of USD capital inflows or USD trading

by field and by sector, and "does not maintain the total value of USD inflow converted

into VND."[4]  *Id.* at 4-5; IDM at 18.  Instead of providing the requested information, the

GOV provided the "total USD inflow in several categories including net commodity

trade, One-way money transfers of the net private sector, FDI in Vietnam, PI in Vietnam

and Net Foreign debt."[5]  GOV's Third Supplemental Questionnaire Response (Oct. 19,

2020) ("GOV SQR3"), PR 287 (internal quotation marks omitted); *Kumho I*, 48 CIT at

__, 741 F. Supp. 3d at 1326.  Because the GOV declined to provide Commerce with the

requested data concerning actual currency conversions in Vietnam, Commerce relied

on data from the International Monetary Fund ("IMF") for USD inflows to Vietnam as a

proxy for currency conversions.[6]  *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1326; PDM

at 23-24; *see* IMF/OECF Mem. (Oct. 8, 2020) at attach. 1, PR 254.  Commerce

determined that "the universe of annual currency conversions would be comprised of

'four major channels of exchange: (a) exports of goods, (b) exports of services, (c)

---

[4] During the investigation the GOV reported that the State Bank of Vietnam "is the main authority handling foreign exchange activities in Vietnam."  PDM at 20.

[5] "PI" refers to "portfolio investment."

[6] The IMF data "reflects data submitted by the State Bank of Vietnam to the IMF."  PDM at 23.

various forms of portfolio and direct investment, and (d) earned income from abroad.'"

*Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1325 (quoting PDM at 23-24).

After dividing the USD inflows to Vietnam from the traded goods sector — i.e.,

the export of goods — by total USD inflows to Vietnam, Commerce found that 71.94

percent of USD inflows to Vietnam during the POI came from the export of goods.  PDM

at 24.  As a result, Commerce concluded that "enterprises that buy or sell goods

internationally are the predominant users of the GOV's currency undervaluation subsidy,

and, therefore, th[e] program is *de facto* specific under" 19 U.S.C. § 1677(5A)(D)(iii)(II).[7]

*Id.*

Commerce then examined whether the currency undervaluation subsidy

conferred a benefit as required by 19 U.S.C. § 1677(5)(B) and (E).  PDM at 24.  For the

benefit analysis, Commerce relied on 19 C.F.R. § 351.528, which provides that a benefit

is conferred from the exchange of USD for the currency of a country under review or

investigation "only if that country's currency is undervalued during the relevant period."

19 C.F.R. § 351.528(a)(1); PDM at 24.  To determine whether a country's currency is

undervalued, Commerce "normally will take into account the gap between the country's

---

[7] "To add precision to the amount of USD inflows received from Vietnam's exports of goods," Commerce "discounted Vietnam's exports of goods value by the amount of intermediary imported goods (based on OECD estimates) to arrive at a reasonable estimate of exports that earned foreign exchange."  PDM at 24; IDM at 18-19 (stating that Commerce "discounted Vietnam's exports of goods by the amount of intermediary goods inputs" to "account for USD inflows which may not have resulted in currency conversion").  Commerce found that the record demonstrated "that 71.94 percent of USD inflows into Vietnam were accounted for by companies that sell goods internationally adjusted to account for the impact of intermediary imported goods; including companies that primarily buy goods internationally in this analysis would not substantially change this percentage, because they do not bring USD into Vietnam." IDM at 19.

real effective exchange rate (REER) and the real effective exchange rate that achieves an external balance over the medium term that reflects appropriate policies (equilibrium REER)."  19 C.F.R. § 351.528(a)(1); PDM at 24.  19 C.F.R. § 351.528(c) directs that Commerce "will request that the Secretary of the Treasury provide its evaluation and conclusion as to" whether and to what extent a country's currency is undervalued.

The U.S. Department of Treasury ("Treasury") reported that the VND was undervalued based on the GOV's actions during the POI because there was a gap between the VND's REER and its equilibrium REER.  Letter from Treasury to Commerce (Aug. 24, 2020) ("Treasury Report") at 1, PR 165; PDM at 24.  Treasury assessed that the GOV's "net purchases of foreign exchange . . . totaling $22 billion. . . . had the effect of undervaluing the dong vis-à-vis the U.S. dollar by 4.7%."  Treasury Report at 1-2; PDM at 24.

In measuring the benefit provided to respondents by reason of the undervalued VND, Commerce "calculated 'the difference between the amount of currency the firm received in exchange for United States dollars and the amount of currency the firm would have received absent the difference'" between the VND's REER and its equilibrium REER by applying the 4.7 percent undervaluation to "each currency exchange transaction" reported by the respondents.  PDM at 25.  For each respondent, Commerce then "aggregated the total benefits in USD based on the sum of these individual transactions during the POI."  *Id.* (citing USD Inflow Calculation Mem. (Nov. 4, 2020), PR 303).  Commerce determined that plaintiff received a currency undervaluation subsidy of 1.69 percent ad valorem.  *Id.*; IDM at 4.

Plaintiff, one of two mandatory respondents in the underlying CVD investigation, challenged Commerce's finding with respect to two subsidy programs. *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1289-90.  Plaintiff challenged specifically certain aspects of Commerce's decision to treat as countervailable subsidies: (1) plaintiff's acquisition of land-use rights for less than adequate remuneration and (2) the currency undervaluation program of the GOV.  *Id.*  Among other arguments, plaintiff asserted that currency undervaluation is not specific and therefore is not countervailable as a subsidy under the U.S. CVD law.  *Id.* at __, 741 F. Supp. 3d at 1328-36.  Plaintiff argued also that Commerce's determination that the VND was undervalued during the POI — which established the existence of a benefit conferred on plaintiff as required under § 1677(5)(B) — was unsupported by substantial evidence.  *Id.* at __, 741 F. Supp. 3d at 1336; *see also* 19 C.F.R. § 351.528(b)(1).

On October 18, 2024, this Court sustained in part and remanded in part Commerce's *Final Determination*.  *Kumho I*, 48 CIT at __, F. Supp. 3d at 1286.  The Court concluded first that Commerce's decision to countervail plaintiff's land-use rights for less than adequate remuneration was supported by substantial evidence and in accordance with law.  *Id.* at __, 741 F. Supp. 3d at 1291-94.  Then, with respect to Commerce's decision to countervail the GOV's currency undervaluation program, the Court held that "U.S. CVD law provides the authority for Commerce to promulgate its regulations in 2020 and to apply them [to countervail currency undervaluation] in investigations and reviews."  *Id.* at __, 741 F. Supp. 3d at 1318.  However, the Court remanded for further explanation certain aspects of Commerce's conclusion that the

GOV's currency undervaluation program was specific and conferred a benefit to plaintiff as required under 19 U.S.C. § 1677(5)(A)-(B). *Id.* at __, 741 F. Supp. 3d at 1353.

To start, the Court ordered that on remand Commerce "state clearly the statutory authority under which it relied upon the available data regarding USD inflows to Vietnam as a proxy for USD currency conversions." *Id.* Then, the Court ordered that Commerce provide a more thorough explanation of its specificity analysis, stating:

> [O]n remand Commerce [is to] provide as to its specificity analysis (1) a clear statement of what precisely Commerce considered to be missing from the record as a result of the failure of the GOV to provide total USD inflows from the traded goods sector, the traded services sector and utilized FDI and inbound portfolio investment; and (2) the reasons that the alternative information provided by the GOV was not useable to perform the necessary analysis. Specifically with respect to (2), Commerce is to provide: (a) specific reasons that Commerce did not use the GOV's third supplemental questionnaire response and whether that response met Commerce's request in its questionnaire that GOV (i) "explain how" the numbers it provided were obtained; (ii) explain "what went into [those] calculations"; and (iii) "report all original values requested"; and (b) specific reasons that Commerce did not accept the six elements of data that GOV provided to comprise total USD inflows and whether those data relate to Commerce's use of the four major channels of exchange to comprise an economy wide surrogate number for currency conversions.

*Id.* (second alteration in original).

The Court added that Commerce failed to provide the reasons that "the four major channels of exchange" constituted "the correct basis for estimating the total proportion of USD inflows that Vietnam received during the POI." *Id.* As a consequence, the Court directed Commerce to:

> (1) explain the reasons that Commerce designated the four major channels of exchange as the correct basis for estimating the total proportion of USD inflows that Vietnam received during the POI; (2) explain how, precisely, Commerce utilized "the information placed on the record by Commerce, which reflects data submitted by the State Bank of Vietnam to the IMF" to derive the four channels analysis; (3) explain what data were not provided in connection with Commerce's development of that analysis; and (4)

> explain why, together, these elements prevented Commerce from using
> those data in its four channels analysis.

*Id.*

Finally with respect to Commerce's specificity analysis, the Court ordered that Commerce "specify whether Commerce made the assumption in its specificity determination that use of the currency undervaluation subsidy is spread evenly in the traded goods sector." *Id.*

In *Kumho I*, the Court sustained most of Commerce's finding that the GOV's currency undervaluation program conferred a benefit on plaintiff. *Id.* at __, 741 F. Supp. 3d at 1343 ("Accordingly, Commerce's determination that there was a 4.7 percent undervaluation of the Vietnamese *dong* against the U.S. dollar during the POI is adequately explained and supported by substantial evidence."). However, the Court agreed with plaintiff that there was a discrepancy in the value of that benefit as calculated in two separate reports from Treasury on the record — a discrepancy that Commerce failed to explain. *Id.* at __, 741 F. Supp. 3d at 1347; Pl. Br. at 33 n.87. Specifically, the Treasury Report that Commerce requested under § 351.528(c) for the benefit analysis in the instant CVD investigation concluded that the State Bank of Vietnam "undertook net purchases of foreign exchange in 2019 totaling about $22 billion." *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1347; Treasury Report at 1. By contrast, a separate report — Treasury's January 2020 Foreign Exchange Report to Congress ("January 2020 Report") — indicated that the value of net purchases of foreign exchange for a partially overlapping time period equated to approximately $2.1

billion.[8] *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1347.  Therefore, the Court ordered that on remand Commerce "provide a more clear and thorough explanation of the size of the discrepancy in net purchases in foreign exchange between the Treasury Report and the Treasury's January 2020 Report, including how the six-month non-overlapping period could have accounted for the discrepancy."  *Id.* at __, 741 F. Supp. 3d at 1353.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 19 U.S.C. § 1516a(a)(2) and 28 U.S.C. § 1581(c).  19 U.S.C. § 1516a(b)(1)(B)(i) provides that the court will hold unlawful any determination, finding or conclusion found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law*." See also SMA Surfaces, Inc. v. United States*, 47 CIT __, __, 658 F. Supp. 3d 1325, 1328 (2023) (reviewing Commerce's remand redetermination under § 1516a(b)(1)(B)(i)).  The court reviews Commerce's redetermination also for compliance with the court's remand order. *Shandong Rongxin Imp. & Exp. Co. v. United States*, 42 CIT __, __, 331 F. Supp. 3d 1390, 1402 (2018), *aff'd*, 779 F. App'x 744 (Fed. Cir. 2019).

Substantial evidence constitutes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," but it requires "more than a mere scintilla." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).

For a reviewing court to "fulfill [its] obligation" to determine whether a determination of Commerce is supported by substantial evidence and in accordance

---

[8] Plaintiff submitted to the record the January 2020 Report.  KTV's September 8, 2020, Submission, attach. 17, CR 76, PR 202.

with law, Commerce is required to "examine the record and articulate a satisfactory explanation for its action." *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016) (quoting *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)). Even so, the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 43 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)); *see also NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court.").

**LEGAL FRAMEWORK**

Commerce will impose a countervailing duty when: (1) Commerce "determines that the government of a country or any public entity within the territory of a country" has subsidized the "manufacture, production, or export of" imported merchandise; and (2) the U.S. International Trade Commission determines that a U.S. industry has been "materially injured" or "threatened with material injury" or "the establishment of a[] [U.S.] industry" is "materially retarded" due to the subsidized imports. 19 U.S.C. § 1671(a)(1)-(2).

A subsidy is countervailable when "an authority . . . provides a financial contribution" that confers a benefit to a specific enterprise, industry, or group of enterprises or industries. *Id.* § 1677(5)(B), (5A). Commerce will treat a benefit as conferred, "in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration." *Id.* § 1677(5)(E)(iv). Commerce will

make its determination with reference to the "prevailing market conditions," including

"price, quality, availability, marketability, transportation[] and other conditions of

purchase or sale."  *Id.* § 1677(5)(E).

A countervailable subsidy is required to be specific as a matter of law (*de jure*

specificity) or specific as a matter of fact (*de facto* specificity).  A countervailable subsidy

is "specific as a matter of fact" where "one or more of the following factors exist":

> (I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
>
> (II) An enterprise or industry is a predominant user of the subsidy.
>
> (III) An enterprise or industry receives a disproportionately large amount of the subsidy.
>
> (IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

*Id.* § 1677(5A)(D)(iii).

Section 1677(5A) provides that "any reference to an enterprise or industry" in §

1677(5A) "is a reference to a foreign enterprise or foreign industry and includes a group

of such enterprises or industries."

Finally, 19 C.F.R. § 351.502(c) states that "[i]n determining whether a subsidy is

being provided to a 'group' of enterprises or industries" under § 1677(5A)(D), "the

Secretary normally will consider enterprises that buy or sell goods internationally to

comprise such a group."

## DISCUSSION

### I.    Commerce's specificity finding

The court addresses first Commerce's Remand Results on the issue of the specificity of the currency undervaluation subsidy before turning to Commerce's benefit analysis.

### A.    The statutory authority under which Commerce relied on USD inflows to Vietnam as a proxy for currency conversions

The Court remanded for Commerce "to state clearly" the statutory authority under which it relied for its decision to use available data for USD inflows to Vietnam as a proxy for USD currency conversions.  *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1353.

The court concludes that Commerce explained adequately the statutory authority on which it relied for its decision to use USD inflows to Vietnam as a proxy for currency conversions.

In the Remand Results, Commerce explained that there were "two issues" underlying Commerce's calculation that led to the conclusion that the traded goods sector is the predominant user of the currency undervaluation subsidy: (1) Commerce's use of USD inflows as a proxy for USD conversions in Vietnam; and (2) Commerce's use of the IMF data in place of information submitted by the GOV in its questionnaire responses during the investigation.  Remand Results at 6.

As to Commerce's use of USD inflows as a proxy for USD conversions in Vietnam, Commerce stated that its "statutory authority was [19 U.S.C. § 1677e(a)(1)], which states that if 'necessary information is not available on the record,' Commerce may rely on the facts otherwise available to reach a determination."  *Id.* at 7. Commerce stated that:

ideally [it] would use data regarding conversions of USD into local currency for its specificity analysis. . . .  The specificity analysis should compare the exchanges or conversions done by a particular enterprise or industry or group of enterprises or industries — in this case, exporters in Vietnam — with the total amount of exchanges or conversions in Vietnam.

*Id.*  However, because "the GOV reported that it does not maintain information on total currency conversions in Vietnam or conversions by the traded goods sector," and because this information did not exist elsewhere in the record, Commerce instead used "data on USD denominated inflows to Vietnam."  *Id.* (citing GOV SQR2 at 4).

Commerce then turned to the statutory authority for its use of IMF data for those USD denominated inflows to Vietnam in the place of the data that the GOV reported in its questionnaire responses.  *Id.* at 8.  Commerce asserted that it relied on § 1677e(a)(2)(A) or, alternatively, § 1677e(a)(2)(B).[9]  *Id.*

Commerce explained that "[i]n the absence of data pertaining to USD conversions by exporters in Vietnam, *Commerce needed data pertaining to USD inflows to Vietnam by exporters*, i.e., companies that sell goods internationally."  *Id.* (emphasis supplied).  During the investigation, Commerce requested this information from the GOV in the initial questionnaire, but the GOV responded with only "data on 'net commodity trade.'"  *Id.* (quoting GOV Initial Questionnaire Response (Aug. 25, 2020), Ex. F-1 at 4, CR 51, 59, PR 166, 170).  The provided figure of "net commodity trade" comprised the USD value of Vietnamese goods exports minus Vietnamese goods imports, which "represented USD inflows *and* outflows, not solely USD inflows from companies that sell goods internationally."  *Id.*

---

[9] Section 1677e(a)(2)(A)-(B) allows Commerce to use facts otherwise available where an interested party "withholds information that has been requested by [Commerce]" or "failed to provide such information . . . in the form and manner requested."

Accordingly, Commerce issued to the GOV a supplemental questionnaire requesting that the GOV "explain how [data on net commodity trade] were obtained and what went into these calculations and report all original values requested including total USD inflow from the traded goods sector and the traded services sector along with a citation for where this info was obtained." *Id.* (quoting GOV SQR3). However, in its response the GOV did not provide the figures that went into the "net commodity trade" data originally reported and did not report the original values for USD inflows from the traded goods sector. *Id.* Commerce in the Remand Results explained that by failing to provide the data underlying the "net commodity trade" figure, along with the total USD inflow from the traded goods sector, "the GOV withheld information that was requested of it[] within the meaning of [§ 1677e(a)(2)(A)]." *Id.* at 8-9.

Commerce then cited § 1677e(a)(2)(B) as an alternative source of statutory authority for Commerce's reliance on the IMF data in the place of the GOV's data provided in its questionnaire responses. *Id.* at 9. Commerce stated specifically that "despite Commerce's repeated requests for USD inflows from the traded goods sector, the GOV reported only 'net commodity trade,' without reporting the component values of this 'net' value." *Id.* Commerce concluded as a result that "the GOV did not provide the requested information 'in the form and manner' requested," thereby permitting Commerce to rely on facts otherwise available. *Id.*

Finally, Commerce specified in the Remand Results that it "did not apply [adverse facts available] pursuant to [§ 1677e(b)]" because Commerce "do[es] not find that the GOV failed to cooperate by not acting to the best of its ability in responding to [Commerce's] requests for information." *Id.* at 10. Commerce continued that it also did

not rely on § 1677e(c), which requires that Commerce corroborate from independent sources secondary information "to the extent practicable," because "Commerce did not rely on secondary information in making [its] specificity determination." *Id.*

Consequently, Commerce provided in the Remand Results an adequate explanation of the statutory authority on which Commerce relied in using the IMF data for total USD inflows to Vietnam as a proxy for USD currency conversions. For that reason, Commerce's Remand Results in this respect are in compliance with the Court's remand order.

**B.    The information that Commerce considered to be missing from the record as a result of the failure of the GOV to provide the requested data concerning total USD inflows**

The Court ordered that on remand Commerce provide a "clear statement of what precisely Commerce considered to be missing from the record as a result of the failure of the GOV to provide total USD inflows from the traded goods sector, the traded services sector and utilized FDI and inbound portfolio investment." *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1353.

Commerce's explanation complies with the Court's remand order.

In the Remand Results, Commerce reiterated that "the GOV failed to provide total USD inflows from exporters, *i.e.*, enterprises that sell goods internationally within the meaning of 19 CFR [§] 351.502(c)." Remand Results at 11. Commerce elaborated that a figure for "total USD inflows from exporters was necessary for Commerce's specificity analysis because it constitutes the numerator in the *de facto* specificity analysis." *Id.*

Commerce continued that a "similar problem existed with respect to the traded services sector" because the GOV "failed to provide total USD inflows from the traded

services sector, instead only providing dollar denominated values for 'net services.'" *Id.*

As a result of the GOV's omission, "information relating only to the value of the export of services (as opposed to the value of exports minus imports of services) was missing from the record." *Id.* Commerce explained further that it "needed the USD value for the export of services because the export of services is a source of USD into the Vietnamese economy, and therefore constituted part of the denominator in the *de facto* specificity analysis."[10] *Id.*

Accordingly, Commerce identified precisely the information that it considered missing from the record as a result of the GOV's failure to provide total USD inflows from the traded goods sector and the traded services sector.

### C.    The reasons that the alternative information provided by the GOV was not useable to perform the necessary analysis

As described above, during the investigation Commerce requested that the GOV provide USD inflows to Vietnam divided by sector. Instead of providing the requested information, the GOV provided the "total USD inflow in several categories including *net commodity trade*, One-way money transfers of the net private sector, FDI in Vietnam, PI in Vietnam and Net Foreign debt." GOV SQR3 at 1 (emphasis supplied) (internal quotations omitted).

---

[10] As to foreign direct investment and portfolio investment, Commerce explained in the Remand Results that "there was nothing substantial missing from the record as a result of the GOV's responses." Remand Results at 12. In fact, the USD values reported by the GOV in its questionnaire responses "were identical to the values in the IMF data and were used by Commerce in the denominator in its specificity analysis." *Id.*

In *Kumho I*, the Court ordered that on remand Commerce explain "the reasons that the alternative information provided by the GOV was not useable to perform the necessary analysis." 48 CIT at __, 741 F. Supp. 3d at 1353.

Commerce's explanation complies with the Court's remand order. As mentioned, in the GOV's questionnaire responses, the GOV reported only "net commodity trade" in response to Commerce's request for total USD inflow from the traded goods sector, which comprised the USD value of exports minus imports. The GOV, despite Commerce's repeated requests, did not report the critical value that Commerce required of *USD inflow from exports*. *See, e.g.*, GOV SQR3 at 3.

In the Remand Results, Commerce explained the reasons that the information that the GOV reported was not usable for Commerce's specificity analysis. Commerce stated that "total USD inflows from exporters was necessary for Commerce's specificity analysis because it constitutes the numerator in the *de facto* specificity analysis." Remand Results at 11. Commerce added based on its regulation at 19 C.F.R. § 351.528(a)(1) that "any potential benefit 'is conferred from the exchange of United States dollars for the currency of a country under review or investigation.'" *Id.* Accordingly, the currency undervaluation subsidy program benefits exporters not importers — i.e., "companies exchanging USD for VND, not companies exchanging VND for USD." *Id.* at 13. However, the GOV's "net commodity trade" figure — which comprised the USD value of *exports minus imports* — did not enable Commerce to derive the figure that Commerce had requested and needed for its analysis: the precise value of *USD inflows to Vietnam from exports. Id.* For that reason, Commerce "did not

use the 'net commodity trade' information provided by the GOV in its third supplemental questionnaire response."[11]  *Id.*

The GOV data as to the traded services sector were not usable for similar reasons.[12]  Namely, as with the GOV "net commodity trade" figure, the GOV reported a "net figure" for the value of the traded services sector in Vietnam; the GOV did not provide to Commerce the requested USD inflows from the export of services, which was the value that Commerce required and would have included in the denominator in its specificity analysis.[13]  *Id.* at 13-14; *see* GOV SQR3 at 3.

Finally, with respect to the last two figures that the GOV reported in the third supplemental response — "[n]et [o]ne-way money transfers of the private sector" and

---

[11] In the Remand Results, Commerce explained:  "Commerce asked the GOV to explain how these numbers were obtained and what went into these calculations and report all original values requested including total USD inflow from the traded good sector and the traded services sector along with a citation for where this info was obtained."  Remand Results at 5.  The GOV described the *source* of the net figures that it reported in the third supplemental response:  "Data regarding net commodity trade is calculated from the General Department of Customs statistics for imported and exported goods, and the survey results on insurance and freight for international trade of goods are used to convert CIT values of imported goods to FOB values."  GOV SQR3 at 2.  However, as described above, the GOV did not provide, inter alia, "all original values."  As a result, this information was still not responsive to the "fundamental question" that Commerce posed repeatedly to the GOV and that the GOV repeatedly failed to answer: the value of USD inflows from the traded goods sector.  Remand Results at 13.

[12] In any event, and as Commerce described in the Remand Results, the figure for the export of services that Commerce derived from the IMF data and included in the denominator for the specificity analysis was far larger than the figure that the GOV reported.  Remand Results at 14.  So, "if anything, Commerce's decision" to use the IMF data for the value of USD inflows from the export of services "benefited the GOV and KTV."  *Id.*

[13] As described above, the values in the IMF data for foreign direct investment and portfolio investment that Commerce included in the denominator for its specificity analysis were identical to the data that the GOV reported for those values.

"[n]et foreign debt" — Commerce satisfied this Court's remand order that Commerce explain the reasons that these figures were not usable to perform the necessary analysis. GOV SQR3 at 3. Commerce explained that, like the "net commodity trade" and "net services" figures that the GOV reported, these final two categories of data were also "net figures," and therefore not usable in Commerce's specificity analysis. *Id.* at 15.

Commerce summarized its reasoning for using the IMF data instead of the data reported by the GOV:

> In short, Commerce did not use the six categories and figures reported by the GOV, except for FDI and PI, because the most important of those figures, covering the traded goods sector, was a net figure and not a figure representing total USD inflows from the export of goods. The IMF data, on the other hand, clearly provided USD inflows from the export of goods. Similarly, the IMF data provided USD inflows from the export of services, rather than a net figure as reported by the GOV. At this point, given that two of the most important elements in the specificity calculation came from the IMF data, it would have made little sense for Commerce to use the GOV-reported information for the remainder.

*Id.*[14]

In sum, the court concludes that Commerce's explanation of the reasons that the GOV-provided information was not usable to perform the necessary analysis complies with the Court's remand order.

---

[14] Indeed, in the Remand Results, Commerce set out what would have been the result of its predominant use calculation had Commerce actually relied on the information provided by the GOV in its third supplemental response. Remand Results at 16. Commerce explained that, even if it had used the GOV's values, the results of that calculation reveal that "the traded goods sector would still be the predominant user of the subsidy." *Id.* That is because, using the GOV's values, the traded goods sector would account for 74.86 percent of the USD inflows, while Commerce in the *Final Determination* concluded that the traded goods sector accounted for only 71.94 percent of the USD inflows. *Id.*

### D.    Commerce's "four channels" analysis

In the investigation, Commerce "estimated the total proportion of USD inflows" to Vietnam during the POI "through the following four major channels of exchange": (1) exports of goods, (2) exports of services, (3) various forms of portfolio and direct investment, and (4) earned income from abroad.  PDM at 23-24; IDM at 18-20; USD Inflow Calculation Mem.  Commerce then calculated that 71.94 percent of USD inflows into Vietnam during the POI came from exports of goods.[15]  USD Inflow Calculation Mem.  Commerce concluded on this basis that companies that sell goods internationally were the predominant users of the currency undervaluation subsidy.  IDM at 20.

In the Court's remand order, the Court directed that Commerce on remand "explain the reasons that Commerce designated the four major channels of exchange as the correct basis for estimating the total proportion of USD inflows that Vietnam received during the POI."  *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1353.

Commerce's explanation in the Remand Results complied with the Court's remand order.

In the Remand Results, Commerce explained that it derived its four channels analysis from the IMF data that Commerce placed on the record.  Remand Results at 17.  Commerce pointed to the USD Inflow Calculation Memorandum on the record, which detailed Commerce's methodology in utilizing the IMF data.  *Id.* at 17 n.64 (citing USD Inflow Calculation Mem.).  The IMF data detailed the balance of payments figures for Vietnam during 2019 and provided balance of payments line items for the following

---

[15] The percentage value of USD inflows of the remaining three channels of exchange was: export of services (8 percent); earned income from abroad (7 percent); and financial account liabilities (13 percent).  USD Inflow Calculation Mem.

values: (1) "Goods, credit (exports)," (2) "Services, credit (exports)," (3) "Primary income, credit," (4) "Secondary income, credit," (5) "Direct investment, liabilities," (6) "Portfolio investment, liabilities," and (7) "Other investment, liabilities." Remand Results at 17 (quoting IMF/OECD Mem.). For its first and second channels of exchange, Commerce tracked the IMF categories. Commerce found the first channel to be exports of goods ("Goods, credit (exports)") and the second channel to be exports of services ("Services, credit (exports)"). *Id.*; USD Inflow Calculation Mem. For its third channel, Commerce collapsed the three IMF investment categories — (5) ("direct"), (6) ("portfolio") and (7) ("other") — into a third channel. USD Inflow Calculation Mem. And, finally, for its fourth channel, Commerce collapsed the IMF remittance categories — (3) ("primary") and (4) ("secondary") — into a fourth channel. USD Inflow Calculation Mem. Commerce considered that these balance of payments data comprised the universe of USD inflows to Vietnam during the POI.

Commerce continued that the IMF "is a credible international institution that tracks and disseminates international monetary and financial data, broadly from data it collects directly from its member countries, which in this case includes Vietnam." Remand Results at 17. Commerce explained that "the IMF data used by Commerce was originally reported to the IMF by the State Bank of Vietnam." *Id.* As a consequence, Commerce stated that it "appropriately can rely on such data and regularly relies on it in other contexts." *Id.*

In sum, Commerce's explanation on the above four points is in compliance with the Court's remand order.

### E.    Commerce's finding that the traded goods sector was the "predominant user" of the currency undervaluation subsidy program

In *Kumho I*, the Court discussed and addressed plaintiff's various objections to Commerce's specificity analysis.  One of plaintiff's arguments was that Commerce's calculation of the usage of the currency undervaluation subsidy by exporters as a group and relative to all USD currency conversions in Vietnam was "based on the assumption that use is spread relatively evenly throughout various sectors of the economy."  *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1329.  The Court "[did] not understand the relevance of the point" raised by plaintiff and observed that Commerce in the *Final Determination* explained that "information on the record demonstrated that Commerce's finding that the currency program is *de facto* specific was not due merely to the lack of economic diversification in Vietnam."  *Id.*  Nevertheless, the Court remanded "so that Commerce may ensure to address KTV's argument fully," and instructed Commerce "to specify whether [it] made the assumption in its determination that use of the currency undervaluation subsidy is spread evenly in the traded goods sector."  *Id.*

Plaintiff objects on two grounds to this aspect of the Remand Results.  The court addresses each in turn.

### 1.    Whether Commerce complied with the Court's remand instructions

Plaintiff argues first that Commerce in its Remand Results did not comply with the Court's instructions that Commerce specify whether it made the assumption that use of the currency undervaluation subsidy is spread evenly in the traded goods sector.  According to plaintiff, Commerce attempted in its Remand Results to "rewrite the Court's remand instructions" and "fail[ed] to address the issue raised by the Court's decision."  Comments of Kumho Tire (Vietnam) Co., Ltd. on Commerce's Remand Redetermination

("KTV Remand Comments") at 3, ECF No. 95.  Plaintiff maintains that this failure, "by itself, requires a further remand."  *Id.*

The court concludes that Commerce's Remand Results complied with this aspect of the Court's remand instructions.

Commerce addressed directly the Court's instruction that Commerce explain whether it assumed in its specificity analysis that the currency undervaluation subsidy is spread evenly in the traded goods sector.  Commerce stated that it "made no assumption, one way or the other, whether the subsidy usage was spread evenly within the . . . group of companies that sell goods internationally," and that Commerce does not consider the question relevant under § 1677(5A)(D).  Remand Results at 19.  Rather, according to Commerce, "group" within the meaning of § 1677(5A)(D) is a "unitary whole, similar to an 'industry' or 'enterprise.'"  *Id.*  Commerce explained that:

> [t]he question under [§ 1677(5A)(D)] is not whether the subsidy is distributed or used evenly *within* the beneficiary group or industry or even enterprise, but rather whether it is distributed or used evenly *among* different groups or industries or enterprises.  For example, if the question is whether the steel industry is a predominant user, or receives a disproportionately large amount of, a subsidy, it does not matter whether the subsidy is distributed evenly within the steel industry.  Rather, what matters is whether the steel industry receives a predominant or disproportionate share compared to other industries.  The same principle holds true for a "group."  The issue is not the distribution of the subsidy within the group, but rather the distribution of the subsidy compared to other groups.

*Id.*

Further, as this Court affirmed in *Kumho I*, Commerce addressed plaintiff's arguments concerning the level of economic diversification in Vietnam.  Commerce "described extensive information on the record" and found that "[t]he evidence on the record indicates that, for the purposes of [the] *de facto* specificity analysis, the Vietnamese economy is diversified."  *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1329;

PDM at 19.   Accordingly, Commerce stated the record "demonstrated that Commerce's finding that the currency program is *de facto* specific was not due merely to the lack of economic diversification in Vietnam." *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1329 (citing PDM at 19).[16]

Accordingly, Commerce's Remand Results complied with this Court's order that on remand Commerce "specify whether Commerce made the assumption in its determination that use of the currency undervaluation subsidy is spread evenly in the traded goods sector."  *Id.*

### 2.    Commerce's designation of exporters as a group in the specificity analysis

Plaintiff asserts next that Commerce's interpretation of "group" in the Remand Results "would . . . render the statutory provisions concerning identification of *de facto*

---

[16] The CVD law requires that Commerce in conducting the *de facto* specificity inquiry "take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy."  19 U.S.C. 1677(5A)(D)(iii).  The Statement of Administrative Action ("SAA") elaborates that the question of economic diversification is to "serve to inform the application of, rather than supersede . . . [t]he enumerated specificity factors. . . .  Thus, for example, with respect to economic diversification, in determining whether the number of industries using a subsidy is small or large, Commerce could take account of the number of industries in the economy in question."  Uruguay Round Agreements Act ("URAA"), Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 931 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4209; *see also* 19 U.S.C. § 3512(d) (stating that the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application" of the URAA).  In the PDM, Commerce explained that Vietnam did not have just one or two industries, but rather had a diversified economy with agriculture, forestry and fishing, mining and quarrying, manufacturing, construction, retail trade, banking, real estate, transportation and storage, etc.  PDM at 19.  If Vietnam did not have a diversified economy, but rather had only one or two industries, it would have cast doubt on whether the currency undervaluation subsidy was *de facto* specific.  That is because in a non-diversified economy the benefit of a subsidy would naturally be concentrated in the one or two existing industries.  That was not the case here.  Vietnam's economy is diverse; nevertheless, the benefit is concentrated in the sector that sells goods internationally.

specificity meaningless" because, plaintiff maintains, "[i]t is always possible to define a 'group' of industries in a manner that will find the group to be the predominant user of a subsidy program."  KTV Remand Comments at 4-5.  Plaintiff posits that this Court "previously held that Commerce cannot use its discretion to define 'groups' so broadly as to render meaningless the statutory language concerning 'disproportionate' use of a subsidy program."  *Id.* at 4-5 (citing *Hyundai Steel Co. v. United States*, 48 CIT __, 745 F. Supp. 3d 1345 (2024)).  Plaintiff adds that to give meaning to the statutory language, "a finding of 'predominant use' must consider whether the 'predominance' arises from a discriminatory preference for one enterprise or industry over another rather than from the sheer size of the group."  *Id.* at 5.

Commerce's decision in this case to treat companies that sell goods internationally as a "group" under § 1677(5A)(D) is in accordance with law.

To start, this Court addressed in its remand order plaintiff's opposition to Commerce's designation of companies that sell goods internationally as the group for specificity purposes.  *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1332.  The Court rejected plaintiff's arguments and explained that "[t]here is no limitation in the statute on the size of a 'group of . . . enterprises or industries,' nor is there a requirement that there be shared characteristics among such a group."  *Id.*  The Court discussed in detail plaintiff's opposition to this aspect of Commerce's finding before holding that "the traded goods sector is comprised of a 'group of . . . enterprises or industries' within the

meaning of § 1677(5A)(D)."[17]  *Id.* (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024)); *see also id.* at __, 741 F. Supp. 3d at 1296, 1324-36 (examining in detail each of plaintiff's arguments and concluding that "Commerce had the authority to promulgate [§ 351.502(c)] and to apply it in this case"); *see* 19 C.F.R. § 351.502(c).

In addition, the SAA refutes plaintiff's apparent contention that companies that sell goods internationally comprise too large of a "group" to be used as the numerator in a predominant use analysis.  Instead, the SAA contemplated expressly that Commerce might reach a finding of specificity even where the number of users of the subsidy is "very large":

> [G]iven the purpose of the specificity test as a screening mechanism, the weight accorded to particular factors will vary from case to case.  For example, where the number of enterprises or industries using a subsidy is not large, the first factor alone would justify a finding of specificity. . . .  On the other hand, *where the number of users of a subsidy is very large*, the predominant use and disproportionality factors would have to be assessed.  Because the weight accorded to the individual *de facto* specificity factors is likely to differ from case to case, clause (iii) makes clear that Commerce shall find *de facto* specificity if one or more of the factors exists.

SAA at 931 (emphasis supplied).

Moreover, plaintiff's position is unpersuasive that Commerce has interpreted "group" such that "[i]t is always possible" to find that "group to be the predominant user of a subsidy program."  KTV Remand Comments at 4-5.  The question of whether a subsidy is specific is a fact-intensive inquiry and "will vary from case to case."  SAA at 931.  That maxim applies in full force to the methodology that Commerce employed

---

[17] The Court also agreed with Commerce that "enterprises that buy and sell goods internationally are 'an identifiable set of enterprises' that 'constitute a subset of all economic actors within a country.'"  *Kumho Tire (Vietnam) Co., Ltd. v. United States* ("*Kumho I*"), 48 CIT __, __, 741 F. Supp. 3d 1277, 1332 (2024) (quoting *Final Rule*, 85 Fed. Reg. at 6,039).

here.  "For example, if 10 years from now Vietnam's economy were to shift to become a predominant exporter of services, then Commerce's determination of a numerator in this case might well not meet the predominant user standard.  This example further illustrates that Commerce's formulation is fact dependent . . . ."  *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1328-29.[18]

In the instant case, Commerce did not define "group" such that the designated group would necessarily and in every instance constitute the predominant user of the currency undervaluation subsidy.  To the contrary, Commerce identified companies that sell goods internationally as the "group of enterprises or industries" whose USD currency inflows would be compared to the "total proportion of USD inflows" into

---

[18] Defendant-intervenor offers two other examples that illustrate further the error in plaintiff's reasoning:

> In one country, the traded goods sector may be very large compared to other sectors such as services.  In another country — such as an island nation that relies on tourism or a financial hub that relies on investment — the traded goods sector may not be large relative to other sources of foreign exchange.  Thus, defining a group of enterprises as the traded goods sector does not always mean that the "size" of the sector is large.  That will depend on the facts of each case.

Def.-Intervenor's Resp. to Pl.'s Comments on the Remand Redetermination at 2, ECF No. 99.

Vietnam during the POI.[19]  Remand Results at 18.  Under this fact-specific inquiry and in the context of the Vietnamese economy, Commerce found that this group accounted for 71.94 percent of those USD inflows to Vietnam.  *Id.* at 15.  As a consequence, Commerce concluded that the designated group *in this case* was the predominant user of the currency undervaluation subsidy.  *Id.*; *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999) ("Determinations of disproportionality and dominant use are

---

[19] Plaintiff asserts that Commerce's identified group in the instant case is tantamount to identifying essentially all manufacturers as a group.  Oral Arg. Tr. at 23:2-16, ECF No. 109.  Plaintiff's assertion is incorrect.  As the Court noted in *Kumho I* and above, the traded goods sector is not equivalent to all manufacturers in Vietnam.  *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1328-29.

Further, to assess whether the traded goods sector was a predominant user of the subsidy, Commerce did not compare manufacturing recipients of the subsidy to all recipients of the subsidy, but rather USD inflows from the export of goods against all USD inflows to Vietnam during the POI.  For example, a company that manufactures goods in Vietnam may receive USD inflows from not only the export of goods but also from FDI or the export of services.  Conversely, a company that manufactures goods in Vietnam may not receive *any* USD inflows from the export of goods.  Commerce's group captures only those enterprises or industries that receive USD inflows and then USD inflows only from the export of goods.

not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case.").[20]

Finally, plaintiff's reliance on *Hyundai Steel* is unavailing. The Court in *Hyundai Steel*, 48 CIT at __, 745 F. Supp. 3d at 1351-52, addressed a Commerce finding of *de facto* specificity based on the conclusion by Commerce under § 1677(5A)(D)(iii)(III) that the group of industries in that case received a *disproportionately large* amount of the electricity program subsidy. The Court did not consider whether Commerce had permissibly applied § 1677(5A)(D)(iii)(II), which pertains to whether an identified group of enterprises or industries was the *predominant user* of a subsidy. *See id.* Indeed, in its remand decision, the *Hyundai Steel* Court declined to opine as to whether Commerce's group in that case and finding of *de facto* specificity would be reasonable under a predominant use analysis. *Hyundai Steel Co. v. United States*, 49 CIT __ n.9, Slip Op. 25-102, at *12 n.9 (Aug. 12, 2025) ("Even assuming that Defendant-

---

[20] At oral argument, plaintiff argued also that Commerce's specificity analysis was "incoherent" because many holders of USD may benefit from currency undervaluation even if they do not convert USD to VND, which, plaintiff maintains, Commerce's approach "ignor[es]." Oral Arg. Tr. at 37:8-38:8, 39:14-40:3 ("If I'm the hypothetical investor holding $1,000 in a U.S. bank, I'm richer as a result of this."); *see id.* at 41:13. However, to apply the CVD statute to the currency undervaluation subsidy, as to *any* potentially countervailable subsidy, Commerce is required to find that the subsidy "provide[d] a financial contribution," such as "a direct transfer of funds." 19 U.S.C. § 1677(5)(B)(i). Commerce concluded, and this Court affirmed, that plaintiff's "*exchanges of currency* constitute financial contributions." *Kumho I*, 48 CIT at __, 741 F. Supp. 3d at 1324 (emphasis supplied) (quoting IDM at 16). The statute does not direct either Commerce or this court to address whether plaintiff's hypothetical holder of "$1,000 in a U.S. bank" may be "richer" as a result of the GOV's currency undervaluation subsidy program. The court does not consider relevant under the statute such potential second order effects raised by plaintiff. Rather, the statute sets forth clearly that Commerce must find that the three core elements — financial contribution, benefit and specificity — are met for a subsidy to be countervailable.

Intervenor's point concerning relative consumption were apt with respect to predominance, it would not be apt for disproportionality.").[21]

In sum, the court concludes that Commerce's decision to treat companies that sell goods internationally as a "group," and Commerce's finding that the group was a predominant user of the currency undervaluation subsidy, are supported by substantial evidence and are in accordance with law.

## II.    Commerce's explanation in its benefit analysis of the discrepancy between the two Treasury reports in the record

The Treasury Report on which Commerce relied in the investigation for its benefit analysis estimated that the GOV — through the State Bank of Vietnam — "undertook net purchases of foreign exchange in 2019 totaling $22 billion." Treasury Report at 1. According to Treasury, these net purchases "had the effect of undervaluing Vietnam's REER by 4.2%." *Id.* at 2. By contrast, Treasury's January 2020 Report to Congress stated: "[T]he Vietnamese authorities have credibly conveyed to Treasury that net purchases of foreign exchange were 0.8 percent of GDP over the four quarters through June 2019." January 2020 Report at 37.[22] Plaintiff observed in its brief in support of its

---

[21] Further, Commerce in *Hyundai Steel* combined the steel industry with three other industries to reach its finding of disproportionality. The Court found that Commerce failed to provide "a rational basis for the grouping." *Hyundai Steel Co. v. United States*, 48 CIT __, __, 745 F. Supp. 3d 1345, 1353 (2024). However, as mentioned, the Court's rejection of Commerce's group came in the context of Commerce's disproportionality analysis, not predominant use. *Id.* Moreover, by contrast to *Hyundai Steel*, in this case the traded goods sector was a rationally limited and clearly defined group. The sector represents an identifiable "subset of all economic actors within" Vietnam. *Final Rule*, 85 Fed. Reg. 6,039. And unlike in *Hyundai Steel*, in this case, Commerce determined as its group a certain segment of the Vietnamese economy and found that that segment was the predominant user. *Cf. id.*

[22] The full name of the January 2020 Report is "Report to Congress: Macroeconomic and Foreign Exchange Policies of Major Trading Partners of the United States."

motion for judgment on the agency record that the figure in the January 2020 Report equates to "roughly $2.1 billion."  Pl. Br. at 33 n.87.

In *Kumho I*, the Court ordered that Commerce "provide a more clear and thorough explanation of the size of the discrepancy in net purchases in foreign exchange between the Treasury Report and the Treasury's January 2020 Report."  48 CIT at __, 741 F. Supp. 3d at 1353; *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) ("A reviewing court must consider the record as a whole, including that which 'fairly detracts from its weight,' to determine whether there exists 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").

Commerce's explanation of the difference between the two reports complies with the Court's remand order and is supported by substantial evidence.

In the Remand Results, Commerce explained that "the discrepancy in the net foreign exchange transactions is largely attributable to inconsistent time periods between the Reports" in that the Treasury Report to Commerce covers specifically the 2019 POI (January through December 2019) while the January 2020 Report covers only "the first six months of the relevant POI . . . as well as the six months prior to the POI." Remand Results at 21.  Commerce cites the following passage from the January 2020 Report to support Commerce's position that the six-month non-overlapping period accounts for the difference in net foreign currency purchases:

> Vietnam intervened in both directions over the course of these four quarters. The authorities sold foreign exchange over the second half of 2018 as financial turbulence in a few large emerging markets led to a pullback from other small emerging markets and created downward pressure on many emerging market currencies, including the dong. *As global financial conditions eased and holiday-related remittances increased in early 2019,*

> *the authorities shifted to purchasing foreign exchange, with net purchases over the first half of 2019 modestly outweighing net foreign exchanges over the prior six months.*

*Id.* at 22 (emphasis supplied) (quoting January 2020 Report at 37).

Commerce cited as another factor contributing to the difference that "the majority of Vietnam's foreign exchange purchases during the 2019 POI occurred in the latter half of 2019" — according to the IMF data in the record — which the January 2020 Report "did not take . . . into account." *Id.* For that reason also, the Treasury Report, which concerned the 2019 POI, calculated significantly higher net purchases of foreign exchange than the January 2020 Report. *Id.* Indeed, at oral argument, defendant noted that the IMF data concerning GOV foreign currency reserves during the POI approximates closely the net purchases of foreign exchange documented in the Treasury Report. Oral Arg. Tr. at 45:19-24; Department Memorandum to File: IMF Data (Jan. 8, 2025), PRR 5 (showing reserves during 2019 of $23.26 billion); Treasury Report at 1 (reporting that the GOV made $22 billion in net purchases of foreign exchange during the POI).[23] Accordingly, Commerce has addressed fully the difference between the two reports in net purchases of foreign exchange. *See Canadian Solar Int'l Ltd. v. United States*, 43 CIT __, __, 378 F. Supp. 3d 1292, 1305 (2019) (stating that substantial evidence requires "Commerce to address evidence that supports its finding as well as that which 'fairly detracts from its weight'" (quoting *Universal Camera Corp.*, 340 U.S. at 477-78)).

---

[23] The data from the IMF providing the GOV's balance of payments supports Commerce's analysis, showing that GOV's "reserves" in millions of USD for 2018 equated to $6,035.2, while "reserves" for 2019 equated to $23,257.9. Department Memorandum to File: IMF Data.

Plaintiff objects to the manner in which Commerce characterizes the decision of the GOV to increase significantly its purchases of foreign exchange.  KTV Remand Comments at 5-7.  Plaintiff points specifically to Commerce's statement that the "sharp increase in net purchases of foreign reserves in the second half of 2019 is likely attributable to the GOV's efforts to depreciate the VND vis-à-vis the USD during the period leading up to and including the holiday season in the United States, the largest consumer market for its goods" because, "[a]fter all, a devalued VND will help make Vietnamese goods cheaper on U.S. markets, and therefore more competitive."  Remand Results at 22-23; KTV Remand Comments at 6-7.  According to plaintiff, this statement by Commerce is "not supported by substantial evidence and is contradicted by the record" because "there is no evidence to support Commerce's allegation that the GOV manipulated the VND's value in late 2019 to benefit Vietnamese exporters to the United States."  KTV Remand Comments at 6-7.

Plaintiff's assertion is not accurate.  On the contrary, the record supports Commerce's position that the GOV increased vastly its foreign currency reserves in the third and fourth quarters of 2019, reflecting the significant increase in net foreign exchange purchases and explaining the significant difference between the two reports.  For example, the IMF balance of payments table on the record shows a substantial increase in foreign currency reserves from the second quarter to the third quarter of 2019, after which the GOV nearly doubled its foreign currency reserves from the third

quarter to the fourth quarter of 2019.[24]  Department Memorandum to File: IMF Data.

Accordingly, Commerce's assertion in the Remand Results that the GOV's "foreign

exchange purchasing behavior changed significantly from 2018 to 2019, including in the

final two quarters of 2019," is supported by substantial evidence on the record.[25]

Remand Results at 26.

In sum, Commerce's explanation in the Remand Results of the difference

between the two Treasury reports on the record in net purchases of foreign exchange

complies with the Court's remand order and is supported by substantial evidence.

**CONCLUSION**

For the reasons described above, Commerce's Remand Results are sustained.

Judgment will enter accordingly.

/s/       Timothy M. Reif
Timothy M. Reif, Judge

Dated: August 22, 2025
New York, New York

---

[24] The IMF data provide the following for the GOV's reserves in millions of USD:
2019Q2, $1,929.8; 2019Q3, $4,853.2; 2019Q4, $9,259.9.  Department Memorandum to File: IMF Data.

[25] As the court has stated, Commerce's explanation of the difference in net purchases of foreign exchange is based on data in the record reflecting Vietnamese foreign exchange purchasing behavior.  In reaching this conclusion, the court does not consider Commerce's unwelcome speculation as to the role the "holiday season" may have played in the GOV's decision to increase substantially its foreign exchange purchases in the second half of 2019.

Addendum 6

*Kumho Tire (Vietnam) Co. v. United States*,
August 22 Judgment

## UNITED STATES COURT OF INTERNATIONAL TRADE

**KUMHO TIRE (VIETNAM) CO., LTD.,**

       Plaintiff,

v.

**UNITED STATES,**

       Defendant,

and

**UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,**

       Defendant-Intervenor.

**Before: Timothy M. Reif, Judge**

**Court No. 21-00397**

## JUDGMENT

This case having been submitted for decision, and the court, after due deliberation, having rendered an opinion; now in conformity with that opinion, it is hereby

**ORDERED** that the Final Results of Redetermination Pursuant to Court Remand are **SUSTAINED**; and it is further

**ORDERED** that judgment is entered for defendant.

/s/    Timothy M. Reif
Timothy M. Reif, Judge

Dated: August 22, 2025
     New York, New York

APPX000037

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2026-1089

**Short Case Caption:** Kumho Tire (Vietnam) Co., Ltd. v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✔] the filing has been prepared using a proportionally-spaced typeface and includes __11,940__ words.

[ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 03/23/2026

Signature: /s/ Jeffrey M. Winton

Name: Jeffrey M. Winton